| | |
|---|---|
| IN THE MATTER OF | ADVERSARY NUMBER |
| GEORGE JOSEPH PORTER | |
| ARALEAN H. PORTER | 10-13553 |
| | |
| DEBTOR(S) | SECTION A |
| | CHAPTER 7 |

-------------------------------------------------------------------------------------------------------

| | |
|---|---|
| HIGHSTEPPIN' PRODUCTIONS, LLC | ADVERSARY NUMBER |
|    PLAINTIFF | 10-1130 |
| VERSUS | SECTION A |
| GEORGE JOSEPH PORTER, JR., ET AL | |
|    DEFENDANTS | |

*Administratively Consolidated for Trial With*

| | |
|---|---|
| HIGHSTEPPIN' PRODUCTIONS, LLC | ADVERSARY NUMBER |
|    PLAINTIFF(S) | 10-1131 |
| VERSUS | SECTION A |
| BRIAN HERBERT STOLTZ, ET AL | |
|    DEFENDANT(S) | |

**************************************************************************

## DEBTORS/ADVERSARY DEFENDANTS'
## FIRST SUPERSEDING AND AMENDING COUNTERCLAIM

NOW INTO COURT, through undersigned counsel, come Debtors/Adversary Defendants, George Porter, Jr. ("Porter"), Brian Stoltz ("Stoltz") (collectively and/or individually "Debtors" or "Artists") and Porter-Batiste-Stoltz, LLC ("PBS") (collectively and/or individually "Adversary Defendants"), who hereby file their First Superseding and Amending Counterclaim against

Adversary Plaintiff, Highsteppin' Productions, LLC ("HSP"), as follows:

## PARTIES

1.     Debtors are George Porter, Jr. and Brian Stoltz, who, in conjunction with David Russell Batiste, Jr., are all natural persons above the age of majority, domiciled and residing in the Eastern District of Louisiana and members of Adversary Defendant PBS LLC, a juridical person formed under the laws of Louisiana, with its principal place of business in the Eastern District of Louisiana.

2.     Adversary Plaintiff is Highsteppin' Productions, LLC, a Massachusetts limited liability company with its principal place of business is 240A Elm Street, Suite 20, Somerville, Massachusetts, 02144.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1332 (diversity of citizenship), and venue is proper pursuant to 28 U.S.C. § 1391, as well as the USDC-EDLA's standing order of reference to this (LAEB) Court.

## FACTS

4.     George Porter, Jr. began playing music professionally in 1964, approximately 41 years prior to his representation by HSP. From 1964-2005 he has performed thousands of live shows for a wide range of groups, and has written and recorded well over a hundred songs for commercial release. Mr. Porter's extensive work product had been purchased on records and experienced live by millions of paying fans and customers prior to his representation by HSP.

5.     Brian Stoltz began playing music professionally in 1972, approximately 33 years prior to his representation by HSP. From 1972-2005 he has performed in thousands of live shows for a wide range of groups, written hundreds of songs, and has recorded well over a hundred songs

for commercial release. Mr. Stoltz's extensive work product has been purchased on records and experienced live by millions of paying fans and customers prior to his representation by HSP.

6.     Russell Batiste began playing music professionally in 1978, approximately 27 years prior to his representation by HSP. From 1978-2005 he has performed in thousands of live shows for a wide range of groups, written numerous songs, and has recorded numerous songs for commercial release. Mr. Batiste's work product has been purchased on records and experienced live by millions of paying fans and customers prior to his representation by HSP.

7.     During their combined 90+ years of music and entertainment activity and experience, for recording sessions, live performances, and other jobs, Porter, Stoltz and Batiste were customarily paid monies for their contributions to each and every project, typically at the time of performing the work per long established music industry custom and practice.  The total number of artist work-related payments is in the tens of thousands for their contributions to a vast body and range of musical recordings and events – prior to becoming involved with HSP and various other associates and agents of HSP.

8.     Prior to the Artists' involvement with HSP, it was customary for the Artists to receive immediate payment for their services/performances, whether performing as individuals, a group, sideman or equal partner.  PBS was operating successfully in this manner at the time they began their relationship with HSP, and had been for a number of years prior thereto. Typically, the booking agent for a musical entity or artist receives an Artist Fee deposit to secure the performance, and then the balance due is paid at the time of performance, with a concomitant release of any escrowed monies (Deposit, Guarantee, etc.) less agent commissions. A touring/traveling Artist Group deducts expenses and pays each crew and

band member or sideman performer at the time of an individual show after "settlement" from ticket sales monies received by the Promoter or Venue. In the event of a short tour, an Artist Group's share of ticket monies are received each night of the tour and distributed in full no later than the last performance day of the multi-performance run. The artist(s) and crew members typically have their pay in hand on the drive or flight home, and walk away with their fees. This "cash and carry" ongoing payment procedure is the universal norm for the vast majority of artist teams, groups, and/or bands, and active musicians receive thousands of separate payments in the course of their multi-decade careers.

9.     PBS, LLC was self-managed by the Artists, and was operating successfully within its means when Stepanian (and then HSP) came into the picture.

10.    The Artists successfully conducted PBS and prepared tour budgets, computed and paid costs, and then divided net profits, for a number of years prior to Stepanian/HSP's involvement., on an ongoing basis without incurring any significant business debt, and virtually every PBS performance and/or business activity generated "positive cash flow" for the Artists.

11.    In the years prior to Hurricane Katrina and HSP's subsequent involvement, PBS generated gross annual revenues of approximately $70,000 to $80,000 as an artist-owned and controlled business, in addition to the revenues the Artists generated and/or earned from their respective other artistic and entertainment endeavors.

12.    The Artists successfully ran PBS from 2003 through May 8, 2006 (the date the PBS and HSP entered into a Personal Management Agreement ("PMA" or "Agreement")) prior to Stepanian/HSP's involvement, with gross guaranteed fees averaging roughly $4,000 per show and net profits ("take home" pay) for each member.

13. The members of PBS are each long-standing members of ASCAP and BMI, performing rights organizations which license and collect royalties for performance of their writer's works, and have collectively registered well over one hundred songs which they have contributed to as composers.

14. The first contact any of the Defendants had with HSP was when Philip Stepanian, HSP's sole member, cold-called Porter in early January, 2005, regarding a wedding ("Wedding") PBS was contracted to play at in Windermere, FL on January 22, 2005. Contrary to the allegations in HSP's original Complaint, PBS had been in existence as a musical aggregation for approximately three (3) years prior to Stepanian's initial contact, and had been in legal existence since June 2, 2003.

15. Stepanian then contacted Porter, via e-mail, on January 18, 2005, to claim responsibility for getting PBS to play the Wedding, and to inquire if Porter "would be interested in discussing a few marketing ideas for [his] bands, [his] upcoming CD's, etc."

16. Although HSP was not yet in legal existence, Stepanian represented that he "own[ed] a direct marketing company and over the past year [] ha[d] been working on a number of ideas with the sole objective of creating an 'artist-controlled environment' that brings the very best to the fans."

17. Stepanian further contacted Porter in the Spring of 2005, to discuss doing some type of merchandizing/marketing, and he then met with the Artists at Porter's house in New Orleans on or about April 20, 2005, at which time Stepanian presented his basic concept for producing and selling merchandise, including a rough outline of different products he wanted to hawk. All through-out these initial overtures, Stepanian repeatedly represented that he wanted to create an "artist-controlled environment," which, if true, would have been

consistent with the long established business paradigm utilized in entertainment and artistic enterprises whereby artists maintain ultimate control, make final decisions/approval, and operate their business as an Artist Team, while using a variety of specialized representatives, managers and agents (such as business manager, tour manager, recording company, etc.) to further the Artists' interests.

18.    The Artists did not need concepts, but because they saw possible value in having somebody sell the Artists' concepts/merchandise, they were mildly interested in Stepanian's proposals, including his specific representations that he was committed to creating and fostering an "artist-controlled environment" (which was subsequently contradicted by Stepanian/HSP's actions), and his claims that he could, and would, increase Artists' income in a fair and accountable manner.

19.    After the April 20, 2005 merchandising meeting, Stepanian went to Artists individually and began to make overtures about managing the Artists/PBS, but the Artists were not particularly interested in being the test-case for Stepanian's fledgling foray into the entertainment industry's competitive arena, especially given that they had already been approached by an established manager in the entertainment industry, who had expressed interest in managing the Artists/PBS.

20.    After the April 20, 2005 meeting, Stepanian continued to pursue Artists/PBS, and persisted in his attempts to convince them to allow him to manage them, despite being rebuffed on more than one occasion, and despite being told that the Artists/PBS were already quite experienced in managing themselves, and that they really were not very interested in having a "rookie" manager.  In fact, HSP was not created until June 13, 2005, was involuntarily dissolved on

April 30, 2009 for failing to file annual reports from 2006 through 2009, and then reinstated on February 25, 2010.

21.     While lobbying each respective Artist about a management deal, Stepanian also tried to land a merchandizing/marketing deal with the Artists/PBS, and draft merchandizing agreements were circulated in June and July, 2005, around the time HSP was officially formed, but were never consummated.

22.     Stepanian began appearing at PBS gigs, as well as Funky Meters gigs (Porter, Batiste and Stoltz were all members of the Funky Meters at that time), trying to sell mainly Porter-related T-shirts and merchandise, and was eventually told that if he wanted a merchandising deal, it would have to be for PBS as a group, and not with an emphasis on Porter only.

23.     A short while later, Hurricane Katrina impacted New Orleans on August 29, 2005, with concomitant devastation and upheaval, seriously affecting the Artists and their careers, including forced evacuation, loss of homes, equipment, personal property, gig opportunities, and the unavoidable personal and professional financial, emotional and physical hardships. During Katrina's immediate aftermath, Stepanian sought to convince the Artists (and particularly Porter) to move to the Boston area, ramped up his attempts to talk the Artists/PBS in a management deal, and generally made promises (which remain unfulfilled) of generating greater business results (financial and popularity) while touting an "artist-controlled environment."

24.     After pursuing Porter and the other Artists for the better part of a year, the first draft of the PMA was circulated on December 9, 2005, with a subsequent Redline version dated March 3, 2006.  Apparently non-plussed with the Artists' lack of demonstrable enthusiasm for the PMA, HSP mounted a full-court press, with Stepanian traveling to New Orleans during

JazzFest 2006, to personally lobby for, and try to expedite, the execution of the PMA, which eventually occurred on May 8, 2006.

25. At that time, HSP had only two clients under contract, PBS and Bonerama; HSP now has only one client, Bonerama.

26. The PMA pertained to the management of PBS as a group, and specifically references PBS, LLC, as opposed to the management of any of the individual defendants' careers beyond their participation in PBS.

27. The PMA, second unnumbered paragraph, specifically acknowledged that HSP's **compensation was to be "determined in such manner as will permit Highsteppin to accept the risk of failure"** regarding PBS' career.

28. The PMA, paragraph 1(b), set PBS' 2005 gross earnings at $72,000.00, from which each band member equally shared in net profits, with no residual debt.

29. The PMA, paragraph 2, required HSP to "advise, counsel and guide" PBS in "all matters relating to [PBS'] professional career". Implicit in this covenant are the duties of loyalty, honesty and the fiduciary duty to place PBS' interests above those of HSP.

30. HSP failed to adhere to the requirements of paragraph 2 of the PMA, and failed to disclose to PBS, prior to the execution of the PMA, that HSP had no prior experience "advising, counseling, and/or guiding" professional musicians. HSP also failed to properly discharge its fiduciary duties, and duties of loyalty and honesty.

31. The PMA, paragraph 3(a)(iv), required that HSP and PBS "mutually agree upon the selection of a business manager," and further, that HSP had the authority to engage lawyers on PBS' behalf. Rather than seeking out persons or entities with a proven track-record as a Business Manager in the entertainment industry, or offer suggestions as to independent legal counsel,

HSP unilaterally usurped those functions without full, proper, prior (written or verbal) disclosure, and even held its own in-house counsel out to the Artists as "your lawyer" without securing any prior written waivers of any actual or potential conflicts of interest. As such, HSP failed to adhere to the requirements of paragraph 3(a)(iv) of the PMA and failed to adequately advise PBS as to possible experienced Business Manager options, opting instead to engage in conduct tantamount to the self-appointment of itself as PBS' business manager, along with improper and unlawful claims of entitlement to compensation therefor.

32.     The PMA, paragraph 3(a)(vi), required that the business manager (which was, *de facto,* HSP) "to audit and examine the books and records of all parties with whom [PBS] had contracted", but HSP failed to adhere to the requirements of paragraph 3(a)(vi) of the PMA.

33.     The PMA, paragraph 3(a)(viii), required that HSP "shall obtain [PBS'] approval beforehand concerning actions taken [by HSP] under this paragraph 3(a)", except in case of exigent circumstances when PBS was unavailable for more than 48 hours, and further, that if and when HSP took action under exigent circumstances, it "shall promptly inform [PBS] in writing of actions [HSP] ha[d] taken under this paragraph 3(a).

34.     HSP failed to adhere to the requirements of paragraph 3(a)(viii) of the PMA and further, never notified PBS regarding any actions taken under exigent circumstances, be it in writing or otherwise.

35.     The PMA, paragraph 3(c), required that, upon termination or expiration of this PMA, HSP "shall provide [PBS] with a true and complete electronic copy of the then-current E-mail List for [PBS'] use, at no cost to [PBS]," and also provided that HSP "will not use the Email List in connection with [PBS] . . . without [PBS'] consent."

36.     HSP failed to adhere to the requirements of paragraph 3(c) of the PMA.

37. HSP, despite repetitive verbal assurances to the contrary, never provided timely, complete and/or accurate accountings of the activities it allegedly undertook on PBS' behalf, including but not limited to financial and agency activities. Further, HSP failed to provide quarterly reports to PBS, and HSP's principal, Stepanian has admitted, in November 2008, that "[i]t's been quite awhile (if ever) since we have sat down and discussed all of the band's financial details."

38. Regarding expenses, the PMA, paragraph 6(b), specifically stated that: 1) PBS "will not be responsible for any portion of [HSP's] overhead expenses; 2) PBS would only "be responsible for [its] pro rata share of [travel] expenses when such expenses were jointly incurred on behalf of PBS and HSP's other client Bonerama); 3) HSP "**shall not incur without [PBS'] prior consent (A) any single expense in excess of Seven Hundred Fifty Dollars ($750) Dollars [sic] or (B) aggregate monthly expenses in excess of Two Thousand ($2,000) Dollars".**

39. HSP failed to obtained the requisite "prior consent" regarding singular and/or aggregate expenses, let alone provide appropriate "advice, counsel and guidance" in the handling of PBS' career.

40. The PMA, paragraph 6(d), required HSP, "on a quarterly basis", to deduct its commission and "recoup all monies reimbursable or deductible." HSP's ongoing failure to provide notice of the alleged mounting debt, which was incurred without the Artists' prior consent or proper, timely accountings thereof, as required by the PMA, while simultaneously controlling and making unilateral decisions concerning expenses, was deceptive and materially mislead the Artists.

41.     HSP failed to adhere to the requirements of paragraph 6(d) of the PMA, and by so doing prevented Artists from obtaining a timely and accurate understanding regarding the negative change in their profitability which occurred after HSP began managing PBS.

42.     The PMA, paragraph 6(a), stated that in the event HSP made loans or advances, or incurred expenses on PBS' behalf, PBS was to reimburse HSP "no later than on a monthly basis." Despite this requirement, HSP did not request, nor provide documentation supporting any alleged entitlement to, any such reimbursement. When HSP was queried about expenditures, Artists were repeatedly assured (albeit deceptively and in a misleading manner) by HSP that it would be solely responsible for those expenses, as Stepanian often stated that he viewed those expenditures as necessary to establish HSP in the entertainment management business, and would refer to his investment in HSP and the use of "my" money.

43.     Admittedly, HSP rarely met with PBS or its individual members, to discuss business and financial matters; once with Porter only, in early summer 2006, with all three Artists on August 24, 2006, and with Porter and Stoltz on August 17, 2009.  The "meetings" all occurred at HSP's office in Somerville; at the time of the 2006 "meetings", the office space was not functional, and the 2009 "meeting" was essentially a non-event, as HSP failed to produce any meaningful financial records or information.  HSP, through Stepanian, admitted these failures in a November 14, 2008 email, wherein HSP admitted that: "[i]t's been quite awhile (if ever) since we have sat down and discussed all of the band's financial details, but it is clearly time that we do so.  We have compiled many detailed reports that will provide a complete insight into where we have been and where we need to go."  Despite this statement, no "accounting" meetings occurred other than the August 17th non-event, and the "detailed reports" have never materialized.

44.     HSP and its agents failed to advise, counsel, and obtain appropriate agreements and approvals from Artists concerning their image and work product, and have yet to provide minimal accountability for digital downloads, recording sales, license fees, merchandising and other activities unilaterally operated by HSP without clearly defined terms and conditions that comport with industry norms and customary agreements.

45.     HSP's "managerial" actions were often (if not always) initiated unilaterally by HSP, without clear prior disclosure or notice to Artists, all of which materially and negatively altered the so-called "artist-controlled environment" promised to the Artists by HSP.

46.     When PBS inquired about various matters, including PBS' financial position, HSP, through Stepanian, repeatedly told PBS members, their spouses and others, that HSP would be assuming the risk: in fact, during the term of the PMA, HSP routinely failed to adequately provide information and/or answers to PBS' questions, opting instead to state that PBS need not worry, as the expenses were "an investment in HSP" and not PBS/Artists' responsibility.

47.     HSP sought to gain, and did gain, control over Artists' websites, merchandizing, live performance revenues and then recording revenues, including Artists' recording income derived from releases that were issued prior to the term of the PMA.  In fact, HSP confirmed, through Stepanian's affidavit of March 31, 2010 filed in conjunction with HSP's pleadings, that **"**HSP collected all of the monies earned from PBS's performances and e -commence. These funds were deposited in banks in Massachusetts. . . . All of the monies arising out of the agreement and earned by HSP for the Artists and the Artists themselves were deposited and administered in HSP's Massachusetts accounts."  Moreover, at the same time, HSP made numerous managerial decisions that were not in the Artists' best interests: to wit; despite being a reasonably profitable, ongoing business concern prior to the PMA, three and one-half

years after executing the PMA, the Artists' are allegedly $600,000.00 in debt to HSP, without any contemporaneous, itemized disclosure of how this debt occurred, and despite HSP's representations and assurances, through Stepanian, that "[o]ver the past few years I have made an enormous investment in everything that is Highsteppin' Productions", as opposed to expenses that the Artists would be responsible for repaying.

48.     HSP had a heightened duty of care to provide responsible, objective and helpful advice, counsel and career guidance to the Artists, in the context of the oft-touted and promised "artist-controlled environment", but failed to manage PBS/Artists within acceptable entertainment industry business standards, including the failure to keep the costs of marketing, business activities, tour expenses and general operations to the appropriate level for PBS' drawing power, live attendance fees, and recording sales, and thus mismanaged PBS.

49.     Federal copyright law, licensing law, ideational property law, and standard recording industry agreements, all require and/or should be governed by clear written agreements, yet such agreements were completely lacking in the PMA and were not independently obtained or provided by HSP.

50.     Copyright law exists to protect authors, ideational property, music and artistic works, and the major established entertainment companies do not control, own and/or legally exploit artistic works without clearly addressing terms in extremely clear written agreements, but in this case, those specific written agreements are lacking.

51.     HSP continually pressured PBS members not to play non-PBS related gigs (despite knowledge that all members had traditionally played in numerous different groups prior to the PMA), and ultimately elected, unilaterally, to place each member on salary, starting in

November 2007. This arrangement was not presented to PBS, nor classified, as a "loan" or an "advance". Rather, HSP, through Stepanian, stated that this material alteration to the PMA was presented as way for PBS to attempt to develop exclusivity, at HSP's sole risk. As a result of this arrangement, which was initiated solely by HSP, the various members of PBS lost/refused other gigs and business opportunities, with a concomitant loss of potential income.

52. Thus, despite HSP's initial representations and assurances that it would provide an "artist-controlled environment", which was an integral part of PBS' decision to execute the PMA, in reality, HSP maneuvered and placed itself in a position of virtually total control over PBS' existence, acting (albeit deficiently), *inter alia,* as business manager, tour manager, financial backer, licensing agent, and merchandizing agent.

53. HSP knew, at the time of negotiation, and then execution, of the PMA, that providing PBS with an "artist-controlled environment" was an essential component of PBS' expectations, and without HSP's assurances regarding same, PBS would not enter into the PMA.

54. HSP's representations and assurances that it would provide an "artist-controlled environment" were made deceptively, with the purpose of inducing PBS to enter into, and renew, the PMA.

55. HSP's continued representations and assurances that it sought to provide an "artist-controlled environment" were made deceptively, with the express purpose of inducing PBS not to terminate the PMA.

56. During the course of the PMA, HSP failed to properly advise, counsel and/or guide PBS regarding establishing new market presence, increasing revenues, securing licensing deals,

securing record deals, securing publishing deals, re-issuing recordings, and other accoutrement of a professional musician's career.

57.    During the course of the PMA, HSP mismanaged PBS by, *inter alia*, unreasonably incurring expenses allegedly on PBS' behalf, without the requisite prior consent from PBS, to the extent that after three and one-half years, despite a combined gross income of approximately $400,000.00 during that time-frame, HSP now claims that PBS owes it in excess of $569,000.00, even though HSP admits that it controlled all the finances for the bulk of the PMA's duration.

58.    HSP negligently missed, or intentionally refused to accept, numerous business opportunities that would have inured to PBS' benefit (such as Sony's offer to distribute the PBS catalog and each member's entire individual catalogs, and Stoltz' specific request that HSP contact *ANTi* Records, regarding Stoltz' recording "God, Guns and Money").

59.    HSP overstaffed and overpaid road crew, and failed to disclose to PBS (either timely or otherwise) what it was paying each crew member, although HSP now claims entitlement to reimbursement for these unauthorized, unwarranted, undisclosed expenses.

60.    HSP failed to timely book plane flights, and failed to timely and/or correctly arrange for other tour-related expenses and activities such as "back-line", deposits, gig contracts, etc., resulting in unnecessary expense to PBS.

61.    HSP has failed to pay any monies due PBS or Artists regarding royalties from the income due to PBS and/or Artists resulting from recordings HSP released and/or administered, including a live recording, *Moodoo,* which was released by HSP on HSP's own record label, without specific agreement and authorization by PBS, and without payment of the customary advance. HSP continues to collect all income from the sale of *Moodoo* and other PBS and/or

member recordings, but has not paid any royalties in clear and ongoing violations of established Federal Copyright and Mechanical Royalties statutes and case law.

62.    HSP acted as Business Manager, yet failed to properly account for and pay any fees, royalties, profits or payments from any and all sales of recordings and licensed goods belonging to PBS and Artists, an ongoing and pervasive violation of Federal Copyright laws, including but not limited to the 26 recordings, numerous merchandising items bearing PBS and individual members names, images and likeness have been manufactured, marketed and distributed without requisite approvals, agreement and compensation, and continue to be sold without requisite accountability to date.

63.    HSP acted as a Recording Company, but failed to propose, let alone execute, any modification to the PMA, or any new agreement(s) concerning mandatory, basic music recording industry terms, including, yet not limited to: Scope, Term, Roles, Costs/Budgets, Copyright Registration, Master, Accounting/Accountability, Artist Performance Fees, Manufacturing, Artwork, Marketing, Advertising, Direct Sales, Distribution, Licensing Fees, Downloads,  Negotiation/Placement, Publicity, Promotional Efforts, etc.

64.    HSP would tell each artist different things in an ongoing effort to gain their trust, in contravention of the equal partnership operational style of PBS. Over time, HSP attempted to represent each of PBS' members' solo projects, in an effort to extend financial and business control over each member and PBS as a whole.

65.    PBS timely and lawfully provided written notice of its decision not to exercise any additional options regarding the PMA, and the PMA expired, as per its terms, in November, 2009.

66. PBS and Artists played all dates, gigs and performances it was contractually obligated to play, prior to the PMA's expiration, and at all times relevant to these proceedings, acted in good faith.

67. Neither PBS, nor any of Artists, breached the PMA.

68. PBS and Artists have suffered damages, **and continue to do so through the present,** in an amount to be calculated, due to HSP's negligence, mismanagement, lack of experience, failure to disclose relevant information, and, *inter alia,* failure to provide timely and accurate accountings.

69. HSP is obligated to pay PBS' reasonable attorneys fees and costs incurred in this lawsuit.

70. Due to HSP's misrepresentations, the PMA and any and all copyrights, merchandise, recordings and other business activities are null and void.

71. Due to HSP's misrepresentations, concealment, and failure to provide minimal documentation per industry standard and Federal laws, the PMA should be rescinded.

72. Due to HSP's misrepresentations, the PMA lacks adequate consideration.

73. HSP is not entitled to any future commissions or monies from PBS and/or Artists.

74. Prior to the legal creation of HSP, and thereafter, Stepanian made deceptive and/or misleading representations to PBS and/or Artists, including repetitive statements that the Artists would not be responsible for monies Stepanian was "investing in HSP", which inured to their detriment and caused them damage.

75. Stepanian has engaged in self-dealing and otherwise conducted the affairs of HSP in a manner that warrants the piercing of HSP's "corporate veil", as on information and belief, Stepanian exercised sole and pervasive control of HSP, with related injurious consequence to the Artists.  Moreover, Stepanian also confusingly intermingled his and HSP's actions and

assets, with substantial disregard of the separate nature thereof, and also created serious ambiguity about the manner and capacity in which HSP and Stepanian were acting. Stepanian thus should be held personally liable to the Artists, due to his personal involvement in the breach(es) of fiduciary duties owed to the Artists for the detriment and damages they suffered as a result of Stepanian's actions taken in his position as the owner/sole member and president of HSP, including but not limited to his misleading and/or deceptive representations, his withholding of financial information from the Artists, his exercise of personal control over HSP, and the various other relevant factors used when determining whether to pierce a corporate veil.

76.    After the creation of HSP, HSP and Stepanian misrepresented its in-house counsel, David Herlihy ("Herlihy"), to PBS/Artists as "your lawyer" in a November 15, 2008 email to Artists, when in fact, Herlihy was the same lawyer retained by HSP in 2005/2006 to represent its interests (against the Artists) during the negotiation and confection of the PMA. HSP and Stepanian also failed to address, let alone obtain, any written waivers of actual and/or potential conflicts of interest.  HSP also failed to adhere to the applicable standards of professionalism and ethics when dealing with Artists, as it failed to: 1) communicate timely and adequately; 2) draft appropriate agreements; 3) act in good faith and deal fairly with Artists;  4) provide timely, accurate and complete expense accountings related to commercially-released recordings; 5) prepare and file copyrights on behalf of the Artists related to commercially-released recordings and other creations which thus negatively impacted the Artists' ideational property rights and remedies; and 6) adequately represent its (and its employees/agents') experience, skill, success and/or ability to obtain certain results in various areas such as song licensing, recording contracts, and the like, all in an

unauthorized and unlawful usurpation of the Artists' rights to control, and derive income from, their creative endeavors.

77.    At the same time HSP was preparing to institute litigation against the Artists, it was also claiming to be acting in Stoltz' best interest in November and December 2009, when it negotiated and presented Stoltz with a *song placement/licensing deal* ("CBS Deal") with *Measurement Arts/CBS.*

78.    At the same time HSP was preparing to institute litigation against the Artists, in early December, 2009, it took advantage of Mr. Stoltz by adamantly insisting that Stoltz immediately execute the CBS Deal at a time when HSP was, or should have been, fully aware that Stoltz was sedated the evening before major neck surgery, and thus unable to adequately review the document and give proper consent.

79.    At the same time HSP was preparing to institute litigation against the Artists, in early December, 2009, it insisted, over Stoltz' objection, to the point of coercion, that Stoltz re-title songs for the CBS Deal – a controversial practice, frowned on by the industry due to the oft-repeated dilution of rights and confusion in the market place by introducing and attaching new titles to prior artistic Works.

80.    At the same time HSP was preparing to institute litigation against the Artists, and thereafter, it failed to provide Stoltz with a signed, executed copy of the CBS Deal.

81.    At the same time HSP was preparing to institute litigation against the Artists, and thereafter, it failed to inform Stoltz which songs, if any, were actually placed in the CBS Deal, and HSP has never provided Stoltz, despite written request, with a signed executed copy of the CBS-Deal agreement, nor a list of the re-titled songs, registration of materials to protect Stoltz, nor any file information to Stoltz.

82. At the same time HSP was preparing to institute litigation against the Artists, and thereafter, it failed to pay Stoltz *royalties* and *synchronization license fees* for songs used in the CBS Deal, choosing instead to unjustly enrich itself at the Artists' expense.

83. At the same time HSP was preparing to institute litigation against the Artists, it purportedly attempted to negotiate a *Song Download/Ringtone License* deal for Stoltz with David Eidler/Fleurdelismusic.com ("Ringtone Deal").

84. At the same time HSP was preparing to institute litigation against the Artists, and after the PMA expired, as per its terms, in November 2009, HSP interfered with Stoltz' own attempt to secure a CD distribution deal for his upcoming CD ("Sony/Red Deal"), with the full knowledge that HSP had recently turned down a music distribution deal from *Sony/Red Distribution* that would have been more advantageous to the Artists than any deal HSP ever generated, negotiated or obtained for the Artists.

85. HSP failed to properly register at least 26 separate Artists' recording(s), and instead of copyright registering some or all of the 26+ recording(s) in the Artists' names, utilized the universally acknowledged Copyright symbols of © (C circle) and ℗ (P circle) to improperly attempt to claim ownership of the Artists' creation(s), and on information and belief have kept 100% of the revenues derived therefrom, without any signed writings or transfers authorizing HSP's unlawful registration of the recording(s) in HSP's own name, such as the "*Moodoo*" release. HSP thus failed to act in the Artists' best interests and protect the Artists' legal rights of ownership and income, and also failed to execute clear written agreements prior to releasing the 26+ recordings, failed to investigate existing copyright interests, failed to properly register the live versions as Performer's rights in an SR Copyright in Artists'

names, and by unlawfully listing the copyright on all copies of *Moodoo* as "© and ℗ 2008 HighSteppin' Productions, LLC".

86.    HSP failed to properly advise the Artists and provide them with written recording agreements, including that upon the release of *Moodoo*, and failed to provide written recording agreement(s) regarding Copyright ownership, Copyright and Publishing registrations, artist and production credits, Artist Royalty rates and payment terms, personnel fees, accounting and project costs, promotion and marketing budgets, compensation terms, Artist and Business approval rights, monetary advances, Compulsory Mechanical Royalties, Controlled Composition clauses, Duration, Renewals and Options for additional Recordings.

87.    HSP failed to provide any accounting of Artist Royalties, including compulsory mechanical royalties, and upon the release of *Moodoo,* failed to provide an accounting of Mechanical Royalty payments, did not address Controlled Composition clauses and costs to third parties on a contracted-for rate or Compulsory License Rate, thereby exposing the Artists' to potential liability to third parties in violations of Federal law, while depriving the Artists' of their rightful income and statutory Compulsory Mechanical Royalty rates.

88.    HSP failed to advise or even attempt to register lawful copyrights on numerous Sound Recordings on behalf of the Artists for their copyright works, in addition to the failures attendant to the Moodoo release, and instead, HSP has now released, and continues to control 100% of the revenue from, at least twenty-six (26) unauthorized CDs (hard copy & digital download) (listed below) without ever properly addressing, advising, or assisting Artists, or securing their prior consent or approval, in registering the performed Sound Recording Copyrights in Artists' names.

    a)  Porter, Batiste, Stoltz w/ Steve Kimock 02/24/06  Mexicali Blues, Teaneck, NJ
    b)  Porter, Batiste, Stoltz w/ Steve Kimock 02/25/06  Mexicali Blues, Teaneck, NJ

c) George Porter Jr + Runnin Pardners,  Southport Hall 04/27/2006 - No More Okey Doke
d) Porter, Batiste, Stoltz w/ Skerik, 4/29/06 – The Howlin' Wolf, New Orleans, La
e) Porter, Batiste, Stoltz w/ Steve Kimock 09/21/06 Orange Peel, Asheville, NC
f) Porter, Batiste, Stoltz w/ Steve Kimock 09/22/06 Lyric Theatre, Blacksburg, VA
g) Porter,Batiste and Stoltz w/ Steve Kimock 3/15/07 Cervantes Masterpiece Ballroom, Denver, CO
h) Porter Batiste Stoltz 4/29/07, Howlin Wolf, New Orleans, LA
i) Porter Batiste Stoltz 07/13/07 All Good Festival, WV
j) Porter Batiste Stoltz 11/10/2007 Double Door Inn, Charlotte, NC  HSP-PG906
k) Porter Batiste Stoltz  11/24/2007 Cervantes' Masterpiece Ballroom, Denver, CO  HSP-PG902
l) Porter Batiste Stoltz and Bonerama 11/24/2007 Cervantes' Masterpiece Ballroom, Denver, CO (3rd set) HSP-PG901
m) Porter Batiste Stoltz & Friends 12/29/07 Blender Theatre, New York, NY
n) Bundle Gov't Mule, Porter Batiste Stoltz & Friends & Tea Leaf Green  12/29/07  Blender Theatre, New York, NY (SAME RELEASE AS ABOVE, JUST BUNDLED)
o) Porter Batiste Stoltz 12/30/07 New York, NY (SAME RELEASE AS 12/29/07 WITH ERRONEOUS DATE)
p) Porter Batiste Stoltz 4/27/08, Howlin Wolf, New Orleans, LA
q) Porter Batiste Stoltz 5/1/08, Jazz Fest 2008 (released by HSP 7/8/08)
r) Porter Batiste Stoltz 5/2/08, Howlin' Wolf New Orleans, LA
s) Porter Batiste Stoltz 5/4/08, Howlin Wolf,  New Orleans, LA
t) Porter Batiste Stoltz with Page McConnell 9/24/2008 Revolution Hall, Troy, NY – HSP 501
u) Porter Batiste Stoltz with Page McConnell 9/25/2008 Lupo's, Providence, RI – HSP 502
v) Porter Batiste Stoltz with Page McConnell 9/26/2008 B.B. King's, New York, NY – HSP 503
w) Porter Batiste Stoltz with Page McConnell 9/27/2008 Higher Ground, Burlington, VT – HSP 504
x) Porter Batiste Stoltz 10/29/2008 Live Wire Music Hall, Savannah, GA – HSP-PG904
y) Porter Batiste Stoltz 10/30/2008 Smith's Olde Bar, Atlanta, GA  - HSP 505
z) Porter Batiste Stoltz feat. Kyle Hollingsworth 3/18/2009 Boulder Theater, Boulder, CO – HSP-PG907
aa) Porter Batiste Stoltz featuring Page McConnell – MOODOO – HSP 101 ℗&©2008 Highsteppin' Productions LLC. All rights reserved. Unauthorized duplication is a violation of applicable laws.

89.     HSP released inferior-quality recordings, including all of the above-listed releases, despite

objection by the Artists and without their artistic involvement and approval regarding the

final product, without proper and accurate copyright registration documents, proper prior

approvals, clearances, quality control, artistic editing, professional engineering, and

mastering, to the continuing damage to the image, livelihood, catalogue, careers and reputations of the Artists.

90.    HSP has failed to provide any agreements, concerning Recording, Publishing and Merchandise functions, that address essential industry standard terms and/or clarify the allocation of Costs, Artistic Royalties, Fees, Advances, Profit-sharing, Tour Support, income, Revenues, Publishing, risk allocation, Controlled Compositions, Compulsory Mechanical Royalties, and any other essential terms and issues prior, during or after the release of the 26+ above-listed CDs, and also further failed to provide an accounting of Costs, Gross Revenues, Sales Records, Tour Financials, and Copyright registration, opting instead to keep 100% of Revenues while refusing to contemporaneously discuss and disclose any specific project or business financials.  Also, when challenged, HSP continuously misrepresented to the Artists that any monies spent by HSP were an "investment in all things HighSteppin'". This ongoing failure to provide the Artists with timely agreements and accountings, and the unauthorized release of numerous poorly accounted Artistic Works and titles, has harmed the Artists' careers and exposed them to potential liability for inaccurate Mechanical Royalty payments and possible violations of Copyright law to third party Authors and Performers, in violations of Federal law, while depriving the Artists' of their rightful income.

91.    HSP also failed to provide an accounting, and any Recording Agreement, Distribution deal or other required written agreement that covers the broad range of possible terms that address payments, fees, costs, and basic Copyright registration and Compulsory Mechanical Royalties, Fees, Controlled Composition clauses, time frames, Artist digital sales volume, per unit rates and other essential terms for the following unauthorized solo Artist-owned releases by HSP:

- Brian Stoltz – "Up All Night~Live (Long Overdue Recordings)  LOR0003 - 2007

- Brian Stoltz - "God, Guns & Money"(Long Overdue Recordings) LOR0002 – 2005

- Brian Stoltz - "East of Rampart Street" (Long Overdue Recordings) LOR0001 – 2003

- George Porter Jr. – It's Life (Indy) 2007

- George Porter Jr.  and Runnin Pardners - Funk N' Go Nuts (Transvideo) 2000

- George Porter Jr.  and Runnin Pardners – Funk This (Transvideo) CTV2112 – 1997

- George Porter Jr. and Runnin Pardners – Things Aint What They Used To Be – (Indy) 1994

- Russell Batiste Jr., Orkestra from da Hood – The Clinic (Indy) RBJ71944

- Porter-Batiste-Stoltz - Expanding The Funkin' Universe (OUW Records) OUW0001 2005

92.     HSP attempted to usurp Artists' business opportunities by failing to adequately advise Artists and/or pursue their best interests regarding potential licensing and recording contracts.

93.     HSP misled the Artists, with repeated and coercive requests for any and all original music by PBS, individually and collectively, and by guaranteeing that it would create numerous licensing opportunities for the Artists, when in fact HSP was simply trying to get the Artists to provide more song titles to HSP during the term of the PMA, so that HSP could gain financially.

94.     HSP deceptively attempted to obtain more involvement and exert more influence over each Artist's solo projects and individual song catalogs, in an effort to extend HSP's financial and business control over each Artist's entire career.

95. HSP, intentionally or otherwise, jeopardized Stoltz' relationship(s) with other musicians such as Zachary Richard, by failing to timely execute a standard, 50/50 co-publishing agreement between Stoltz and Zachary Richard for the co-written song, *Last Kiss*, ("Last Kiss Deal").

96. HSP deceptively sought to gain control of the Last Kiss Deal from Stoltz by substituting HSP's office address for Stoltz mailing address, without prior permission.

97. HSP repeatedly ignored the Artists' requests for a specific list of its prior success regarding Licensing Placements, and failed to fully and adequately answer that inquiry.

## CLAIMS

### Count I - Breach of Contract and Fiduciary Duties Owed PBS/Artists by HSP/Stepanian

98. Defendants reallege, reaver, and incorporate herein, *in globo* and *in extenso*, paragraphs 1 through 97.

99. The PMA at issue was executed on May 8, 2006, in New Orleans, Louisiana.

100. The PMA was never modified, updated or amended by the Artists, and thus, they never approved nor authorized HSP to establish itself or otherwise function as a record company, production business, artistic works distribution entity, merchandising business, or Business Manager for Artists. HSP's unauthorized usurpation of these functions, and concomitant failure to contemporaneously generate and secure specific written proposals regarding these functions, are material breaches of the PMA.

101. The PMA expired, as per its terms, on November 8, 2009, based on timely written notice thereof by Artist(s).

102. Despite the provisions of the PMA, HSP/Stepanian failed to honor and/or properly perform their obligations thereunder, and thus breached the PMA.

103. HSP/Stepanian failed to shoulder their duty of loyalty, and thus breached the PMA.

104.    HSP/Stepanian failed to shoulder their duty of honesty, and thus breached the PMA.

105.    HSP/Stepanian failed to shoulder their fiduciary duties, and thus breached the PMA.

106.    HSP/Stepanian failed to properly "advise, counsel and guide" PBS and/or the Artists, and thus breached the PMA.

107.    HSP/Stepanian failed, and continue to fail, to timely and adequately provide financial accountings to PBS and/or the Artists, and thus breached the PMA.

108.    HSP/Stepanian failed to timely and properly obtain the necessary prior consents from PBS and/or the Artists, and thus breached the PMA, despite Stepanian's repeated representations that HSP would be acting within standard industry management practices.

109.    HSP/Stepanian exceeded their authority by repeatedly violating provisions of PMA, including but not limited to: 1) Paragraph 3(a), which required, *inter alia*, the Artists' prior approval regarding the use and exploitation of their likeness, voice and musical materials; 2) Paragraph 3(a)(viii), including the Personal Manager limitations therein, by acting unilaterally when no emergency situation was present; and 3) Paragraph 6(b) which specifically stated, *inter alia,* that PBS would not be responsible for HSP's overhead, would only be responsible for its *pro rata* share of jointly-incurred travel expenses, and most significantly, would not be responsible, absent prior consent (which was not obtained) for "**(A) any single expense in excess of Seven Hundred Fifty Dollars ($750) Dollars [sic] or (B) aggregate monthly expenses in excess of Two Thousand ($2,000) Dollars",** as HSP/Stepanian routinely failed to obtained the requisite "prior consent" regarding singular and/or aggregate expenses.

110.    HSP/Stepanian failed to timely and properly account for, set, and pay Artist and Mechanical royalties due PBS and/or Artists, and thus breached the PMA.

111. As a result of the HSP/Stepanian's breach(es) of the PMA, as set forth herein and as will be shown as discovery and this litigation unfold, PBS and/or Artists have been damaged, and further, HSP/Stepanian are liable for all of Artists' costs and reasonable attorney's fees arising out of this Counterclaim.

### Count II
### Breach of the Covenant of Good Faith and Fair Dealing Against HSP

112. Defendants reallege, reaver, and incorporate herein, *in globo* and *in extenso*, paragraphs 1 through 111.

113. HSP has failed to, and refuses to, pay PBS and/or Artists monies owed them under the PMA, including but not limited to royalties required by federal Copyright and related laws, performance fees to Artists, and fees related to merchandise and recordings.

114. HSP and /or Stepanian acted deceptively and in bad faith when failing to adhere to the provisions of the PMA.

115. Every contract entered into and enforceable under the laws of the Commonwealth of Massachusetts contains a covenant of good faith and fair dealing.

116. As a result of the HSP and/or Stepanian's breach of the Covenant of Good Faith and Fair Dealing, PBS and/or Artists have been damaged.

### Count III
### Quantum Meruit/Unjust Enrichment

117. Defendants reallege, reaver, and incorporate herein, *in globo* and *in extenso*, paragraphs 1 through 116.

118. PBS and/or Artists performed their obligations consistent with the terms of the PMA, and with the reasonable expectation that HSP was qualified to, and would actually, adequately perform its obligations under the PMA and applicable law.

119.    HSP and/or Stepanian knew that PBS and/or the Artists relied on HSP and/or Stepanian's advise, counsel and guidance with the expectation of improving PBS and/or the Artists' financial position, but despite that knowledge, HSP and/or Stepanian deceptively represented their experience, intentions and abilities to PBS and/or Artists, nor did HSP and/or Stepanian act in a manner consistent with their representations and/or obligations under the PMA.

120.    As a result of PBS' and/or Artists' labor and efforts, HSP and/or Stepanian was/were enriched monetarily and otherwise, with increased but undeserved business opportunities, good will, and recognition.

121.    If HSP and/or Stepanian are allowed to receive the benefits of PBS' and/or Artists' labor and efforts, HSP and/or Stepanian will be unjustly enriched.

**Count IV**
**Promissory Estoppel**

122.    Defendants reallege, reaver, and incorporate herein, *in globo* and *in extenso*, paragraphs 1 through 121.

123.    Based on HSP and/or Stepanian's actions and representations, HSP intended to be bound by the PMA and to act consistently within its limitations and provisions.

124.    As a result of the HSP's promises and representations, PBS and/or Artists entered into, and engaged in conduct consistent with, the PMA to the financial benefit of HSP and Stepanian.

125.    To date, HSP and/or Stepanian engaged in conduct that resulted in damage to PBS' and/or Artists' image, reputation, career opportunities, ideational property rights, and financial position, and additional damages remain undocumented and are still accruing and being calculated.

126.    HSP has failed to perform as required by the PMA, and, *inter alia*, failed to establish, determine pay Artist Royalties, Mechanical Licensing Fees, and other compensation and

monies it owes to PBS and/or Artists, both in the aggregate and on an individual product and/or project basis.

127.    Given HSP and/or Stepanian's representations and PBS' and/or Artists' material change in position as a result, it is inequitable for HSP to seek enforcement of, and/or avoid its obligations under, the PMA.

128.    PBS and/or Artists have supplied adequate and sufficient consideration for the PMA, and therefore HSP and/or Stepanian should be held liable for its breaches thereof.

**Count V**
**HSP and/or Stepanian Failed to Provide Adequate Accountings**

129.    Defendants reallege, reaver, and incorporate herein, *in globo* and *in extenso*, paragraphs 1 through 128.

130.    On or about May 8, 2006, HSP and PBS/Artists entered into the PMA.

131.    Despite the provisions of the PMA, HSP failed to provide the PMA-required accounting(s) regarding monies owed to PBS and/or Artists, as well as for monies HSP claims it is owed by PBS/Artists, and Stepanian was complicit in HSP's failures.

132.    Despite the provisions of the PMA, HSP has refused to pay royalties and other monies owed to PBS and/or Artists under the PMA, in ongoing violations of federal Copyright and Mechanical Royalty License laws, without proper and required accountings and disclosures.

133.    HSP and/or Stepanian are thus liable to PBS and Artists for damages, in an amount to be determined.

**Count VI**
**Negligent Misrepresentation**

134.    Defendants reallege, reaver, and incorporate herein, *in globo* and *in extenso*, paragraphs 1 through 133.

135. HSP/Stepanian made misrepresentations regarding their: 1) track record and ability to adequately perform as a professional manager; 2) commitment to providing an "artist-controlled environment"; 3) intention to be bound by the PMA and to act consistently with its provisions; and 4) other misrepresentations that will be more fully articulated upon completion of discovery. These, and other, misrepresentations were material to the Artists' decision to enter into the PMA.

136. When HSP/Stepanian made their statements, they negligently failed to determine whether those statements were true or false. A person utilizing reasonable care would have been able to determine whether the statements were true or false.

137. HSP/Stepanian made those statements with the intention that PBS and Artists would rely on those statements in determining whether to enter into the PMA.

138. PBS and Artists reasonably relied on HSP/Stepanian's statements and misrepresentations.

139. As a result of PBS' and Artists' reasonable reliance on HSP/Stepanian's statements and misrepresentations, PBS and Artists have been damaged.

**Count VII**
**Violation of M.G.L. c. 93A, §§ 2 and 11**

140. Defendants reallege, reaver, and incorporate herein, *in globo* and *in extenso*, paragraphs 1 through 139.

141. PBS and/or Artists are engaged in trade and commerce in Massachusetts pursuant to the PMA within the meaning of M.G.L. c 93A.

142. HSP and/or Stepanian are engaged in trade and commerce in Massachusetts, as a purported professional manager and/or financier, within the meaning of M.G.L. c 93A.

143. HSP and/or Stepanian engaged in unfair and deceptive trade practices when it misled PBS and/or Artists into executing the PMA, as well as when they misled PBS and/or Artists into

believing that HSP would fulfill its obligations under the PMA and continue to fulfill its obligations under the PMA after termination.

144.     As a result of HSP and/or Stepanian's unfair and deceptive trade practices, PBS and/or Artists have been damaged.

145.     HSP and/or Stepanian are liable for PBS' and Artists' costs and attorney's fees.

146.     HSP and/or Stepanian's actions constituted a willing and knowing violation of Chapter 93A, and they are therefore liable for treble damages.

**Count VIII**
**Alter-Ego/Corporate Veil Piercing Allegations Against Stepanian**

147.     Defendants reallege, reaver, and incorporate herein, *in globo* and *in extenso*, paragraphs 1 through 146.

148.     Stepanian engaged in self-dealing and otherwise conducted the affairs of HSP in a manner that warrants the piercing of HSP's "corporate veil", as on information and belief, Stepanian exercised sole and pervasive control of HSP, with related injurious consequence to the Artists.   Moreover, Stepanian also confusingly intermingled his and HSP's actions and assets, with substantial disregard of the separate nature thereof, and also created serious ambiguity about the manner and capacity in which HSP and Stepanian were acting. Stepanian is thus jointly and severally personally liable to the Artists, due to his personal involvement in the breach(es) of fiduciary duties owed to the Artists for the detriment and damages they suffered as a result of Stepanian's actions taken in his position as the owner/sole member and president of HSP, including but not limited to his misleading and/or deceptive representations, his withholding of financial information from the Artists, his exercise of personal control over HSP, and the various other relevant factors used when determining whether to pierce a corporate veil.

**Count IX**
**Declaratory Judgment**
**Against HSP and Stepanian**

149. Defendants reallege, reaver, and incorporate herein, *in globo* and *in extenso*, paragraphs 1 through 148.

150. PBS and Artists seek declaratory judgment to determine the rights, duties, status and other legal relations of the parties, including but not limited to the parties' rights under the PMA.

**Count X**
**Copyright Infringement**

151. Defendants reallege, reaver, and incorporate herein, *in globo* and *in extenso*, paragraphs 1 through 150.

152. PBS and Artists are protected for their body of artistic works under 17 U.S.C. § 102, et seq., which extends copyright protection to "original works of authorship" including musical works and sound recordings.

153. 17 U.S.C. § 106 establishes exclusive rights in copyrighted works, including the right to control the commercial release and exploitation of said works.

154. PBS and/or the Artists assert that their entire body of protected artistic works, recordings and performances continues to be held in their full respective share as performers, songwriters, authors and owners, including any and all works performed or created by them during the term of the PMA, without any lawful transfer, waiver, or diminution of said right and interest.

155. HSP/Stepanian failed to obtain or provide written transfers or conveyances, where necessary or appropriate to protect PBS and/or the Artists' creations, in compliance with 17 U.S.C. § 204, including but not limited to the *MOODOO* release, which, despite HSP's requests for

credit as Executive Producer only, was released by HSP, who knowingly and unlawfully listed the copyright thereto as being "℗ & © 2008 HighSteppin' Productions, LLC", without prior approval of PBS and/or the Artists, who have yet to receive any federal Compulsory License royalties or compensation from the sales thereof.

156. HSP/Stepanian failed to properly register PBS and/or the Artists' live recording(s) as a copyright(s) in PBS and/or the Artists' name(s), which unlawful conduct constitutes unjust enrichment, breach of fiduciary duties, and an action that HSP/Stepanian should have known would deprive Artists of their ideational property, and/or dilute the value of said ideational property, by deceptive trade practices. Due to the lack of any clear prior registration, approval and written authority, and in violation of the PMA and HSP/Stepanian's specific prior representations regarding the creation of an "artist-controlled environment", any copyrights unlawfully registered in HSP's name are voidable and compensable.

157. HSP/Stepanian has/have systematically and extensively violated standard Copyright law (as well as the PMA at issue), and continue(s) to unlawfully sell PBS and/or the Artists' creations and goods directly through web sites bearing PBS and/or the Artists' names and other sites that cater directly to consumers, in an unlawful and /or misleading manner.

158. Under 17 U.S.C. § 115, Mechanical License Royalty Rates are established to compensate the original authors for each and every audio song commercially released and sold in any manufactured unit, distribution or download format, and payment for songs in accordance with Title 17 of the U.S. Code is compulsory absent any written agreement to the contrary, and right to receive payment for commercial exploitation of on artist's work is a long-established cornerstone of musical author's compensation recognized by federal law.

159. HSP/Stepanian failed to provide a timely and accurate accounting of Mechanical Royalty payments and costs to third parties on a contracted-for rate or Compulsory License Rate, thereby exposing PBS and/or the Artists to potential liability to third parties due to their unwitting, yet potential, violation of federal law.

160. HSP/Stepanian unilaterally and consistently failed to allow PBS and/or the Artists the opportunity to exercise their right to control the sonic quality, and/or determine the suitability for commercial exploitation and release, of their work(s), including but not limited to the right to edit, engineer, enhance and improve the extremely inexpensive, low-fidelity live recordings released by HSP without proper, prior authorization by PBS and/or the Artists, in violation of federal copyright laws.

161. In addition to the *MOODOO* sound recording performed and recorded by Artists, HSP/Stepanian unilaterally, and without the Artists' written authorization, transfer, agreement or lawful prior consent, commercially released at least 25 other sound recordings of Artists' work product without clear terms, proper copyright registration or written transfer of copyright interest by HSP/Stepanian, and thus, HSP/Stepanian unlawfully misappropriated and diminished the rights, value, interest and remedies regarding PBS and/or the Artists' ideational property, to PBS and/or the Artists' detriment and damage, which continued to be sold in physical copies and downloads, without any accounting or payment to PBS and/or the Artists as performers and/or copyright holders to date.

162. HSP/Stepanian is/are an infringer(s) as that term is defined under 17 U.S.C. § 102 et seq. (including 17 U.S.C. § 501 et seq.), and thus, PBS and/or the Artists have the exclusive right, and thus, are entitled to institute this action for any and all infringements by HSP/Stepanian,

especially in the absence of any prior written authority from PBS and/or the Artists to HSP and/or Stepanian regarding same.

163. Artists are entitled to the full panoply of remedies available under applicable copyright law, including but not limited to 17 U.S.C. § 501-506, such as injunctive and monetary relief, impoundment, statutory damages, costs and attorney's fees, from HSP/Stepanian.

164. HSP/Stepanian failed to properly register, protect and enforce the ideational property, copyrights and work product belonging to PBS as their clients for the MOODOO recording, choosing instead to release the work with phonorecord and copyright notice "℗ & © 2008 HighSteppin' Productions". Because PBS' members are the performers and engineers of said work, said wrongful registration and actions are clearly willful and deceptive.

165. HSP/Stepanian failed to pay any Artist fees, Artist royalties, profits or payments to PBS' members from any and all sales of *MOODOO,* in an ongoing violation(s) of Federal Copyright laws, and instead, on information and belief, HSP/Stepanian has retained 100% of the revenues derived from the sale of *MOODOO.*

166. HSP/Stepanian unlawfully failed to pay PBS Artists' fees, and/or Artists' royalties, due in connection with at least 25 other PBS/Artists recordings, all of which have prior copyright registered works by third persons, and all of which have a copyright interest as a newly created and owned Sound Recording by PBS/Artists, which HSP/Stepanian has unilaterally released, distributed, administered and controlled, all without proper, prior authority and/or clearly delineated written terms and conditions therefor.

167. HSP/Stepanian willfully, wantonly, and in conscious disregard and intentional disregard or indifference to the rights of PBS and/or the Artists, made and distributed in the United States, caused to be made and distributed in the United States, and aided, abetted, contributed to, and

participated in the unauthorized making and distribution of phonorecords containing copyrighted sound recording ("SR") and/or artistic performance ("PA") owned by PBS and/or the Artists. HSP and/or Stepanian either knew, or should have reasonably known, that the sound recording and/or artistic performance was protected by copyright. HSP and/or Stepanian continue to infringe on PBS and/or the Artists' rights in and to the copyrighted sound recording(s) and/or artistic performance(s).

168. As a direct and proximate cause of their wrongful conduct, HSP and/or Stepanian have realized and continue to realize profits and other benefits rightfully belonging to PBS and/or the Artists. Accordingly, PBS and/or the Artists seek an award of damages pursuant to 17 U.S.C. § 504.

169. HSP and/or Stepanian's infringing conduct is continuing and ongoing. PBS and/or Artists have suffered, and will continue to suffer, irreparable injury for which there is no adequate remedy at law, unless HSP and/or Stepanian are enjoined by the Court. Therefore, PBS and/or Artists pray that HSP and/or Stepanian, their respective agents, servants, employees, officers, attorneys, successors and assigns, and all of these persons actively in concert or participation with each or any of them, be preliminarily and permanently enjoined from directly or indirectly infringing on the copyrights owned by PBS and/or the Artists in any manner, and from duplicating, causing to be duplicated, or aiding, contributing to or participating in the unauthorized duplication of each said copyrighted work. PBS and/or the Artists ask that all infringing works be recalled and destroyed.

170. HSP and/or Stepanian should be required to account for all gains, profits, and advantages derived by them from their acts of infringement.

171. HSP/Stepanian is/are thus liable to PBS and/or Artists for a range of compensatory damages.

172.  HSP/Stepanian is/are thus liable to PBS and/or Artists for punitive damages under 17 U.S.C. § 504, et seq.

173.  HSP/Stepanian is/are thus liable to PBS and/or Artists for Mechanical License fees and damages.

174.  HSP/Stepanian is/are thus liable to PBS and/or Artists for a complete and full accounting of any and all sales, monetary payments, manufacturing, distribution and payments to third parties as required under relevant Federal Copyright Law.

175.  PBS and Artists seek to have injunctive relief under 17 U.S.C. § 505 et seq. to compel HSP/Stepanian to immediately cease collecting monies and selling any and all PBS and/or Artists-owned products, and set aside any and all proceeds from said sales.

176.  PBS and Artists seek to have injunctive relief under 17 U.S.C. § 505 et seq. to compel HSP/Stepanian to immediately cooperate in the disclosure of any and all copyright and licensing records and modify, transfer and execute Artist-owned copyrights in their client's names.

177.  PBS and Artists seek to have injunctive relief under 17 U.S.C. § 509 et seq. to seize any and all products belonging to PBS/Artists that have been manufactured under the control, management and directives of HSP/Stepanian, and to immediately transfer any and all goods and sales distribution links to the lawful owners.

178.  PBS and Artists seek to have injunctive relief under 17 U.S.C. § 504 et seq. to compel HSP/Stepanian to immediately cease and desist from conducting any and all business with Bug Music, Live Nation, Bugaloo Music, authors and the representatives associated with the 26 recordings HSP/Stepanian are selling.

179. PBS and Artists seek to have injunctive relief under 17 U.S.C. § 503 et seq. to compel HSP/Stepanian to immediately disclose to the court and PBS any and all correspondence, records, bank statements, accounting, payments, receipts and records relating to said recording sales business activities.

180. PBS and/or Artists, as copyright owner(s), are is entitled to recover the actual damages and loss of profits under 17 U.S.C. § 504 suffered by them as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

181. PBS and Artists seek to have attorney's fees and costs paid under 17 U.S.C. § 505 et seq. as deemed appropriate by the court, as well as an award of prejudgment interest according to the proof.

182. PBS and Artists seek to have other injunctive relief and damages under 17 U.S.C. § 502 et seq. as deemed appropriate by the court.

## REQUEST FOR RELIEF

WHEREFORE, PBS and the Artists respectfully requests this Court provide the following relief:

1. Find for PBS and Artists on all claims and award all damages, injunctions, impoundment, restraining orders, costs, attorney's fees, and other relief deemed appropriate;

2. Find for PBS and Artists that HSP and Stepanian's actions constituted unfair and deceptive trade practices in violation of M.G.L. c. 93A and award all damages as appropriate, including, but not limited to, attorney's fees, interest and costs;

3. Award PBS and Artists costs and attorney's fees under M.G.L. c. 93A and federal copyright law;

4. Award PBS and Artists costs and attorney's fees under the terms of the PMA;

5. Find for PBS and Artists that HSP/Stepanian's unfair and deceptive trade practices were willful or knowing and award treble damages pursuant to M. G. L. c 93A;

6. Find that HSP/Stepanian violated federal copyright law, and as such, PBS and the Artists are entitled to: a) compensatory damages; b) punitive damages; c) Mechanical License fees and damages) a complete and full accounting of any and all sales, monetary payments, manufacturing, distribution and third-party payments; e) injunctive relief under 17 U.S.C. § 505 et seq.; f) injunctive relief under 17 U.S.C. § 509 et seq.; g) injunctive relief under 17 U.S.C. § 504 et seq.; h) injunctive relief under 17 U.S.C. § 503 et seq.; i) actual damages and loss of profits under 17 U.S.C. § 504; j) injunctive relief and damages under 17 U.S.C. § 502 et seq. and k) attorneys fees and costs under 17 U.S.C. § 505 et seq.

7. Find that HSP's "corporate veil" should be pierced, and that Stepanian be found liable to PBS and Artists for damages; and

8. Grant and award any such other relief this Court deems just and proper.

Respectfully Submitted,


   /s/ John O. Pieksen, Jr.
John O. Pieksen, Jr. (LA Bar #21023)
829 Baronne Street
New Orleans, LA 70113
Telephone:    504-581-9322
Facsimile:    504-324-4844
Email:    jpieksen@cox.net
**Special Counsel for the U.S. Bankruptcy Trustee/Debtors' Bankruptcy Estates, and George Porter, Jr. individually**

and

_____/s/ Ronnie Glynn Penton_____
Ronnie Glynn Penton (LA Bar # 10462)
**THE PENTON LAW FIRM**
209 Hoppen Place
Bogalusa , LA 70427
Telephone:     985-732-5651
Facsimile:      985-735-5579
Email: fedcourtmail@rgplaw.com
**Counsel for Brian Stoltz and PBS, LLC individually**


## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served upon all counsel of record by ECF filing, facsimile, electronic transmission, and/or by depositing same in the United States mail, properly addressed and postage prepaid, this 6th day of June, 2011.

____/s/ John O. Pieksen, Jr._____