## IN THE UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF:                                    NO. 10-13553

**GEORGE JOSEPH PORTER, JR.**
**ARALEAN H. PORTER**                                SECTION "A"

   *Debtors*                         CHAPTER 7
**********************************************************************
HIGHSTEPPIN' PRODUCTIONS, LLC          ADVERSARY NUMBER
   PLAINTIFF                           10-1130 A

VERSUS

GEORGE JOSEPH PORTER, JR., ET AL
   DEFENDANTS

### ADMINISTRATIVELY CONSOLIDATED FOR TRIAL WITH

HIGHSTEPPIN' PRODUCTIONS, LLC          ADVERSARY NUMBER
   PLAINTIFF                           10-1131 A

VERSUS

BRIAN HERBERT STOLTZ, ET AL
   DEFENDANTS
**********************************************************************

### AP DEFENDANTS' POST-TRIAL <u>MEMORANDUM</u>

**MAY IT PLEASE THE COURT:**

Debtors and Adversary Proceeding Defendants, George Porter, Jr. ("Porter"), Brian Stoltz ("Stoltz"), David Russell Batiste ("Batiste") (collectively and/or individually "Artists" or "Debtors") and PBS, LLC ("PBS") (collectively "Defendants"), hereby submit this Post-Trial Memorandum ("Memo"), to address the legal issues articulated by the Court, and further, to respectfully submit that Adversary Plaintiff, Highsteppin' Productions, LLC ("HSP"), and individual Adversary Plaintiff, Phillip I. Stepanian's

("Stepanian") (collectively "Plaintiffs"), have failed to meet their burden of proof on all actionable claims, have failed to adequately demonstrate entitlement to any specifically calculable amount of reimbursement, and are concomitantly liable to Defendants on numerous claims, as more fully set forth below.   This Memo also specifically incorporates by reference, *in globo* and *in extenso*, the suggested Findings of Fact ("FoF") and Conclusions of Law ("CoL") submitted contemporaneously herewith to the Court, which Defendants respectfully commend to the Court for consideration and adoption.

First, Defendants' claims for: 1) breach of contract; 2) breach of fiduciary duties; 3) promissory estoppel; 4) negligent misrepresentation; 5) Massachusetts Unfair Trade Practices Act ("MUTPA"); 6) unjust enrichment; 7) copyright violations; 8) failure to timely, fully and correctly account to PBS; and 9) alter-ego/veil piercing claims against Mr. Stepanian, will be analyzed.   Then, HSP's claims which survived summary judgment[1] will be disposed of: namely, 1) fraud; 2) promissory estoppel; 3) negligent misrepresentation; 4) Massachusetts Unfair Trade Practices Act ("MUTPA"); 5) civil conspiracy; and 6) intentional interference with a contract.   Lastly, HSP's claim for reimbursement, and inherently, its fatally defective Proof of Claim ("PoC"), will be negated.

## I.      DEFENDANTS HAVE PROVEN LIABILITY AGAINST HSP/STEPANIAN

Based on the trial testimony and evidence, Defendants have established liability against HSP and Stepanian on a number of causes of action.

---

[1] The Court is referred to its May 18, 2012 ruling which jettisoned HSP's breach of contract claim (other than a claim for reimbursement), as well as HSP's unjust enrichment claim.

###### A.    BREACH OF CONTRACT (PMA)

The Personal Management Agreement ("PMA"), *Exhibit* "1", dated May 8, 2006, forms a primary basis of this litigation, and imposed contractual (and fiduciary) obligations upon HSP and Stepanian under Massachusetts law, which Defendants respectfully submit were breached in myriad and willful fashion.  Due to said pervasive breaches, HSP has forfeited any right to compensation, and is liable to Defendants for an award damages, penalty damages, attorneys' fees, costs and interest.

The PMA's preamble placed the risk of failure of this project on HSP. *Exhibit 1*, p.1.  Stepanian initially claimed that the project was a success because he maximized HSP's commissions (reflecting a profound lack of understanding of, and adherence to, his fiduciary duties).  (Findings of Fact Number 659).  However, he eventually admitted that the project was not a success.(Findings of Fact Number 670).  This admission alone should establish HSP's (and Stepanian's) liability for breach of contract, based on the adage "the proof is in the pudding".  HSP also breached Paragraph 2 of the PMA, based on HSP's failure to adequately and effectively "advise, counsel, and assist" Defendants; a failure that resulted in financial disaster and bankruptcy for Defendants.

This failure includes: 1) wanton deficit spending; 2) without prior approval or disclosure; 3) that outstripped revenues on a 2-to-1 basis; 3) over-staffing tour support to create the illusion of a "big-time" act; 4) the lack of income/expense projections; 5) the lack of tour budgets until 2009 (the first year the band turned a profit under Stepanian's "tutelage"); 6) the abject failure of HSP as a business manager; 7) the lack of non-tour budgets; 8) the failure of disclosure on just about every front; 9) the failure to increase the number of PBS' gigs or gross revenue to any appreciable degree; 10) the failure to

protect and/or advise Defendants to protect, their intellectual properties; 11) the failure to disclose 3rd-party distribution and vendor agreements and the revenues derived from those deals; 12) the failure to advise Defendants of actual and/or potential conflicts of interest; 13) the failure to instruct Defendants to get independent legal advice; and 14) the breaches of fiduciary duty, good faith and fair dealing, outlined herin, *infra*.

HSP breached Paragraph 3 of the PMA in myriad fashion. Paragraph 3(a)(iv) required that HSP "engage, discharge and/or direct" accountants, business managers, and other service providers for Defendants. Despite lamenting the inability of Blue Mountain Artists ("BMA") (Defendants' booking agent) to secure a larger number of gigs and a higher per-gig price, HSP acknowledged that it did not secure any acceptable replacements for BMA (and thus, tacitly admitted its failure to increase Defendants' bookings and related revenues). (Findings of Fact 753, 754) HSP also failed to adhere to Paragraph 3(a)(vi) by failing to properly function as Business Manager, replete with a lack of provision of the requisite disclosures, accountings and deductions mandated by that sub-paragraph. HSP further breached Paragraph 3(a)(viii) by failing to secure Defendants' approval of the many unilateral decisions made and effected by HSP (including many non-tour expenses, some tour staffing decisions, the Nimbit agreement, the NUGS distribution contract, and other 3rd party vendor contracts, as discussed in greater detail below) prior to entering into those agreements and relationships. Moreover, HSP admitted that the 48-hour emergency authority provision was never triggered, and thus, is inapplicable.

HSP admittedly breached Paragraph 3(c) of the PMA by the unauthorized and undisclosed use of the Defendants' email list, after termination of the PMA, and the

admitted failure to remit the revenues derived from that unlawful use.  (Findings of Fact

706, 707, Exhibt 209). HSP also admitted to "hostaging" the email list on advice of

litigation counsel, as well as all monies derived from the unauthorized, post-PMA use of

that email list, all without timely disclosure, without any consent from the Defendants,

without any adequate or contemporaneous accountings to the Defendants, and without

any payments to the Defendants.  To this day, Defendants have not received a copy of the

e-mail list, despite a clear entitlement to do so.

HSP breached Paragraph 4 of the PMA by improperly calculating its

commissions.   Reserving a discussion on HSP's forfeiture of all rights to any

compensation due to its breaches of fiduciary duty for the section on fiduciary duties,

*infra,* the methodology by which HSP calculated its commission was doubly flawed.

First, HSP failed to back out "reasonable 'tour expenses'" when calculating its

commission.  Exhibit 1, ¶ 4(d).  Although HSP maintains that the

"reasonable 'tour expenses'" definition is limited to the laundry list of examples,

Defendants assert that the laundry list is not exclusive, and further, if the applicable

contract language is ambiguous, it should be construed against the original drafter, HSP.

As such, HSP would be entitled to no more than a 15% commission (if any commission

at all) once the proper Gross Earnings numbers were calculated, because a simple

comparison of PBS' gross earnings to tour expenses establishes that HSP never attained

the necessary benchmarks, once "reasonable 'tour expenses' " are properly factored into

the equation. (Exhibits 8, 9, 12, 13, 14, 17, 20, 21, 24, 26, 29)

Second, Defendants maintain that it is more reasonable to conclude that the

commission calculation should be recalibrated on an annual basis, due to the "any

consecutive twelve (12) month period" language that appears in Paragraph 4(a), rather than on an end-to-end basis.  Although there is scant caselaw on that particular issue, Defendants submit that "resetting" the annual calculation is the more reasonable interpretation of Paragraph 4, and again, any ambiguity should resolve against HSP. Thus (even assuming a limited deduction for "reasonable 'tour expenses' ", based on HSP's interpretation of this aspect of the PMA), based on the financials reflected in Defendants' PBS tax returns (prepared based on input from HSP in 2007 and 2008, with no return for 2009 due to a lack of financial input from HSP), HSP would only be entitled to a 15% commission the first year ($86+K gross income in 2006), a 17.5% (or perhaps 20%) commission the second year ($150+K in 2007), a 15% commission the following year ($88+K in 2008), and 2009 is unfathomable, as HSP's Bankruptcy Proof of Claim ("PoC") shows $0 revenue for PBS that year (although the 2009 P&L shows $159+K). Again, as shown below, Defendants assert that this exercise is purely academic, as HSP's multiple breaches of its fiduciary duties negate any right to receive compensation, which obviates a "commission" calculation.

HSP also breached Paragraph 6 of the PMA in multiple and material fashion. HSP cannot realistically dispute that it failed to provide the requisite monthly and/or quarterly accountings (commissions, expense reimbursement, advances, loans, merchandise, etc.) required under ¶ 6(a) and (d).  Also, HSP acted as *de facto* business manager, and failed to provide any consistent, correct or comprehensive accountings while functioning in that capacity.  As noted at trial, all of the "accountings" referenced by HSP during testimony, be they P&Ls, Balance Sheets, tax returns, Cost Recovery Models, Sales Reports, Ubuntu Reports, exhibits to the federal Complaints filed in

Massachusetts, or the PoC filed with this Court, contained material defects.  (Exhs. 2, 5, 6, 8-17, 20-29, 3, 151A-F, 152, 154, 199-A-AA, 197A-J, 200A-P, 239-224G).

Equally fatal to HSP's attempt to avoid liability is the overwhelming absence of Defendants' prior approvals for expenses, as required by Paragraph 6(b).  Despite Stepanian's assertion (both at deposition and initially at trial) that there were hundreds, if not thousands, of emails establishing the Defendants' prior consent, no such evidence was ever presented at trial, and his mid-testimony capitulation to Mr. DeBiasi or Ms. Malangone to identify any such emails (which never materialized) rang hollow. (Findings of Fact 700).  Thus, there can be no doubt that HSP repetitively and consistently violated ¶ 6(b)[2] throughout the entire term of the PMA, especially because HSP routinely incurred more than $2,000.00 in expenses each and every month of the PMA, without the requisite prior approval of the Defendants, and thus, is not entitled to any reimbursement for any of those unapproved expenses[3].

HSP also breached Paragraph 8 of the PMA on a consistent and continuing basis, due to its failure, both as Defendants' Business Manager and as Personal Manager, to: 1) set up separate bank accounts for HSP, PBS, the individual Defendants, Bonerama, and Stepanian personally, upon commencement of the PMA; 2) set up separate QuickBooks files for  HSP, PBS, the individual Defendants, Bonerama, and Stepanian personally, upon commencement of the PMA; 3) avoid commingling the funds of HSP, Stepanian,

---

[2] As discussed below, Defendants maintain that HSP has failed to establish entitlement to any reimbursement of non-tour expenses (other than a handful of invoices related to MOODOO, It's Life and Up All Night which the Defendants were made aware of and approved, before those expenses were incurred).

[3] As noted by the Court, HSP's accounting records are woefully inadequate and are insufficient to verify the accuracy of HSP's PoC.  AS such, the Court could deny that claim outright, but in fairness to all parties, indicated its intention to try and arrive at its own calculations.  Defendants assert that they lack the pecuniary resources to conduct such an extensive undertaking.

PBS, the individual Defendants, and Bonerama; 4) avoid conversion of the funds of HSP, Stepanian, PBS, the individual Defendants, and Bonerama; and 5) provide monthly and/or quarterly accountings. All "accounting" witnesses opined that these deficiencies were material deviations from good accounting practices and/or GAAP. (Schimmel testimony pages 255-294; Debiasi testimony page 600-640; See generally, Dyer, Friedman and Weinstein testimony)

HSP further breached Paragraph 16(b) of the PMA by failing to make any efforts to comply with the Leaving Member/KeyPerson clause. HSP admittedly made no effort to replace Porter after he timely tendered his notice of termination, in violation of ¶ 16(b).

Lastly, Defendants assert that the following conduct and omissions by Stepanian and HSP constitute additional breaches of the PMA, as do the breaches of fiduciary duty set forth herein, *infra*:

1) instituting a "salary" program, without full and simultaneous disclosure to all Defendants, that provided different amount of monthly salary to the three individual defendants, thus creating conflicts of interest and jettisoning the traditional one-third/one-third/one-third paradigm established by the PBS, LLC Articles of Organization and the traditional operational model of the band;

2) collapsing the solo projects of the individual defendants into the PMA, without disclosure of the attendant costs to all members, again distorting the traditional paradigm and creating inequities among the band members due to the *in solido*/joint and several liability provision of the PMA;

3) the lack of separate recording, reproduction, licensing and distribution

agreements for all projects involving the Defendants' intellectual properties/creative works;

4) the failure to timely account for and remit payment, including artist and mechanical royalties, despite HSP's receipt, retention and use of all revenues derived from the commercial exploitation of Defendants' creative works;

5) holding David Herlihy out to the band as "your lawyer" without disclosing Herlihy's prior representation of HSP, his (then) current in-house status, and without securing written waivers of any potential or actual conflicts of interest;

6) the failure to prepare and disclose budgets for non-tour expenses throughout the term of the PMA, and for tour budgets from May 2006 through early 2009;

7) the failure to conduct income/expense projections to make sure expenses were kept in line with income, both before embarking on the project and during it;

8) creating deficit spending as a basic strategy, without preparing realistic budgets and income/expense projections and by making unwise expense decisions that did not translate into increased revenue;

9) acting, without authority, as a record label, production company, distribution company, merchandising purveyor, and Business Manager for Artists, all without generating specific written proposals and obtaining Defendants' prior consent (other than MOODOO, IT's Life, Expanding the Funkin' Universe and Brian Stoltz' 3 solo projects);

10) ignoring known errors in PBS' tax returns and the financial information and

documents prepared and desseminated by HSP, including the 2006 and 2008 PBS partnership returns, without disclosure to the Defendants and without correction of the known accounting and reporting errors;

11) issuing Defendants 1099s in 2007 and 2008, and then voiding those 1099s two-plus years later, on advice of counsel, and claiming that those payments were actually recourse loans, despite a lack of any indicia of loans, such as promissory notes, IOUs, interest terms, loan duration, repayment terms, etc.; and

12) transferring PBS' revenue from the PBS bank account (once one was actually set up) to HSP's account, and then transferring the same funds to an outside payroll company which then disbursed the monies back to the individual defendants as "salaries".

Defendants respectfully assert that the above-detailed litany of HSP and Stepanian's transgressions constitute breaches of the PMA (and, as shown below, violations of fiduciary duties, federal copyright law, and the Massachusetts Unfair Trade Practices Act), and render HSP and Stepanian liable to Defendants for a panoply of remedies, including damages, attorney's fees, costs, and penalty damages.

**B.    SCOPE AND BREACH OF FIDUCIARY DUTIES**

The offensive conduct detailed above, in addition to constituting breaches of the PMA, also establishes many breaches of the fiduciary duties HSP and Stepanian owed the Defendants to competently and faithfully guide them through the term of the PMA with honesty and loyalty, while acting scrupulously, in good faith, and with complete candor and full disclosure.

This section will set forth the scope and breach of HSP/Stepanian's fiduciary duties to PBS and its members, and will also specifically address three (3) of the seven (7) specific issues the Court directed the parties to brief: namely, 1) what is a fiduciary and their obligations under Massachusetts law; 2) how should a fiduciary handle conflicts of interest when it represents an entity (PBS) and its constituent members (individual defendants), with a focus on the debt allegedly owed; and 3) does a conflict of interest automatically terminate a fiduciary relationship.

Court-Directed Issues

1.      Definition of Fiduciary and Its Obligations

As set forth in the CoLs, under Massachusetts law, a fiduciary relationship is established whether the relationship is one of pure agency, attorney-in-fact, trustee, escrow agent, partner, attorney-at-law or corporate director of a close corporation, and a fiduciary holds a time-honored, selfless and hallowed position of trust.  Paragraph 3 of the PMA specifically creates a fiduciary relationship, as it appoints HSP as Defendants' "exclusive, true and lawful attorney-in-fact." *Exhibit 1*, ¶ 3(a).

As eloquently stated by Justice Cardoza (while Chief Judge of the New York Court of Appeals), a fiduciary owes the duties of honesty and of the finest loyalty to its principal:

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A [fiduciary] is held to something stricter than the morals of the market place. **Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate**. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating

erosion' of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a higher level than that trodden by the crowd.

Additionally, an agent's fiduciary duties are greater than those of other types of fiduciaries because it is the agent's duty to obey the will of the principal, to respond to the principal's wishes, and not to act contrary to the principal's directions, even if the principal's directions amount to a breach of the agency contract.  It is within this paradigm of the utmost candor, loyalty, obedience and disclosure that HSP/Stepanian were honor-bound to operate; they failed miserably.

The two basic fiduciary duties, honesty and loyalty, have been judicially construed to include the expansive duty of full disclosure, including full disclosure of all facts related to the subject-matter of the fiduciary relationship, full accountings, disclosure of conflicts of interest, disclosure of opportunities available to the principal, disclosure of the fiduciary's desire to take advantage of such opportunities, mistakes and errors in performance by the fiduciary, and the avoidance of self-dealing, commingling and conversion.

2.    Conflict of Interest Protocol

HSP created two different actual conflicts of interest: 1) one between HSP/Stepanian and Defendants (PBS, as an entity); and 2) between HSP/Stepanian and each of the three (3) individual defendants[4].  The conflict between HSP/Stepanian and PBS arose when Stepanian put HSP" and his own interests in conflict with, and ahead of, the interests of PBS as a band, with regard to a lack of distinct bookkeeping, commingling of funds, entering into 3rd-party vendor deals such as NUGS, Nimbit, etc.,

---

[4]  Also, a potential conflict of interest was created, as between each individual defendant, due to potential claims resulting from the possible inequitable imposition of joint and solidary liability.

conversion of revenues, undisclosed post-PMA sales, and a lack of meaningful accountings.

The conflict between HSP/Stepanian and each of the individual defendants arose when Stepanian put HSP's and his own interests in conflict with, and ahead of, the interests of said defendants, again with regard to a lack of distinct bookkeeping, commingling of funds, entering into 3rd-party vendor deals such as NUGS, Nimbit, etc., conversion of such revenues, post-PMA sales, and a lack of accountings, as well as the salary program that provided each member a different amount of money, and the lack of separate agreements for each member's solo projects, while imposing *in solido* liability on each defendant for the total aggregate amount of salaries and solo-project related expenses, paid regardless of the specific amount received by each individual, all without prior disclosure of the overall arrangement to each member.

The basic starting point is the rule that a fiduciary agent cannot serve two masters simultaneously. By doing so, the agent places himself in a conflict situation, creates the opportunity and concomitant temptation to take advantage of his principal, is presumed to act for his own mercenary interests, and by assuming a double relation, cannot faithfully perform the services for which he was originally employed. Also, a fiduciary forfeits a right to compensation when he creates such a conflict, and cannot claim he served both masters equally well or that his primary loyalty was not weakened by the pull of his secondary one. Once a conflict situation arises, a fiduciary does not have the option of choosing which principal to favor, and the fiduciary best satisfies the duty of loyalty by terminating the relationship with one or the other party.

Put another way, wearing more than one hat (in this case, four hats) requires a

fiduciary to be "very nimble as well as most prudent", because although the fiduciary may purport to wear one hat at a particular moment, in truth, all hats are worn together at all times.    To ensure that a fiduciary is both nimble and prudent in dealing with a potential conflict, Massachusetts law has imposed both procedural and substantive safeguards.    Procedurally, the fiduciary who contemplates taking its principal's prospective opportunity (such as the NUGs deal) must first offer that opportunity to the principal, disclosing all material details, and receive the informed consent of the principal, absent which the fiduciary must bear the burden of proving that its conduct was fair to the principal.    Massachusetts courts vigorously scrutinize self-interested transactions involving fiduciaries, and in such situations, the business judgment rule has no application whatsoever.

In order to satisfy its burden, a fiduciary must demonstrate the intrinsic fairness of the transaction from the point of view of the principal, and also must demonstrate that it acted in good faith, which requires full and honest disclosure of all relevant circumstances to permit a principal to provide its informed consent, as ratification of self-dealing transactions can occur only with full disclosure.    As matter of law, *sotto voce* indications do not fulfill a fiduciary's duty of full disclosure of self-dealing: "[n]o half-hearted disclosure or partial discovery" will satisfy the fiduciary's obligation to make full disclosure; rather, the principal "must be apprised of all the material facts and as well of their legal effect."    **Further, it is a conflict for a fiduciary to sell property of its principal and then place the proceeds in its individual account: under Massachusetts Law, such an act by a fiduciary amounts to a conversion and a breach of fiduciary duty.**

-14-

That is exactly what happened in this instance, where HSP, with Stepanian and Herlihy's full involvement, knowingly substituted HSP (as the main party in interest) in place of PBS when confecting the NUGS, Nimbit and CD Baby agreements. Further, HSP and Stepanian **never** specifically informed Defendants of those deals (either prior to, or after, execution of the deals), and certainly never obtained Defendants' consent thereto. Further, all revenues from those deals, and all other 3rd-party vendor arrangements, flowed into HSP's operating bank account (and not into PBS' account), and were spent by HSP in its normal course of business. It is of no moment that HSP belatedly claims that it credited PBS and its members for their respective shares of those revenues (even assuming HSP truly and accurately created and applied any such credits, which is highly doubtful and unsupported by the evidence introduced at trial). The very acts of non-disclosure and conversion constitute breaches.

Also, because HSP/Stepanian were duty-bound to act on behalf of PBS, as an entity, free from any and all actual conflicts of interest, the dual representation of PBS as an entity, and the simultaneous representation of its individual members created an impermissible conflict. By way of analogy, under Massachusetts law, the dual representation of a general partnership and its general partners almost invariably entails a plain conflict of interest, as the representation of an individual partner has been deemed an abandonment of the fiduciary duties owed to the partnership as an entity. It is respectfully submitted that that maxim, *a fortiori*, applies to an LLC such as PBS, LLC (although counsel has not found any caselaw specifically addressing that factual situation). HSP could only properly represent one entity, without prior disclosure (and receipt of waivers) of the inherent conflicts. They did not do so.

-15-

Also, by paying each individual member a different amount of monthly salary, without any disclosure of those specific amounts to all the other members or getting their informed consent to such an arrangement, HSP/Stepanian created a conflict of interest and breached its fiduciary duty, due to the *in solido* nature of each member's liability under the PMA.  In essence, HSP foisted liability upon individual members who were not given any corresponding benefit, and without their consent.  Likewise, HSP/Stepanian's failure to create separate recording, reproduction, licensing and distribution agreements for each of the individual member's solo projects and merchandise, and failure to provide contemporaneous disclosure to, and obtain consent from, all members, also created an impermissible conflict, as HSP now seeks recoupment of expenses, allegedly incurred on behalf of each individual defendant, from all Defendants globally.  Not only has HSP/Stepanian shackled each individual member with potential debt when they have not benefitted financially from the solo projects of the other members, but HSP also created a potential basis for litigation and liability as between the individual members.

Thus, HSP should have: 1) limited its representation to only one entity; 2) disclosed all actual and potential conflicts; 3) disclosed all "individual" arrangements (salary amount and solo projects); 4) obtained written waivers or withdrawn; and 5) informed all individuals of the legal effect of the actual and potential conflicts and instructed the members to obtain independent legal advice and/or a different agent.

3.      Automatic Termination Of Fiduciary Duty Due To Conflict of Interest

The undersigned's research has not yielded any caselaw directly on point, but it appears that the simple answer is no.  It would seem counterintuitive that a fiduciary could avoid its obligations simply by breaching its duties. To the contrary, a fiduciary

breaches its duties, and continues to breach its duties, by creating a conflict of interest and/or by not acting to resolve a conflict (either by withdrawal from the relationship or by obtaining waivers of the conflict) once such a conflict arises.  This approach is to be supported by analogous federal, Massachusetts and other states' partnership, ERISA securities and real estate law.

In the context of a partnership, the individual partners owe a continuing fiduciary duty to each other and the partnership, even after dissolution (whether amicable or due to a breach of a fiduciary duty) during the "wind-up" period, which specifically includes the duty to account for monies derived from pre-dissolution activity.  It also appears that in the context of securities law, the fiduciary duty of disclosure continues after a breach. The same rationale appears in the context of a real estate escrow arrangement, akin to HSP's retention of revenues from the sale of Defendants' creative works and merchandise (during and after the term of the PMA), as an escrow agent's duties to both parties to a sale continue after the sale (either with or without a breach) until all monies are dispersed to the rightful recipients.  Also, an ERISA fiduciary may operate under a conflict of interest, but if it does so, it loses the presumption that its actions were reasonable.

<u>Specific Instances of HSP/Stepanian's Breaches</u>

As admitted by Stepanian and Mr. DeBiasi, and as observed by the Court, HSP/Stepanian committed many fiduciary breaches of duty.  (Exhs. 626, 631, 632, 687, 708, 725, 728). The following is a laundry list of those violations:

1)    Stepanian's deposition testimony, confirmed at trial, that he considered this project a success because HSP earned the maximum commission, demonstrates an abject

disregard for the duty of loyalty owed to Defendants, as it is clear he placed HSP's and his own interests ahead of Defendants' interests;

2)      Stepanian's wanton deficit spending (putting aside the lack of prior consent from Defendants), when coupled with a lack of budgeting and financial controls, again exhibits an complete lack of concern for his clients' financial well-being that rises to the level of a breach of loyalty, as this litigation (based on inaccurate, incomplete and flatly erroneous financial documentation) has forced Defendants into bankruptcy, due to an alleged debt which allegedly exceeds $600,000.00 and to incur sizeable litigation-related costs that exceed $100,000.00 exclusive of attorney fees;

3)      It cannot be stressed enough that HSP/Stepanian's filing of admittedly deficient, erroneous and incomplete exhibits, as confirmed by Ms. Dyer and Stepanian, in connection with their initial Complaint and related injunction pleadings filed in Massachusetts federal court, unlawfully placed Defendants in a financial choke-hold that resulted in their bankruptcy filings; as can be seen in the Massachusetts PACER docket, HSP unilaterally obtained an *ex parte* injunction for 30-40% of Defendants' gross income within days of filing suit on December 29, 2009, based on financial representations that HSP knew where wrong but used them anyway, in violation of FRCP 11.

4)      Stepanian's deposition and trial testimony regarding his "willingness" to provide information to the Defendants, if and when they affirmatively asked for it, again exhibits a profound ignorance regarding his affirmative duty of disclosure which is the hallmark of a fiduciary relationship, as it was his burden to disclose all pertinent information; not Defendants' obligation to seek out that information;

5)      The accounting systems, protocols (or lack thereof), and documentation and

-18-

reports maintained and prepared by HSP are so abysmal that they constitute breaches of fiduciary duties, including: a) the lack of separate bank accounts; b) lack of separate credit cards; c) lack of separate QuickBooks files; d) erroneous and incomplete P&Ls, Balance Sheets, Tax Returns, Sales Reports, Cost Recovery Models, Ubuntu Reports, Merchandise Reports, and Cost of Goods Sold calculations; e) lack of monthly, quarterly, and/or annual accountings to Defendants owed under the PMA; f) lack of royalty and sales reports; and g) lack of any accountings, post-PMA, to Defendants regarding revenues HSP still continues to receive as a result of its unabated distribution and sales of Defendants' merchandise and creative works;

6)      The failure to timely provide any meaningful degree of information to Defendants regarding the financial condition of the project until, at the earliest, late October 2008 and more reasonably, until November 2011 in litigation discovery;

7)      The failure to provide Shannon Chabaud with pertinent financial information for use in preparing the 2006 and 2009 PBS partnership tax returns;

8)      The failure to provide Alan Freidman with accurate and complete financial information regarding the 2007 and 2008 PBS partnership tax return preparation;

9)      The failure to correct known errors in the 2006 and 2008 PBS partnership tax returns;

10)      The provision of admittedly incorrect and hastily prepared exhibits to the Massachusetts federal court in conjunction with the Complaints and Injunction pleadings filed by HSP on December 29, 2009;

11)      The failure to prepare a complete and accurate Proof of Claim in the main bankruptcy proceeding;

12)     The use of unverified and unaudited batch journal entries to "create" a set of PBS-related QuickBooks files;

13)     The "burying" of the Clinch photo shoot costs in Retained Earnings;

14)     The failure to obtain Defendants' prior consent to almost every non-tour expense;

15)     All of the breaches of the PMA, previously set forth above;

16)     The unauthorized retention, commingling and conversion of PBS' and each individual defendant's revenues derived from the sale of their respective creative works and merchandise;

17)     The failure to protect, and/or advise Defendants to protect, Defendants' intellectual property rights via copyright registration;

18)     The usurpation of Defendants' intellectual property rights via undisclosed and unauthorized 3rd-party vendor agreements such as the NUGS agreement, Nimbit agreement, Dave Morrison/Digitalsoundboard.net agreement, etc.;

19)     The creation of actual and potential conflicts of interest between HSP and PBS, HSP and each individual defendant, and between the individual defendants themselves, both as a result of the "salary" program, and as it relates to various intellectual property projects (solo and PBS-related releases);

20)     The failure to use any written (or verbal) recording, reproduction, licensing and distribution agreements for all merchandise and creative works, with clearly delineated terms, obligations and remedies for each separate recording project;

21)     The institution of the "salary" program without adequate disclosure to all Defendants and without securing their prior consent;

22)     The use of PBS' gig revenue to fund the "salary" program, without disclosure;

23)	The issuance of 1099s and subsequent "correction" thereof;

24)	The failure to treat each individual member's solo projects as distinct projects, with their own agreements, terms, accountings, etc.;

25)	The "bootlegging" of Defendants' live performance recordings under 17 U.S.C. § 1101;

26)	The failure to pay mechanical royalties to the Defendants under 17 U.S.C. § 115, for their authored compositions, while booking those revenues and expenses on HSP's books;

27)	The failure to pay any Artists' royalties to the Defendants, while booking those revenues and expenses on HSP's books;

28)	The failure to pay merchandise revenue to Defendants, while booking those revenues and expenses on HSP's books;

29)	The improper use and retention of Defendants' fan-base email list;

30)	The failure to provide post-PMA accountings or other "wrap-up" efforts and information;

31)	The failure to disclose and provide agreements, terms, signed documents, and contact information regarding existing 3rd-party vendor arrangements, during and after termination of the PMA;

32)	The failure to account for, and pay, monies to Defendants post-PMA, regarding their creative works and merchandise;

33)	The unauthorized distribution, post-PMA, of Defendants' creative works and merchandise;

34)	Stepanian's presentation of contradictory, and/or false testimony, both in

deposition and under oath at trial;

35)    The actions of David Herlihy taken while employed and/or retained by HSP, such as the surreptitious alteration of the NUGS contract, the failure to disclose his prior representation of HSP, his failure to correct Stepanian's representation to Defendants that Herlihy was "your lawyer", his purported "representation" of PBS and its members while actually representing HSP, and his "representation" of Brian Stoltz simultaneously with his preparation of a lawsuit against Defendants;

36)    Stepanian's provision of marijuana to Mr. Batiste and others; and

37)    The failure to segregate, account for, and transmit the post-bankruptcy filing receipt of revenue derived from the unabated, unauthorized sale of Defendants' creative works and merchandise.

Defendants submit that these violations establish a pervasive pattern of negligent, reckless, and/or knowing and intentional breaches of HSP and Stepanian's fiduciary duties, rendering them liable for damages, penalty damages, attorney's fees and costs, injunctive relief, the expense of a full accounting for all transactions, revenues and "off-sets" that occurred during and after the PMA, and the cost of remedial work needed to correct the known tax return deficiencies.  As shown in the COLs, a separate damages hearing should be conducted to determine the appropriate amount of damages, but at a minimum, the parties have stipulated that HSP has received (and retained) $76,387.15 in gross sales related to Defendants' merchandise and digital content, as of June 2012.  Due to the egregious nature of HSP/Stepanian's breaches, and the willful nature of those breaches, HSP/Stepanian are also liable for penalty damages under MUTPA, discussed *infra,* as well as other related damages such as the costs and fees incurred in filing

bankruptcy, the costs and fees incurred in defending and prosecuting claims in this litigation, the remedial costs associated with fixing HSP's faulty accounting and tax return preparation, and general damages.

## C.    THE SALARIES WERE NOT LOANS

HSP made a belated and rather transparent May 2011, mid-litigation, advice-of-counsel attempt to reclassify previously-issued IRS Form 1099s.  Those 1099s totaled more than $225,000.00 in taxable compensation, and reflected monies which Defendants earned as a result of their live performances in late 2007 and most of 2008, for which they paid income taxes.  HSP erroneously issued the 1099s (as opposed to the issuance of K-1s from PBS, LLC), and then  "corrected" those 1099s, claiming that said amounts of compensation actually constituted "loans", despite a complete lack of any indicia of any loan arrangements.  In fact, all the various tax preparers and CPAs involved in this matter (Stuart Schimmel, Shannon Chabaud, Alan Freidman, James DeBiasi and Lewis Weinstein), consistently opined that if indeed a *bona fide* loan was made, there should be a promissory note, specific terms regarding a repayment schedule, interest rates, duration of the loan, accounting entries, whether recourse or not, and other accoutrement of actual loan transactions.  *Findings of Fact* 283, 397, 404, 405, 406, 421, 462, 551, 553, 586, 598, 696, 759.  Despite a complete absence of any such validating documentation, HSP/Stepanian persist with this canard, insisting that their *post hoc* financial léger-de-main should prevail.  It is respectfully submitted that such obvious shenanigans should not be countenanced by this Court.

The salary program was unilaterally instituted by Stepanian, who used "my

money" to pay a different amount of a monthly salary to each individual defendant[5], from late November 2007 through the end of November 2008.  Defendants submit that these salaries were paid by Stepanian, of his own volition, and in exchange for more "availability" of the Defendants to perform PBS-related gigs.   (Porter and Stoltz Testimony). As such, they cannot now be reclassified as legitimate recourse loans.  As evidenced by Stepanian's own writings, he unilaterally, and without obligation, initiated a salary program, consistently referred to it as salary, and even called it a "Salary" on his court filings submitted at the inception of litigation.  (Exhs. 106, 110, 125, 132, 160, 182, 184, 220).  The salaries were paid directly from HSP at first, and then through PAY CHOICE, an outside payroll service that also handled HSP's internal payroll.  Stepanian subsequently terminated the salary program by emails dated November 14-15, 2008, stating that although he "ha[d] been very generous with my money", he had decided to discontinue the salary program (Exh. 132).

HSP issued both 1099s and K-1s to the Artists in 2007, and only 1099s in 2008. (Exhs. 112, 163, 171, 24).  HSP also took the expense deductions for the salary payments on its books until mid-2011.  At that point, well after filing suit against PBS on December 29, 2009, on advice of its tax counsel, Stephen Meyers, and tax preparer ,Lewis Weinstein, HSP elected (in May 2011) to void the prior 2007 and 2008 1099s and instead, issue "corrected" 1099s showing $00.00 (Zero) in non-employee compensation. (Exh. 17, 290, 212, 163)   Notably, all three of the "voided and corrected" 1099s contained Porter's social security number.  (Exh. 197). Also, despite Mr. Weinstein's

---

5 The payment of different amounts of monthly salary per each defendant, without prior and full disclosure to all involved, created multiple conflicts of interest for Stepanian/HSP, and between the members, given the *in solido* liability imposed by the PMA.

specific professional advice that any "loan" arrangements should be documented with promissory notes and other indicia of a true loan, and Mr. Freidman and Ms. Dyer's professional concurrence, has failed to produce any promissory notes, emails indicating loan agreement, interest rates, repayment terms and other applicable conditions.

Absent such specifics, there cannot, as a matter of law, be a meeting of the minds regarding these *post hoc*, so-called "loans". Also, from a purely factual standpoint, the evidence and testimony does not support HSP's last-ditch attempt to characterize the salaries as loans. Given the complete lack of any factual basis upon which to conclude that the monies paid to the Defendants (and on which they paid income taxes) in conjunction with the salary program HSP/Stepanian unilaterally instituted, were anything other than compensation Defendants earned by playing gigs, as opposed to *bona fide* "loans", any claim for reimbursement of these amounts should be dismissed in its entirety.

### D.    PROMISSORY/EQUITABLE ESTOPPEL

HSP should be estopped from claiming a right of reimbursement for non-tour expenses and salaries, due to Stepanian's persistent misrepresentations which Defendants relied upon to their detriment. The Defendants, and particularly Porter, repeatedly inquired, both verbally and via email, about numerous transactions and expenses, including the salary program, which comprised Stepanian's profligate deficit spending. (Exhs. 60, 79, 80, 96, 97, 106, 109, 110, 127, 160, 182, 186; Porter and Stoltz testimony).

The evidence conclusively demonstrates, and Stepanian ultimately admits, that he did not respond in writing to Porter's written inquiries; despite producing well in excess of 25,000 pages of documents in discovery, HSP has yet to identify one solitary, specific

email that is even remotely responsive to Defendants' financial inquiries.  In contrast, the emails that do exist support Defendants' position, such as Stepanian's admission that he had been very "generous with my money"; hardly the tone and tenor of an email claiming that Defendants were responsible for reimbursement.  Further, although Stepanian eventually shifted his testimony, and tried to claim he provided verbal responses to Defendants' inquiries, the more credible testimony is that of the Defendants, who testified that they were consistently told by Stepanian: 1) not to worry about it; 2) that Defendants would not be fiscally responsible for repayment; 3) that HSP/Stepanian was investing in HSP; 4) that he needed to build **his** brand, and had it covered; 5) that the salaries were not recoupable; and 6) other such palliatives and bromides.  (Exhs. 157, 160, 109-110, 127, 79, 62).

Also, there is little doubt that Defendants relied on HSP/Stepanian's representations and promises regarding financial matters, to their detriment.  As testified to by Porter and Stoltz at trial, had Defendants been told that HSP expected them to be responsible for repayment of "salaries", they would have refused them.  Also, had the Defendants been made aware of many of the non-tour expenses (listed in Exhibit 159) and been told, up front, that they would be responsible for repayment of those costs, Defendants would not have agreed to incur that debt.  Further, but for Stepanian's misrepresentations regarding his willingness to defray expenses, Defendants would have decided to terminate the PMA earlier, would have demanded a full accounting earlier than late 2009, and would have taken legal measures to protect themselves from Stepanian's wanton, unauthorized deficit spending, and after-the-fact attempts to re-characterize his unilateral expenditures as loans.  In fact, Porter indicated he intended to

talk to a lawyer, but did not follow through with legal action after being placated by Stepanian's false representations.

### E.    NEGLIGENT MISREPRESENTATION

HSP/Stepanian made misrepresentations regarding their: 1) track record and ability to adequately perform as a professional manager; 2) commitment to providing an "artist-controlled environment"; 3) intention to be bound by the PMA and to act consistently with its provisions; and 4) 1099s, tax returns and other financial documents prepared for PBS by HSP or at its instruction; and 5) routine and repetitive statements that monies spent by HSP (without PBS' prior approval) were investments in HSP and were not for PBS' account.  These misrepresentations were material to the Artists' decisions, and, as shown at trial, caused harm to PBS, as the Defendants took Stepanian's representations at face value and relied upon them, to their detriment.  Also, HSP negligently misrepresented PBS' 2008 gross income to Alan Freidman, in connection with the 2008 tax return, and never corrected that error, despite subsequently being told of the mistake, and to date, the error has never been corrected.

### F.    MUTPA

Defendants respectfully assert that HSP/Stepanian's degree of "rascality" was sufficient to raise the Court's eyebrow, and was sufficiently egregious to warrant not only the imposition of liability, but also a finding of willfulness, entitling Defendants to double compensatory damages, attorney's fees and costs, based on Stepanian's offending conduct and "disingenuous" explanations for his actions.  As set forth above, HSP/Stepanian committed multiple breaches of their fiduciary duties to Defendants during the term of the PMA, and those breaches are sufficiently severe and pervasive

enough to constitute MUTPA violations, as a matter of law.  Further, HSP/Stepanian's

violative conduct continued unabated after the termination of the PMA, and also after the

filing of bankruptcy petitions by each defendant, and it is well-settled law that conduct

during litigation can constitute a §93A violation.  In light of MUTPA's focus on

eliminating business-related deceptions, and ensuring equitable treatment of all entities

participating in a business venture, HSP/Stepanian's conduct during and after the PMA

clearly establish willful MUTPA violations.

### G.      UNJUST ENRICHMENT

As a result of Defendants' labor, efforts, and creative works, HSP and Stepanian

have been unjustly enriched.  Not only did HSP deficit spent PBS into bankruptcy, but if

Defendants are required to "reimburse" HSP for its unauthorized, profligate spending,

and undocumented, unsecured "loans", in essence, the only entity that will have seen any

remuneration from this project would be HSP.  Stated another way, requiring Defendants

to work for free for the three and one-half years of the PMA can only be seen as an unjust

enrichment of HSP.

Additionally, Stepanian falsely testified, both at deposition and trial, that he/HSP

had not sold any of Defendants' merchandise or creative works ("PBS goods") after the

termination of the PMA, had not done so in 2010, had not done so in 2011 and had not

done so in 2012.  (Exh. 208, 239-246).  However, when confronted with documentary

evidence to the contrary, including emails, sales reports and responses to 3rd-party

subpoenas issued during trial, Stepanian was forced to admit that he/HSP had been

selling PBS goods unabated and without any license or authority to do so, including the

shipment of PBS goods to vendors in 2010 and 2011, and the receipt of revenues from

the sale of PBS goods in 2010, 2011 and 2012[6].  To add insult to injury, Stepanian

eventually admitted that he/HSP had not segregated those post-PMA revenue receipts,

had not paid them to Defendants, had not accounted to Defendants for those revenues

post-PMA, and had used (spent) the purloined, commingled and converted revenues for

its own purposes, without entitlement; a practice which continues to this day.  It is

respectfully submitted that Defendants' unjust enrichment claim has both factual and

legal efficacy, entitling Defendants to an award of damages.

### H.     COPYRIGHT INFRINGEMENT

HSP/Stepanian's copyright infringement was knowing, pervasive, commercially

exploitative, and continued unabated and surreptitiously, without remorse or disclosure,

throughout the PMA and continues up to the present day.  In fact, Stepanian falsely

testified that no infringement (distribution or receipt of revenues) was occurring post-

PMA initially, but was forced to admit the falsity of his testimony, when confronted with

documentary proof  such as emails re sales of PBS merchandise post-PMA and 3rd-party

sales data (obtained by Defendants, over HSP's objection, via 3rd-party subpoenas issued

mid-trial).

It cannot be stressed enough how important the Court's decision will be to Artists

and other copyright owners, and how much of an impact it will have on the entertainment

industry and related public policy.  As discussed below, Defendants' claims under 17

U.S.C. § 1101 involve issues of first impression in both this federal Circuit as well as

nationwide.  Additionally, the issues regarding statutory damage award ranges is very

---

[6]   HSP/Stepanian's receipt of revenue from the commercial exploitation of Defendants intellectual
properties still continues, as HSP direct-deposited $31.31 to HSP on January 6, 2013, derived from the sale
of Stoltz' copyrighted works.

much in the forefront of current litigation, as both the Tenenbaum and Thomas-Rasset cases[7], which have sought U.S. Supreme Court review, are seminal lines of decisions in this area of law. Thus, the importance and impact of this case is not limited to a localized dispute, but rather, has wide-ranging and over-arching implications for the entire industry.

Also, in calculating the extent of HSP/Stepanian's copyright violations, it is important to remember that, due to HSP and Stepanian's penchant for non-disclosure, making misleading representations (if not outright false testimony), and attempts to obstruct the verification of their "numbers" by opposing 3rd-party subpoenas, Defendants will never know: 1) the true number of CD's manufactured by HSP or entities HSP contracted with; 2) the entire scope of the distribution and commercial exploitation of their Sound Recordings/Creative Works; 3) how much money HSP has received from the sales of Defendants' CD's, digital downloads, merchandise, goods, etc.; and 4) the size or content of their email list or the number of lost contacts, due to HSP and Stepanian's calculated decision not to turn over the email list (essentially allowing it to remain dormant).

As shown below, HSP and Stepanian have violated 17 U.S.C. § 1101 by reproducing, distributing and profiting from the unauthorized "bootleg" recordings of Defendants' live performances, and have also willfully and knowingly committed all three types of §§106/201 infringement: direct, contributory, and vicarious infringement. The entire body of nearly 500 songs owned by Defendants as performers, as well as all of

---

[7] Both Tenenbaum and Thomas-Rasset involved **non-commercial**, **non-willful** copyright violations but, as discussed more in the "damages" portion of this Memo, statutory damages were awarded at the 75% level; by comparison, this case involves the ongoing, undisclosed, clandestine commercial exploitation of Defendants' copyrights, which is a much more egregious fact pattern.

their self-authored compositions, was violated per 17 U.S.C. §§ 106 and 115, mandating

relief under §§ 502-506.  As a result, Defendants are entitled to an award of damages,

attorney's fees, costs, the return of all PBS goods, a full accounting, and disclosure of all

3rd-party vendor relationships, agreements, customer information, websites and other

pertinent information.  For purposes of receiving damages, Defendants elect to receive

statutory damages (as opposed to actual damages).

Defendants will first address the three (3) copyright/license issues which the

Court directed the parties to brief: namely, 1) does a personal manager need a license to

publish its client's works, if acting as an agent (is that a form of self-publishing); 2)

assuming the existence of an implied license and its subsequent termination, what is an

agent's duty regarding existing merchandise/creative works' agreements; and 3) can a

manager be commissioned on a client's mechanical royalties?

<u>Court-Directed Issues</u>

1.    Self-Publishing Issue

Again, research does not reveal any caselaw directly on point.  However, as a

starting point, 17 U.S.C. §§ 102(2), 102(7), 106, 201 and 1101 mandate that all aspects of

copyrights (recording, reproduction, distribution, etc.) are exclusively owned by the

respective Author(s), including PAs on authored works and SRs on the recordings of

performances, for all creative works (absent an assignment, sale, license or other

agreement to the contrary).  Thus, the factual circumstances within which the agent is

acting becomes crucial.  In this case, HSP did not merely act in a representational

capacity for Defendants, but rather, signed many agreements in its own name rather than

in Defendants' name(s) (such as NUGS, Nimbit, CD Baby, etc.), did not indicate on

those agreements that it was signing "as agent for Defendants", and also actually reproduced and distributed recordings of Defendants' live performances on its own record label (HSP-catalog numbered releases) as opposed to a "PBS" label, or an individual defendant-designated label.

HSP/Stepanian also usurped its authority to act solely as a fulfillment company, which was a limited authority granted by Mr. Stoltz regarding God, Guns and Money, and East of Rampart Street.   HSP/Stepanian went far beyond merely fulfilling distribution demand, and, as set forth above, inked manufacturing and distribution deals without disclosure to Defendants, without clear terms as between HSP and Defendants, and in numerous cases, by simply inking a deal between HSP and a 3rd party, such as NUGS, Nimbit, many of the CD Baby partners, and others.   Thus, HSP was **not** acting merely as an agent, but was also acting as record label and distributor, and as such, a license is required.   Further, HSP routinely omitted reference to Defendants as Copyright owners, in the 3rd-party agreements HSP entered into without disclosure to Defendants, and diverted all revenues.   This is directly contrary to a self-publishing arrangement, which, by definition, means an Artist-directed environment.

Had HSP merely communicated and disclosed agreements or inked deals in Defendants' name(s) after obtaining Defendants' informed consent, or reproduced and distributed recordings on a PBS or individual defendant record label on a "duly authorized" basis, pursuant to 17 U.S.C.   § 204, such an arrangement would arguably constitute an extension of self-publishing; i.e., if each deal, such as the NUGS deal, had been reviewed and approved by Defendants, with their receipt of all revenues pre-HSP commission deduction, then those deals could potentially be deemed self-publishing.

However, in this case, because HSP/Stepanian released recordings on an HSP record label, and secretly signed deals in HSP's name as opposed to signing in a purely representational "duly authorized" capacity under § 204 for PBS and/or the individual defendants, a written, agreed-upon license would be required under 17 U.S.C. §§ 106, 201 and 1101.

In this case, the only releases that could possibly qualify as self-releases would be two of Mr. Stoltz' solo projects, East of Rampart Street and God, Guns and Money, as those releases were paid for by Stoltz, and distributed by him pre-PMA, but even with those releases, no specific terms were ever agreed to, obviating a valid license.  As for Up All Night, Expanding the Funkin' Universe, and It's Life, HSP insisted on controlling and paying for the production and manufacturing of those 3 releases, and the Defendants were stripped of all distribution rights during the entire time HSP has been involved (even up to the present day).  All others (Kimock shows, NOLA LateNite shows, N.O. JazzFest show, All Good Fest, Blender Theater shows, and the HSP-catalog numbered shows) were not recorded, engineered, reproduced, or distributed in-house by Defendants, but rather, were "commercially exploited" and distributed by Kimock, Dave Morrison/Digitalsounbdboard.net, FestivalLinks, MunckMix and/or HSP.    The essence of self-publishing is Artist-controlled distribution, not the clandestine, surreptitious scheme employed by Stepanian and HSP.

2.    Agent's Duties Post-Termination Of License

Yet again, no caselaw can be found that specifically addresses this point. However, in this case, as long as HSP/Stepanian were acting in an agency capacity pursuant to the PMA, their fiduciary duties would continue, including the duty to assist

any "wrap-up" activities and the duty to disclose all information regarding 3rd-party vendor, sales outlets and revenue sources, Internet distributors and the like, based on the applicable authorities in the CoLs and analysis contained herein above regarding a fiduciary's continuing obligations post-termination/breach.  Thus, at a minimum, an agent cannot simply walk away, without disclosure of all relevant agreements, arrangements or deals, be they self-serving or "duly authorized".  Moreover, it would seem eminently fair and prudent to require an agent to contact all 3rd-party vendors and distributors, inform them of the change in circumstances, covey the principal's wishes (be it termination of distribution or otherwise), and redirect all revenues and communications to the principal.

3.       Payment Of Mechanical Royalties

This issue concerns Stoltz' testimony regarding payment of mechanical royalties by HSP "pre-commission".  Although perhaps not as crystal-clear as possible, what Stoltz was trying to convey was the position that HSP would not be entitled to receive a commission on mechanicals, absent Stoltz' specific written agreement to such an arrangement, in accordance with 17 U.S.C. § 115.  Changes to the statutory compulsory Mechanical Royalty rates can only be done after negotiation with the Author as owner of the controlled composition (a controlled composition is a song that has been written and/or is owned by the recording artist), and by use of a signed writing executed by Author, and that certainly never happened.

As Stoltz indicated, mechanical royalties paid to songwriters and publishers are not recoupable by the record company, meaning the record company cannot deduct any expenses from them.  As such, record companies usually negotiate into the

singer/songwriter's contract that the mechanical royalty rate the Author will receive as the songwriter/publisher will be 75% of the statutory rate.  In other words, if the writer of a song records that song herself, the writer would then get 25% less royalty money than he/she would get for writing a song that someone else recorded, but the trade off is that the Author/writer would also get all Artist royalties (for the performance) when the song is played on the radio, TV, released commercially, etc.

A good example of what Stoltz was discussing can be seen in the way Ann Blonston and FestivalLinks handled the All Good Festival release.  In that case, FestivalLink, acting as record label, paid all Mechanical Royalties directly to the Defendants as writer/publisher, prior to any recoupment or expense deductions by FestivalLink.  Moreover, the payment of mechanicals was made directly to the Artists/Defendants, and not to a management company; as such, the mechanicals were not commissionable (absent a written agreement to the contrary, which was never in place with HSP).  The Rhapsody subpoena return also shows payments for mechanical royalties being broken out and paid "off the top".

In practice, HSP did not act properly, and in Defendants' best interests, with full disclosure and the use of clearly delineated, negotiated terms contained in written agreements, and thus, HSP never availed itself of the opportunity to negotiate a lower rate.  HSP is therefore required to pay the full (100%) statutory rate set by 17 U.S.C. § 115, which it never did.  Also, even if HSP could somehow be entitled to consider itself one and the same as the band (which Defendants deny and do not concede), there is no such thing as a permanent waiver of mechanicals, so any possible implied license, based on Defendants' prior course of conduct, would have been negated by the filing of

Defendants' Counterclaim, again exposing HSP/Stepanian to liability for failing to pay mechanicals after September 27, 2010. Thus, HSP/Stepanian's failure to follow the prescribed statutory procedures to negotiate, waive or alter compulsory mechanical royalty entitlement/payments violates § 115, with related entitlement to the remedies found in 17 U.S.C. § 502-506.

§ 1101 Violations

The issue of recovery of statutory damages for violations of 17 U.S.C. § 1101 appears to be an issue of first impression, both in this Circuit and nationwide, as there are very few reported decisions on point. By way of background, after the Uruguay Round Trade Agreements had been executed, Congress enacted the Uruguay Round Agreements Act ("URAA"), which contains two  Pub.L. No. 103-465, 108 Stat 4809 (1994). The URAA contains two sections aimed at preventing bootlegging of records, and designed to implement global efforts protecting artistic content from wrongful release and dissemination of digital content. Section 512, codified at 17 U.S.C. § 1101, provides a civil cause of action for a performer whose performance was recorded and/or distributed without her specific consent, while Section 513, codified at 18 U.S.C. § 2319A, provides criminal remedies to the government. As set forth in the CoLs, § 1101 prohibits the unauthorized recording, reproduction and distribution of a live performance, and allows for the remedies found in 17 U.S.C. § 502-505, which include statutory damages, due to the acknowledged global concern for unlawful recording and rapid international transmission of digital audio and video content belonging to live performers. In practice, it is impossible to immediately register Copyrights as each live concert is being performed, and the URAA and provisions of 1101 are attempts to keep pace with

technology that allows global distribution of digital masters of a performer's creative works (live performance), with the inherent risk of unlawful commercial gain and unjust enrichment of anyone recording/distributing such a performance without specific authority to do so.  Thus, § 1101 does not incorporate, and thus does not require, the copyright registration prerequisite to an award of statutory damages found in 17 U.S.C. § 412.

Critical to this issue is the fact that Defendants acknowledge that HSP's tape archivist, Brett Wohlgemuth, was authorized to record Defendants' live performances, but for archival purposes only, and there was never any proper content-specific terms, consent, approval, writings nor blanket authority from Defendants to allow the recording of their performances for commercial release and exploitation. This is directly analogous to  Kiss II, wherein § 1101 was deemed to apply to live concert footage recorded with the performer's consent and shown live at the performance to attendees via a big screen, but then wrongfully sold as a DVD for profit by a concert production member 26 years after the concert occurred.  Defendants acknowledge that at some point after the reproduction and commercial release of a number of their live performances (reflected as HSP-catalog numbers on Exhibit 237), they became aware of those releases and did not actively object to the release of, or seek to remove from distribution, those recordings, which arguably created some type of oral or implied license in favor of HSP.   However, the Defendants never received any revenues from any of those "licensed" releases, which should arguably void said licenses.

However, Defendants assert that there was never any license between HSP and Defendants, of any type, in place as of the time of the unauthorized recording for

commercial purposes, the reproduction of those recordings and the initial distribution of those recordings.  Moreover, any license (be it written, oral or implied) that may have been arguably created by Defendants' lack of objection/acquiescence, terminated no later than September 27, 2010, when Defendants filed their counterclaim alleging copyright violations.  Thus, Defendants contend that HSP/Stepanian violated § 1101 from initial unauthorized use and exploitation for profit of all recordings of Defendants' live performances, as well as their unauthorized reproduction and distribution, up to the point of creation of a license (if any), and then again, after termination of any such license, and continuing to the present.  In effect, what was permissibly allowed for archival recording was exploited without proper and requisite agreement to distribute PBS live works in direct contravention of § 1101 and related caselaw such as the KISS II decision. Defendants thus contend that, pursuant to § 1101, they are entitled to the maximum statutory damage award of $150,000.00 per work, plus attorney's fees and costs, and that there are 9 such works listed on Exhibit 237 that were infringed under § 1101.

## §§ 106/201 Violations

In addition to violating § 1101, HSP/Stepanian also violated Defendants §§ 102(2), 102(7), 106 and 201 copyrights by the unauthorized reproduction and distribution of Defendants' creative works without payment of applicable mechanical royalties, without establishing and paying agreed-upon artists' royalties, and without provision of requisite accountings, obtaining proper licenses, delineating applicable terms of various agreements such as recording, reproduction, licensing, and distribution agreements (both for PBS as a band, and for each individual member on their respective solo projects), and without authority to enter into certain deals such as the NUGS deal, Nimbit deal, and

other non-disclosed 3rd-party vendor arrangements that Defendants did not learn about until after the inception of this litigation.  Although HSP has repeatedly admitted that it has no claim of ownership in any and all of Defendants' copyrights, HSP and Stepanian acted as if it owned and controlled all of the rights to 100% of all proceeds from the sales of Defendants' creative works merchandise.  The actual terms, albeit undisclosed, of the HSP-established and operated, invalid and unapproved written agreements with 3rd parties, wrested control of all of Defendants' copyrights, including performance royalties on 454 songs, and Mechanical Royalties as authors on 201 songs in 27 different Sound Recording versions.  *See Trial Exhibits 237, 201, 202; Stoltz' testimony regarding recordings; Tr. proffer re: Exh. 203* (proffered CDs produced at Herlihy's deposition); *Memo Exhibit "A"*.

Unlike § 1101, an award of statutory damages for violations of §§ 106/201 copyrights requires that the copyright be registered prior to the first act of infringement, in order to be eligible for an award of statutory damages.  Thus, for §§ 102(2), 102(7), 106 and 201 purposes, the critical focus is on dates of registration and dates of infringement.  Obviously, no infringement by HSP could have occurred prior to its recording, reproduction and/or distribution of Defendants' creative works.  Moreover, for purposes of trial, the parties have stipulated that Defendants gave HSP some type of license to reproduce and/or distribute all of the HSP-catalog numbered releases (MOODOO and the various live shows that bear an HSP-catalog number), and all of the individual defendants' solo projects (ETFU, It's Life, and Stoltz' three projects – EORS, GGM and UAN), either prior to reproduction and distribution (non-live performance release), or shortly thereafter (live performances other than UAN and MOODOO).

Likewise, for all other releases (those not directly distributed by HSP), the parties have stipulated that Defendants granted some type of license to the various entities that recorded, reproduced and distributed those works. However, by taking all of the proceeds without ever paying the Defendants' their rightful proceeds, each 3rd-party deal is little more than a thinly-veiled hijacking of Defendant's creative works, and related rights and revenues, on an ongoing basis.

Defendants never agreed that any such license authorized that HSP/Stepanian could receive all revenue, not pay mechanical and/or artist royalties, not provide monthly and/or quarterly accountings, nor apply Defendants' revenues against any alleged indebtedness they may have had to HSP. Further, any license that may have existed terminated, as a matter of law, and at the latest, as of the filing of Defendants' counterclaim, on September 27, 2010. Thus, for purposes of analyzing Defendants' entitlement to an award of statutory damages under 17 U.S.C. §§ 106/201, the date of first infringement would be September 27, 2010 (the date of termination of any licenses that may have existed). As of that date, Defendants had registered copyrights on 53 works (Exhs. 237, 201, 202, 203 proffer); *see also Memo Exhibit "A"*.[8]

Based on the stipulated facts, as well as the additional facts and evidence adduced at trial, the can be little doubt that HSP and Stepanian are liable for direct copyright infringement, regarding the reproductions and distributions of Defendants' authored works effected directly by HSP/Stepanian. Moreover, HSP/Stepanian are also vicariously and/or contributorily liable for the copyright violations regarding the recording, reproduction and/or distribution copyright violations effected by third-parties

---

[8] Defendants attach Memo Exhibit "A", which is a detailed breakdown of songs on each release, to assist the Court in reviewing the Defendants' calculation of statutory damages.

from whom HSP/Stepanian received revenues (but for which HSP/Stepanian failed to inform, account to, or pay to Defendants), such as Dave Morrison, NUGS, Nimbit, Rhapsody, I-Tunes, Lee's Homegrown Music Network, Louisiana Music Factory, MunckMix, All Good Festival/FestivalLinks, Kufala, and Buffalo records.  HSP's known concealment of all of the undisclosed agreements and writings (many of which were not even disclosed or discovered until during litigation and/or trial) is an additional level of copyright infringement and PMA/MUTPA violations

Given: 1) HSP/Stepanian's admitted distribution of creative work, which HSP knew had been registered by Defendants, after the filing of Defendants' counterclaim; 2) HSP's admitted receipt of revenues derived from the sale of Defendants' copyrighted works; 3) the lack of any post-PMA accountings for those revenues; 4) the failure to pay mechanical or artists' royalties on any of Defendants' works; and 5) the continued distribution of Defendants' creative works pursuant to the unauthorized, undisclosed NUGS, Nimbit, Louisiana Music Factory, Lee's Homegrown Music Network, and Dave Morrison agreements, without redirection of those revenues away from HSP and towards Defendants, and without any efforts by HSP to terminate those 3rd-party, Defendants assert that they are thus entitled to a maximum award of statutory damages for all works that were undoubtedly infringed upon, and which were registered prior to the infringement.

Defendants also assert that HSP/Stepanian's direct infringement can only be seen as willful violations of Defendants' copyrights, especially given Stepanian's false and contradictory trial and deposition testimony about his unabated and unrepentant distribution and receipt of revenue from Defendants' intellectual properties.   HSP's

digital transfer of files via the Internet for commercial purposes vastly outstrips the scope and intentional violations reflected by the facts of the Tenenbaum, Napster and Thomas-Rasset cases, all of which were non-commercial violations. In fact, in those cases, the awards were set at 75% of the statutory maximum for non-willful violations ($22,500) per work, simply for unauthorized, non-commercial downloading and sharing.

However, as set forth herein, there is no doubt that HSP and Stepanian's conduct was done for commercial exploitation, and without disclosure (even during discovery and trial). In fact, Stepanian offered false testimony regarding the ongoing violations, until confronted with proof to the contrary. Moreover, those violations continued unabated, even after the filing of Defendants' counterclaim, which HSP's Herlihy admitted negated any possible license or legitimate basis for distribution and revenue receipt/retention. Thus, due to the overwhelming evidence of the willful and pervasive nature of HSP/Stepanian's infringement activity, and the judicially-recognized public policy and need to deter any such future rampant commercial exploitation, Defendants maintain that they are entitled to an award of the statutory maximum of $150,000.00 per each infringed work, totaling $7,950,000.00.

Defendants are also entitled to an award of attorney's fees and costs, to be determined at a "damages" hearing, as well as injunctive relief requiring that HSP/Stepanian: 1) return all of Defendants' intellectual properties, at HSP's sole cost; 2) provide all records, including source documents, for all vendors they have provided product to and/or received revenue from; and 3) contact all vendors they have provided product to and/or received revenue from and redirect all future revenues and communications to Defendants.

-42-

I.      **FAILURE TO ACCOUNT**

Although this claim has already been generally addressed in the prior sections regarding breaches of the PMA, breaches of fiduciary duties, and copyright violations, it is addressed here due to the specific cause of action set forth in Defendants' counterclaim(s).   HSP's accounting systems and practices left much to be desired, as poignantly admitted by Plaintiffs' accounting "expert", James DeBiasi, and as detailed in Defendants' expert, Mr. Stuart Schimmel's, testimony.  (Findings of Fact 578-618; esp. 605; 257-296).  HSP has also failed to provide the statutory disclosures and accountings mandated by federal copyright law.  Also, despite the provisions of the PMA (¶¶ 3, 4, 6 and 8), HSP failed to provide the PMA-required accounting(s) regarding monies owed to PBS and/or Artists, as well as for monies HSP claims it is owed by PBS/Artists.  HSP also has refused to pay royalties and other monies owed to PBS and/or Artists, in ongoing violations of federal Copyright and Mechanical Royalty License laws, without proper and required writings, accountings, notices and disclosures.

J.      **ALTER-EGO/VEIL PIERCING CLAIM**

There should be little dispute that Stepanian committed business torts, engaged in self-dealing and otherwise conducted the affairs of HSP in a manner that warrants the imposition of personal liability against him, including a piercing of HSP's "corporate veil".  As set forth above, Stepanian: 1) was personally involved in numerous breaches of the fiduciary duties owed to Defendants; 2) admittedly used "my money" to fund the project; 3) routinely made reference to Defendants as "my artists", the use of "my money", "my vans", and "my" this and that; 4) was actively involved in numerous business torts such as promissory estoppel, negligent misrepresentations, and willful

MUTPA violations, due to his specific statements, representations, communications and conduct; and 5) was knowingly involved and complicit in intentional copyright violations (such as the NUGS usurpation, post-PMA distribution, and receipt, retention and use of all related proceeds), all of which render him personally liable.

The following is a laundry list of Stepanian's active involvement which renders him personally liable to Defendants: 1) breaches of the fiduciary duties owed to Defendants; 2) the co-mingling and conversion of the funds and assets of multiple entities, including Bonerama, HSP and Stepanian personally; 3) the lack of separate bank accounts and QuickBooks files; 4) the admitted use of personal funds to "bankroll" the project; 5) Stepanian's sole and pervasive control of HSP; 6) his substantial disregard of the separate nature of the parties involved (including the creation of conflicts of interest between HSP  and PBS, and HSP and each individual defendant); 7) the creation of a serious ambiguity about the manner and capacity in which Stepanian was acting; 8) his misleading and/or deceptive representations; and 9) his unilateral decisions to withhold monies, the email list, post-PMA revenues, merchandise, and financial information from the Defendants (with an obvious intent to gain leverage in this litigation); and 10) the decision not to fix the known errors in Defendants' tax returns HSP actually created by withholding complete information from Alan Freidman to try and continue to hide the "off-the-books" treatment of merchandise and creative works' related revenue.

## II.     NONE OF HSP'S "NON-REIMBURSEMENT" CLAIMS HAVE MERIT

Initially, Defendants note that HSP's breach-of-PMA and unjust enrichment claims have already been dismissed, in their entirety, and with prejudice, by way of summary judgment.  Additionally, as shown at trial, HSP did not incur (with or without

authority) any appreciable non-tour expenses after November, 2008.  Thus, HSP can recover on its remaining claims, only if it can prove that Defendants acted unlawfully during the time frame from May 8, 2006 through November 2008.  As shown below, Defendants did not act unlawfully, and HSP has failed to articulate any factual basis for their allegations, nor any legal right to recover damages.

### A.    Fraud

As set forth in the accompanying COLs, Massachusetts law recognizes two (2) types of fraud claims: 1) fraud *in factum*; and 2) fraud in the inducement.  Fraud *in factum* has not been plead by HSP and is not at issue; all parties to the PMA had counsel, HSP admittedly initiated contact with, and pursued, Defendants and spearheaded the execution of the PMA in New Orleans in May 2006, and no trial testimony nor evidence was established which could even remotely support any allegation that Defendants acted fraudulently regarding the negotiation and execution of the PMA.  *Complaint, Count VII, passim.*

The "fraud in the inducement" claim also lacks legal and factual efficacy.  First, the only allegation of fraud contained in HSP's pleadings is a rather specious assertion that Defendants allegedly knew, both before and during the term of the PMA, that they did not intend to, and would never, repay any monies owed to HSP.  *Complaint, Count VII,* pp.15-16.  This assertion fails to comport with Rule 9's heightened specificity requirement, was not established at trial, is facially ludicrous, and even if it were true and proven, would serve only to void the PMA and negate any right to reimbursement; if HSP knew Defendants would not repay any monies, before HSP provided said monies, then HSP lacks any reasonable basis to believe it would be, or should be, reimbursed.  More to

-45-

the point, no such testimony or evidence was adduced at trial.

To the contrary, each Defendant testified that if it were proven that they (individually or collectively) owed any monies to HSP, they would pay those monies. Further, the only "factual" basis for this claim asserted by HSP/Stepanian was Stepanian's subjective conclusion (offered at deposition) and myopic perception that Defendants apparently had no intention whatsoever to pay him back, due to their post-PMA termination conduct. However, HSP has failed to specifically articulate any "false representations" allegedly made by Defendants, failed to specify what reliance HSP placed on said allegedly false representations, and failed to prove that Defendants had the requisite intent to defraud HSP. Again, to the contrary, all three individual Defendants testified that, if HSP conclusively demonstrated that PBS or any given Defendant actually owed HSP monies, they intended to repay said proven amounts. HSP has failed to prove any fraud in the inducement, and this claim should suffer dismissal.

**B.      No Negligent Misrepresentation By PBS To HSP/Stepanian**

Akin to the lack of specific factual allegations attendant to its defective fraud claim, HSP failed to: 1) identify any specific information it claims was negligently provided by the Defendants; 2) identify any specific loss suffered by HSP as a result thereof; 3) establish any justifiable reliance by HSP; and 4) prove that Defendants failed to exercise reasonable care or competence in obtaining or communicating the (unspecified) information. There is an utter dearth of trial testimony or evidence related to this claim, and thus, HSP has once again failed to meet its burden of proof. This claim should be jettisoned.

C.      **No Civil Conspiracy By Defendants Against HSP**

As set forth in the CoLs, there are two (2) types of civil conspiracy (coercive and joint-liability), but neither type was ever factually supported at trial, and like HSP's other "non-reimbursement" claims, these allegations are little more than a paltry attempt to recast the reimbursement claim as an ancillary legal theory of recovery.   First, HSP did not allege a coercive conspiracy, and even if a liberal interpretation of HSP's pleadings could somehow be extrapolated to include such a claim, there simply is no basis in fact, based on the trial testimony and evidence, to support this type of "conspiracy."   HSP never specifically alleged, and certainly did not establish at trial, that the Defendants, acting together, had some type of synergistic power over HSP that each individual defendant lacked on its own.   In fact, HSP has never specifically alleged the underlying facts of any "coercive conspiracy", let alone how Defendants allegedly coerced HSP.

Likewise, HSP did not allege facts sufficient to set forth a *prima facie* case of a "joint-liability" form of civil conspiracy.   HSP did not establish any common design or agreement by Defendants to do a wrongful act, nor any proof of any tortious act taken in furtherance of such an agreement.   Without proof of any common design, or act in furtherance, any conspiracy claim must fail.   Again, Defendants admittedly did not breach the PMA and the Defendants consistently testified that they always had the intent to repay any legitimate, substantiated debt that may have owed to HSP.

D.      **Promissory Estoppel Does Not Pertain**

Even affording HSP's pleadings, evidence and trial testimony a liberal interpretation, HSP has failed to articulate, let alone prove its estoppel claim, which is yet another impermissible attempt to recast the reimbursement claim under the guise of a

separate and distinct cause of action.  *Complaint, passim.*  HSP did not articulate what promises Defendants allegedly made, nor did it show any reasonable reliance upon any unarticulated promises.  In contrast, all three individual Defendants testified that, if HSP conclusively demonstrated that Defendants actually owed HSP monies, they intended to repay said proven amounts.  However, as shown below, HSP has failed woefully in its accounting proof, and no such specific amounts have been proven.  Moreover, HSP has made no showing of any imminent "injustice."  As such, HSP's promissory estoppel claim must fail, both as a matter of fact and as a matter of law.

### E.   Porter Did Not Interference With HSP's Business Relations

As reflected by the Court's prior ruling which dismissed HSP's breach of contract claims against Defendants on summary judgment, Defendants did not breach the PMA, and HSP's pleadings and trial testimony failed to specify which exact opportunities Porter allegedly usurped or interfered with.  *Complaint, Count V, pp. 14-15.*  Even affording the trial testimony and evidence the most expansive interpretation possible, the only factual allegation that could possibly be gleaned is that Porter supposedly convinced a promoter to hire him instead of HSP's other client, Bonerama, but HSP has not proven that even a glimmer of truth attaches to this generic, and rather anemic, allegation.  HSP failed to establish: 1) which specific gig(s) Porter allegedly interfered with; 2) which promoter was involved; 3) that Bonerama actually had any confirmed gig(s) under contract that were actually "usurped" by Porter; 4) that HSP actually suffered any economic loss as a direct result of Porter's alleged conduct; and 5) any improper motive or means employed by Porter, as a desire for personal economic gain is legally insufficient to establish the requisite intent need to impose liability.  This claim must also

suffer dismissal.

### III.   HSP HAS NOT SHOWN ENTITLEMENT TO REIMBURSEMENT

Lastly, because their "accounting" documentation is so inadequate and admittedly incorrect and incomplete, it is virtually impossible to properly calculate any specific amount of alleged indebtedness by Defendants. As such, HSP has failed to shoulder its burden to prove entitlement to any specific dollar amount. As a jumping-off point, HSP's "accounting expert", James DeBiasi, CPA, candidly admitted, under withering cross-examination and related questioning, that he could **not** verify the accuracy of HSP's Proof of Claim ("PoC") filed in the main bankruptcy proceeding. In fact, Mr. DeBiasi was forced to retract his written report (which claimed that HSP's accounting system was "exceptional") and capitulate that HSP's accounting system was not "exceptional, in a positive sense". (Exh. 627). Likewise, neither Stepanian nor his long-term assistant, Donna Malangone, could substantiate the numbers contained in HSP's PoC (nor any other accounting documentation prepared or utilized by HSP).

In contrast, Defendants' accounting expert, Mr. Stuart Schimmel, CPA, thoroughly debunked HSP's PoC, as well as the accuracy, completeness and propriety of many of the financial reports, documents and accounting protocols prepared and/or used by HSP. (Findings of Fact 296-297). Some of the most glaring examples of ineptitude or outright misstatement are: 1) the failure to set up separate bank accounts, QuickBooks files, or credit cards for PBS, its individual members, HSP's other client (Bonerama), HSP itself and Stepanian, until 18 months into the term of the PMA; 2) the use of Stepanian's personal bank account and credit card to do business for the entities listed in sub-paragraph 1 for at least 18-plus months and to some degree thereafter; 3) HSP's

failure to provide financial data to Shannon Chabuad in 2006 and 2009; 4) the discrepancy between the 2006 PBS tax return figures and the 2006 PBS P&L prepared by HSP; 5) the discrepancies between the 2007 and 2008 PBS tax returns prepared by Alan Freidman and the 2007 and 2008 P&Ls and Balance Sheets prepared by HSP; 6) the burying of expenses (Clinch photo shoot, etc.) in Retained Earnings for 2007; 7) the use of 1099s to report earnings of PBS, rather than K-1s; 8) HSP's failure to even disclose, let alone amend, the known errors in PBS' 2006 and 2008 tax returns; 9) the use of batch journal entries without itemization or auditing to "create" a set of books for PBS from the commingled accounts kept by HSP for the first 18 months; 10) the recasting of compensation to PBS as loans from HSP with "correcting" 1099s; 11) the lack of any loan documents; 12) the disparity between the merchandise revenue reflected on HSP's books and the lack of corresponding income on PBS' books; 13) the inaccuracy of "cost of goods sold" information on HSP's books; and 14) PBS' inability to accurately correct or amend the deficient tax returns.

In addition to the plethora of incompetence and errors detailed by Mr. Schimmel, additional accounting errors and deficiencies were noted during trial, including errors in HSP's Cost Recovery Models, Ubuntu meeting reports, 3rd-party vendor Sales Reports, lack of source documents, commingling of funds, conversion of funds, lack of any post-PMA accountings (until forced to do so by the Court), and admittedly incomplete and inaccurate exhibits prepared by HSP for use in Massachusetts federal court to obtain injunctions against the Defendants' wages and other earnings. (Findings of Fact 562-566). Suffice it to say, as opined by Mr. Schimmel, that HSP's accounting data is insufficient to establish entitlement to any specific dollar amount of reimbursement, even

assuming HSP could prove Defendants' prior consent and other necessary accoutrement of proof of entitlement. If one simply backs out the unapproved non-tour expenses of approximately $200,000.00, the amounts of compensation earned by the Defendants, as reflected in the PBS partnership tax returns and 1099s, of approximately $306,000.00, and then adds in all of Defendants' "missing" gross income for 2009 of about $70,000.00, any amount arguably due HSP, as per its PoC, is negligible, and more than offset by the amount of damages Defendants are entitled to for HSP/Stepanian's breaches of fiduciary duty, MUTPA and copyright law.

## CONCLUSION

In sum, for the reasons set forth above, and with reference to the Conclusions of Law and Findings of Fact offered by Defendants, it is respectfully submitted that Defendants are entitled to an award of damages, double damages, attorney's fees and costs for HSP and Stepanian's breaches of the PMA and MUTPA violations (to be established at a future "damages" hearing), an award of the statutory maximum of $150,000.00 per infringed work (totaling $7,950,000.00) as damages for copyright infringement, related attorney's fees and costs, the cost of a complete audit, the cost of remedial work needed to fix the defective 2006 and 2008 PBS partnership tax returns, injunctive relief returning all of Defendants' mailing lists, web-related materials, merchandise and copies of all creative works, as well as the full disclosure of all 3rd-party relationships plus all related source documents and the redirection of all associated future

revenues and communications.

Respectfully Submitted,

_/s/ Ronnie Glynn Penton__                    _____/s/ John O. Pieksen, Jr.___
Ronnie G. Penton (#10462)                    John O. Pieksen, Jr. (#21023)
The Penton Law Firm                          John Pieksen & Associates, LLC
209 Hoppen Place                             829 Baronne Street
Bogalusa, LA  70427                          New Orleans, LA  70113
Phone:  (985) 732-5651                       Phone:  (504) 581-9322
Telecopier:  (985) 735-5579                  Telecopier (504) 324-4844
E-Mail:  fedcourtmail@rgplaw.com             E-Mail:  jpieksen@cox.net

**Counsel for AP Defendants and the U.S. Bankruptcy Trustee, Wilbur "Bill" Babin**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served upon all counsel of record by ECF filing, facsimile, electronic transmission, and/or by depositing same in the United States mail, properly addressed and postage prepaid, this 14th day of January, 2013.

/s/ John O. Pieksen, Jr.