UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re | ) Docket Number |
| | ) |
| GEORGE J. PORTER, JR. and ARALEAN H. PORTER, | ) 2:10-bk-13553 |
| | ) |
| Debtors | ) Chapter 7 |

| | |
|---|---|
| HIGHSTEPPIN' PRODUCTIONS, LLC, Plaintiff, | ) Docket Number |
| v. | ) 2:10-ap-01130 |
| GEORGE PORTER, JR., et al., Defendants | ) |

**Administratively Consolidated for Trial With**

| | |
|---|---|
| HIGHSTEPPIN' PRODUCTIONS, LLC, Plaintiff, | ) Docket Number |
| v. | ) 2:10-ap-01131 |
| BRIAN STOLTZ, et al., Defendants | ) |

**Administratively Consolidated for Trial With**

| | |
|---|---|
| HIGHSTEPPIN' PRODUCTIONS, LLC, Plaintiff, | ) Docket Number |
| v. | ) 2:11-ap-01163 |
| DAVID RUSSELL BATISTE, et al., Defendants | ) |

## <u>HIGHSTEPPIN AND PHILIP I. STEPANIAN'S POST-TRIAL BRIEF</u>

Plaintiff, Highsteppin' Productions, LLC ("HSP"), and Third-Party Defendant, Philip Stepanian ("Stepanian"), (collectively "HSP") submit the following post-trial brief.

## <u>Notes on Citations and References</u>

References to exhibits are cited in this brief using the convention "([Volume] Ex.

[Exhibit Number]:[Trial Bates Stamp])".[1] The testimony of specific witnesses is cited as ([Witness Name] Test.). The term "Artists" refers to George Porter, Jr.; Russell Batiste; and Brian Stoltz. "The Defendants" refers to the Artists and Porter Batiste Stoltz, LLC ("PBS").

## **Table of Contents**

Notes on Citations and References ........................................................................................... 1

Table of Contents ................................................................................................................... 2

Specific responses to the Court's questions ............................................................................ 5

I.   Fiduciary duties under Massachusetts law. ....................................................................... 5

II.   The existence of a conflict of interest does not terminate a fiduciary relationship as a matter of law. ......................................................................................................................... 7

III.   When a fiduciary is confronted with a conflict of interest under Massachusetts law regarding: 1) debts jointly and severally owed among those clients to whom the fiduciary owes his duties, and 2) a single client who owes a debt to the fiduciary, the fiduciary must deal fairly and honestly with each such party. ................................................................................. 8

IV.   A personal manager does not need a license to publish and/or distribute copyrighted works if it is merely acting as an agent of the artist; this circumstance is merely an instance of self-publishing. ....................................................................................................................... 9

V.   Assuming 1) there is an implied license and 2) the implied license was validly terminated, the former licensee has no obligation—or authority—to stop distribution of the copyrighted works by third-parties. ......................................................................................... 9

VI.   HSP's commission percentage did not reset every twelve months. ............................... 10

VII.   Stoltz incorrectly testified HSP did not earn commissions on the mechanical royalties and royalties are not subject to recoupment or attachment ...................................................... 11

Proposed Rulings on the Parties' Claims .............................................................................. 12

I. HSP met its burden of proving the amount of its claim for reimbursement of expenses and management fees .................................................................................................................... 12

II.   The Court should find for HSP on its fraud claim and find Defendants' debt to HSP nondischargeable. ............................................................................................................... 124

---

[1] For example, the citation "(1 Ex. 2:19)" refers to Volume 1, Exhibit 2, Trial Bates Stamp 0019.

A.   The Defendants made numerous fraudulent misrepresentations to HSP they would repay the monies HSP advanced, but lacked the intent to do so ......................................... 166

B.   HSP's reliance on Defendants' continued fraudulent misrepresentations was justifiable. 20

III.   The Court should find for HSP on the parties' Chapter 93A claims. ............................ 220

A.   The Defendants have engaged in unfair and deceptive acts and practices. .................. 22

B.   The Defendants' unfair and deceptive actions were willful and knowing. ................. 233

C.   The Defendants are liable to HSP for its attorneys' fees and costs as a result of its unfair or deceptive acts or practices ..................................................................................... 255

D.   The Defendants have failed to demonstrate HSP has engaged in unfair and deceptive acts and practices. ................................................................................................................ 255

IV.   The Court should enter declaratory judgment on the terms of the PMA regarding the Artists' post-termination commissions. ................................................................................... 255

V.   The Court should find for HSP on Defendants' breach of fiduciary duty claim because it has accounted for all of the monies it received and paid on behalf of PBS ........................... 266

A.   HSP did not use its position as a creditor against the Artists while it was a fiduciary. 266

B.   HSP's fiduciary duties were modified by the PMA ..................................................... 27

C.   HSP has correctly and accurately accounted for the monies it took in and spent on Defendants' behalf and are supported by the evidence ......................................................... 27

VI.   The Court should find for HSP on Defendants' copyright infringement claims. ............. 30

A.   HSP is entitled to its attorney's fees and costs arising out of its defense of the Artists' copyright claims because the claims were frivolous, motivated by bad faith, and objectively unreasonable. .......................................................................................................................... 31

B.   In the PMA, Defendants represented to HSP all music the Artists played, recorded, or released during the term of the PMA had been properly licensed, and they agreed to indemnify HSP if that music was not. ............................................................................... 334

C.   The Defendants have not proven substantial similarity between the original works and the compositions or sound recordings ................................................................................. 345

D.   The Defendants were solely responsible for procuring mechanical licenses for the music HSP distributed ........................................................................................................... 355

1.   Mechanical licenses generally. ............................................................................... 355

2. The Artists had and have a practice of granting each other gratis, non-exclusive mechanical licenses for the performance of their controlled compositions and therefore they are not owed mechanical royalties for those compositions....................................... 366

3. The Artists are liable to HSP for all costs and attorney's fees arising out of their failure to procure mechanical licenses from themselves or third parties. ....................... 378

E. Regarding the HSP Part Numbers, HSP obtained compulsory licenses for all non-controlled compositions and all compositions written in whole or part by persons other than Defendants. ........................................................................................................................ 388

F. The Artists granted HSP a gratis, non-exclusive, irrevocable, implied licenses to copy and distribute the HSP Part Numbers. ................................................................................ 389

1. The Artists' licenses to HSP can be implied from their repeated failure to object to HSP's activities on the numerous occasions they discussed or learned about the releases of the HSP Part Numbers. .................................................................................................. 399

2. The Artists' licenses to HSP are irrevocable and exist apart from the PMA............. 42

G. The Defendants have failed to prove as a matter of law HSP infringed their copyrights in the the Non-HSP Part Numbers. ....................................................................................... 423

1. The Defendants have not proven HSP actually copied—or even had access to—the sound recordings of the Non-HSP Part Numbers. ......................................................... 434

2. The Defendants have not proven the Non-HSP Part Numbers are probatively similar to the originals................................................................................................................... 434

H. Regardless of whether the Artists granted HSP a gratis, non-exclusive, irrevocable, implied license to distribute the Studio Recordings and the HSP Part Numbers or HSP was acting as the Artists' agent in selling music, HSP is not liable for infringement of those works........................................................................................................................................ 445

I. HSP has accounted for all monies received in payment for the sales of all of the live recordings it received and has credited Defendants for that income. ................................. 456

VII. The Court should find for HSP on Defendants' breach of contract claims. .................. 456

A. The Defendants breached the PMA or failed to comply with its terms. ...................... 467

B. HSP did not breach the PMA because it attained approval for the expenses it paid on Defendants' behalf. ............................................................................................................... 47

C. To the extent the Court finds any of the expenses were not approved by the Artists, the Artists' conduct constituted a waiver of the approval requirement of the PMA or constituted a course of performance permitting HSP to obtain approval orally. ................................... 488

D.    HSP cannot be held in material breach because they were never given an opportunity to cure any alleged breach of the PMA. .................................................................................... 51

VIII.   The Court should find for HSP on Defendants' remaining claims. ............................... 51

IX.     Massachusetts law provides for prejudgment interest at 12% per annum on any award from the date of demand or breach in contract actions and the date of filing in tort actions.... 53

X.      Under the PMA, HSP is entitled to recover its attorney fees and costs ...................... 53

Conclusion ............................................................................................................................. 53

<u>**Specific responses to the Court's questions.**</u>

At the conclusion of the trial on September 28, 2012, the Court posed several questions to which it requested specific responses.  These questions are answered in this first section.

**I.      <u>Fiduciary duties under Massachusetts law.</u>**

The Supreme Judicial Court of Massachusetts has stated the following regarding fiduciary duties generally:

> A fiduciary duty exists "when one reposes faith, confidence, and trust in another's judgment and advice."  <u>Van Brode Group, Inc. v. Bowditch & Dewey</u>, 36 Mass. App. Ct. 509, 516 (1994), quoting <u>Fassihi v. Sommers, Schwartz, Silver, & Tyler, P.C.</u>, 107 Mich. App. 509, 515 (1981).  Its central tenet is the "duty on the part of the fiduciary to act for the benefit of the other party to the relation as to matters within the scope of the relation."  1 A.W. Scott & W.F. Fratcher, Trusts § 2.4 (4th ed. 1987).  <u>See</u> Restatement (Second) of Trusts § 2 comment b (1959) ("A person in a fiduciary relation to another is under a duty to act for the benefit of the other as to matters within the scope of the relation").  Although some fiduciary relationships, such as that between guardian and ward, are created by law, others arise from the nature of the parties' interactions.  The "circumstances which may create a fiduciary relationship are so varied that it would be unwise to attempt the formulation of any comprehensive definition that could be uniformly applied in every case."  <u>Warsofsky v. Sherman</u>, 326 Mass. 290, 292 (1950) (and listing examples of fiduciary relationships). <u>See</u> <u>Patsos v. First Albany Corp.</u>, 433 Mass. 323, 335- 336 (2001) (specific circumstances determine whether fiduciary or arm's-length relationship exists between investor and broker).

<u>Doe v. Harbor Schools, Inc.</u>, 446 Mass. 245, 252 (2006).

The fiduciary relationship implicated in this case may be thought of as a hybrid of an agent, a trustee, and a conservator. For example, while HSP took in funds on behalf of the artists, it did not invest those funds in order to maximize investment income for the Artists as a trustee might, but rather managed them more like a conservator. And while HSP was empowered to act on behalf of the Artists, HSP assumed some of the obligations to manage the Artists' income like a conservator or trustee, however, unlike a conservator, HSP did not manage all of the financial affairs of the Artists, and the Artists were and are each capable of managing their individual finances.

The precise contours of a fiduciary's duties are a function of the nature of the duty, although in the abstract, they are generally divided into the duty of care and the duty of loyalty. A trustee, for example, owes the duty of utmost good faith in all matters pertaining to the trust and in the management of trust property. Ball v. Hopkins, 268 Mass. 260 (1929). The trustee also has the duty to exercise reasonable care and prudence in the administration of the trust. Welch v. Flory, 294 Mass. 138 (1936); Milbank v. J.C. Littlefield, Inc., 310 Mass. 55 (1941). A conservator, however, must give his personal attention to the management of the ward's estate. Wiley v. Fuller, 310 Mass. 597 (1942); Brigham v. Morgan, 185 Mass. 27 (1904); Roulston v. Roulston, 285 Mass. 489 (1934). All fiduciaries in Massachusetts have a duty to account fully and accurately all of their actions involving the assets of those to whom they owe their duties. See, e.g., Russell v. Klein, 227 Mass. 297 (1917) (agents); M.G.L. c. 108A, § 20 (partners of a partnership); M.G.L. c. 190B, § 5-418 (conservators); M.G.L. c. 190B, § 7-303 (trustees).

Most significantly, where specific contractual provisions govern the relationship of the parties, **the contractual provisions supersede the fiduciary obligations that otherwise control.** See Chokel v. Genzyme Corp., 449 Mass. 272 (2007); Blank v. Chelmsford OB/GYN,

P.C., 420 Mass. 404 (1995); <u>Fronk v. Fowler</u>, 456 Mass. 317 (2010) (emphasis added).  This allows the parties to structure the fiduciary duties otherwise imposed by law to meet their needs.  Thus, in the present case, the Personal Management Agreement (PMA") controls and defines HSP's duties to Defendants.

II.    **<u>The existence of a conflict of interest does not terminate a fiduciary relationship as a matter of law.</u>**

The caselaw is clear the existence of a conflict of interest does not disqualify a fiduciary from serving or otherwise terminate, modify, or limit the duties owed by the fiduciary; however, "[w]earing more than one [fiduciary] hat… requires a fiduciary to be very nimble as well as most prudent.  While the fiduciary may purport to wear one hat at a particular moment, in truth, all hats are worn together at all times."  <u>Johnson v. Witowski</u>, 30 Mass. App. Ct. 697, 704 (1991).

When a possible conflict of interest exists, the burden of proof shifts to the fiduciary to demonstrate his actions did not violate his fiduciary obligations.  In the context of an executor's accounting of the cash flow of an estate, for example, after a fiduciary "has admitted the relation and the receipt of a certain sum," the fiduciary's burden is "to prove that he has disposed properly of the amounts for which he is accountable, and to show what that amount is." <u>Boston Safe Deposit & Trust Co. v. Lewis</u>, 317 Mass. 137, 140-41 (1944).  Similarly, for a trustee, "[p]ersonal gains accruing to a [fiduciary] from the transfer of trust property must be accounted for by him even though he was acting in good faith."  A "fiduciary who benefits in transaction with the person for whom he is a fiduciary bears the burden of establishing that the transaction did not violate his obligations."  <u>Cleary v. Cleary</u>, 427 Mass. 286, 290 (1998). The burden of proof is to a preponderance of the evidence.  <u>Hanover Ins. Co. v. Sutton</u>, 46 Mass. App. Ct. 153 (1999); <u>see</u> <u>also</u> <u>Cleary</u>, 427 Mass. 286, 290 (1998).

**III.** **When a fiduciary is confronted with a conflict of interest under Massachusetts law regarding: 1) debts jointly and severally owed among those clients to whom the fiduciary owes his duties, and 2) a single client who owes a debt to the fiduciary, the fiduciary must deal fairly and honestly with each such party.**

There does not appear to be caselaw in Massachusetts that specifically addresses this issue. However, drawing an analogy to trust law, a trustee and corporate director under Massachusetts law may have "potentially conflicting duties arising from his different [fiduciary] positions [that] do not create grounds for his removal. In acting in his corporate role, the trustee may sometimes have to subordinate the interests of the beneficiaries to that of the corporation." Symmons v. O'Keefe, 419 Mass. 288, 298 (1995). Again, however, the burden shifts to the fiduciary to demonstrate he has not violated his obligations to those to whom he owes duties. See Cleary, 427 Mass. at 290; Boston Safe Deposit, 317 Mass. at 140-141.

As applied to this case, the debts of PBS are jointly and severally owed by the Members. They were also informed in some instances HSP was paying the different amounts on behalf of the individual Artists for which they were all liable. In the case of the salaries, for example, the distributions to the members were reflected in the 2007 profit and loss statements the Artists received.[2] Moreover, the Artists are each members of PBS LLC and therefore their knowledge is imputable to the others. Under Louisiana law, "Each member [of an LLC] is a mandatary of the limited liability company for all matters in the ordinary course of its business." La. Rev. Stat. § 12:1317. "The principal is bound to the mandatary to perform the obligations that the mandatary contracted within the limits of his authority." La. C.C. art. 3010. The individual Artists owe each other the duty of good faith and fair dealing to each other. If they concealed

---

[2] It should also not be lost on the Court that the Artists spent long stretches of time together in vans travelling or at hotels. The Artists had an unparalleled opportunity to discuss the minutiae of their business dealings and disclose whether they were being treated differently. It can therefore be inferred either the Artists make such disclosures to each other or their failure to do so was knowing and intentional. Any such willful failure to disclose is not the fault of HSP.

information (such as their salaries) from each other, they are estopped from foisting concealment onto HSP's shoulders.

**IV.** **A personal manager does not need a license to publish and/or distribute copyrighted works if it is merely acting as an agent of the artist; this circumstance is merely an instance of self-publishing.**

In this instance, assuming HSP was acting as agents for the Artists when HSP was putting the Artists' music up for sale, then this constitutes self-publishing by the Artists. Otherwise, a copyright holder would have to give licenses to each of his agents[3]. The PMA, paragraph 3, removes any doubt by appointing HSP as the agent of the Artists to approve and authorize the use of their musical material for the purposes of promotion of their products.[4] (1 Ex. 1:13).

**V.** **Assuming 1) an implied license exists and 2) the implied license was validly terminated, the former licensee has no obligation—or authority—to stop distribution of the copyrighted works by third-parties.**

Upon the valid termination of an implied license (or any license) that permits the distribution of phonorecords, no caselaw or other statutory provision imposes an affirmative obligation on the former licensee to stop distribution of the products. If the license was somehow validly terminated,[5] therefore, HSP would have no obligation to halt further distribution of the CDs by third parties.[6] Similarly, HSP had no right to stop third-party distribution of the CDs in the possession of the various vendors: the right reverted to the Artists upon the termination of the license.

---

[3] For example, consider a music publisher that own music that it records to CDs for sale. Under a strict reading of copyright law, if the company does not grant a license to the employee (and thus, agent) who actually operates the machinery and actually performs the burning process, the employee is liable to the company for copyright infringement. Similarly, the individual employee/agent who delivers the CDs to a music store is liable for infringement.

[4] Other areas of copyright law permit the use of agents. <u>See</u>, <u>e.g.</u>, Copyright Circular 1, p. 11 (permitting the use of agents in filing applications for copyrights).

[5] As discussed below, an implied license granted for consideration is irrevocable.

[6] As argued below, HSP's implied license was irrevocable.

Additionally, HSP was not permitted to interfere in the distribution of the CDs because of their obligation to mitigate their damages. One who has been damaged by the wrongful act of another is bound to exercise reasonable care and diligence to avoid loss and to minimize damages. The plaintiff may not recover for losses that could have been prevented by reasonable efforts on its part. <u>Burnham v. Mark IV Homes, Inc.</u>, 387 Mass. 575, 586 (1982); Restatement (Second) of Contracts § 350(1) (1981). If HSP had attempted to stop the distribution of the Artists' music, they would have failed to minimize the Artists' damages because there would be no additional sales to credit to the Artists. Further, the Artists would have accused HSP of interfering in their right to profit from the exploitation of their music and interfering in their relationships with the various vendors.

Lastly, even if HSP was found to have distributed the discs after its license was validly terminated, any infringement would have been *de minimis*, especially where the Artists were fully credited for the sales. Further, because of their failure to timely register the works or demonstrate the contents of the allegedly infringed works, they are not entitled to statutory damages. The Artists therefore sustained no damages.

## VI.  <u>HSP's commission percentage did not reset every twelve months.</u>

The plain language of paragraph 4(a) of the PMA is clear the commissions plateaued once so long as the conditions outlined in the paragraph are met. The first sentence states, "Highsteppin is and shall be entitled to receive from Artist or directly from third parties pursuant to paragraph 3 hereof, throughout the Term and thereafter as set forth in this Agreement, fifteen (15%) percent (hereinafter "Commissions") of Artist's Gross Earnings (as hereinafter defined)." The amount given in this sentence is then modified (but the remaining terms of the sentence remain the same): if the earnings thresholds are met in **any** twelve-month period, "the

Commission *shall* increase…. on a prospective basis." [7]  (1 Ex. 1:5) (emphasis added).  At no time does the threshold reset according to the express terms of the paragraph.  The twelve months referred to in the paragraph govern only the timeframe in which gross earnings was to be calculated to determine whether the percentage increase applied.

Furthermore, the conduct of the parties demonstrates no question existed among them. The commission percentage increased permanently upon reaching the necessary thresholds.  In none of the testimony adduced by any of the parties did anyone question the scheme by which HSP calculated its commissions.   Stepanian himself testified regarding the commission thresholds, and this testimony was never contradicted. (Stepanian Test).  In early drafts of the PMA, HSP proposed 20% commissions. In response, Eveline counteroffered 10%.  (1 Ex. 3:55). The parties eventually compromised on the tiered commission scheme. (1 Ex. 3:44).

**VII.**   **Stoltz incorrectly testified HSP did not earn commissions on the mechanical royalties and royalties are not subject to recoupment or attachment.**

Under the PMA, "gross earnings" is defined as "the total of all earnings throughout the world earned or received by the Artist… whether in the form of… royalties (including, without limitation, literary royalties, songwriter and music publishing royalties)…."   (1 Ex. 1:5) (emphasis added).  Under paragraph 4(a), HSP's commissions are calculated as the commission percentage multiplied by gross earnings.   Id.  The PMA, therefore, intended HSP earn commissions on the Artists' royalties.

Royalties (whether statutory or contractual) may be attached under the Bankruptcy Code. Indeed, pre-bankruptcy copyrights are property of the bankruptcy estate, and the trustee is entitled to all of the royalties paid on those copyrights.  See, e.g., In re Yes! Entertainment Corp., 336 B.R. 203, 213 (D.Del. 2006); Waldschmidt v. CBS, Inc., 14 B.R. 309, 310 (M.D. Tenn.

---

[7] "Prospective" here defined as "concerned with or applying to the future."
http://www.google.com/search?q=prospective&oq=prospective&sourceid=chrome&ie=UTF-8

1981) (interpreting section 70(a) of the Bankruptcy Act). Even in the nonbankruptcy context, federal courts may attach copyrights (including the right to receive royalties). <u>See</u>, <u>e.g.</u>, Order Appointing Receiver and Authorizing Sale of Copyrights, <u>Hendricks & Lewis, PLLC v. Clinton</u>, 12-00841 (W.D. Wash. 2012) (appointing a receiver to hold musician's George Clinton's intellectual property and use royalties paid on that property to satisfy creditor's claims). Royalties, therefore, are part of the bankruptcy estate and can be used to satisfy creditors' claims.

**Proposed Rulings on the Parties' Claims**

The Plaintiffs have asserted claims, *inter alia*, for enforcement of the PMA, fraud, and violation of M.G.L. c. 93A, §§ 2 and 11 ("Chapter 93A"). The Defendants have asserted claims for breach of contract, breach of fiduciary duty, copyright infringement, and violation of Chapter 93A.

**I.    HSP met its burden of proving the amount of its claim for reimbursement of expenses and management fees.**

HSP met its burden of proving the amount of its claim for reimbursement of expenses advanced and management fees owed under the terms of the PMA. Several HSP witnesses testified this amount totaled $632,017.59. 2 Ex. 2:00019. This amount consists of four major components: tour expenses, non-tour expenses, disbursements to the Artists, and management fees. Against these four, the artists are entitled to credit for performance fees received.

Defendants did not dispute the total performance fees received of $308,667.99, nor did they dispute other income received of $1,723.00. Defendants conceded their liability for tour expenses, which amounted to $321,303.81. Defendants challenge their liability for non-tour expenses, disbursements to the members of the band, and management fees, but not the amounts. Non-tour expenses totaled $245,919.17, disbursements to the band totaled $323,719.97, and management fees totaled $70,640.40. The total deficit for these expenses over and above

performance fees and other income received equaled $651,192.30. HSP conceded defendants are entitled to credit for merchandise sales over and above costs in the net amount of $19,174.71, for a net owed of $632,017.59. 2 Ex. 2:00019.

HSP submitted evidence proving far beyond a legal certainty the accuracy of its figures. HSP's numbers were based on the raw data consisting of invoices, checks, and other documentation entered into HSP's accounting system through QuickBooks. HSP's expert James Dibiasi testified to the great effort he expended to audit HSP's data entry and journal entries. Defendants' expert Stu Schimmel could not identify any errors in HSP's data entry or the amounts of its journal entries. Thus, Defendants never questioned any of HSP's numbers.

Defendants challenged the manner in which HSP set up PBS's books and the accuracy of the financial reports HSP furnished to Defendants. These challenges have no relevance whatsoever to the accuracy of the amounts reflected in HSP's claim. **HSP did not rely on any of those financial records at all in arriving at the amount of its claim.** Instead, HSP relied on the raw data underlying its journal entries, and DiBiasi's uncontradicted testimony established the reliability of that data.

10 Ex. 147 consists of the individual journal entries for PBS activities posted to HSP's books. Although defendants challenged HSP's practice of posting these entries to HSP's books rather than PBS's books, this accounting procedure did not affect the accuracy of the amount of HSP's claim. Each of the journal entries is fully supported by documentation, as verified by the audit conducted by James Dibiasi and as established by the testimony of other HSP witnesses such as Shelly Dyer and Donna Malangone. All of the entries relating to PBS activities, and only those entries, were reflected in the determination of the amount of HSP's claim.

Defendants admit HSP incurred the non-tour expenses, but challenge their liability for those non-tour expenses listed in 11 Ex. 159, arguing HSP did not obtain the authorization required by Section 4(b) of the PMA. HSP's proof of authorization for these expenses is covered at length below and in HSP's proposed findings of fact. HSP incorporates that discussion here by reference.

Defendants admit HSP made the disbursements to the band, but challenge their liability for them, claiming these amounts were salaries, not loans. HSP's witnesses flatly contradicted Defendants' claims. Neverthelss, HSP notes the PMA obligates Defendants to reimburse HSP even if the disbursements are characterized as salaries. The PMA states, "Highsteppin' is not required to make any…advances hereunder to Artists…, but, in the event Highsteppin' does so, Artist **shall** reimburse Highsteppin' therefore promptly… PMA, Section 6(a). No matter the characterization of the advances to Artists or to PBS, because HSP was the source of the funds so advanced, Defendants are obligated by the PMA to reimburse HSP.

Defendants do not challenge HSP's calculation of the management fees it claims, but Defendants contend they are not liable for the fees because HSP breached the PMA. The lack of merit to Defendants' claims is discussed below. Although Defendants have demonstrated the flaws in HSP's method of accounting for merchandise sales and costs, Defendants also have not challenged HSP's calculations of those merchandise sales and costs. Thus, the calculations of HSP's claim are supported by the raw data, whose reliability was established by DiBiasi and unchallenged by Defendants' CPA. Because HSP is entitled to the full amount of reimbursement it claims, the Court should enter Judgment for HSP on this issue for $632017.59.

II.     **The Court should find for HSP on its fraud claim and find Defendants' debt to HSP nondischargeable.**

Under 11 U.S.C. § 523(a)(2)(A),

> A discharge under section 727... of this title does not discharge an individual from any debt... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretense, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition….

A creditor must prove its claim of nondischargeability by a preponderance of the evidence. AT&T Universal Credit Card Svcs. v. Mercer, 211 F.3d 214, 216 (5th Cir. 2000). In order for a debtor's representation to be a false representation or pretense, a creditor must show the debtor (1) made a knowing and fraudulent falsehood; (2) describing past or current facts; (3) that was relied upon by the creditor; (4) who thereby suffered a loss. Id. at 216-17; RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1292-93 (5th Cir. 1995). The creditor must also show it actually and justifiably relied on the debtor's representations. Field v. Mans, 516 U.S. 59, 69-70 (1995).

To prove a claim for fraud under Massachusetts law, a plaintiff must demonstrate (1) a defendant or its agent made a false representation of a material fact (2) with knowledge of its falsity (3) for the purpose of inducing the plaintiff to act thereon, and (5) the plaintiff justifiably relied upon the representation as true and (5) acted upon it to its damage. Danca v. Taunton Sav. Bank, 385 Mass. 1, 8 (1982); Reisman v. KPMG Peat Marwick, LLC, 57 Mass. App. Ct. 100, 108-09 (2003); International Totalizing Sys. v. PepsiCo, Inc., 29 Mass. App. Ct. 424, 431 (1990); see also Restatement (Second) of Torts § 525 (1977) ("One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation"). Unsurprisingly, the elements of nondischargeability under § 523 mirror the common law claim for fraud in Massachusetts. Id. at 70 n. 9 (the Court construes "the terms in § 523(a)(2)(A) to incorporate the general common law of torts", particularly the Second Restatement of Torts). Thus, if HSP proves nondischargeability, it necessarily process fraud.

**A.    The Defendants made numerous fraudulent misrepresentations to HSP they would repay the monies HSP advanced, but lacked the intent to do so.**

One of the most in-depth cases on the application of § 523(a)(2)(A) is <u>LA Capital Federal Credit Union v. Melancon</u>, 223 B.R. 300 (M.D.La. 1998) (Phillips, J).  The debtor, Melancon, obtained thousands of dollars in cash advances on her credit card.  Id. at 304.  The credit card company sued after Melancon declared bankruptcy, arguing, "Mrs. Melancon committed fraud when she took the cash advances with neither the intent nor the ability to pay for them…." <u>Id.</u> at 305.

A misrepresentation may arise from conduct on the part of the defendant that establishes the existence of a fact.  <u>See</u> Restatement (Second) of Torts § 525, comment (b) ("words or conduct asserting the existence of a fact constitute a misrepresentation if the fact does not exist"); <u>Melancon</u>, 223 B.R. at 315.  A misrepresentation does not require "words formed and spoken by the interactive use of diaphragm, air, brain, larynx, tongue, lips, and teeth." <u>Melancon</u>, 223 B.R. at 313.

Significantly, in <u>Melancon</u> the promise to repay was implied from the acceptance of the cash advance.  "Without that promise, there is nothing to bind the debtor, and the creditor must be viewed as … having given its money away." <u>Id.</u> at 313.  If, as the creditor asserted, Caldwell had no intention to pay for the merchandise at the time she acquired it, then, as we shall see, that lack of intent was fraudulent, because she had (with conduct, perhaps, rather than words) misrepresented to the creditor her intent to pay for the merchandise.  Despite the majority's contrary holding, this deception was the obtaining of property by false pretenses.  The Melancon court cautioned the reader to not equate a "promise" (meaning the manifestation of an intent to do or not do something in the future) with "a hope to do it or a belief that it can be done":

> No lender would be so foolish as to have a borrower sign a contract that said "I hereby expect to repay this money," or "I believe I will repay it," and/or "I hope to

repay this money," or "I can repay this money," or even " I truly believe, hope, and expect that I can and will repay this money."  The reason such an action would be foolish is that the lender would have given his money to the "borrower" without any reciprocal obligation.  The "borrower" hasn't promised to do anything, and hence isn't a borrower at all.

Id. at 316-17.

Following this analysis, the Melancon court analyzes the definition of "fraudulent misrepresentation."  The Second Restatement of Torts explains:

[a] misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies.

Melancon, 223 B.R. at 319.  Further, "[i]t should be obvious that a person will always know his present intentions." Id.  Again, the court cautions not to focus on a debtor's "hope" he or she will be able to repay:

It is insufficient for a debtor to simply state that he always planned to pay the money back "somehow" (we have a mental image of cash suddenly falling from the skies, like manna from heaven).  If the debtor has no idea how the money will get paid back, or if it will get paid back, then he may hope to repay--he may even want to repay--but he certainly does not intend to repay.

Id. at 321.

Proof of the Debtor's intent is often circumstantial.  Id. at 323.  The analysis of the debtor's intent is narrow and focused on the debtor's state of mind at the time of the representation.  The creditor "need not prove the existence of a scheme to avoid repayment. He is required to prove only that the debtor did not have the intent to repay." Id. at 321.  The Melancon court concludes a debt is nondischargeable if "a debtor [when he makes the representation] has no idea whether he will be able to repay his debts, but will be quite happy to repay them if things happen to work out so that he can…." Id. at 322. Additionally, the debtor's ability to repay at the time may reflect on his intent to repay at the time he makes the

representation.  Id.  Similarly, a debtor's inability to repay and knowledge of that inability may support the conclusion the debtor made a fraudulent misrepresentation, as "[o]ne cannot intend to do something that one knows to be impossible." Id. at 323.

Based on the foregoing analysis, the Melancon court concluded even though Melancon did not "come out and say 'I promise I'll pay the money back' while [she was] standing at the teller machine, [she did make] a promise" to repay when she took the cash withdrawals.  Id. at 312.  Further, because at the time she requested the cash advances she was insolvent, and because she actually knew her financial position, the court concluded she did not intend to repay the cash advances when they were made.  Id. at 336.

Unlike Melancon, this is not a situation where only circumstantial evidence exists of the Artists' lack of intent to repay.  To the contrary, the Court need not attempt to divine the intent of the Artists.  **Each of the Artists testified in open court multiple times he did not intend to repay HSP at the time he accepted the monies HSP advanced or at any other time before, during, or after.** (Stoltz Test.); (Porter Test.); (Batiste Test.).  Moreover, at the time each executed the PMA, each testified he had no intent to repay the monies HSP advanced in the future.

At the outset of the PMA, Defendants signed a contract representing they would repay the debts they incurred to HSP.  (1 Ex. 1:8) (paragraph 6(b)).  They also made numerous ongoing representations they would repay HSP when they accepted the monies paid for the salary draws and when they requested on numerous occasions HSP pay bills and expenses on their behalf.  (7 Ex. 85:2972) (Stoltz requesting payment of Up All Night labor); (7 Ex. 85:2995) (same); (7 Ex. 88:3030) (Porter requesting payment of It's Life expenses); (9 Ex. 130) (salary draws); (1 Ex. 7:68-78) (wire transfers to the Artists); (3 Ex. 37) (PBS American Express bills paid by HSP).

They also misrepresented their intent to repay when Porter signed the 2007 tax return acknowledging for tax purposes the debt due to HSP was $227,661. (1 Ex. 17:69). Like in Melancon, the Artists frequently asked for cash advances from the "HSP ATM" and made implied representations they would repay HSP. Melancon, 223 B.R. at 313.

These misrepresentations were fraudulent because at the time they were made, the Artists lacked intent to repay. Each of the Artists testified in open court multiple times did not intend to repay HSP at the time accepted the monies HSP advanced or at any other time before, during, or after. On March 3, 2007, less than nine months after the Artists signed the PMA, Porter knew PBS was over $100,000 in debt. (3 Ex. 60:1787). None of the Artists objected to future payments after Porter questioned in March 2007 how Defendants would repay "over a $100,000.00 of debt…." (3 Ex. 60:1787). Further, Shannon Chabaud advised Porter not to sign the 2007 tax return if he disagreed with the "due to affiliate" line item. (Chabaud Test.); (1 Ex. 18:183-84). Porter then stated in an E-mail to the other Artists he would "do [his] work" and sign the tax return, but "be ready when or if the shit hits the fain [sic]." (9 Ex. 112:3651). The Court can reasonably infer from these statements the Artists were content with continuing to receive HSP's direct and indirect advances for the benefit of themselves and their careers, regardless of whether they could repay the debt. The Artists also made clear they would continue to allow HSP to make those advances until the day HSP demanded its repayment or HSP refused to advance any more and demanded repayment, and a battle for repayment would then ensue. This clearly demonstrates a lack of intent to repay the debt, which is therefore is nondischargeable under 11 U.S.C. § 523(a)(2)(A). See Melancon, 223 B.R. at 322.

**B.     HSP's reliance on Defendants' continued fraudulent misrepresentations was justifiable.**

The creditor's reliance on a debtor's fraudulent misrepresentation does not need to be reasonable: it must be *justifiable*. Field, 516 U.S. at 73-75; Melancon, 223 B.R. at 327. The Restatement defines "justifiable reliance." "Section 538(1) of the Restatement provides reliance on a fraudulent misrepresentation is not justifiable unless the misrepresentation is material. Restatement § 538(2)(a) says a matter is material if a reasonable man would think it was an important factor in deciding his course of conduct." Melancon, 223 B.R. at 327. A creditor has no obligation to investigate whether the representation was actually false, even if such investigation would have confirmed whether the representation was false. Id. at 328. When a material statement concerns a debtor's intentions, the creditor must only have reason to believe it will be carried out, given the circumstances surrounding the transaction. Restatement (Second) Torts, § 544.

Here, HSP advanced the monies to build PBS's brand, and HSP relied on the Artists putting their efforts into making PBS successful. At the time the PMA was signed, the Artists were represented by counsel, and the Artists understood expenses would be advanced to make PBS successful. HSP justifiably believed the Artists were working to maximize PBS's success. On March 30, 2007, Stepanian stated in an E-mail there was "no doubt in my mind that Porter Batiste Stoltz IS the vehicle [Porter's] aiming to work with the most." (13 Ex. 186:6538). HSP was therefore justified in relying on the Artists' representations, especially considering they were even made in writing and on advice of the Artists' counsel and accountant.

**III.     The Court should find for HSP on the parties' Chapter 93A claims.**

Under M.G.L. c. 93A, § 2(a), "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

Massachusetts General Laws Chapter 93A is a widely-applied[8] statute that creates a private

cause of action to remedy damages sustained as the result of unfair or deceptive acts or practices:

> Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two may, as hereinafter provided, bring an action… for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper.

M.G.L c. 93A, § 11[9]. A claim under Chapter 93A is "neither wholly tortious nor wholly

contractual in nature, and is not subject to the traditional limitations of preexisting causes of

action such as tort for fraud and deceit." Slaney v. Westwood Auto Inc., 366 Mass. 688, 703-04

(1975). To determine whether a defendant has violated Section 2, courts are to be "guided by the

interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1)

of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended."

M.G.L. c. 93A, § 2(b).

### A. The Defendants have engaged in unfair and deceptive acts and practices.

A large plurality of Section 11 jurisprudence attempts to interpret the phrase "unfair or

deceptive acts or practices."[10] The Defendants' unfair and deceptive acts or practices arise out of

the same facts giving rise to HSP's counts for breach of contract and fraud.

---

[8] As a justice of the Supreme Judicial Court once observed, "It's easy to distinguish the criminal from the civil appeals on our docket: criminal cases don't have a 93A count." Dwight E. Golann, Chapter 93A Rights and Remedies, § 1.1 (Hon. Margot Botsford ed., 2d ed. 2007).

[9] Section 11 provides the basis for relief in a dispute between two parties engaged in "trade or commerce." M.G.L.c. 93A, § 9, on the other hand, creates a cause of action for consumers who are not engaged in "trade or commerce." The burden of proof under Section 9 is lower than for Section 11, as "[o]ne can easily imagine cases where an act might be unfair if practiced upon a commercial innocent yet be common practice between two people engaged in business." Spence v. Boston Edison Co., 390 Mass. 604, 616 (1983).

[10] In Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498, 504 (1979), the court articulated an often-quoted standard: "[t]he objectionable conduct must attain a level of rascality that would

A "mere breach of contract without more" is not a violation of Chapter 93A. See, e.g., Madan v. Royal Indem. Co., 26 Mass. App. Ct. 756 (1989). A party that has not breached a contract may nevertheless be held liable under Chapter 93A. NASCO, Inc. v. Pub. Storage, Inc., 127 F.3d 148 (1st Cir. 1997). To rise to the level of a c. 93A violation, a breach must be both knowing and intended to secure "unbargained-for benefits" to the detriment of the other party. NASCO, Inc. v. Public Storage, Inc., 29 F.3d 28, 34 (1st Cir.1994). There are several instances in which breach of contract does violate Chapter 93A, however.

A party's breach of contract violates Chapter 93A when the party withholds payment on a debt without a good faith basis for denying repayment. Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498, 504 (1979); See also, e.g., Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10 (1st Cir. 1985) (a debtor who willfully withholds payments on a properly owed debt to attempt to obtain an advantage in negotiations regarding future sales commits an unfair practice violative of Chapter 93A). Here, Defendants might argue about the extent of the debt they owe to HSP, but they have not challenged the tour expenses were incurred by HSP and the Artists approved those expenditures. Even as early as 2007, Porter and Stoltz knew they owed HSP a significant debt, but Porter decided instead to do nothing but "be ready when or if the shit hits the fain [sic]." (9 Ex. 112:3651). However, at no time prior to their bankruptcy did they attempt to make any repayment on the debt.

Defendants are also liable under Chapter 93A for the same reasons they are liable under HSP's claim of common law fraud discussed above. A violation of Chapter 93A occurs where a

---

raise an eyebrow of someone inured to the rough and tumble of the world of commerce." The Defendants have also cited this standard in their pleadings. However, the Supreme Judicial Court has criticized the "rascality" test as "uninstructive." Mass. Employers Ins. Exch. v. Propac-Mass, Inc., 420 Mass. 39, 42 (1995); see also NASCO v. Pub. Storage, Inc., 127 F.3d 148, 151 (1st Cir. 1997).

borrower never intended to repay a debt and deceptively led the lender to believe it would be repaid. Adams v. Diplomat Limousine Serv., Inc., No. 87–1140, slip op. at 12 (Worcester Sup. Ct. 1989). Similarly, a finding of common law fraud is sufficient for a finding of a violation of Section 2. McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704 (1990). A Section 11 claim is distinct from common law fraud, however, because "proof of actual reliance by the plaintiff on a representation is not required." Slaney, 366 Mass. at 703. Thus, if the Court finds the Artists are liable for common law fraud (or if the Court finds the Artists would be liable but HSP did not prove actual reliance), they are necessarily liable for a violation of Chapter 93A.

**B.      The Defendants' unfair and deceptive actions were willful and knowing.**

If the Court "finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation of said section two," then the plaintiff's recovery "shall be… up to three, but not less than two, times" the plaintiff's actual damages. M.G.L. c. 93A, § 11 (¶ 5). Whether to award greater than two times the plaintiff's actual damages is in the Court's discretion.

An unfair or deceptive act or practice is "willful or knowing" if the action or practice was committed intentionally or with a reckless disregard for whether the act or practice was unfair or deceptive. Computer Systems Engineering, Inc. v. Qantel Corp., 571 F. Supp. 1365, 1375 (D. Mass. 1983), aff'd, 740 F.2d 59 (1st Cir. 1984). "Willful" conduct is equated with "intentional" conduct and "knowing" conduct is equated with "reckless conduct). Still v. Comm'r of the Dep't of Employment & Training, 423 Mass. 805, 812–13 (1996); Kattar v. Demoulas, 433 Mass. 1, 16 (2000).

Again, the evidence is clear the Artists defrauded HSP into believing they would repay the debts they were accruing. At the outset of the PMA, Defendants made an affirmative written representation they would repay the debts they incurred to HSP. (1 Ex. 1:8) (paragraph 6(b)).

They also made numerous ongoing representations they would repay HSP when they accepted the monies paid for the salary draws and when they requested on numerous occasions HSP pay bills and expenses on their behalf. (7 Ex. 85:2972) (Stoltz requesting payment of Up All Night labor); (7 Ex. 85:2995) (same); (7 Ex. 88:3030) (Porter requesting payment of It's Life expenses); (9 Ex. 130) (salary draws); (1 Ex. 7:68-78) (wire transfers to the Artists); (3 Ex. 37) (PBS American Express bills paid by HSP). They also misrepresented their intent to repay when Porter signed the 2007 tax return acknowledging for tax purposes the debt due to HSP was $227,661. (1 Ex. 17:69).

However, the Artists lacked any intention to repay HSP. **<u>Each of the Artists testified in open court multiple times he did not intend to repay HSP at the time that he accepted the monies that HSP advanced or at any other time before, during, or after.</u>** (Stoltz Test.); (Porter Test.); (Batiste Test.). On March 3, 2007, less than nine months after the Artists signed the PMA, Porter knew PBS was over $100,000 in debt. (3 Ex. 60:1787). None of the Artists objected to future payments after Porter questioned in Mach 2007 how Defendants would repay "over a $100,000.00 of debt…." (3 Ex. 60:1787). Further, Shannon Chabaud advised Porter not to sign the 2007 tax return if he disagreed with the "due to affiliate" line item. (Chabaud Test.); (1 Ex. 18:183-84). Porter then stated in an E-mail to the other Artists he would "do [his] work" and sign the tax return, but "be ready when or if the shit hits the fain [sic]." (9 Ex. 112:3651). The Artists' conduct was therefore intentional (or at least in reckless disregard of whether HSP would loan them money as a result of their statements) and HSP must be rewarded at least two times (but not greater than three times) its actual damages.

**C.     The Defendants are liable to HSP for its attorneys' fees and costs as a result of its unfair or deceptive acts or practices.**

If a defendant engages in unfair and deceptive acts or practices, then the plaintiff "**shall**, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action." M.G.L c. 93A, § 11 (¶ 6) (emphasis added). The statute does not require the conduct be willful or knowing. Id. Because Defendants have engaged in unfair and deceptive acts and practices, as described above, HSP is entitled to its costs and attorney's fees.

**D.     The Defendants have failed to demonstrate HSP has engaged in unfair and deceptive acts and practices.**

HSP directs the Court to the arguments made elsewhere refuting Defendants' claims. The Defendants have not demonstrated HSP committed fraud, breached the PMA, or otherwise engaged in wrongdoing against the Artists. For that reason, HSP cannot be held liable under Chapter 93A.

**IV.     The Court should enter declaratory judgment on the terms of the PMA regarding the Artists' post-termination commissions.**

As described above, HSP is entitled to payment on portions of the Artists' Gross Earnings during the Post-Termination period pursuant to paragraph 17 of the PMA. (1 Ex.1:12-13). The Defendants have not made any payments pursuant to this paragraph of the PMA, and to the extent any ambiguity exists in Defendants' obligations, declaratory judgment is appropriate. Even if this executory provision of the PMA is be deemed rejected by the trustee, HSP is still entitled to commissions on Gross Earnings prior to the Artists' filing for protection under Title 11. See 11 U.S.C. § 365(d)(1) (executory contracts not assumed within 90 days of order for relief deemed rejected).

**V.** **The Court should find for HSP on Defendants' breach of fiduciary duty claim because it has accounted for all of the monies it received and paid on behalf of PBS.**

The Defendants have claimed HSP's accounting was unsatisfactory. While the form of the accounting may not have been optimal, when presented questions under oath about the damages they suffered, neither Schimmel, Porter, Stoltz, nor Batiste could testify to any damages suffered by the Artists as a result. Furthermore, the form of the accounting is irrelevant to whether HSP is liable for breaching its fiduciary duties.

If Defendants can make a prima facie case the fiduciary has breached his obligations, the burden shifts to the fiduciary to demonstrate by a preponderance of the evidence he did comply with his duties. Hanover Ins. Co. v. Sutton, 46 Mass. App. Ct. 153 (1999); see also Cleary, 427 Mass. 286, 290 (1998). If Defendants can meet their initial burden, it becomes HSP's burden to demonstrate it treated the Artists fairly when acting both as their fiduciary and as their creditor. This requires HSP demonstrate (1) it did not use its position as a creditor to the detriment of Defendants, and (2) the funds HSP paid and received on Defendants' behalf have been allocated correctly. If HSP can do so, then even if its accounting methodology breached its fiduciary duties to the Artists, HSP cannot be held liable to the Artists for any such breach because the Artists have not been damaged.

**A.** **HSP did not use its position as a creditor against the Artists while it was a fiduciary.**

As established in detail above, the Artists knew HSP was accruing debt on behalf of the Artists and PBS. Indeed, by the beginning of 2007 they owed HSP $227,661. For such a substantial sum, HSP could have exploited a variety of commercial and legal methods to be paid back, but it never did. The evidence shows HSP said nothing in public about the debt; did not change the way it managed the Artists; did not insist on repayment within thirty days, despite its right to do so in the PMA; or take any other actions. The only steps HSP took to get paid were

designing new income streams to make the Artists more successful. HSP even took no punitive measures when Porter rejected most of those new revenue sources, such as music licensing and the bobblehead. In fact, HSP sacrificed for the benefit of the Artists: it deferred its commissions from virtually the beginning of the PMA until 2009. Only after the PMA was terminated did HSP take steps (including this suit) to reclaim the monies it advanced to the Artists and the commissions that it deferred. HSP met and surpassed its obligations to the Artists in this respect.

**B.      HSP's fiduciary duties were modified by the PMA.**

Where there are specific contractual provisions governing the relationship of the parties, the contractual provisions supersede the fiduciary obligations that otherwise control. See Chokel v. Genzyme Corp., 449 Mass. 272 (2007); Blank v. Chelmsford OB/GYN, P.C., 420 Mass. 404 (1995); Fronk v. Fowler, 456 Mass. 317 (2010). Here, the parties provided HSP had the authority to advance monies on Defendants' behalf. (1 Ex. 1:7). Thus, to the extent HSP failed to acquire the Artists' approval, Defendants' claims against HSP would arise in breach of contract, not in breach of fiduciary duty.

**C.      HSP has correctly and accurately accounted for the monies it took in and spent on Defendants' behalf and are supported by the evidence.**

HSP's accounting did not conform to GAAP standards. This is undisputed. However, this does not have to establish its accounting complied with GAAP or any other accounting standards.[11] In order for HSP to meet its burden of proof, it must demonstrate it accounted for the monies that came in and the monies that it paid to Defendants.

The evidence of the transactions comes from primarily two sources: the HSP P&L Journal Detail of PBS transactions for 2005-2009 (the excerpt from Exhibit 146) and PBS's Profit and Loss Detail Reports for those same years. Stepanian and Malangone both testified

---

[11] Furthermore, HSP is neither an accounting firm nor a business manager, and therefore should not be held to the same standard as a business manger.

until the middle of 2008, HSP ran PBS's books through one QuickBooks account that charted transactions for HSP; PBS; the individual Artists; and HSP's other artist, Bonerama. They tracked the charges by assigning the transactions to classes based on the person or entity to whom the transaction was assigned. (Stepanian Test.); (Malangone Test.).  At the end of each calendar year HSP made batch transfers of the transactions into a separate Quickbooks file that just held PBS's transactions and was used to generate the end-of-year reports.  In 2009, HSP was no longer running the PBS transactions through HSP's QuickBooks files (except for the merchandise in the cost recovery model).

The frequency and detail required to be presented by a fiduciary depends upon the facts of each case. Stepanian testified he had no experience as a business manager and did not intend on being a business manager, and the role was thrust upon him because the Artists did not want to pay an additional 5% commission to a business manager.  During the negotiation of the PMA, Eveline acknowledged PBS did "not have a business manager but are actively seeking one."  (1 Ex. 3:55).   In the PMA, the Artists were explicitly informed Stepanian was not a business manager and had no business management experience.  (1 Ex. 1:9) ("Artist understands and hereby acknowledges that Highsteppin is not… [a] business manager…").  Thus, with the full knowledge of the Artists, HSP reluctantly assumed some of the duties that otherwise would have been performed by a separate business manager (at no additional cost to the Artists).  HSP's accounting system was set up by a CPA, Marie Kirchberger, who presumably designed the system based on the assumption PBS would have a separate business manager. Stepanian routinely and frequently discussed the business of PBS with the Artists. He also made written disclosures regarding their financial condition. Notwithstanding, Defendants never expressed their desire for more formal information.

HSP has demonstrated the Court can easily find that the entries memorializing the underlying transactions that comprise HSP's accounting are accurate. Malangone and Dyer both testified they had experience as a bookkeeper, and therefore were skilled at entering data into accounting platforms such as Quickbooks. When bills or income came into the office, Malangone or Dyer diligently entered those bills into Quickbooks and classified to whom the transaction applied. If a single transaction applied to multiple entities, the transaction would be split and classified appropriate. See, e.g., (11 Ex. 159P:5170) (crediting an expense 1/3 each to the individual Artists).

The underlying transactions are also accurate because HSP verified each of them at multiple levels in the course of this litigation, as was described during Malangone's testimony, Stepanian's testimony, and the Court's numerous colloquies with counsel. This knowledge was also readily available to Defendants during this litigation, had they chosen to search for it. HSP presented Trial Exhibits 146, 147, 148, and 149 to Defendants at the end of November 2011,[12] more than six months before trial. Exhibit 146[13] comprises the detailed profit and loss reports of HSP and classified expenses as for PBS for the individual Artists (these are the Charts the Court received). For each of the transactions in those detail reports, HSP identified every deposit slip, check, invoice, receipt, and other document that supported the number in the transaction detail. Each of the documents identified in Exhibit 146 were included in the proposed exhibits as Exhibit 149.

---

[12] Compiling these exhibits required the labor of four temporary accountants and Dyer working full days for two weeks, including weekends. All told, the report cost HSP approximately $19,000, making Defendants' acknowledged failure to read the report in detail all the more frustrating.

[13] Exhibit 146, when printed out on 8 ½" x 11" paper and at its actual size is onerous to read, but Defendants received the information in Excel spreadsheets that listed on each line, in the columns to the right of the journal entries, the underlying documents in support of the transactions.

The amounts owed to HSP by the individual Artists (excluding merchandise in the Cost Recovery reports) are given in the Account QuickReports in the Exhibit 146 Excerpts. The amount PBS owes HSP is described in (1 Ex. 2:19). Plaintiff's expert CPA testified he audited HSP's journal entries and verified HSP's total claim of $632,017.59 by matching **each of the charges to the underlying accounting documents.** Defendants did not challenge this amount. (Schimmel Test.). HSP met its obligation to account by providing the raw documentation for each accounting entry of a PBS accounting activity.

**VI.**     **The Court should find for HSP on Defendants' copyright infringement claims.**

To prevail on a copyright infringement claim, a plaintiff must show (1) ownership of a valid copyright and (2) unauthorized copying. Peel & Company Inc. v The Rug Market, 238 F.3d 391, 394 (5th Cir. 2001); Positive Black Talk Inc. v. Cash Money Records, Inc., 394 F.3d 357, 367 (5th Cir. 2004). "'Copying' in this context is a term of art that requires the plaintiff to "prove (1) factual copying and (2) substantial similarity." Positive Black Talk, 394 F.3d at 367-68; Bridgmon v. Array Sys. Corp., 325 F.3d 572, 576 (5th Cir. 2003).

> **A.**     **HSP is entitled to its attorney's fees and costs arising out of its defense of the Artists' copyright claims because the claims were frivolous, motivated by bad faith, and objectively unreasonable.**

Under 17 U.S.C. § 505,

> In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

The statute makes no distinction between prevailing plaintiffs and prevailing defendants. Fogerty v. Fantasy, Inc., 510 U.S. 517, 519 (1994). The Court therefore has the discretion to award costs and attorney's fees to HSP when it prevails against the Artists. The Supreme Court has given a non-exhaustive list of factors for a court to consider in exercising its discretion,

including the "frivolousness, motivation, [and] objective unreasonableness (both in the factual and in the legal components of the case) [of the claims] and the need in particular circumstances to advance considerations of compensation and deterrence…." <u>Id.</u> at 534, n. 19.

It is appropriate and necessary in this instance to award HSP its costs and fees arising out of its defense of Defendants' copyright infringement claim. First, the claims were plagued with numerous procedural errors that were simply due to sloppiness. The works allegedly infringed were never produced to the Plaintiffs in discovery and consequently excluded from evidence. Defendants also failed to meet the jurisdictional prerequisite for statutory damages because they never registered their copyrights. Defendants offered no expert testimony regarding the probative similarity between the deposits with the copyright office and the allegedly infringed works. From January 2012 to September 2012, Defendants' best evidence of infringement were three vague charts outlining the alleged statutory violations. In sum, Defendants did not establish even the meanest *prima facie* case of copyright infringement.

Nevertheless, the Artists' baseless allegations of copyright infringement were unsupported by the evidence and therefore frivolous and objectively unreasonable. Defendants repeatedly insisted until the last week of trial HSP had failed to produce source documents demonstrating monies it received from NUGS, Nimbit, and other vendors on the Artists' behalf; however, numerous source documents were produced at trial and contained the very information Defendants sought, such as the Harry Fox licenses for non-controlled compositions. (7 Ex. 84).

Defendants' testimony on the copyright issues was self-serving, contradictory, and illogical; was crafted simply to keep their copyright claims on life support through the end of trial; and ultimately demonstrated the claims were motivated by bad faith. Stoltz insisted he did not want his music sold on iTunes, but only in local New Orleans shops. (Stoltz Test.). He also

testified he thought "livedownloads.com" was an archive site. (Stoltz Test.). While the Artists accused HSP of infringing their music with the assistance of "Digital Dave" Morrison, Defendants themselves produced E-mail correspondence with Morrison from early 2012 showing they approved Morrison's efforts on their behalf and "looked forward to [their] relationship moving into a prosperous future." (12 Ex. 164:5382-83). In the stipulation of facts, contrary to their insistence HSP had secretly sold their music, the Artists stipulated they had provided the music to HSP for "commercial purposes." (Stipulation of Facts, ¶ 8).

Defendants' legal theories also continued to morph as time went on. First, they alleged HSP had transferred the Artists' copyrights into HSP's name. <u>See</u> (Supp. Counterclaim, ¶ R (Document 11)). Second, they alleged HSP had failed to procure written licenses, despite there being no requirement that licenses be in writing. (Counterclaim, ¶ 137). Third, they alleged HSP had failed to pay any mechanical royalties to the Artists despite (a) the Artists as the performers are liable for the payment of mechanical royalties and (b) the Artists were receiving payments on the entirety of the net income minus HSP's commission. (7 Ex. 84). Fourth, the number of allegedly copyrighted works undulated from "13 complete albums" and "259 songs" in the September 29, 2010, Counterclaim, to 24 "unauthorized CDs" in the Supplemental Counterclaim of February 14, 2011; to 27 sound recordings in the June 8, 2011, Second Amended Counterclaim; to 26 albums in their proposed Exhibit 150, produced by Stoltz in January 2012; to numerous distinct compositions in five charts including proposed Exhibit 206, the "Statutory Violations Chart", which was produced in the summer of 2012; to finally the 27 live performances, five studio recordings, and 12 compositions in the parties' Stipulation of Facts. Defending against their amorphous copyright claims took a substantial amount of HSP's resources.

Based on the paucity of evidence, fatal procedural missteps, shifting sands of testimony, and vague allegations, the Court should conclude the infringement claims were frivolous, objectively unreasonable, and motivated by bad faith.[14] The stipulation of facts the parties entered into by itself makes abundantly clear that at no time did Defendants genuinely believe any basis existed for their infringement claims. They knew the compositions were being recorded and distributed, participated in the distribution, and had (and have) ongoing relationships with the various distributors. Defendants vainly sought a statutory windfall in an attempt to shave away at the amount they owe HSP. Defendants' claims did not "ultimately serve…the purpose of enriching the general public through access to creative works." Fogerty, 510 U.S. at 527. Defendants' copyright claims amounted to nothing more than a colossal waste of the parties' and the Court's time,[15] and therefore HSP should be awarded its costs and fees for having to defend against them.

**B.     In the PMA, Defendants represented to HSP all music the Artists played, recorded, or released during the term of the PMA had been properly licensed, and they agreed to indemnify HSP in the event of any lawsuit for infringement.**

Paragraph 10 of the PMA states as follows:

Artist further warrants, represents, and agrees that each name used by Artist individually or as a group, and all other musical, dramatic, artistic and literary materials, ideas, and other intellectual properties, furnished or selected by Artist contained in or used in connection with any master recordings or the packaging, sale, distribution, advertising, publicizing or other exploitation of records ("Materials") will not violate any law or infringe upon or violate the rights of any person or entity.

(1 Ex. 1:10). The Artists expressly warranted in this paragraph none of the music HSP released would violate any copyrights. The burden was therefore on the Artists to ensure HSP had the

---

[14] Bringing a claim in bad faith or otherwise bringing a meritless lawsuit also constitutes a breach of Chapter 93A, § 2. See Zabin v. Picciotto, 73 Mass. App. Ct. (2008); see also, e.g., Refuse & Envtl. Sys., Inc. v. Indus. Servs. of Am., Inc., 932 F.2d 37 (1st Cir. 1991).

[15] Several days of trial were devoted just to the copyright infringement issues.

necessary licenses to release their music.  This further supports the conclusion the Artists gave HSP implied mechanical licenses to release their music.

Paragraph 11 of the PMA obligates Defendants to indemnify HSP for its damages, costs, expenses, and fees incurred to defend this infringement suit against HSP:

> Artist agrees to indemnify and to hold Highsteppin (and its officers, employees, directors and agents) harmless against any and all damages, costs, expenses, or fees (including attorneys' reasonable fees) incurred or suffered by Highsteppin in any claim, suit, or proceeding instituted by or against Highsteppin in which any assertion is made which is inconsistent with any warranty, representation, or covenant of Artist or which arises in connection with any act or omission by Artist.

Id.  The Artists are therefore liable to HSP for its costs and attorney's fees in the event HSP lacked the necessary licenses to release the Artists' music (**irrespective of the frivolity or unreasonableness of Defendants' claims**).

### C. Defendants have not proven substantial similarity between the original works and the compositions or sound recordings.

In order to prove substantial similarity, "a side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as 'substantially similar.'"  Id. at 576-77; Creations Unlimited v. McCain, 112 F.3d 814, 816 (5th Cir. 1997) (*per curiam*).  This comparison is required. As the Fifth Circuit has stated:

> The Creations Unlimited decision contemplates that a fact-finder will have the opportunity to view the two works side-by-side. Indeed, . . . **copying is an issue to be determined by comparison of works, not credibility. [The plaintiff's] failure to adduce evidence for such a comparison vitiates her claim**.

Bridgmon, 325 F.3d at 577 (quoting King v. Ames, 179 F.3d 370, 375-76 (5th Cir. 1999) (internal citations omitted)) (emphasis added).  In fact, *even evidence of direct copying does not obviate the need to prove substantial similarity*, because "not all 'factual' copying constitutes legally actionable copyright infringement."  Creations Unlimited, 112 F.3d at 816.  Defendants

did not submit the deposits with the Copyright Office or allegedly infringed works into evidence; therefore, their claims must be dismissed.

### D. Defendants were solely responsible for procuring mechanical licenses for the music HSP distributed.

As described above, in Paragraph 10 of the PMA, the Artists warranted to HSP they had or would procure the necessary mechanical licenses for the music they performed and HSP released. (1 Ex. 1:10).

#### 1. Mechanical licenses generally.

Title 17 U.S.C. § 115 governs the issuance of compulsory mechanical licenses. One who makes a recording of a musical work (referred to in Title 17 as a "phonorecord") owes a royalty to the owner of the underlying composition (referred to in the statute as the "musical work"). 17 U.S.C. § 115(c)(2). This is what is now known as the "mechanical royalty[16]."

Consequently, every phonorecord of a recording contains two distinct copyrights: the first is the copyright of the composition, and the second is the copyright of the performer. The responsibility for paying mechanical royalties falls on the person who "make[s] and distribute[s] the phonorecords of the work," meaning the performers of the work. 17 U.S.C. § 115(a).

Generally, artists will hire a company (such as the Harry Fox agency) to administer his mechanical licenses. When someone wishes to release a phonorecord, they pay the statutory rate

---

[16] The term originated in the beginning of the twentieth century, when player pianos were invented; player pianos can play compositions mechanically by "reading" sheets of paper with perforations corresponding to the keys that the piano should play (called "rolls"). Composers sued the roll manufacturers for copyright infringement, arguing that the mechanical representation of their music infringed their copyrights. The player piano roll manufacturers argued that they were not infringing on the copyrights of the composition owners because they were merely selling perforated paper, not intellectual property. In response to pressure from composers, Congress decided that it would be inefficient for the roll manufacturers to have to negotiate directly with hundreds of composers. Congress therefore devised and passed Section 115 to balance the interests of composers and the fledgling player-piano industry. See H.R. Rep. No. 2222, at 6 (1909).

to the agency, which assesses a management fee and then pays the net income to the artist. Under the statute, an artist retains the authority to perform his own music without having to pay mechanical royalties to himself. 17 U.S.C. § 115(a).

> **2.** **The Artists had and have a practice of granting each other gratis, non-exclusive mechanical licenses for the performance of their controlled compositions and therefore they are not owed mechanical royalties for those compositions.**

The owner of a copyright may grant licenses to others permitting them use of his intellectual property. Title 17 requires any transfer of copyright (including licenses) must be in writing. 17 U.S.C. § 101; 17 U.S.C. 204(a); <u>Lulirama Ltd., Inc. v. Axcess Broadcast Svcs., Inc.</u>, 128 F.3d 872, 879 (5th Cir. 1997). However, this writing requirement does not apply to non-exclusive licenses.[17] <u>See</u> 17 U.S.C. § 101 ("A 'transfer of copyright ownership' is an… exclusive license… but not including a nonexclusive license."). A nonexclusive license therefore does not need to be in writing and may be oral or inferred by the conduct of the licensor and licensee. <u>Lulirama</u>, 128 F.3d at 879.

Further, a license (whether exclusive or non-exclusive) may be granted for consideration or without consideration. The latter is termed a "gratis" license. Section 115, under a strict reading, does not permit others to perform a composer's work without paying the mechanical license. Thus, for example, if Porter, Batiste, and Stoltz jointly release phonorecords of a work composed by Porter, the statute requires Stoltz and Batiste pay mechanical royalties to Porter on that income; however, Porter may grant to Stoltz and Batiste a non-exclusive license to perform a copyrighted work without having to pay Porter a mechanical royalty. This is called a "gratis mechanical license."

---

[17] As its name implies, the rights under a non-exclusive license (such as, for example, the right to perform a composition in public) may be granted to multiple individuals by the licensor.

Both Porter and Stoltz testified they did not charge the other for performing their individually owned compositions while they were members of PBS. (Porter Test.); (Stoltz Test.). They also, obviously, did not charge themselves mechanical licenses for releasing their own individual compositions.[18]    Additionally, at no time did Batiste request the payment of mechanical royalties from the other Artists.  It follows that each of the Artists granted to the others gratis, non-exclusive, mechanical licenses for the grantor's individually owned compositions.

The net result of this practice is the Artists do not owe themselves mechanical royalties for the music HSP distributed. Even though both Porter and Stoltz maintain they should have been paid mechanical royalties for the underlying compositions on the CDs (Porter Test.) (Stoltz Test.), the Artists were performing their own music and granted the others gratis, nonexclusive mechanical licenses.  Because the performers of the composition would owe the mechanical royalties to the composer of the composition and the Artists licensed away any rights they may have had to be paid by their band-mates, HSP is not liable for paying any such royalties.

3.    **The Artists are liable to HSP for all costs and attorney's fees arising out of their failure to procure mechanical licenses from themselves or third parties.**

If the Court should find the Artists did not grant such licenses, the Artists would be in breach of the warranty.  The effect of such a breach is given in paragraph 11 of the PMA:

> Artist agrees to indemnify and to hold Highsteppin (and its officers, employees, directors and agents) harmless against any and all damages, costs, expenses, or fees (including attorneys' reasonable fees) incurred or suffered by Highsteppin in any claim, suit, or proceeding instituted by or against Highsteppin in which any assertion is made which is inconsistent with any warranty, representation, or covenant of Artist or which arises in connection with any act or omission by Artist.

---

[18] This would lead to the perverse result that, rather than collecting 100% of the income from the sale, the Harry Fox Agency (or other administrator) would collect a commission from the artist for performing his own works.

Id.  The Artists are therefore liable to HSP for its costs and attorney's fees in the event HSP

lacked the necessary licenses to release the Artists' music.

      **E.**      **Regarding the HSP Part Numbers, HSP obtained compulsory licenses for all non-controlled compositions and all compositions written in whole or part by persons other than Defendants.**

      The Harry Fox licenses were submitted into evidence.  (7 Ex. 84).  These licenses

demonstrate HSP acquired compulsory licenses for each of the compositions that appeared on

the HSP Part Numbers and were not owned solely by the Artists.  At no time during the trial did

Defendants demonstrate HSP failed to acquire those licenses, and the only example they cited

during the trial was in fact in 7 Ex. 84 and shown to the Court.[19]

      **F.**      **The Artists granted HSP gratis, non-exclusive, irrevocable, implied licenses to copy and distribute the HSP Part Numbers.**

      "Under federal law, a nonexclusive license may be granted orally, or may even be

implied from conduct."  3 NIMMER, § 10.03[A] at 10-40 (footnotes omitted); Lulirama, 128

F.3d at 879; I.A.E., Inc., v. Shaver, 74 F.3d 768, 775 (7th Cir. 1996)); Effects Assoc., Inc., v.

Cohen, 908 F.2d 555, 558 (9th Cir. 1990).  "An implied license can be found where the

copyright holder engages in conduct 'from which the other party may properly infer the owner

consents to his use.'"  Field v. Google Inc., 412 F. Supp. 2d 1106, 1115-16 (D. Nev. 2006).  The

existence of a nonexclusive license may also be implied from the silence of the owner "when the

copyright owner knows of the use and encourages it."  Id. at 1116.  The court looks to the

totality of the parties' conduct to determine the scope and terms of the nonexclusive license, 3

NIMMER, § 10.03[A] at 10-41, as well as to applicable state contract law to the extent it does

not interfere with the protections of Title 17.  In re Valley Media, Inc., 279 B.R. 105, 140

(D.Del. 2002).  Here, the Artists' conduct and the documentary evidence demonstrate the

---

[19] This is yet another instance of Defendants failing to read HSP's document production.

existence of gratis, non-exclusive mechanical licenses to HSP to release the Artists' music for commercial exploitation. Further, because the licenses were supported by consideration they are irrevocable.

> **1. The Artists' licenses to HSP can be implied from their repeated failure to object to HSP's activities on the numerous occasions they discussed or learned about the releases of the HSP Part Numbers.**

The conduct of the Artists demonstrates they gave HSP the nonexclusive right to distribute and copy the HSP Part Numbers and the Studio Recordings. Defendants had full knowledge of HSP's copying and distribution of the HSP Part Numbers and Studio Recordings, but at no time did Defendants object, from which the Court can conclude HSP had a license to perform those actions. Defendants have also stipulated all of the live recordings listed in the chart attached to the Stipulation of Facts were "specifically recorded with Defendants' consent for commercial purposes." (Stipulation of Facts, ¶ 8). Further, the Artists stipulated they "consented and participated in the recording of the nine (9) HSP Part Numbered Live recordings. The individual artists recorded the studio recordings at issue." (Stipulation of Facts, ¶ 9). Further, Defendants were aware "of the release and distribution of the HSP Part Numbers at some time after the initial recording and first publication/distribution, but before the expiration of the PMA." (Stipulation of Facts, ¶ 11). With respect to the Studio Recordings, "It's Life" and "Up All Night" were recorded by the Artists with HSP's (primarily financial) assistance. The Artists recorded the other Studio Recordings individually and the CDs provided to HSP by the Artists with the intent they be sold at the merchandise table.[20] (Stepanian Test.); (Malangone Test.); (Stoltz Test.). Stoltz also wanted to maximize his income by selling his compositions. (Stoltz Test.). The Artists also received E-mail blasts informing them of the releases. See (Ex.

---

[20] Stoltz testified that after the October 31, 2009, performance, Porter refused to pay a commission on that performance to Stepanian because there was not a merchandise table at that performance.

208).  In an E-mail he sent to HSP's Bret Wholgemuth, Stoltz said the songs offered for sale on digitaldownloads.com looked "great."  (Stoltz Test.)

Additionally, Porter knew HPS was distributing his music because he was receiving statements from the Harry Fox Agency for royalties due on non-controlled compositions Porter co-wrote and the Harry Fox Agency administered.  (7 Ex. 84.)  Porter was receiving payments from the Harry Fox Agency for music HSP was distributing.  Porter's knowledge is clear. Lastly, the Ubuntu memorandum described the digital sales in great detail.  (2 Ex. 36.)  **At no time** did the Artists **ever** object to HSP's actions, despite the avenues available to them (such as sending a cease and desist letter or claiming a material breach of the agreement under paragraph 15 of the PMA).  The only reasonable conclusion is they granted HSP a nonexclusive license to distribute the music.

The terms of the license are also readily inferred from the parties conduct.  First, HSP had the authority to make copies of the HSP Part Numbers and the Artists' Studio Recordings.  For each of the HSP Part Numbers and the Studio Recordings, HSP sent to the Artists three copies of each of the releases. (Malangone Test.).  The Artists therefore knew HSP was copying the performances, but at no time did the Artists object. Second, HSP had the authority to distribute the copies it made.  At nearly every one of PBS's performances, HSP hired someone to sell merchandise. (Stepanian Test.); (Stoltz Test.); (Malangone Test.). Given the Artists' admissions concerning their interest in sales at the "merch" table, it is inconveivable the Artists could not have seen the HSP Part Numbers and Studio Recordings were being sold at those tables.  The Artists also saw a full-page advertisement for all of the HSP Part Numbers in the Jazz Fest Bible, on the facing page of which was an article in memorial of one of Porter's friends. (Ex. 223). Additionally, the HSP Part Numbers and the Studio Recordings were sold at the Louisiana Music

Factory—one of the most popular music stores in New Orleans. (Stepanian Test.) Lastly, the Cost Recovery Models and the Ubuntu Memorandum described in detail the actual sales of physical and digital copies of the HSP Part Numbers and the Studio Recordings. (13 Ex. 172); (2 Ex. 36). Stepanian explained those charts at the Ubuntu meeting in August 2008. (Stepanian Test.) The Artists therefore also knew of the sales of the CDs, but, again, they never objected to the sales or told HSP to stop the sales.

The Artists' testified they did not intend to give HSP a license to copy and distribute the HSP Part Numbers and Sound Recordings, but this testimony made no logical sense. Contrary to Defendants' claims now, the Artists admitted they wanted these works distributed in some form or fashion. Porter testified he personally recorded and delivered to HSP those recordings of two of the HSP Part Numbers—HSP PG904 and HSP 505. Porter later testified he would rather have given away the CDs for free (authorized distribution) rather than selling them, supposedly because of their inferior sound quality.[21] Stoltz also claimed HSP did not have the license to distribute the HSP Part Numbers and Studio Recordings. He testified he did not want HSP selling his music on iTunes—undoubtedly the globe's largest music retailer—simply because of his bizarre parochial desire that his music be sold only in local New Orleans shops. The objective evidence demonstrates Defendants were willing and even active participants in HSP's exploitation of their music.

## 2. The Artists' licenses to HSP are irrevocable and exist apart from the PMA.

A nonexclusive license, even when implied, is irrevocable when supported by consideration. Lulirama, 128 F.3d at 882; 3 NIMMER § 10.02[B] ("Nonexclusive licenses are revocable absent consideration."); Avtec Sys.. Inc. v. Peiffer, 21 F.3d 568, 574 n. 12 (4th Cir.

---

[21] At the same time, Porter also testified in his deposition the only evidence he had that HSP was infringing on his copyrights was "Where's the check?"

1994). "This is so because a nonexclusive license supported by consideration is a contract." Lulirama, 128 F.3d at 882; Effects, 908 F.2d at 559 n. 7 (an implied license is "a creature of the law much like any other implied-in-fact contract"). If a license supported by consideration is freely revocable by the licensor, then the licensor has, in effect, made an illusory promise and there is no contract. Lulirama, 128 F.3d at 882.

Defendants received consideration in exchange for the licenses they gave to HSP. Based on the parties' conduct, the Court can reasonably conclude in exchange for the Artists giving HSP a nonexclusive license to distribute the HSP Part Numbers, HSP advanced marketing, production, manufacturing, and production expenses; arranged for distribution; accounted for the income, and credited the Artists for that income. In addition, HSP continued all of its actions under the PMA to promote the Artists in accordance with the overall marketing plan.

A corollary of this result is **the termination of the PMA did not revoke HSP's nonexclusive license to distribute the HSP Part Numbers**. HSP's agreement to distribute Defendants' music existed independent of the PMA. In fact, to the extent HSP has continued to account for the income it has received from the Artists, HSP is not in material breach of its license and may still distribute the HSP Part Numbers. See Quintin Vespa Co. v. Construction Serv. Co., 343 Mass. 547, 554 (1962) (material breach of contract by one party excuses other party from further performance as matter of law).

### G. Defendants have failed to prove as a matter of law HSP infringed their copyrights in the Non-HSP Part Numbers.

The Fifth Circuit has observed, "As direct evidence of copying is rarely available, factual copying may be inferred from (1) proof the defendant had access to the copyrighted work prior to creation of the infringing work and (2) probative similarity." Peel, 238 F.3d at 394; see also Engineering Dynamics, Inc. v. Structural Software, Inc., 26 F.3d 1335, 1340 (5th Cir. 1994).

Here, Defendants have adduced no evidence in support of their allegation HSP actually copied the works "Digital Dave" Morrison, Peer Munck, and Ann Blonston recorded. <u>See</u> (Stipulation of Fact, ¶ 10). In order to prove their claim, therefore, they must refer to the two-part test of access and probative similarity.

**1. Defendants have not proven HSP actually copied—or even had access to—the sound recordings of the Non-HSP Part Numbers.**

With respect to the Non-HSP Part Numbers, Defendants have not demonstrated HSP had access to the recordings. HSP produced all of the documents and music in its possession, custody, or control that were requested during discovery, and the Non-HSP Part Numbers were not among them. (Stepanian Test.). Stepanian testified HSP did not have the Non-HSP Part Numbers in its possession at any time, because Morrison, Munck, and Blonston made those recordings and offered them for sale. (Stepanian Test.). Defendants submitted no evidence to contradict this testimony and demonstrate access. <u>Ferguson v. Nat'l Broad. Co.</u>, 584 F.2d 111, 113 (5th Cir. 1978) (proof of "access" may not be based on speculation or conjecture).

**2. Defendants have not proven the Non-HSP Part Numbers are probatively similar to the originals.**

"Probative similarity" determines whether there has been actual copying of the allegedly infringed material. The Fifth Circuit has described the "probative similarity" test as follows:

> [A fact-finder] may find that two works are probatively similar if it finds any similarities between the two works (whether substantial or not) that, in the normal course of events, would not be expected to arise independently in the two works and that therefore might suggest that the defendant copied part of the plaintiff's work. <u>See</u> <u>Ringgold v. Black Entm't Television, Inc.</u>, 126 F.3d 70, 75 (2d Cir. 1997) ("[P]robative similarity[] requires only the fact that the infringing work copies something from the copyrighted work; ... substantial similarity[] requires that the copying is quantitatively and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred."); 4 NIMMER § 13.01[B], at 13-12 ("[W]hen the question is copying as a factual matter, then similarities that, in the normal course of events, would not be expected to arise independently in the two works are probative of defendant's having copied as a factual matter from plaintiff's work.")….

Positive Black Talk, 394 F.3d at 370. While the Fifth Circuit has said, "If the two works are so strikingly similar as to preclude the possibility of independent creation, 'copying' may be proved without a showing of access…," Ferguson, 584 F.2d at113, Defendants have not demonstrated probative similarity between the work and those works allegedly infringed.[22] Again, by its very definition, proving probative similarity requires the fact-finder view the two works side-by-side in order to determine whether the elements of the copyrighted work match elements of the allegedly infringed work. The allegedly infringed works were never entered into evidence; therefore, Defendants failed to meet their burden of proof.

**H.**    **Regardless of whether the Artists granted HSP a gratis, non-exclusive, irrevocable, implied license to distribute the Studio Recordings and the HSP Part Numbers or HSP was acting as the Artists' agent in selling that music, HSP is not liable for infringement of those works.**

Paragraph 3(a) of the PMA appointed HSP the Artists' attorney-in-fact "to do any or all… which is permissible as a matter of law to authorize and empower an agent to do." (1 Ex. 1:3). This sweeping language was limited only by paragraph 3(a)(viii), which required HSP to "obtain Artists' approval beforehand concerning actions taken under this paragraph 3(a)…." (1 Ex. 1:4). In effect, HSP was appointed as an agent for the Artists in order to carry out the goals of the PMA. Thus, when HSP was selling merchandise it received from the Artists, it was doing so on behalf of the Artists (with the Artists' knowledge, which they admit) pursuant to HSP's

---

[22] Despite their similarity, "probative similarity" and "substantial similarity" are distinct concepts. "[T]he purpose of the probative similarity inquiry is to determine whether factual copying may be inferred…." Positive Black Talk, 394 F.3d at 370. "Substantial similarity" is defined as "copying of constituent elements of the work that are original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). The purpose of the substantial similarity test is to determine "whether the factual copying, once established, is legally actionable." Positive Black Talk, 394 F.3d at 370. Thus, for example, if A publishes a sentence in a book, and thereafter B produces a book containing the same sentence, even if the fact finder finds probative similarity and finds B actually copied the sentence, the fact finder may find it was so *de minimis* as to be unactionable and therefore not substantially similar. See also Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir.1930) (Hand, J.).

general express authority. As was discussed previously, this is effectively the Artists self-publishing their own music. Hence, HSP did not infringe the Artists' copyrights because they were acting with the Artists' authority and knowledge and on their behalf.

> **I.      HSP has accounted for all monies received in payment for the sales of all of the live recordings and has credited Defendants for that income.**

The total sales of the Artists' music (including the digital income) have been accounted for and entered into evidence. They are given in the accounting reports the Plaintiffs have admitted into evidence, specifically in Exhibit 146 under the heading "Digital Downloads Income." Regardless, even if Defendants can somehow demonstrate HSP has failed to account for every cent it received, HSP's liability sounds in conversion or breach of fiduciary duty, not in copyright infringement.

**VII.    <u>The Court should find for HSP on Defendants' breach of contract claims.</u>**

In Massachusetts, to prove breach of contract, a plaintiff must demonstrate (1) a valid contract exists, (2) the defendant breached the contract, and (3) the plaintiff was damaged as a result. <u>Michelson v. Digital Financial Services</u>, 167 F.3d 715, 720 (1st Cir. 1999). A breach of contract is a failure to perform a material term for which no legal excuse exists. <u>Guckenberger v. Boston University</u>, 957 F.Supp. 306, 316 (D.Mass. 1997); <u>Sterilite Corp. v. Continental Casualty Co.</u>, 20 Mass.App.Ct. 215, 220 (1985), <u>superseded on other grounds</u>, 397 Mass. 837 (1986). Damages in a breach of contract action are calculated to put the plaintiff in the position it would have been in had the contract been performed. <u>Situation Management Systems, Inc. v. Malouf, Inc.</u>, 430 Mass. 875, 880 (2000).

The Artists suggest HSP breached the PMA in part because it failed to properly and competently manage the Artists. The evidence, however, establishes the Artists—particularly

Porter—were disinterested in HSP's efforts because they did not reap an immediate financial reward.

**A.     Defendants breached the PMA or failed to comply with its terms.**

Under the PMA, if HSP advanced Defendants money, Defendants agreed to reimburse it. (1 Ex. 1:7) (paragraph 6(a)).  The Defendants agreed if HSP made such loans, "Artist shall reimburse Highsteppin therefore promptly (i.e. not later than on a monthly basis for reimbursement of expenses and otherwise)…." (1 Ex. 1:7).

These obligations survived the termination of the PMA. The PMA provides "upon the expiration or other termination of the Term of this Agreement for any reason, Artist shall continue to be responsible for their obligations under Paragraph 6 above…." (1 Ex. 1:12-13). Paragraph 6(b) provides the Artists "will reimburse Highsteppin for any and all expenses incurred by Highsteppin on Artist's behalf or in connection with Highsteppin's services performed hereunder…." (1 Ex. 1:8).  The debt incurred by HSP on the Artists' behalf has not been repaid; therefore, the Artists are in breach of the PMA.

**B.     HSP did not breach the PMA because it obtained approval for the expenses it paid on Defendants' behalf.**

The Artists' primary argument in support of their breach of contract claim is HSP did not acquire approval of the expenses it made on the Artists' behalf.  The evidence, on the other hand, demonstrates HSP did acquire the Artists' approval. Stepanian testified he spoke with the Artists on the phone often to discuss financial decisions.  The Artists also frequently phoned HSP, (3 Ex. 44), often, as Stepanian testified, to discuss financial issues.  In the case of many of the larger expenses, there were often ongoing discussions prior to the expense. (Stepanian Test.). For example, the Artists learned several months prior to the Danny Clinch photo-shoot this was a

marketing option (8 Ex. 104), and Stepanian testified they had discussed the details on numerous occasions over the phone before the photo-shoot, including the costs.

Furthermore, in nearly all cases, the Artists were direct beneficiaries of the expenses HSP advanced. They knew the photo-shoot was going to cost money. (Stoltz Test.); (Porter Test). They knew Madison House Publicity was being paid. (Stoltz Test.); (Porter Test). They also knew the salary advances were being paid by HSP. (Stoltz Test.); (Porter Test). Their only argument to the contrary (that Stepanian told them "I got this" and he was building HSP's brand) rings hollow in light of the numerous discussions of the Artists' ever-increasing debt. (3 Ex. 60:1787-88) (asking about PBS's debt and specifically about the cost of the photo-shoot); (9 Ex. 132:3907) (terminating the "bi-weekly draws"); (1 Ex. 19:195) (Stoltz cost recovery reports); (1 Ex. 19:201) (Batiste cost recovery reports); (1 Ex. 19:187) (2007 PBS Profit and Loss); (1 Ex. 19:188) (Sales by Item Summary—PBS Merchandise Sales); (1 Ex. 19:189) (Merchandise Sales and Cost Recovery – Porter Batiste Stoltz); (2 Ex. 36) (the Ubuntu report); (1 Ex. 19:232) (loan due to affiliate on 2007 draft 1065); (1 Ex. 17:169) (signed 2007 tax return reflecting the loan due to affiliate of $227,661). The Artists' knowledge of other expenditures, such as the salaries, Madison House, and Danny Clinch, is demonstrated in HSP's Proposed Findings of Fact in additional detail. Nevertheless, at no time did the Artists tell HSP to stop spending on their behalf. To the contrary, the Artists often asked HSP to pay *additional* bills and expenses on their behalf. (9 Ex. 116:3680) (Porter asking HSP to pay one of the road workers); (9 Ex. 128:3796) (Porter asking HSP in an E-mail to pay for an advertisement in Relix, a trade publication); (7 Ex. 87) (Stoltz suggesting HSP manufacture hooded sweatshirts for sale).

**C.** **To the extent the Court finds any of the expenses were not approved by the Artists, the Artists' conduct constituted a waiver of the approval requirement of the PMA or constituted a course of performance permitting HSP to obtain approval orally.**

A waiver excuses a party from fully performing some term of a contract. Porter v. Harrington, 262 Mass. 203 (1928). Whether a defendant has waived performance of a contractual obligation is a question of fact. "Waiver may be manifested by words…. It would be unconscionable to permit the defendants, in view of their conduct, without notice or warning to insist upon strict performance of the contract and to forfeit all rights of the plaintiff." Taxi Service Co. v. Gulf Refining Co., 252 Mass. 314 (1925).

To the extent the Court finds some expenses were not approved, the Artists' knowledge of HSP's spending coupled with their silence[23] constituted a waiver of their right of approval under the PMA. As described above, the Artists knew HSP was spending on their behalf and they were accruing debt to HSP; however, they never objected to HSP continuing to spend. This was not simply, in Porter's words, a "bad move," this was an affirmative expression he knew his actions accepted the benefits.

Related to waiver is the concept of "course of performance"; to the extent any ambiguity exists in the PMA's language regarding approval of expenses, the parties' course of performance is evidence of the parties' intent:

> Ambiguous terms can be clarified and terms supplemented through a course of performance of a contract, even without explicit incorporation. See Lawrence v. Cambridge, 422 Mass. 406, 411 (1996) (" in an ordinary contract, where matters are left open the court may imply terms either that are reasonable or that may be gathered from the subsequent course of performance" ); Restatement (Second) of Contracts § 202(4) (1981) (" Where an agreement involves repeated occasions for

---

[23] "[S]ilence, in conjunction with acceptance of valuable services performed by another may be the basis for a finding of an agreement to pay for the services when the beneficiary knows, or in the circumstances ought to know, that the person providing the services expects to be paid for them." Bump v. Robbins, 24 Mass.App.Ct. 296, 306 (1987); see Day v. Caton, 119 Mass. 513 (1876).

performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement"); Farnsworth, Contracts § 3.28 at 204 (4th ed.2004) (even without incorporation, an agreement may be " fleshed out" and indefiniteness cured " by a course of performance between [the parties] after their agreement" ).

SAR Group Ltd. v. E.A. Dion, Inc., 79 Mass. App. Ct. 1123 (2011) (Rule 1:28 decision).[24]

As the Court noted during the trial, the approval process "got away from everyone." This was not merely a mistake by the parties, however. This was a demonstration of how they intended to conduct their business relationship and perform their contractual obligations. Their actions have legal consequences and demonstrate the performance of the PMA was intended to be oral, over the phone, and largely informal.

This is similar to how Jaccodine testified he manages his own clients. The lifestyle of the travelling musician is often so demanding and chaotic, it is impractical to seek written approval or, in many instances, prior approval. He also testified he would routinely front expenses for his artists without their knowledge, and they would later repay him. If an artist insisted on written or prior approval, Jaccodine testified, he would not represent them.

Stepanian, Porter, and Stoltz testified they wanted to hold weekly meetings with the Artists over the phone, but this rarely happened; however, it clearly was not important enough to the Artists for them to insist on it, and therefore demonstrates how they wished for the PMA to be performed. Consequently, whether viewed through the prism of waiver or course of performance, the Artists' conduct made clear they knew HSP was spending money on their behalf, they were continuing to accrue debt, and they did not want HSP to stop spending. For the

---

[24] "One of the best ways to determine what the parties intended in a contract is the method in which the contract is performed, particularly if done consistently over and over again for a period of many years." *D'Antonio v. Simone*, 94-798 (La.App. 5th Cir. 3/15/95), 653 So.2d 678, 690 (citing La. C.C. art. 1983; *River Oaks, Inc. v. Blue Cross of Louisiana*, 595 So.2d 785 (La.App. 5th Cir. 1992), *writ denied* 598 So.2d 361 (La. 1992); *Wise v. Lapworth*, 614 So.2d 728 (La.App. 5th Cir. 1991).

foregoing reasons, the Court should find Defendants breached the PMA and HSP did not breach the PMA.

    **D.    HSP cannot be held in material breach because they were never given notice and an opportunity to cure any alleged breach of the PMA.**

Under the PMA, HSP was given the right to cure any material breach. The Artists were required, as a necessary prerequisite to HSP being in material breach, to give notice of the breach to HSP. (1 Ex. 1:11) (paragraph 15). The term "notice" is specifically defined in the PMA, and requires notice "shall be in writing and shall be given by registered or certified mail or telegraph (prepaid). (1 Ex. 1:14) (paragraph 20). This was a term that inured to the benefit of HSP alone and cannot be waived by Defendants. Because Defendants never sent such a written notice, therefore, any breach by HSP cannot be deemed material.

**VIII.    <u>The Court should find for HSP on Defendants' remaining claims.</u>**

Defendants' claim for "Failure to Provide Accurate Accountings" does not state a cause of action recognized under Massachusetts law (and speaks in terms of failing "to provide the PMA-required accountings" and thus breach of contract) and therefore must be dismissed. Furthermore, Defendants have failed to demonstrate HSP negligently misrepresented any facts to the Artists: to the contrary, as set forth above, HSP and its agents were always forthright with the Artists, provided significant financial information, addressed any and all of the Artists' questions and concerns, and worked to further their careers and PBS. (Stepanian Test.); (Malangone Test.).

Similarly, Defendants are not entitled to pierce the corporate veil and seek judgment against Stepanian personally for HSP's actions. Veil piercing is "an equitable tool that ignores the distinction between corporation and shareholder to avoid or prevent injustice or fraud." "A Massachusetts Guide to Preserving and Piercing the Corporate Veil," 78 MBA Law R. 2.

Defendants have not demonstrated HSP or Stepanian utilized HSP for that purpose, nor have they shown Stepanian in any way defrauded Defendants. This claim must also, therefore, be denied.

**IX.** **Massachusetts law provides for prejudgment interest at 12% per annum on any award from the date of demand or breach in contract actions and the date of filing in tort actions.**

In diversity cases,[25] state law governs prejudgment interest. Schwimmer v. Allstate Ins. Co., 176 F.3d 648, 650 (2nd Cir. 1999); see Wyatt v. Penrod Drilling Co., 735 F.2d 951, 955 (5th Cir. 1984) (declining to impose prejudgment interest under an admiralty and diversity claim where plaintiff "presented no state-law claim in his complaint or at trial"); see also Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 497 (1941). Because Plaintiffs' claims arise under Massachusetts law, the law of the commonwealth governs prejudgment interest.

The imposition of prejudgment interest under Massachusetts law is mandated by statute in contract and tort actions. In tort actions,

> there shall be added by the clerk of court to the amount of damages interest thereon at the rate of twelve per cent per annum from the date of commencement of the action even though such interest brings the amount of the verdict or finding beyond the maximum liability imposed by law.

M.G.L. c. 231, § 6B. In contract actions,

> interest shall be added by the clerk of the court to the amount of damages, at the contract rate, if established, or at the rate of twelve per cent per annum from the date of the breach or demand. If the date of the breach or demand is not established, interest shall be added by the clerk of the court, at such contractual rate, or at the rate of twelve per cent per annum from the date of the commencement of the action….

M.G.L. c. 231, § 6C. Massachusetts interprets the statutes as providing for simple interest.

---

[25] This case was originally brought in the Massachusetts District Court on the basis of diversity jurisdiction: Highsteppin' Productions, LLC, v. Porter, et al., 09-12208 (D.Mass. 2009); see also (Amend. Compl. ¶ 13).

With respect to HSP's tort claims, simple interest should accrue from thirty days following October 31, 2009, to the date of the entry of judgment. The evidence here establishes demand for repayment was 30 days after each individual advancement of funds or the delivery of the respective profit and loss statements.[26] (1 Ex. 1:7) (paragraph 6(a) provides for repayment of expenses advanced after thirty days). At the very least, the breach of the PMA occurred on October 31, 2009, when Porter officially resigned from HSP. (5 Ex. 62:1830-33). The PMA, on its face, does not establish an interest rate in the event of breach or nonpayment. Thus, interest will accrue on HSP's damage in the amount of 12%.

X.     **Under the PMA, HSP is entitled to recover its attorney fees and costs.**

Section 11 of the PMA provides, in pertinent part:

> Artist agrees to indemnify and to hold Highsteppin (and its officers, employees, directors and agents) harmless against any and all … cost, expenses, or fees (including attorneys' reasonable fees) incurred or suffered by Highsteppin in any claim, suit, or proceeding instituted by or against Highsteppin … which arises in connection with any act or omission by Artist.

1 Ex. 1, 00010. This action in a claim, suit or proceeding instituted by Highsteppin and including counterclaims against Highsteppin. This action arises in connection with acts or omissions by Artists, i.e., their failure to pay reimbursements due HSP, their fraud, and their violations of M.G.L. c. 93A. Accordingly, under the provision quoted above, Defendants are obligated to indemnify and to hold Highsteppin harmless against the costs, expenses, and fees Highsteppin has incurred. Highsteppin is entitled to an award of its reasonable fees, costs and expenses in an amount to be determined by the Court.

---

[26] The Defendants can point to no waiver of HSP's right to payment within thirty days; HSP simply deferred its right to repayment until bringing this action against Defendants.

## Conclusion

Based on the foregoing, HSP requests this Court:

1.      Find for HSP on all of its claims;

2.      Dismiss all of Defendants' claims;

3.      Enter a declaratory judgment holding the PMA requires the artists pay commissions on their Gross Earnings as provided in the PMA during the Post-Termination Period;

4.      Order the Artists to account for all such Gross Earnings on which HSP may claim commissions during the Post-Termination Period;

5.      Award monetary damages for HSP against the Artists jointly and severally in the amount of $632,017.59;

6.      Find the debt owed to HSP from the Artists nondischargeable pursuant to 11 U.S.C. § 523;

7.      Award costs and attorney's fees pursuant to 17 U.S.C. § 505;

8.      Award costs and attorney's fees pursuant to M.G.L. c. 93A, § 11;

9.      Award attorney's fees, costs and expenses pursuant to paragraph 11 of the PMA;

10.     Assess simple interest at the rate of twelve percent (12%) per annum on the

Court's award of damages pursuant to M.G.L. c. 231, ¶¶ 6B and 6C; and

11.     Enter any other relief this Court deems just and proper.

Respectfully submitted,

s/Pierre V. Miller II
Pierre V. Miller II (17712)
PATRICK MILLER LLC
400 Poydras Tower, Suite 1680,
New Orleans, Louisiana 70130
Telephone:(504) 527-5400
Facsimile: (504) 527-5456
E-mail: pmiller@patrickmillerlaw.com

and

Jeffery S. Baker (MA Bar Roll No.  544929)
BAKER & ASSOCIATES
2 West Hill Place, Suite 100
Boston, MA 02114
Telephone:(617) 573-9505
Facsimile: (617) 573-9503
E-mail: Bakerlaw@aol.com

*Attorneys for Plaintiff and Defendants-in-counterclaim*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies this document along with any attachments was served by first class mail or E-mail on this day upon all interested parties and all parties who have filed their appearances and requested service of all pleadings filed in this case.

/s/ Jeffrey S. Baker
Jeffrey S. Baker, Esq.

Date: January 14, 2013