UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re | Docket Number |
| GEORGE J. PORTER, JR. and ARALEAN H. PORTER, | 2:10-bk-13553 |
| Debtors | Chapter 7 |

| | |
|---|---|
| HIGHSTEPPIN' PRODUCTIONS, LLC, Plaintiff, | Docket Number |
| v. | 2:10-ap-01130 |
| GEORGE PORTER, JR., et al., Defendants | |

**Administratively Consolidated for Trial With**

| | |
|---|---|
| HIGHSTEPPIN' PRODUCTIONS, LLC, Plaintiff, | Docket Number |
| v. | 2:10-ap-01131 |
| BRIAN STOLTZ, et al., Defendants | |

**Administratively Consolidated for Trial With**

| | |
|---|---|
| HIGHSTEPPIN' PRODUCTIONS, LLC, Plaintiff, | Docket Number |
| v. | 2:11-ap-01163 |
| DAVID RUSSELL BATISTE, et al., Defendants | |

## <u>HIGHSTEPPIN AND PHILIP I. STEPANIAN'S PROPOSED FINDINGS OF FACT</u>

Plaintiff, Highsteppin' Productions, LLC ("HSP"), Third-Party Defendant Philip Stepanian ("Stepanian"), (collectively "HSP") submit the following proposed findings of fact.

## Notes on Citations and References

References to exhibits are cited in this brief using the convention "([Volume] Ex. [Exhibit Number]:[Trial Bates Stamp])."[1] The testimony of specific witnesses is cited as ([Witness Name] Test.). The term "Artists" refers to George Porter, Jr.; Russell Batiste; and Brian Stoltz. "Defendants" refers to the Artists and Porter Batiste Stoltz, LLC ("PBS").

## Table of Contents

Notes on Citations and References .............................................................................................. 2

Table of Contents .......................................................................................................................... 2

Proposed Findings of Fact ............................................................................................................ 4

   I.   The witnesses, their background, and their credibility. ........................................................ 4

     A.   George Porter, Jr. .......................................................................................................... 4

     B.   Brian Stoltz. ................................................................................................................... 5

     C.   Russell Batiste. ............................................................................................................. 6

     D.   Philip Stepanian. ........................................................................................................... 7

     E.   Donna Malangone. ........................................................................................................ 7

     F.   David Herlihy. ............................................................................................................... 8

   II.   Pre-contract relationship and the negotiation of the Personal Management Agreement. ... 8

   III.   The Personal Management Agreement. ............................................................................... 9

     A.   Paragraph 4(a). ............................................................................................................ 10

     B.   Paragraph 4(b). ............................................................................................................ 10

     C.   Paragraph 6(b). ............................................................................................................ 10

     D.   Paragraph 10. ............................................................................................................... 11

     E.   Paragraph 11. ............................................................................................................... 11

     F.   Paragraph 17(a). .......................................................................................................... 12

---

[1] For example, the citation "(1 Ex. 2:19)" refers to Volume 1, Exhibit 2, Trial Bates Stamp 0019.

G. Paragraph 17(b). ................................................................................................. 13

IV. Defendants failed to play a sufficient number of performances to make a profit. .......... 13

V. HSP's financial reporting to Defendants. ...................................................................... 14

    A. HSP was responsive to the Artists' questions about the accounting. .......................... 14

    B. The 2007 Profit and Loss Statements. ....................................................................... 15

    C. The 2007 Merchandise Accountings to Defendants. .................................................. 15

    D. The 2007 PBS Tax Return and the "Loan Due to Affiliate." ...................................... 16

    E. The 2008 Financials. .................................................................................................. 17

    F. The Ubuntu meeting. ................................................................................................. 18

VI. The salary advances. .................................................................................................... 20

    A. Starting the salary advances. ..................................................................................... 20

    B. Termination of the salary advances. .......................................................................... 21

    C. The 2007 and 2008 1099's. ....................................................................................... 22

    D. The Artists knew the salary advances exceeded their revenues. .................................. 24

VII. The termination of the Personal Management Agreement. ............................................ 24

VIII. Non-tour expenses. ...................................................................................................... 26

    A. Danny Clinch. ........................................................................................................... 26

    B. Madison House Publicity. .......................................................................................... 28

    C. Karen Stella. ............................................................................................................. 29

IX. Merchandise and digital sales. ...................................................................................... 29

    A. Merchandise sales and cost recovery. ....................................................................... 29

    B. Income from digital sales. .......................................................................................... 31

X. Releases of the Artists' music. ...................................................................................... 31

    A. The HSP Part Numbers. ............................................................................................ 31

    B. The Studio Recordings. ............................................................................................. 32

C.   The Non-HSP Part Numbers. ....................................................................................... 32

XI.   HSP's commissions on Gross Earnings under the PMA earned by the Artists outside of PBS performances................................................................................................................. 34

**Proposed Findings of Fact**

HSP proposes this Court find the following facts based on the testimony and evidence admitted at trial.

I.       **The witnesses, their background, and their credibility.**

A.       **George Porter, Jr.**

George Porter, Jr. ("Porter") is a bassist with nearly 50 years of experience in the music industry. (Porter Test.). He has played throughout the world and worked for such musical groups as The Meters and The Funky Meters. (Porter Test.). He was a member of Porter Batiste Stoltz ("PBS") and was under the management of HSP for the duration of the Personal Management Agreement ("PMA").

Porter never intended to repay the loans he received from HSP "at any time." (Porter Test.). He testified he did not intent to pay before Stepanian advanced any monies. At the time he received the value, he testified, he had no intent to repay. After receiving the 2007 draft tax returns, Porter never intended to repay, even when he signed the tax returns.

The Court should generally not credit Porter's testimony. On the whole, it was self-serving and contradictory. On numerous instances his deposition testimony was different from his testimony on the stand. For example, Porter suggested in his testimony he did not receive E-mails that were clearly addressed to him. He also had no response when the Court asked him why he did not order HSP to stop spending after receiving the 2007 PBS tax return showing a loan due to affiliate of $227,661 other than suggesting it was a "bad move"—even though his

accountant, Shannon Chabaud, advised him not to sign the tax return if he disagreed with the line item. (Chabaud Test.); (1 Ex. 18:183-84). Thereafter, he expressly stated in an E-mail to the other Artists he would "do [his] work" and sign the tax return, but "be ready when or if the shit hits the fain [sic]." (9 Ex. 112:3651). Porter also testified generally he did not know HSP was incurring charges on behalf of him and the other Artists, but many of those charges were incurred on PBS's American Express card, the bills for which were sent to Porter's home. (3 Ex. 37). Taken together, these statements show Porter is willing to misrepresent facts when necessary.

**B.     Brian Stoltz.**

Brian Stoltz has over 30 years of experience as a guitar player and funk artist. He performs primarily in the New Orleans area but has worked with nationally known touring groups such as the Funky Meters. He was a member of PBS and was under the management of HSP for the duration of the PMA.

Stoltz also has very little credibility. In his testimony, he expressed dissatisfaction with how HSP had performed the agreement; however, the evidence demonstrates he was enthusiastic about working with HSP and was very pleased with HSP's results for the Artists and PBS. In an E-mail to Porter on November 21, 2008, Stoltz expressed his desire that HSP "license whatever they can" of his music. (9 Ex. 122:3770). Stoltz encouraged Porter to allow HSP to do the same. (9 Ex. 122:3770).

After Porter terminated the PMA, Stoltz wanted to continue working with HSP. He told HSP in an E-mail in December 2009, "it is imperative that I move on certain things NOW (Jazz fest, gigs for the new band and a decision on the 2 record offers that I have, etc….)." (5 Ex. 62:1850). In that same E-mail, Stoltz asked about the ongoing projects to license his music and secure him additional gigs. Id. Stoltz also stated in an E-mail on October 31, 2009, after Porter

left the group, that "i [sic] truly now feel like it is me that don't fit in with them…." (5 Ex. 62:1837). On October 30, 2009, Stoltz sent a long letter to HSP in which he argued he did not abandon the group, and in particular, he had not "reneged on the deal made when we were put on salary" to play additional performances and increase revenues. (5 Ex. 62:1840).

Stoltz's memory of events on the stand and in his pleadings differed significantly from the sentiments he expressed verbally and in E-mails to Stepanian and Malangone. (Stepanian Test.); (Malangone Test.). After the suit began, Stoltz suddenly testified and stated in his pleadings he did not want HSP to license his music and they were doing it behind his back. Stoltz testified he thought digitaldownloads.net was an archive site, even though the very name of the website itself states otherwise and PBS's music was offered for sale on that site. However, in E-mail he sent to HSP's Bret Wholgemuth, Stoltz said the site looked "great," an odd reaction to an archive website. (Stoltz Test.). Stoltz's testimony therefore lacks credibility.

### C. Russell Batiste.

Russell Batiste has approximately 25 years of experience as a percussionist in the New Orleans area. He has performed with nationally known touring groups such as the Funky Meters. He was a member of PBS and was under the management of HSP for the duration of the PMA.

Undoubtedly, Batiste took little interest in these proceedings. Batiste himself stated his only job was (paraphrasing) "to show up and play the drums." His testimony indicated he has little knowledge or memory of the facts of the case. He admitted he had never read the PMA, and signed it because Stoltz and Porter told him to. He also testified he never intended to repay any of the monies he received from Phil. He also lacked any interest in or understanding of the finances of PBS. Batiste did not even know HSP was separate from Stepanian, nor did he know what Stepanian's role with PBS was. The Court therefore should give his testimony little weight.

### D.    Philip Stepanian.

Philip Stepanian is the manager and sole member of HSP.  He has managed HSP since its creation, and worked with the Artists throughout the term of the PMA.  Prior to managing PBS and the Artists, Stepanian had a background in marketing, including owning Resort Discovery, a time-share business associated with the Marriot chain of hotels.  He sold Resort Discovery to pursue his passion in the music industry, and intended to apply the marketing concepts he had learned to that industry.

While Stepanian had not worked in the music industry prior to him selling Resort Discovery, he sought to learn as much as he could about it by reading books and hiring a consultant with experience in the music industry, Jeannie Smith.  He did not immediately start by managing bands, but began with merchandising and thereafter transitioned into personal management.

Stepanian intended to provide artists under his management—including PBS and the Artists—an "artist-controlled environment" in which the artists made their own decisions about what music they would write and perform.  As Stepanian testified, he wanted the artists under his management to be able to focus on the creative process. (Stepanian Test.).

### E.    Donna Malangone.

Donna Malangone ("Malangone") has been the office manager at HSP since its inception. She is primarily responsible for managing the operations of the business.  Throughout the term of the PMA, she had numerous interactions with the Artists and was privy to many of the essential facts at issue in this matter. (Malangone Test.).

In her capacity as the office manager, Malangone testified she was secondarily responsible (after Shelley Dyer, HSP's bookkeeper) for performing data entry into Quickbooks based on bills that came into the office.  She was also familiar with the methods by which HSP

accounted for the Artists' gross earnings earned outside of HSP (referred to as the "Flowcharts") and the merchandise sales (referred to as the "Cost Recovery Model").

**F.  David Herlihy.**

David Herlihy ("Herlihy") is an attorney and a member in good standing of the Massachusetts bar who practices solely copyright law and litigation and teaches at Northeastern University.  He has worked full-time as an attorney since 1993.  Prior to that, he was a member of the Boston-centered musical group O Positive.  For a time he represented HSP (especially during the negotiation of the PMA with the Artists' attorney) and later was also directly employed by HSP serve its artists.  In those latter roles he worked with the Artists and had knowledge of many of the facts relevant to this matter.

## II.  <u>Pre-contract relationship and the negotiation of the Personal Management Agreement.</u>

Prior to the PMA, the Artists had performed together as Porter Batiste Stoltz on several occasions beginning in the late 1990's.  (Stotlz Test.). Although they did not tour regularly, they did form a limited liability company, PBS, LLC, prior to the PMA. (Stoltz Test.).  They each were members of the LLC.

Stepanian testified he originally sought to work with Porter because he had followed his career for many years and respected him greatly as an artist.  In 2005 at a wedding in Florida, Stepanian proposed handling Porter's merchandising.  Porter agreed, and Stepanian started travelling with Porter throughout the country selling his merchandise at his shows.

Porter and Stepanian started discussing a formal merchandising agreement, even to the point of negotiating an agreement.  Around that time, Stoltz (then a member of Porter Batiste Stoltz and the Funky Meters) also expressed interest in working with Stepanian.  Over time, the merchandising agreement evolved into the Personal Management Agreement ("PMA").

Stepanian retained Attorney Herlihy's services to draft and negotiate the PMA. The Artists retained Greg Eveline, an entertainment attorney in Louisiana. Over several months they exchanged numerous drafts of the PMA. (1 Ex. 3). Attorney Eveline added into the PMA the language regarding approval for individual expenses in excess of $750 or $2000 in the aggregate in one month. (Herlihy Test.); (1 Ex. 3:47). On May 8, 2006, Stepanian and the Artists executed the PMA.

The Artists have suggested Stepanian pressured them to enter into the PMA; however, the extensive correspondence between Attorneys Eveline and Herlihy alone demonstrates the Artists were not manipulated, but rather had competent representation. The Artists asked for the inclusion of numerous additional terms into the PMA, and the negotiations themselves occurred between January 2006 and May 2006. (1 Ex. 3); (1 Ex. 1:2). Lastly, Stepanian testified by the time the PMA was signed, he was already acting as the *de facto* personal manager of HSP, including scheduling and administering tours and arranging travel for the Artists.

For similar reasons, the Artists cannot argue credibly at this time they did not know or understand the contents of the PMA. They were represented by competent counsel who presumably advised them about the contents of the agreement, and insisted on limits on expenses on their behalf. Porter specifically negotiated exceptions regarding his own music and employment with the Funky Meters. The members custom-tailored the PMA to their needs and were familiar with the PMA at the time they signed.

III. __The Personal Management Agreement.__

To the extent any terms of the PMA are ambiguous (and therefore questions of fact), those terms should be interpreted as follows.

## A.    Paragraph 4(a).

The interpretation of this paragraph is discussed in HSP's specific responses to the Court's questions below.

## B.    Paragraph 4(b).

The first sentence of this paragraph establishes the Artists knew HSP was not a business manager.  Because they failed to hire a business manager and were content with HSP bearing the responsibilities of a business manager, HSP should not be held to the same standard of care as a business manager with respect to their accounting procedures.

## C.    Paragraph 6(b).

This paragraph pertains to the approval of expenses incurred by HSP on the Artists' behalf. The paragraph states in relevant part:

> Artist (or Business Manager) will reimburse Highsteppin for any and all expenses incurred by Highsteppin on Artist's behalf in connection with Highsteppin's services performed hereunder, provided that: … (iii) Highsteppin shall not incur without Artist's prior consent (A) any single expense in excess of Seven Hundred Fifty Dollars ($750) Dollars or (B) aggregate monthly expenses in excess of Two Thousand ($2,000) Dollars.

(1 Ex. 1:8). This paragraph does not require approval of expenses be in writing.

The evidence at trial shows HSP did obtain the approval of the Artists for the expenses it incurred.  Stepanian testified he had numerous phone calls with the artists (sometimes multiple times per week) and discussed the band's activities, including upcoming expenditures.  He also testified before new projects were approved (such as merchandising or music production) they were extensively discussed in person or over the phone among the Artists and HSP.  On numerous occasions the Artists called HSP regarding their needs or questions.  See (4 Ex. 44). In many cases, notably with the tour expenses, the Artists directly benefited from the expenditure and the expenditure was often made by Porter himself during the tour and on the band's credit

card.  See (3 Ex. 37).  Lastly, Attorney Eveline initially drafted the paragraph requiring Artist approval but never insisted the approval be written because the term did not appear in the final draft.

The testimony of Ralph Jaccodine is also instructive in this respect.  When he was asked whether the approval paragraph should be in writing, he testified it would be impractical to require a traveling musician to approve expenses.  He also testified the financial decisions he made with his artists are generally made verbally, often over the phone while they are on tour.  He also testified he would front expenses for his artists, and they would later repay him.  If an artist insisted on written or formal approval, Jaccodine testified, he would not represent them.

### D.     Paragraph 10.

Paragraph 10 of the PMA states as follows:

> Artist further warrants, represents, and agrees that each name used by Artist individually or as a group, and all other musical, dramatic, artistic and literary materials, ideas, and other intellectual properties, furnished or selected by Artist contained in or used in connection with any master recordings or the packaging, sale, distribution, advertising, publicizing or other exploitation of records ("Materials") will not violate any law or infringe upon or violate the rights of any person or entity.

(1 Ex. 1:10).  The Artists expressly warranted in this paragraph none of the music HSP released would violate anyone's copyrights, including those of the Artists.  Throughout the term of the PMA, the burden was therefore on the Artists to ensure HSP had the necessary licenses to release their music.

### E.     Paragraph 11.

Paragraph 11 of the PMA states as follows:

> Artist agrees to indemnify and to hold Highsteppin (and its officers, employees, directors and agents) harmless against any and all damages, costs, expenses, or fees (including attorneys' reasonable fees) incurred or suffered by Highsteppin in any claim, suit, or proceeding instituted by or against Highsteppin in which any assertion is made which is inconsistent with any warranty, representation, or

covenant of Artist or which arises in connection with any act or omission by Artist. In the event Artist fails to hold Highsteppin harmless against any and all damages, costs, expenses, or fees as aforesaid, Highsteppin may, in addition to its other rights, deduct such monies from any and all Gross Earnings received by Highsteppin hereunder.

(1 Ex. 1:10). Because the text of this paragraph applies to "*any* claim, suit or proceeding" regardless of whom the parties to that suit might be, the Artists are responsible for HSP's costs and attorney's fees in the event the Artists are found to have breached the PMA or any warranty made by the Artists in the PMA.

      **F.**      **Paragraph 17(a).**

The first clause of the paragraph states in the event the PMA is terminated, the Artists are still responsible for the obligations under Paragraph 6. Thus, even though the PMA was terminated, HSP is still entitled to the repayment of all of the monies it advanced for the Artists. Also, HSP may still recoup the amount of loans, advances, and expenses incurred by the Artists from monies HSP receives on their behalf.

The remainder of the paragraph provides if the Artists terminate the PMA for any reason, they are still "responsible for the obligations under Paragraph 6 above and Highsteppin shall continue to receive its full Commission" on all Gross Earnings received pursuant to contracts the Artists entered into during the PMA or they then enter into up to six months after the termination of the PMA (other than Gross Earnings received from "musical and/or lyrical compositions written, published, and/or exploited during the Term" of the PMA, which are governed under paragraph 17(b)). (1 Ex. 1:12-13). Hence, other than the exclusions in paragraph 17(b), HSP is entitled to its commissions on all Gross Earnings to the Artists' pursuant to any contract the Artists entered into from September 29, 2009, to March 29, 2010.

### G. Paragraph 17(b).

This paragraph provides for the payment of commissions on Gross Earnings after the termination of the PMA that are paid to the Artists for "musical and/or lyrical compositions written, published, and/or exploited during the Term" of the PMA. Thus, if the Artists wrote, published, or exploited their music during the term of the PMA (and it does not fall under any other exception in the PMA), then HSP is entitled to take commissions on Gross Earnings earned on that music during the Post Termination Period as follows (in accordance with the example in the paragraph):

1. HSP's commission rate at the time of termination, 20%, from the termination date, September 29, 2009, through September 29, 2010;

2. 20% from September 30, 2010, through September 29, 2011;

3. 15% from September 30, 2011, through September 29, 2012;

4. 10% from September 30, 2012, through September 29, 2013;

5. 5% from September 30, 2013, through September 29, 2014; and

6. 0% after September 30, 2014.

## IV. Defendants failed to play a sufficient number of performances to make a profit.

One of the assumptions the parties made when negotiating the PMA was the Artists would put significant effort into PBS. However, over the four years PBS was under management, they only performed 186 times. On numerous occasions, the Artists—most often Porter, see (5 Ex. 62:1840)—would be unavailable for additional performances or even cancel previously scheduled PBS performances, such as the Bear Creek Music Festival in November 2009. (6 Ex. 83:2680). In early drafts of the PMA, however, Attorney Eveline requested HSP have an option to extend the PMA only if PBS was performing 130 gigs per year. (1 Ex. 3:55). Thus, the Artists themselves originally contemplated playing over 100 gigs per year.

On the other hand, Jaccodine testified one of his artists worked approximately 250 performances per year. PBS would have greatly benefitted from a similar investment of time. According to the Ubuntu memorandum, in 2009, PBS was averaging gross income of $3,743 per performance. (2 Ex. 36:805). As of that date in 2009, PBS had 38 performances. Even though Porter was involved with the Funky Meters and Stoltz and Batiste also had other commitments, if PBS had performed 125 times in 2009, they would have grossed approximately $467,900. If PBS had been performing that many performances, HSP would likely not have advanced as much on behalf of the Artists.

## V.    HSP's financial reporting to Defendants.

Stepanian testified the financial reporting to the Artists was primarily verbal, as that was the medium with which the Artists seemed most comfortable. Nevertheless, contrary to Defendants' testimony, HSP provided significant financial information to the Artists both verbally and in documentation.

### A.    HSP was responsive to the Artists' questions about the accounting.

The Artists communicated with Stepanian on numerous occasions, often several times per week. (4 Ex. 44). Those communications often concerned financial decisions concerning PBS. (Stepanian Test.).

On several occasions, the Artists asked questions about their personal finances and PBS's finances. HSP often answered these questions within a short amount of time. (Stepanian Test.). For example, on July 16, 2008, Shelley Dyer ("Dyer") sent to Porter an E-mail with his CD sales figures based on a question he posed to Erin, another HSP employee. (1 Ex. 19:212).

On one notable occasion, Porter's wife Aralean asked Porter a number of questions about the finances of the band. Porter E-mailed Phil on March 3, 2007, saying "My Wife is asking ?'s

[sic] that I can not answer…. My head was about to blow off so I called You….” (3 Ex. 60:1787-88). Among those questions were:

> the salary: how much will it be and when will it start[?]… the photo shot we just did will that come out of PBS's gig moneys[?] [sic]… this band as she look's at it because she has seen it before is now in over a $100,000.00 of debt and how will we pay for all of this…. She's asking how are We/PBS going to pay for all his debt that has been made in our behalf.”

(3 Ex. 60:1787-88).

Chabaud was the accountant for Porter and (prior to the PMA) for PBS. (Chabaud Test.). Friedman was hired following the execution of the PMA to act as PBS's accountant. (Stepanian Test.); (Friedman Test.). Both Chabaud and Friedman were informed about Defendants' finances and even communicated directly with the Aritsts about them. (Chabaud Test); (Ex. 211).

### A.     The 2006 Profit and Loss Statements.

Stepanian testified he delivered copies of the 2006 PBS profit and loss statements in hand to the Artists in early 2007. (Stepanian Test.). The Artists never testified they did not receive the P&L's from Stepanian. On the basis of Defendants' impaired credibility, the Court should credit Stepanian's testimony and conclude he did deliver the 2006 Profit and Loss to Defendants.

### B.     The 2007 Profit and Loss Statements.

Stepanian testified he delivered copies of the 2007 PBS profit and loss statements in hand to the Artists on numerous occasions. (Stepanian Test.). They were E-mailed the profit and loss statements in March and July 2008. (1 Ex. 19:186) (March); (1 Ex. 19:206) (July).

### C.     The 2007 Merchandise Accountings to Defendants.

On March 13, 2008, Shelley Dyer sent to Defendants by E-mail the 2007 year-end financial reports, including the merchandise sales details for that year. (1 Ex. 19:186) (E-mail); (1 Ex. 19:187) (2007 PBS Profit and Loss); (1 Ex. 19:188) (Sales by Item Summary—PBS

Merchandise Sales); (1 Ex. 19:189) (Merchandise Sales and Cost Recovery – Porter Batiste Stoltz); see also (1 Ex. 19:191-94). On that same day, Dyer also sent to the individual artists their individual reports and merchandise sales detail reports. (1 Ex. 19:195) (Stoltz); (1 Ex. 19:201) (Batiste); (Stepanian Test.). The Artists testified they did not recall whether they received these reports or not. Stoltz and Porter also both testified none of the information in these reports was explained to them.

On July 7, 2008, Dyer E-mailed PBS's 2007 Profit and Loss Statement and Balance Sheet to Porter and Stoltz. (1 Ex. 19:206) (Profit and Loss); (1 Ex. 19:209) (Balance Sheet). Dyer asked for their approval of that report so it could be forwarded to PBS's accountant, Alan Friedman. Id. The Balance sheet showed a loan payable to HSP in the amount of $227,660.75. (1 Ex. 19:210). Again, Defendants did not affirmatively deny receiving this E-mail in their testimony. On July 16, 2008, Dyer also sent to Porter an E-mail containing the sales figures of Porter's CDs. (1 Ex. 19:212).

### D. The 2007 PBS Tax Return and the "Loan Due to Affiliate."

On October 2, 2008, Dyer E-mailed to the Artists a draft copy of the 2007 1065 tax return for PBS. (1 Ex. 19:214). That draft tax return showed gross receipts of $150,256 and a total ordinary business loss of $225,655. (1 Ex. 19:223). Listed under "Other Current Liabilities" was the "Due to Affiliate" line item of $227,661. (1 Ex. 19:232).

Following the receipt of that E-mail, Porter asked Chabaud to review the draft return. (Porter Test.); (Chabaud Test.). Chabaud testified she was surprised to see the loan due to affiliate, and when she explained the meaning of the line item to Porter, he was angry. With Chabaud's assistance, Porter wrote an E-mail to Alan Friedman asking four questions, one of which was, "There is a liability listed as 'Due to Affiliate' of $227,661, does this mean that PBS owes this money to Highsteppin? This is NOT THE DEAL!" (1 Ex. 19:253).

Dyer replied to Porter's E-mail later that evening, and informed him (and Stoltz, who was CC'd in the E-mail), "The amount in due to affiliate is the accumulation of expenses from 2005-2007. This reflects expenses paid on behalf of PBS by Highsteppin' Productions." (1 Ex. 19:256). Friedman replied to Dyer's E-mail on October 3, 2008, and explained the "loan due to affiliate" line item. (1 Ex. 19:254). His explanation was primarily from a tax perspective, but he did not contradict any of Dyer's statements regarding the line item. (1 Ex. 19:254).

Chabaud acknowledged Porter received these responses from Friedman and Dyer and she discussed them with Porter. She testified she recommended Porter not sign the tax return unless he agreed with the loan payable figure. (Chabaud Test.). She also testified she spoke with Stoltz on the matter. (Ex. 211) (Chabaud deposition transcript). Even though Porter now alleges he did not agree with the amount stated in the loan payable line item, he signed the tax return in his capacity as the tax matters partner of PBS, LLC, regardless, on October 20, 2008. (1 Ex. 17:169).

The Artists further alleged in their counterclaims they did not know the size of the loan to HSP until after the contract termination. The foregoing correspondence demonstrates as early as July 2008, the Artists knew they were already $227,661 in debt to HSP. When the Court asked Porter why he did not tell Stepanian to stop spending, Porter merely suggested it was a "bad move." The Artists clearly knew they owed HSP this large amount of money, but did not complain and allowed HSP to continue spending on their behalf.

E.     The 2008 Financials.

Stepanian also testified he provided the Artists with the profit and loss statements and balance sheet for 2008. (Stepanian Test.). In the 2008 profit and loss statements delivered to Freidman in October 2009, PBS's income was understated. (16 Ex. 200L:7614). However, the remaining income for 2008 was batch transferred in May 2011 because some of the promoters

refused to pay PBS directly following the opening of PBS's bank account and continued to pay HSP. Nevertheless, the income has been attributed to the Artists.

### F.     The Ubuntu meeting.

One of the most expansive descriptions of the financial picture of PBS and the Artists was given on Monday, August 17, 2009, at HSP's office in Somerville, Massachusetts.  At that meeting, each of HSP's employees gave presentations explaining what they were doing for PBS and what they planned to do in the future.  (Stepanian Test.); (Malangone Test.); (Herlihy Test.). While Stoltz and Porter described the Ubuntu meeting as a "dog and pony show" (characteristically, Batiste did not attend the meeting), Stepanian and Malangone testified the purpose of the meeting was to celebrate the group's success to date and plan future projects.

At the meeting, the Artists were given a 36-page report (the meeting itself is referred to as the "Ubuntu meeting" and the report itself referred to as the "Ubuntu report").  (2 Ex. 36). The report is a detailed review of the finances of the Artists and PBS. Stepanian, Malangone, and Herlihy testified Stepanian went through the contents of the reports with the Artists during a "break out" session after the employees' presentations.

Stepanian testified he walked the Artists through the various charts and financial information.  The second page of the report is a chart of PBS's performance fees over the term of the PMA, including the average per-gig income.   The chart demonstrated  under HSP's management, PBS had increased their average gross per-gig income from $2,153.60 to $3,743.22.  (2 Ex. 36:805).  The next several pages showed the sales of PBS's CDs per year, including itemizations and comparisons of physical and digital sales.  (2 Ex. 36:806-11).  Still other charts showed the income earned on the sales of the HSP Part Numbers.  (2 Ex. 36:815-21).  The remaining charts break out the earnings of each individual Artist for CD, merchandise,

and digital sales. (2 Ex. 36:824-27) (Porter); (2 Ex. 36:828-35) (Stoltz); (2 Ex. 36:836-39) (Batiste).

The meeting was a full-day affair, beginning at 10:00 in the morning. (Stepanian Test.); (Porter Test.). While there is some debate about how long the meeting lasted, the Artists suggesting as little as three to four hours, the most credible and vivid testimony was given by Herlihy, who testified in detail about the setting sun in his eyes near the end of the meeting and his desire to go home. The Court can take judicial notice of the fact that on August 17, 2009, the sun set in Boston, Massachusetts, at 7:42 p.m.,[2] suggesting the meeting adjourned at least after 6 p.m. and therefore lasted at least eight hours. See Fed. R. Evid. 201(b)(2).

Despite the detailed information given to the Artists at this meeting, Herlihy, Stepanian, Malangone, and Soltz all testified Porter was angered by the financial figures presented to him. He kept asking where the money had gone and why he had not seen any of it. Stepanian testified he (again) explained the outstanding debt owed to HSP by the Artists and how one of their goals was to pay off that debt. Porter was further incensed when Stepanian started recommending alternative revenue streams, including utilizing his pre-PBS music catalog in movies and video games. When Herlihy told Porter he had to "row the boat" and work together with everyone, Porter became enraged, ended the meeting, and left with Stoltz. (Herlihy Test.); (Stoltz Test.); (Porter Test.). HSP later learned Porter's attendance at the meeting was an empty gesture: Porter had already, with the help of Attorney Eveline, drafted and signed a letter resigning from PBS. (12 Ex. 162:5371).

---

[2]http://www.timeanddate.com/worldclock/astronomy.html?n=43&month=8&year=2009&obj=sun&afl=-11&day=1

## VI.    The salary advances.

For a period of time during the term of the PMA, HSP paid the Artists advances against future earnings on a bi-weekly basis with the aid of a payroll company.  The Artists allege these were salaries HSP paid to them for their services, but the testimony and the documentary evidence all argue against that conclusion.

### A.    Starting the salary advances.

At the beginning of HSP's representation of the Artists, they were frequently in need of financial assistance.   See, e.g., (1 Ex. 7:68-78) (wire transfers to the Artists). Batiste, in particular, frequently needed advances to assist him with his living expenses; on one occasion he needed an advance to keep from being evicted from his apartment.  (Stepanian Test.).  Stepanian, Porter, and Stoltz all testified before they were under management, after a performance, Stoltz and Porter would acquire the payment for an evening's performance, go into a hotel room, pay the expenses, and split the remaining funds while on the bed.  Stepanian testified he was troubled by this practice because of the potential for forgetting to pay an expense and the inherent risk in for dealing in managing such large amounts of cash in a hotel room at 2 a.m.

Stepanian testified part of the problem was the irregularity of the Artists' performances and therefore the irregularity of payment. (Stepanian Test.).  Thus, the Artists would have to go for long stretches (sometimes as long as a month) without any income.  In order to ameliorate this financial difficulty, Stepanian proposed paying the Artists advances on their gig earnings on a bi-weekly basis.  The payments were referred to by all involved as a "salary," and were administered by a payroll company, but they were in fact advances on future earnings that were paid to the Artists on a regular basis rather than at the time of the performances.  The Artists themselves acknowledged this.  During Stepanian's testimony he was questioned extensively about why he was removing money from PBS's account and sending it to the payroll company.

Stepanian testified the artists were initially reluctant to transfer to a "salary" system, and they only agreed to do so in late 2007.

Porter particularly tried to take advantage of the salary advances.[3]  Stepanian testified he approached each of the Artists individually and asked them what their yearly expenses were in order to calculate how much they would need to receive under the salary program.  Porter, in response, sent an E-mail to Stepanian in which he sought to earn $244,750 per year in an attempt to net $125,011 after taxes. (9 Ex. 132:3910-12).  Stepanian and Porter thereafter agreed to approximately $10,000 per month, but this was still a windfall for Porter, whose tax returns proved he never earned $125,000 net per year after his royalties.  (Porter Test.).

The Aritsts have suggested HSP improperly paid the Artists different amounts; however, the Artists were aware of the disparate payments—they were reflected in the accountings HSP delivered to the Artists, including the 2007 PBS profit and loss statements.

**B.  Termination of the salary advances.**

In September 2008, the global economy started feeling the effects of the Great Recession. As a result, HSP was no longer in a position to continue advancing funds to the Artists and postponing collecting its commissions.  On November 15, 2008, Stepanian sent an E-mail to the artsits in which he said HSP needed to "make some very hard decisions in order to stay in the game." (9 Ex. 132:3907).  He reiterated to the Artists he had "made an enormous investment in Higshteppin' Productions," by which he referred to the loans he had made on the Artists' behalf and the funds he had spent to pay HSP's overhead expenses.  (9 Ex. 132:3907).  Consequently, HSP was "no longer [] able to provide a bi-weekly draw to" the Artists.  (9 Ex. 132:3907).

_____

[3] This constitutes another instance of fraud by the Artists, as HSP relied on Porter's false representation of his income to its detriment.

The Artists' reactions were characteristic of their general attitudes during the PMA: Porter was incensed, Stoltz was sympathetic yet optimistic, and Batiste was confused. Porter's response was "Really and when will this happen[,] as of today[?]" (9 Ex. 132:3906). A friend of Batiste wrote Stepanian on Batiste's behalf, saying, "I read your letter and I think I understand the situation but Russell does not!!!!!" (9 Ex. 132:3906). Stoltz told Porter on November 21, 2008, "the little bit that Deb and I have in IRA's is dwindling fast, so I can't even imagine how it's hitting Phil.... He did say that beside[s] having David [Herlihy] exploit the catalogs he had ideas about moving forward despite the dismal touring situation." (9 Ex. 122:3770).

Stepanian testified he and the Artists instituted belt-tightening measures. The salary draw ended. Porter started again handling the tour manager's responsibilities. HSP no longer advanced money for the Artists and, for the first time, started paying itself the commissions it was owed on the Artists performances. As a result of the cost-cutting, PBS, LLC, turned a profit of $72,648.63 in 2009. See (1 Ex. 29:449).

C.     **The 2007 and 2008 1099's.**

While the salary draws proceeded during 2007, HSP used the assets of PBS's account to fund the payroll company's payments to the Artists. (Stepanian Test.). In 2007, HSP issued each of the Artists a 1099 for the salary advances they received in 2007; however, those 1099's were later voided on the advice of Alan Friedman, PBS's accountant, who noticed (during 2008) the payments should have been accounted for as guaranteed earnings to the Members, as Louisiana LLCs do not have member-employees. Thus, Dyer voided the 1099s and issued K-1's instead, which the Artists then received. These updated figures were reflected in the amended 1065 Porter ultimately signed. See (1 Ex. 17:176.)

In 2008, HSP continued administering the salary draw to the Artists, but instead advanced on the Artists' behalf its own funds to the payroll company. (Stepanian Test.).

Therefore, at the end of 2008, HSP again issued 1099's to the Artists. <u>See</u> (1 Ex. 29). However, this was again the incorrect way to account for these payments because they were actually loans from HSP to the Artists and therefore should not have been treated as income to the Artists for tax purposes. Before HSP was able to correct the 1099's (which it would have done before October 15, 2009), Porter resigned from PBS on September 29, 2009. (5 Ex. 62:1831). This litigation began soon thereafter, on December 29, 2009. Because of the financial and legal questions surrounding this litigation, HSP did not reissue the 2008 1099's to reflect a zero income until they were advised to do so by their tax accountant, Steve Meyer, in 2011. (Stepanian Test.)

Defendants invested a significant amount of energy and trial time attempting to make the 1099's relevant to the case. While they may have tangential relevance, it does not prove or even suggest, as Defendants' claim, HSP defrauded Defendants or were paying them a salary. Defendants may argue HSP's treatment of the 1099's demonstrates HSP's intent to treat the payments as salary directly from HSP, but this is clearly contradicted by other evidence. First, Stepanian stated on November 14, 2008, due to the economy, HSP was "no longer [] able to provide a bi-weekly draw" to the Artists. (9 Ex. 132:3907). Apart from the blatant illegality of ceasing to pay an employee wages,[4] Stepanian referred to the payments as "draws," verbiage he reiterated in his testimony meant draws from PBS, LLC, funded by loans from HSP. Second, on two separate occasions HSP attempted to treat the salary advances as income for tax purposes, only to be told by Friedman and then by Meyer this was not the correct way to account for those payments. On another occasion, Porter indicated he knew the Artists were responsible for their own finances: "Highsteppin' Productions is not paying us we are paying us…." (8 Ex. 107).

---

[4] <u>See</u>, <u>e.g.</u>, 29 U.S.C. § 206(a), 215(a)(2), 216(a).

Third, the amount the Artists were paid were based on what they *needed*, not an objective economic value of their services. Fourth, HSP did not insist on treating the payments as salary to the Artists, but rather amended the returns to correct the record.

>        **D.    The Artists knew the salary advances exceeded their revenues.**

Throughout the term of the PMA, Porter was the tour manager for PBS. (Porter Test.); (Stepanian Test.). Chabaud testified Porter is familiar with the financial aspects of the music business and well-versed in managing a band "on the road" and he knows how to put together a simple budget and chart income and expenses. He is familiar with the costs of merchandising, advertising, travel, and lodging. (Chabaud Test.). Indeed, for many of PBS's tours, Porter provided reconciliation reports to HSP documenting the funds Porter collected and paid while on tour. (5 Ex. 65).

Because they knew precisely how much their income was from their touring, the Artists easily determined they were not earning enough money to justify their advances. In fact, in 2008, PBS grossed approximately $150,000. (2 Ex. 36:805). Porter easily determined his $120,000 per year advance alone was significantly in excess of the money PBS was earning after paying tour expenses. All of the foregoing facts demonstrate the Artists knew the salary advances were advances on their future earnings and they could not afford the advances they were receiving.

**VII.    The termination of the Personal Management Agreement.**

Porter testified he terminated the PMA for two reasons: his dissatisfaction with HSP and conflict among the band members. Much of Porter's dissatisfaction with HSP came from what Porter perceived as an inability to generate more gigs for PBS, even though the primary cause of HSP's inability to secure additional performances for PBS was Porter's numerous other projects and commitments, as discussed previously.

In order to compensate for HSP's inability to schedule PBS for more performances, HSP sought to derive additional revenue streams for the Artists. Stepanian testified part of the purpose of the August 2009 Ubuntu meeting was to chart a course for PBS in light of the depressed performance market following the September 2008 recession. Stepanian had discussed creating new revenue streams as early as November 15, 2008. (9 Ex. 132:3907). One of his chief focuses during 2009 was generating these new income streams, including licensing the Artists' music in video games and movies and manufacturing George Porter, Jr. "bobbleheads" for sale. With respect to the bobbleheads, Porter declined to invest in the manufacture of the bobbleheads and so that project was scrapped. (Stepanian Test.).

Stepanian testified Porter viewed attempts to license his music catalog with suspicion.[5] This is also demonstrated in Porter's correspondence with HSP. When the salary draws ceased, Porter balked, "Now you want us to give you and David Herlihy control of our music publishing and licensing." (9 Ex. 132:3906). HSP's allegedly underhanded attempts to control Porter's music catalog were an overarching theme of Defendants' pleadings, although no evidence in support of these allegations was adduced.

While HSP was working on monetizing the Artists' assets, the Artists (particularly Porter and Batiste) were spending their time arguing on Facebook. On August 25, 2009, Porter wrote an E-mail to the Artists, Stepanian, and Malangone stating, "Calling a member of the band a [sic] asshole for the world to see is no [sic] respect." (3 Ex. 62:1834).

Thus, on September 29, 2009, Porter sent a letter to Stepanian and the other Artists resigning from PBS. (3 Ex. 62:1831-33). His resignation officially took effect October 30, 2009.

---

[5] Indeed, while Porter's skepticism may have been unreasonable, it is perhaps understandable. Porter brought suit against his former producers, Marshall Sehorn and Alan Toussaint, in the mid-1980's after Porter and the other members of The Meters unwittingly signed the publishing rights to The Meters' music catalog over to Sehorn and Toussaint.

(3 Ex. 62:1832). Porter lamented in that letter that he was "somewhat discouraged by what I see as a lack of effort and creativity on the part of Highsteppin' Productions LLC in making this band more known as musicians and as a performing band…." (3 Ex. 62:1831). Ironically, Porter expressed the belief that PBS suffered because "everyone's individual projects have taken a priority." (3 Ex. 62:1832).

Following the termination of the PMA, Attorneys Herlihy and Eveline had some discussions regarding the monies Porter owed to HSP. (3 Ex. 62:1854-71). Nothing resulted from these discussions. In response to Porter's resignation letter, Batiste appears to have done nothing.

Stoltz, on the other hand, attempted to keep working with HSP, including working on additional licensing opportunities. He told HSP in an E-mail in December 2009, "It is imperative that I move on certain things NOW (Jazz fest, gigs for the new band and a decision on the 2 record offers that I have, etc….)." (5 Ex. 62:1850). In that same E-mail, Stoltz asked about the ongoing projects to license his music and secure him additional gigs. Id.

## VIII. Non-tour expenses.

Defendants do not challenge the tour expenses were approved, because they knew they were incurred. Similarly, Defendants do not challenge the totals for the non-tour expenses are accurate. HSP has demonstrated they are in fact accurate. Defendants have simply challenged whether HSP properly attained their approval for those expenses, which can largely be inferred from the conduct of the parties. Significant nontour expenses are discussed below.

### A. Danny Clinch.

On May 25, 2006, Stepanian sent to the Artists an E-mail in which he recommended they "check out www.dannyclinch.com... for photos." (4 Ex. 47:1541). Stepanian testified after sending that E-mail, he orally discussed Clinch's reputation (including his having photographed

nationally known groups such as the Dave Matthews Band), and discussed the Artists hiring Clinch for a photoshoot, which they eventually agreed to do. The photoshoot occurred in New York City between February 25, 2007, and February 27, 2007. (4 Ex. 47:1549). The Artists were advised by Stepanian on February 23, 2007, that "Wardrobe will be available." (4 Ex. 47:1554).

The shoot produced numerous photographs for the Artists to use in their publicity. (8 Ex. 103). The Artists also kept the wardrobe. (Stepanian Test.). The Artists' publicist, Madison House, used the photos extensively in its promotion of the Artists. See (8 Ex. 101). The Artists also were very pleased with the results of the Clinch shoot: on one occasion, Porter sent promotional photographs in an E-mail and made sure to say "these pics were taken by Danny Clinch so please place his name some where…." (4 Ex. 47:1556). On another, the Artists agreed to an informal photoshoot with Clinch at the Bonnaroo Music Festival in 2008. (7 Ex. 100:3118).

However, when the relationship between the Artists and HSP soured, opinions changed quickly. Porter called the photoshoot a "joke." (3 Ex. 62:1848). Stoltz testified it was overpriced and he could have recommended numerous photographers in New Orleans who were just as good and would have charged much less.

Stoltz claimed prior to the photoshoot, he confronted Stepanian about the cost of the photoshoot but Stepanian said "I got this" and therefore intended to provide it gratuitously. However, this is not borne out by the facts. Stepanin testified he never said that. While Porter may have not known on March 5, 2007, if the photoshoot would "come out of PBS's gig moneys," (5 Ex. 60:1787), Stepanian testified he told Porter on the phone afterwards it would. (Stepanian Test.); 1787), Stepanian testified he told Porter on the phone several days afterwards it would. (Stepanian Test.); (4 Ex. 44). The Artists' approval can be inferred from the long

period of time they discussed the photoshoot, their participation in the photoshoot, and their knowledge of the cost of the photoshoot and their liability for that cost (whether granted before the photoshoot or ratified after the photoshoot).

### B.   Madison House Publicity.

As part of HSP's overall management plan for the Artists, HSP recommended the Artists hire a publicity agent. HSP suggested Madison House Publicity, a nationally-renowned publicity firm. HSP secured a meeting with Madison House in March 2007.  (Stepanian Test.). Stepanian, Stoltz, and Porter met with representatives of Madison House at that meeting, including their dogs, and discussed what services Madison House could provide.  Stepanian testified this meeting was essentially a two-way interview, where the Artists interviewed Madison House but Madison House also interviewed the Artists.  While they did not specifically discuss the cost of Madison House's services at that meeting, it was apparent to all involved Madison House did not work without being paid. (Stepanian Test). Shortly after that meeting, Madison House informed HSP it would take on the Artists and, mindful of the Artists' financial profile, charge them a rate that was approximately half of what they normally charged.  (Stepanian Test.).  Stepanian testified he discussed hiring Madison House with the Artists, and the Artists decided to hire Madison House as their publicist.  Madison House started representing the Artists in June 2007.

As with many of the Artists' expenses, HSP advanced to the Artists the fees for Madison House and paid Madison House on the Artists' behalf.  (Stepanian Test.), and as with many of the advances HSP made on the Artists' behalf, the Artists happily accepted and utilized Madison House.  They participated in numerous interviews Madison House secured.  (8 Ex. 101).

The Artists stated HSP hired Madison House for the Artists gratuitously for the purpose of building HSP's brand. (Porter Test.); (Stoltz Test.).  Madison House was hired to represent the Artists and PBS, not HSP; however, this is not supported by the evidence.  Interviews with the

Artists were arranged by Madison House with the Artists, not HSP. See, e.g., (7 Ex. 100:3118). Interviewers would either call the Artists directly or, if the Artists did not want the interviewer to have their phone number, through a conference call arranged by Madison House. (Stepanian Test.). Madison House also billed PBS directly (albeit at HSP's address). (4 Ex. 51).

### C. Karen Stella.

Defendants alleged HSP charged the Artists for the services of Karen Stella, a travel agent, but this is not the case. Karen Stella does not appear on the PBS or HSP Profit and Loss Details. See (1 Ex. 8); (1 Ex. 13); (Ex. 146). In fact, Stepanian sent an E-mail to Batiste on August 7, 2007, stating Karen Stella was not the Artists' agent and she was being paid directly by HSP. (9 Ex. 117:3696). He asked Batiste to "refrain from asking Karen to handle your travel requests directly." Id.

## IX. Merchandise and digital sales.

HSP has accurately recorded the monies it earned on the Artists' behalf for merchandise and digital sales.

### A. Merchandise sales and cost recovery.

Merchandise sales were accounted for by HSP utilizing a system set up by HSP's CPA, Marie Kirschberger, who worked for HSP when it initial started operations in 2005 and 2006. Malangone testified HSP intended to handle merchandise purchases and sales as follows:[6]

1. HSP would front payment for the merchandise produced for sale;

2. Upon the sale of an article of merchandise, the gross income from that sale would be repaid to HSP in order to set off the amount it paid to produce the merchandise; and

---

[6] Malangone testified not all of the merchandise was produced by HSP: some, such as CDs given to HSP by the Artists to sell on their behalf, were already produced and therefore do not appear on the Cost Recovery Model and are referred to as "Non-Inventory Parts" in the Quickbooks reports.

3.    When the production cost of the merchandise was fully repaid, only then would additional income be credited to the Artists.[7]

In order to accommodate this request, Ms. Kirschberger set up what has come to be known as the "Cost Recovery Model."  In the Cost Recovery Model, the sales of individual products were tracked individually and it was determined whether the income from the sale of the individual products exceeded the amount HSP paid to produce them.  When the gross income exceeded the total cost of producing the specific products, then the Artists would be credited with that gross income.  (Malangone Test.).

Undoubtedly, the Cost Recovery Model does not account for sales and inventory as would be expected in a fully GAAP-compliant accounting system; however, the information that would permit one to calculate cost of goods sold and the cost of inventory is present in evidence.

There are four separate Cost Recovery Models: one each for PBS, Porter individually, Batiste individually, and Stoltz individually. (13 Ex. 172).  As an example, Porter's Cost Recovery Model gives a list of his individual merchandise that was produced by HSP and sold at the PBS "merch" table.  (5 Ex. 69).  The top half of the page shows the income from all of the profitable products (those that have gross sales in excess of their production costs).  The bottom of the page lists how much each individual product must earn in order to repay the outstanding production cost as of the date of the report (December 31, 2010).  The middle of the page lists the gross sales on all of Porter's merchandise, broken out by year, and the commission HSP charged on those sales.  The chart concludes Porter has earned $3,449.70 to date on the personal merchandise HSP produced and he still owes HSP $9,811 for outstanding costs for those items that have not yet repaid their production costs.

---

[7] HSP also charged its full commission on all sales pursuant to the PMA.

### B. Income from digital sales.

Despite Defendants' suggestion HSP did not account for the digital sales HSP received on behalf of the Artists, the sales are readily apparent in the accounting HSP produced. The HSP Profit and Loss Details for 2005-2010 each itemize the income from digital music sales under "4015 – Digital Downloads Income." Far from hiding or secreting that income, the amounts due to the Artists have been accounted for.

## X.    Releases of the Artists' music.

During the term of the PMA, HSP released recordings of the Artists' music, including both in physical CDs and electronically. The Artists also permitted third parties such as "Digital Dave" Morrison to record and sell their performances. These performances have been broken down into a list under the parties' Stipulation of Facts (Ex. 237), and are discussed below.

### A.    The HSP Part Numbers.

HSP released several recordings of the Artists' performances both digitally and as physical CDs. These CDs have HSP part numbers on them and therefore are referred to as the "HSP Part Numbers." These recordings are:

- Moodoo (HSP 101);

- 11/10/07, Double Door Inn, Charlotte, NC (HSP PG906);

- 11/24/07, Cervantes' Ballroom, Boulder, CO (HSP PG902);

- 9/24/08, Revolution Hall, Troy, NY (HSP 501);

- 9/25/08, Lupo's Providence, RI (HSP 502);

- 9/26/08, BB King's, NYC (HSP 503);

- 9/27/08, Higher Ground, Burlington, VT (HSP 504);

- 10/29/08, Live Wire Music Hall, Savannah, GA (HSP PG904);

- 10/30/08, Smith's Olde Bar, Atlanta, GA (HSP 505);

- 11/24/07, Cervantes w/BNR, Boulder, CO (HSPPG901);

- 3/18/09, PBS w/ Hollingworth, Boulder, CO (HSP PG 907); and

- 11/24/07, Cervantes 3CD set w/ BNR (HSP-PG-903).

**B.      The Studio Recordings.**

HSP also sold several of the Artists' CDs on their behalf:

- Up All Night (Stoltz individually);

- It's Life (Porter individually);

- East of Rampart Street (Stoltz individually);

- God Guns and Money (Stoltz individually); and

- Expandin' the Funkin Universe (Porter Batiste Stoltz).

Of those CDs, HSP paid for the production of Up All Night and It's Life.  (7 Ex. 85) (Up All Night); (7 Ex. 88) (It's Life).  Both are reflected on the respective Artist's cost recovery reports. (5 Ex. 69) (Up All Night); (5 Ex. 68) (It's Life).

**C.      The Non-HSP Part Numbers.**

The Artists stipulated they gave Morrison, Blonston, and Munck permission to record the live performances that were released and sold on Mule Tracks, NUGS.net, Festivalink, and Digital Soundboard. (Stipulation of Facts, ¶ 8).  They intended those performances would be exploited for commercial purposes. (Stipulation of Facts, ¶ 8).  These recordings are:

- PBS & Friends - Blender Theater (Recorded by Dave Morrison);

- 7/13/07 All Good Festival (Recorded by Ann Blonston);

- 5/1/08 Jazz Fest (Recorded by Munck Music);

- 2/24/06 PBS with Kimock (Recorded by Charlie Miller of Digital Soundboard);

- 2/25/06 PBS with Kimock (Recorded by Charlie Miller of Digital Soundboard);

- 4/29/06 Howlin Wolf (Recorded by Dave Morrison of Digital Soundboard);

- 9/21/06 PBS with Kimock (Recorded by Charlie Miller of Digital Soundboard);

- 9/22/06 PBS with Kimock (Recorded by Charlie Miller of Digital Soundboard);

- 3/15/07 PBS with Kimock (Recorded by Charlie Miller of Digital Soundboard);

- 4/29/07 Howlin' Wolf (Recorded by Dave Morrison);

- 4/27/08 Howlin' Wolf (Recorded by Dave Morrison);

- 5/2/08 Howlin' Wolf (Recorded by Dave Morrison);

- 5/4/08 Howlin' Wolf (Recorded by Dave Morrison);

- Gov't Mule PBS & Friends - Blender (Recorded by Dave Morrison); and

- 6 Show special package - Blender (Recorded by Dave Morrison).

Defendants allege HSP was somehow involved in the distribution of these recordings and the distribution of these recordings constituted copyright infringement. Defendants offered no evidence, though, to support these allegations. This allegation is untrue. HSP has maintained it at no time sold or distributed those recordings made by "Digital Dave" Morrison, Charlie Miller, Ann Blonston, or Peer Munck and sold on those websites. Stepanian testified he did not participate in the recording of these performances, and did not even possess copies of the performances. Porter also received payments directly from Festivalink. Further, three of the recordings were recorded in February and May 2006, before the PMA was signed. HSP did receive payment from the websites for royalties due to the Artists from the sale of those recordings, but it always credited the Artists for that income. HSP's evidence was uncontroverted.

## XI.    HSP's commissions on Gross Earnings under the PMA earned by the Artists outside of PBS performances.

The Artists were responsible for accounting for Gross Earnings they received outside of PBS and reporting that information to HSP so HSP could charge its commissions pursuant to the PMA. (1 Ex. 1:5-6).  HSP recorded the Gross Earnings on the Tour Flowcharts.  (13 Ex. 173). HSP depended on the Artists to report their individual Gross Earnings.  See, e.g., (2 Ex. 35:783-84).  However, as Stepanian and Malangone testified, the Artists often did not report their income to HSP, and as a result, HSP did not have the opportunity to calculate its commissions on those Gross Earnings.

Furthermore, following the end of the PMA, the Artists are obligated to pay a commission to HSP based on some of their Gross Earnings over a period of five years following the termination of the Agreement.  To date, Defendants have made no payments to HSP pursuant to that provision.

Respectfully submitted,

    s/Pierre V. Miller II
Pierre V. Miller II (17712)
PATRICK MILLER LLC
400 Poydras Tower, Suite 1680,
New Orleans, Louisiana 70130
Telephone:(504) 527-5400
Facsimile: (504) 527-5456
E-mail: pmiller@patrickmillerlaw.com

and


Jeffery S. Baker (MA Bar Roll No.  544929)
BAKER & ASSOCIATES
2 West Hill Place, Suite 100
Boston, MA 02114
Telephone:(617) 573-9505
Facsimile: (617) 573-9503
E-mail: Bakerlaw@aol.com

*Attorney for Defendants-in-counterclaim*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies this document along with any attachments was served by first class mail or E-mail on this day upon all interested parties and all parties who have filed their appearances and requested service of all pleadings filed in this case.

/s/ Jeffrey S. Baker
Jeffrey S. Baker, Esq.

Date: January 14, 2013