IN THE MATTER OF:                                   NO. 10-13553

**GEORGE JOSEPH PORTER, JR.**
**ARALEAN H. PORTER**                              SECTION "A"

     *Debtors*                                CHAPTER 7
**************************************************************************

**HIGHSTEPPIN' PRODUCTIONS, LLC**                   **ADVERSARY NUMBER**
     **PLAINTIFF**                              **10-1130 A**

**VERSUS**

**GEORGE JOSEPH PORTER, JR., ET AL**
     **DEFENDANTS**

**ADMINISTRATIVELY CONSOLIDATED FOR TRIAL WITH**

**HIGHSTEPPIN' PRODUCTIONS, LLC**                   **ADVERSARY NUMBER**
     **PLAINTIFF**                              **10-1131 A**

**VERSUS**

**BRIAN HERBERT STOLTZ, ET AL**
     **DEFENDANTS**

**************************************************************************

## <u>DEFENDANTS' REPLY TO HSP/STEPANIAN'S PROPOSED FINDINGS OF FACT</u>

     Debtors and Adversary Proceeding Defendants, George Porter, Jr. ("Porter"),

Brian Stoltz ("Stoltz"), David Russell Batiste ("Batiste") (collectively and/or individually

"Artists" or "Debtors") and PBS, LLC ("PBS") (collectively "Defendants"), hereby

submit this Reply Memorandum ("Reply") and respond to Highsteppin' Productions LLC

("HSP") and Philip Stepanian's ("Stepanian") proposed findings of fact ("HSP FOF"). In

so doing, Defendants would point out that despite six (6) weeks of trial testimony, HSP's FOFs are utterly devoid of any specific citation to trial transcripts of any witness testimony. Rather, HSP's FOF distorts, misconstrues, and blatantly misrepresents the Defendants' testimony, and completely ignores the plethora of damaging and unassailable testimony offered by its own witnesses such as Stepanian himself, Donna Malangone, Shelly Dyer, David Herlihy, Lewis Weinstein and Ralph Jaccodine, while also shying away from, and failing to negate, the testimony of Stuart Schimmel, Alan Freidman, and others..

In all candor, it certainly appears that HSP and Stepanian have given up the ghost: despite professing entitlement to reimbursement in excess of $600,000.00, they consciously elected not to expend less than $1/5^{th}$ of 1% of the amount of their claim to obtain the transcripts necessary to "support" the vast bulk of their proposed factual findings. That decision is not at all surprising, however, for the obvious reasons that the transcripts would not support their proposed findings of fact[1]. As set forth below, Defendants offer specific citation to trial testimony to rebut HSP's FOF, when responding to HSP's proposed findings of fact and tracking the format used in HSP's FOF.

---

[1] Due to pecuniary constraints, Defendants were only able to purchase certain components of the trial transcripts, including Stepanian, Herlihy, Malangone, and Schimmel and Batiste, but could not obtain other witness transcripts.

1.    **George Porter, Jr.**

HSP, without any specific citation, claims that Porter testified that he never had any intent to repay any monies expended on his or PBS' behalf.  HSP then claims that Porter's testimony should be generally discredited and offers a few distorted and/or erroneous examples of Porter's alleged testimony by way of "support."   In response, Defendants note that contrary to HSP's assertion, based on counsel's trial notes, Porter actually testified that he did have the intention to repay any monies he legitimately owe by way of reimbursement.  In contrast, Mr. Porter clearly testified that he did not enter into any loans with HSP, did not sign any loan documents, did not believe the salary payments were meant to be repaid, and was consistently told by Stepanian, when questioned by Porter, that neither Porter nor the band would be responsible for reimbursement of the challenged non-tour expenses (nor the "salary").

In what appears to be a last-gasp desperate attempt to legitimize their professed entitlement to reimbursement, HSP persists with their untenable assertion that Porter's signing of a 2007 PBS partnership tax return, in late October 2008, was a legal and factual admission of liability and confirmation of the alleged amount owed.  Such is not the case, as consistently pointed out by the Court, both during the summary-judgment hearing, and at trial (See Generally Transcript of May 18, 2012 Hearing on Motion for Summary Judgment Conducted by Court on May 18, 2012; See Porter Trial Testimony Generally).   Further, Porter specifically challenged that $227,000 was allegedly "due to affiliate" by written email (and one must wonder why HSP did not simply say "due to HSP", rather than try and obfuscate the identity of the purported creditor) (Trial Exhibit 18) .

Porter also testified that he spoke with Stepanian by telephone regarding the alleged $227,000 "due to affiliate", and was told that he (Porter) would not be responsible for repayment of that money. Based on that representation, Porter did not file suit or otherwise take legal steps to dissolve the one (1) year remaining on the full term of the PMA. It was that misplaced trust in Stepanian that Porter was referring to at trial as a "bad move"; not the characterization HSP seeks to ascribe to that two-word snippet of testimony. Also, HSP's reference to charges being incurred on the PBS American Express card is of no real moment, as those charges related primarily to tour expenses[2], and Porter's testimony was that generally some tour travel and gear expenses would be on the American Express bill such as plane tickets, hotels, van rentals (but not some of the costs incurred without his specific knowledge and paid by HSP such as excessive crew).

What HSP fails to acknowledge are Porter's emails questioning the extent of various expenses, and asking who was going to be responsible for paying them (Trial Exhibits 18, 60, 109, 157). Those emails are conclusive proof of someone who is trying to gain a full and accurate understanding of the financial condition of the project, and are not reflective of someone who is simply "playing ostrich" or someone who has no intent to honor the PMA. It is also instructive that Stepanian **never** responded in writing to Porter's direct written inquiries, which seriously undermines any argument that Defendants know the extent of any alleged debt and/or lacked any intent to repay monies

---

[2] Defendants concede that reasonable tour expenses are recoupable, but challenge the reasonableness of some tour expenses, which were unreasonable and unknown to Defendants, such as the crew hired by Stepanian. For example, in 2009 when HSP began to use realistic tour budgets, and eliminated virtually all but $4,000 in non-tour expenses, tour expenses ran roughly 50% of gross tour revenue, and the band turned a profit (Trial Exhibit 29).

they legitimately owed.

## 2. **Brian Stoltz**

HSP also seeks to discredit Stoltz's testimony, citing a few emails from late 2009, and claiming that those emails somehow establish that Mr. Stoltz's trial testimony was not credible. Curiously, there is no mention whatsoever of Mr. Stoltz's testimony that he did not approve any of the challenged non-tour related expenses, prior to expenditure, that he did not give HSP or Stepanian *carte blanche* to sell his creative works without timely accountings, without payment of artist and mechanical royalties, and without disclosure of the scope of HSP's distribution or the related agreements (be they written or verbal). HSP also conveniently ignores Stoltz's testimony that he did not believe that the "salary" payments were a loan or were otherwise reimbursable to HSP, because they were exactly what Stepanian referred to them as (before he was advised, mid-litigation, to reclassify them as recourse loans); taxable income in the form of salary for being available and playing PBS gigs.

## 3. **Russell Batiste**

Just like HSP distorts Porter and Stoltz' testimony beyond recognition, it also distorts Batiste's testimony by claiming that Batiste testified "he never intended to repay any of the monies he received from Phil," which is simply not true. In truth, Batiste testified that if he indeed owed any monies to HSP, he intended to repay those monies from gig revenue (See Batiste Trial Transcript Pages 34-35; 71-72; 80-81). Contrary to HSP's assertion, Mr. Batiste testified candidly, although rather colorfully, about numerous facets of his interaction (albeit primarily non-business related) with Stepanian. Notably, Stepanian did not counter that testimony, nor deny his involvement in the extra-

curricular activities Batiste referenced.

4.    **Philip Stepanian**

HSP's propensity for creating revisionist history is on full display in its discussion of Stepanian's testimony, which charitably could best be described as delusional.  Out of five days of testimony, the best HSP could cobble together is a scant three-paragraph recitation (of questionable veracity) of its "interpretation" of Stepanian's testimony.  Again, HSP offers absolutely zero specific citation to the trial transcript, and completely ignores or even indication of the various subject matters he allegedly testified, where he allegedly offered truthful and credible testimony.  In contrast, as set forth in Defendants' FOFs, previously submitted to the Court, Stepanian's pervasive predisposition towards, and penchant for, prevarication and palaver runs rampant throughout his testimony.  Stepanian was forced to admit his lack of candor and false trial (and deposition) testimony on more than one occasion (See Defendants' FOF #72, 86, 349, 350, 351, 352, 356, 704, and 769).

Some examples would be: 1) denying under oath that he sold PBS merchandise after the termination of the PMA (until confronted with his own emails and third-party revenue reports); 2) denying he used the PBS email list for commercial purposes without permission after the PMA (until proven to be false); 3) never fully disclosing all the merchandising and intellectual property sales, agreements, revenues, and expenses associated therewith (until confronted with third-party sales reports, emails, etc.); 4) lying about selling PBS merchandise in 2010, 2011 and 2012, both on the stand at trial and in his deposition (again, until confronted with documentary proof to the contrary); and 5) lying about entering into third-party agreements (NUGS, Nimbit, etc.) regarding, and

receiving revenues derived from, the sale of Defendants' merchandise and intellectual property, without disclosure and without segregation of those monies. In fact, as set forth in Defendants' Motion To Compel, filed on January 24, 2013 (Record Document 265), Stepanian's unabashed effrontery has continued full bore, as evidenced by his undisclosed receipt of Stoltz-related revenues as recently as January 6, 2013.

Perhaps nowhere is Stepanian's lack of truthfulness and credibility more evident than in his deposition and repetitive trial testimony, wherein he falsely claimed that there were hundreds, if not thousands, of emails demonstrating the Defendants' alleged prior consent to various expenses (Defendants' FOF #69). In fact, after it was conclusively established that he (Stepanian) could not specifically identify any of these phantom emails (Defendants' FOF #70), Stepanian speciously revised his ever-changing storyline to assert that Mr. DeBiasi and Ms. Malangone would be able to identify the same elusive, non-existent emails (and also prove up HSP's Proof of Claim ("POC")) (Defendants' FOF #220). However, once again, Stepanian was eventually was forced to admit that no such emails existed, and neither Mr. DeBiasi nor Ms. Malangone could live up to their advance billing (Defendants' FOF #60, 219, 220, 221, 222, 223, 226, 712, and 731).

**5.    <u>Donna Malangone</u>**

Contrary to HSP's assertions, Malangone offered little in the way of support for HSP's POC, nor could she identify any emails wherein Defendants gave prior approval to non-tour expenses (other than limited expenses related to Up All Night, It's Life, and MooDoo). Malangone admitted that she never sent the Defendants any invoices or estimates regarding non-tour expenses (Defendants' FOF #219). She also admitted that it was Stepanian, and Stepanian alone, who allegedly obtained Defendants' prior consent to

various expenses (Defendants' FOF #220, 222, 223, 226, 224 and 225). Malangone also admitted that she could not validate Mr. Stepanian's prefatory remarks regarding her expected testimony concerning approval emails or accounting explanations (Defendants' FOF #219).

**6.    David Herlihy**

Again, without any specific record citation or reference to particular subject matter, HSP claims that Herlihy had knowledge of many relevant facts. As set forth in Defendants' FOFs, Herlihy's testimony was quite damaging to HSP. Herlihy confirmed that he, and he alone, substituted HSP in place of PBS regarding the NUGS agreement (after initially denying same at deposition and failing to produce all drafts and emails related to the NUGS agreement), that he never disclosed that fact to the Defendants (nor did Stepanian or anyone else), that he did not secure any verbal or written licenses or agreements from the Defendants regarding their creative works, and that he instead opted to "rely" on an alleged *gratis*, non-exclusive, irrevocable implied license, purportedly given for consideration by the Defendants to HSP for the sale of their merchandise and intellectual properties (Defendants' FOF #97, 98, 99, and 100).

Like Stepanian, Herlihy's credibility is highly suspect, given his abrupt change in testimony regarding the NUGS negotiations and agreement, following the first day of his testimony (Defendants' FOF #98). HSP also studiously ignores Herlihy's failure to correct Stepanian's 2008 introduction of him to Defendants as "your lawyer" and the related emails where he fails to disclose his prior involvement with HSP (claiming to be new to the team) (Defendants' FOF #123 and 124). He also failed to secure written waivers of potential conflicts of interest from the individual members of PBS, and went

-8-

so far as to claim he was adequately representing Stoltz while simultaneously assisting the preparation of HSP's lawsuit against the Defendants (Defendants' FOF #128).

## 7. <u>Other Witnesses Ignored By HSP</u>

Most likely, for obvious reasons, HSP's pleadings contain no reference, let alone specific citation, to any testimony offered by the accounting personnel involved in this case, including Shelly Dyer, Stuart Schimmel, Alan Friedman, Louis Weinstein, and Shannon Chabaud. As set forth in Defendants' FOFs, each of the "accounting" witnesses detailed HSP's horrific pattern and practice of incompetence, shoddy record-keeping, obfuscation, off-the-books entries, lack of disclosure, lack of "loan" documentation, outright breaches of accounting principles and fiduciary duties, commingling, conversion, and erroneous financial reports, litigation exhibits and POC, as shown by the following excerpts from Defendants' FOFs (Defendants' FOF # 28, 32, 38, 218, 219, 232, 260, 261, 263, 267, 268, 271, 272, 278, 283, 392, 394, 395, 425, 428, 429, 435, 443, 450, 477, 478, 540, 546).

<b>Response to HSP's Argument-Specific FOF Discussion</b>

## 1. PMA Issues and Ambiguity

HSP next offers "factual findings" (again without any citation to trial transcripts) regarding the PMA and related issues. HSP first claims that the Defendants claim they did not know or understand the contents of the PMA. That argument is simply a red herring, and of no legal significance, although all three Defendants did testify that even though they signed the PMA, it was never thoroughly explained to them, nor did Mr. Stepanian specifically referred to it, with or without explanation, during the term of the PMA.

HSP then devotes four pages to an argument regarding PMA ambiguity. As set forth in Defendants' proposed Conclusions of Law ("COLs") previously submitted to the Court, all ambiguities should be construed against the drafter, namely HSP. HSP claims that Paragraph 4(b) somehow relieves HPS of operating with the proper standard of care required by Massachusetts law for someone acting as a business manager. Not surprisingly, HSP's PTB is devoid of any legal support for this "creative" argument, nor does the argument make sense. HSP voluntarily assumed the role of business manager, and thus, also assumed the obligations to perform that role with adherence to well established legal and fiduciary duties. Further, HSP failed miserably as a business manager, as more fully set forth in Defendants' Post-Trial Memorandum ("PTM") previously filed herein. (See Defendants' FOF #626, 631, 632, 687, 707, 708, 710, 711, 715, 717, 725 and 728).

HSP then claims that the evidence at trial showed that it obtained the Defendants' prior approval for all expenses incurred. Nothing could be further from the truth. Despite Stepanian's assurances that hundreds, if not thousands, of emails demonstrating consent would be produced at trial, neither Stepanian nor Malangone nor DeBiasi could ever specifically identify any such emails, other than some tour-related expenses and a few non-tour expenses related to MooDoo, It's Life and Up All Night (See Defendants' FOF #69, 70, 218, 219, 221, 222, 462, 661, 662, 703, 704, 712, 713, and 731)

Perhaps mindful of the lack of any such approval emails, Stepanian changed his tune mid-trial, when he veered away from the "hundreds, if not thousands of emails" tack and re-charted a course based on his newly-contrived assertion that the Defendants approved numerous expenses verbally, either in person or over the phone (See

Defendants' FOF #72 and 704).  The only support for this assertion is a general cite to generic telephone records, without any supporting testimony as to specific conversations on specific days or other evidence of the contents of any phone calls which may or may not have actually resulted in conversations, let alone conversations disclosing specific expense amounts and obtaining approvals.

HSP also seeks to rely on the testimony of Ralph Jaccodine, claiming that Jaccodine would find it impractical to require traveling musicians to approve expenses. That interpretation is a gross distortion of Jaccodine's testimony, and again, HSP elected not to obtain Jaccodine's transcript.  However, based on counsel's notes, Jaccodine testified that, as a general rule, he would not act as a business manager and a personal manager simultaneously, due to the inherent conflict of interest, (other than for Ellis Paul, with whom he had been business partners for a number of decades).  Jaccodine also testified that in the limited instance where he would handle business matters for Mr. Paul, he would always send copies of all invoices and estimates and other financial documentation to Mr. Paul.  HSP conveniently ignores this testimony, and failed to mention that Jaccodine also testified that he was in litigation with a former client over the recoupment of expenses.

HSP then claims that Paragraph 10 should be interpreted to mean that HSP had absolutely no obligation to either protect Defendants' intellectual property, or advise Defendants to protect their own intellectual property, and thus HSP did not have to obtain "the necessary licenses to release" Defendants' music.  Not only is that conclusion self-serving and unsupported by law, but is specifically negated by HSP's conduct wherein HSP did obtain third party mechanical licenses for all noncontrolled composition that

were contained in the performances or Defendants' live performances that were released by HSP, either with or without Defendants' knowledge. Further, this is really a legal argument, anemic as it is.

HSP next claims that under Paragraph 11 of the PMA, it is entitled to indemnification from the Defendants with regard to Defendants' copyright counterclaim. The assertion defies common sense and again is not supported by any legal authority. As set forth in Defendants' PTM, HSP and Stepanian have violated Defendants' copyrights, and have not shown any entitlement to indemnification. HSP also claims that the Defendants would be responsible for HSP's costs and fees if the artists were found to have breached the PMA. As the Court has already ruled, with regard to the prior Motion for Summary Judgment, Defendants, as a matter of law, and based on Stepanian's own admission, did not breach the PMA, and any such claim was dismissed prior to trial.

HSP next claims that Paragraph 17a applies and mandates that HSP receive certain "tail" commissions. Again, these arguments regarding the PMA are really more in line with legal theories, not findings of fact. Moreover, HSP did not put on any proof of any specific works which were allegedly written, published or exploited during the term of the PMA for which it would be entitled to any "tail" commission. Also, based on HSP and Stepanian's multiple breaches of fiduciary duties, they have forfeited any right to compensation, as more fully set forth in Defendants' PTM and COLs.

## 2. "Number of Gigs" Argument

HSP then makes an irrelevant and nonsensical argument regarding the alleged anticipated number of performances needed to make a profit. Suffice it to say that HSP's argument lacks credibility. First, there is absolutely no evidence to support any

determination that the parties had any realistic expectation that PBS would play a hundred and thirty (130) gigs per year, let alone that the Defendants "themselves originally contemplated playing over a hundred gigs per year."  HSP ignores the fact that the same booking agent, Blue Mountain Artists ("BMA"), was employed before and during the entire term of the PMA, that BMA could not appreciably increase the annual number of gigs PBS played during the PMA, and that Stepanian was unable to increase the number of PBS' gigs (due, not to a lack of availability, but due to a lack of managerial acumen) (See Defendants' FOF # 776 and 777; See also Trial Exhibit 36).

This argument is all the more perplexing, given HSP's admission that the Defendants did not breach the PMA.  Further, even if the trial testimony and evidence were liberally construed in HSP's favor, at best, it establishes that the only PBS gig that may have been cancelled was possibly the Bear Creek Music Festival (evidence was inconclusive as to whether it was ever a confirmed gig or not).  However, HSP fails to acknowledge that even if that were true, HSP actually made more money by way of commission from Porter's side project with John Scofield, because the only reason HSP put forth for cancelling Bear Creek (assuming it was ever confirmed), was that the gig could not be played because Porter was playing with Scofield.  Again, HSP was commissioned on all of the Scofield gigs, and thus, HSP actually made more money from Porter's stint with Scofield than it would have from the commission of the Bear Creek Festival gig.

Moreover, HSP's argument regarding its rejection of  Mr. Eveline's allege request that HSP would only have an option to extend the PMA if and only if PBS was performing a hundred and thirty (130) gigs a year, actually indicates that HSP did not

have any realistic expectation that PBS would be able to secure and perform a hundred and thirty (130) gigs a year. There is simply no credible evidence that PBS could have obtained a hundred (100) to a hundred twenty-five (125) gigs per year as HSP claims, and even if they could have, that really has little or no factual and legal effect on the issues at hand.

**3.      HSP's Alleged Disclosure of Financial information To PBS**

HSP then claims "it provided significant financial information to the artists, both verbally and in documentation."   Again, that assertion is delusional, as noted in the Defendants' FOFs regarding the testimony of Stuart Schimmel, Shelly Dyer, Alan Friedman, Louis Weinstein, Shannon Chabuad, Mr. Stepanian himself, and the Court's observations (See Defendants' FOF #222, 255-295; 343, 600-640 and 802).

 HSP first claimed it was responsive to the Defendants questions about finances. Again, that simply is not an accurate recollection of the trial testimony.  In fact, each and every time Mr. Porter sent a questioning email to Mr. Stepanian, or others, there is absolutely no written response coming from Mr. Stepanian (Trial Exhibits 18 and 60). For example, there is no written response from Stepanian in response to Porter's March 3, 2007 email regarding "my wife is asking questions."   Addtionally, there is absolutely no written response to Mr. Porter's October 2, 2008 wherein he specifically challenges Stepanian's financial numbers and states that any alleged debtedness "is not the deal."

Mr. Stepanian, whose credibility is highly suspect at best, in light of his admittedly impeached testimony, would have the Court believe him over Ms. Chabaud and the Defendants, regarding the 2006 and 2007 P&Ls, which were allegedly given to the Defendants "in hand."   That explanation is rather convenient, when confronted with

the reality that there are no transmittal emails or other such proofs of any provision of P&Ls by Stepanian himself (there is a P&L emailed to the Defendants from Ms. Dyer in March and July of 2008, regarding alleged 2007 P&Ls, but as we saw at trial, those documents were deficient and erroneous, and were later edited and revised and issued in May of 2011 (although the 2011 numbers were not accurate)) (See Trial Exhibits 8, 13; Also see Defendants' FOF #36, 55, 56, 263, 498, 603, 613, 616, 629, and 720). Moreover, although Mr. Stepanian testified that he actually saw Ms. Malangone mail the 2006 P&L, that testimony is rather incongruous as Stepanian did not explain how he came to know what was in the specific envelope he claims Malangone mailed.

In actuality, it appears that HSP just simply failed to grasp the scope of the fiduciary obligations it owed the Defendants, including an abject failure to understand its affirmative duty of disclosure. As Stepanian stated at deposition, and confirmed at trial: if the Defendants had asked, he would have told them. (See Defendants' FOF #653). One such indication is the fact that Porter had to ask for information regarding his 2007 release, It's Life, which he did not receive until sometime in March, 2008 (although again the report was inaccurate) (Trial Exhibit 88 and 93).

Contrary to HSP's assertions, the documentary evidence clearly reflects an inadequate level of disclosure, both as frequency and as to the specificity of the contents. Not only did HSP fail to provide monthly, quarterly, or even annual accountings (let alone accurate and complete reports), but in many instances HSP never bothered to tell the Defendants about many revenue streams HSP was receiving from the sale of Defendants' intellectual property.

Also, HSP once again tries to gain some traction from the fact that Porter signed

the 2007 PBS partnership return. As already discussed, that signature is neither an admission of liability, nor a verification of the accuracy of the alleged loan "due to affiliate". Also, there simply are no loan documents, even though HSP was specifically told that loan documents are an integral part of establishing the existence of an actual *bona fide* loan (See Defendants' FOF #61, 271, 392 393, 394, 450, 608, 639, 762, 763, and 781). Lastly, the Ubuntu meeting should be seen for what it was, a hastily prepared dog and pony show to try and placate Defendants, with an emphasis on Porter, in the wake of Stepanian's admission that it had been "seldom if ever that the band's financials had been discussed." (Defendants' FOF #802) Even the name given to this August 7, 2009, Ubuntu, reveals some insight into HSP and Stepanian's *modus operandi*, namely using other people's creative ideas and works for its own benefit.[3] As shown at trial, the documents provided to the Defendants at this meeting were also incomplete and inaccurate, did not contain all merchandise streams. Further, the Ubuntu meeting, if anything, was "too little, too late", and is really of no moment with regard to the main issues at hand, namely HSP's breaches and lack of evidence supporting its claim for reimbursement.

**4. Salary Program Issues**

HSP next discusses the salary program, it actually coins a new phrase for it, referring to that scenario now as the "salary advances." Obviously, the term "salary advance" is inappropriate, as the salary program, which was subsequently reclassified as loans, is a complete misnomer to begin with, and HSP never advanced Defendants any

---

[3]    Mr. Stepanian's testimony was effusive regarding his love for the Boston Celtics and his use of their internal mantra to describe his spin on the interactions with his clients.

part of their salaries[4].  The Defendants were all members of PBS, LLC.  They were never employees nor independent contractors of HSP.  As such, their earnings would be the net profits of PBS, LLC which should be reflected in K-1 IRS forms, not 1099 forms, which by definition, are for nonemployee compensation.  HSP's PTB even admits that the salaried "payments were referred to by all involved as 'salary' and were administered by a payroll company, but they were in fact advances on future earnings."  Stepanian's emails consistently referred to the arrangement as salaries, and that he had been generous with his money (Trial Exhibits 106, 125, 132, and 182).  In fact, as Shelly Dyer admitted, HSP was actually taking revenues earned by PBS, and deposited in PBS' bank account, out of that bank account, putting it into High Steppin's operating account, then sending those monies to a third party payroll service, who would in turn wire the money to the Defendants under the guise of salaries (See Defendants' FOF #65).

HSP is now claiming a right to reimbursement of PBS' own monies under the guise of advances or "loans".  However, there are no loan documents, and all of the financial advisers, including Mr. Friedman, Mr. Weinstein, Mr. Schimmel, Ms. Chabaud and Ms. Dyer, all testified that if a *bona fide* loan arrangement was in place, there should be a promissory note with specific terms and other indicia of a true loan (See Defendants' FOF #61, 271, 392 393, 394, 450, 608, 639, 762, 763, and 781).  No such indicia exist. Moreover, HSP claims that the Defendants somehow tacitly agreed that the payments are recourse loans, simply because they knew that the amount of loans exceeded PBS' annual gross income.  That argument flies in the face of reason.  First, none of the individual

---

[4]      In other words, PBS was not receiving advances against a previously-agreed upon salary; they
         were receiving actual salary payments, which HSP now seeks to characterize as "salary advances"
.

Defendants knew how much the others were getting, specifically because Stepanian never bothered to disclose that information to all of the Defendants contemporaneously. More to the point, Mr. Stepanian clearly knew that the monies he was paying exceeded PBS' annual gross revenues, and thus, one can only assume that he voluntarily agreed to do so with specific knowledge of PBS' anticipated future revenues (as well as with knowledge of the value of Porter's Meter's catalog), especially in light of his email claiming that he had been suggesting the salaries and his profuse testimony as to his professed desire to benefit the Defendants financial situation (at least back in 2007).

Regarding the 1099s, HSP actually admits that the use of 1099 was improper. Not only did Ms. Dyer confirmed it in her deposition (See Defendants' FOF #507 and 509), but HSP's brief even admits the same. In fact, despite claiming that it voided the 2007 1099s because that was the wrong way to account for PBS' own earnings, HSP again issued 1099s in 2008, which it never voided until 2011, in the middle of litigation, claiming that it did not do so because Mr. Porter had resigned from PBS, as if that fact somehow relieved or precluded HSP from properly accounting to its clients.

Lastly, HSP completely ignores Porter and Stoltz's testimony that they believe that the salary, which was instituted unilaterally and voluntarily by Mr. Stepanian, was offered in exchange for more availability from Defendants. At no time did Stepanian explain or discuss his belief that the salary payments would be recourse loans which the Defendants would have to pay back. Stepanian merely asked Stoltz and Porter how much they needed each month (and simply told Batiste how much he would receive) and then agreed to pay a specific sum.

**5.      PMA Termination**

HSP devotes a couple of pages of its PTB to a discussion regarding the termination of the PMA.  As Stepanian previously admitted, and as ruled on by the Court, and as confirmed by both Stepanian and Herlihy during their testimony, Porter timely and lawfully exercised his right not to renew the PMA, opting instead to let the PMA automatically terminate after the first three and a half years (See Defendants' FOF # 682)  Thus, it is clear, and factually supported by evidence, that Porter lawfully exercised his right not to renew the PMA, and less than sixty days later, HSP, without even providing a full and accurate accounting of Porter's alleged indebtedness, filed suit in federal court, based on admittedly erroneous financial evidence, obtained an injunction against the three Defendants, their future earnings, and all their royalty income, all without so much as an adversarial hearing (See Defendants' FOF #129, 131, and 548).  Therefore, contrary to Stepanian's assertion, it certainly looks like Porter's extensive Meter's catalog of previous songs written and recorded with the Meters, was certainly in the forefront of Stepanian's mind and in his crosshairs.

**6.      Non-Tour Expenses**

HSP next discusses non-tour expenses, again without any specific citation to, or even recognition of, the documentary evidence.  As an initial matter, HSP claims that tour expenses are not an issue.  Not exactly.  The Defendants did not challenge the authenticity of the tour expenses.  However, as Porter and Stoltz testified, a number of tour related expenses were unknown to them and were not approved by the band.  This is specifically true regarding a lot of "entourage" type expenses for extra crew and support staff.  In reality, it appears that HSP was out-sourcing many aspects of its managerial

obligations, at exorbitant cost, without disclosure to the Defendants, and now seeks to dump those expenses on the Defendants. In fact, as HSP actually admits, beginning in 2009, when HSP began using realistic tour budgets, "PBS, LLC turn a profit of $72,648.63 in 2009." (See Trial Exhibit 29, pg. 449).

Thus, HSP's pleadings establish that many of the tour expenses unilaterally incurred by HSP in 2006, 2007, and 2008 were unnecessary, did not result in added value, did not translate into increased income, and were not approved by the band. As previously set forth in Defendants' FOFs and PTM, Malangone admitted that she never sent the band any non-tour related invoices or estimates prior to incurring those expenses (See Defendants' FOF #218, 219, 220, 222, 223, 224, and 225). Likewise, Stepanian could not point to any emails other than some expenses related to It's Life and Up All Night, and to a lesser degree, MooDoo, which were approved by the band (Defendants' FOF #70, 71, and 218). Regarding the Danny Clinch photo shoot, why would HSP bury that cost in retained earnings, then in advertising, and essentially hide the actual cost from the Defendants for approximately two years, rather than simply send the estimate HSP received a month before the shoot to the Defendants for approval, if HSP was acting in good faith and with full disclosure as required by its fiduciary duties? The same rational also applies to Madison House and a host of other non-tour (and tour crew) expenses. HSP has simply not shown an entitlement to reimbursement for non-tour expenses (and limited tour expenses) based on a lack of prior approval and a lack of reasonable necessity.

**7.      Merchandise and Digital Sales**

HSP next discusses the sale of merchandise and digital sales, and admits that its cost recovery model "does not account for sales and inventory as would be expected in a fully GAAP-complying accounting system."  As noted by the Court at trial, the cost recovery models were, like the other financial reports HSP prepared, inadequate and incomplete (See Defendants' FOF #25, 342, 671, 715, 744, 784, 793, 811, and 817). Stepanian admitted, and Dyer and Malangone corroborated, that HSP was actually operating out of two sets of books regarding PBS' income (both gig and intellectual property revenues) (See Defendants' FOF #33, 238, and 521).  Amazingly, HSP cannot even bring itself to acknowledge the disparity between the hundreds of thousands of dollars in merch/CD/download revenues booked on HSP's P&Ls, as prepared and discussed by Lewis Weinstein (See Defendants' FOF #376 - 412; See Also Trial Exhibit 197 A-J), while only a scant couple of hundred dollars appears on the PBS' financials prepared by HSP (See Trial Exhibits 8, 13, and 20).

Perhaps the easiest way to highlight the lack of accuracy and completeness with regard to financial information regarding the sale of Defendants' works is a comparison between the stipulation arrived at between the parties during trial, which stated that HSP had sold $76,387.15 in Defendants merchandise as of June 1, 2012, but that number cannot be reconciled with the Ubuntu meeting reports, the cost recovery models, the numbers on the POC and other financial data. (See Trial Exhibits 2 - 30, 36, 197, 237). Essentially, HSP's argument is that somewhere in all of the documents they provided during the discovery in the court reposes the proof supporting their position, but they cannot or will not specifically identify that proof.  Suffice it to say that HSP has not

shouldered its burden of proof.

**8.    Copyright Violations**

With regard to HSP copyright violations, despite admitting to receipt of revenues related to the sale of Defendants creative works, regarding both works distributed directly by HSP (with or without Defendants' knowledge, such as Nugs, Nimbit, CD Baby, etc.) and by third-parties such as Dave Morrison, Kufala, Buffalo Records, FestivaLinks, etc., HSP claims it has not committed copyright infringement.  That whole argument hinges on whether or not HSP had a *gratis*, non-exclusive, irrevocable, implied license, obtained for consideration.  That position is preposterous at best. First, there are no facts in evidence that HSP ever requested that Defendants create any works specifically for HSP, nor is there any evidence that HSP ever paid any consideration to Defendants for any "requested" works.  Herlihy admitted that the filing of a counterclaim would terminate any implied license (Defendants' FOF #154).  Further, the "consideration" HSP claims it provided in exchange for a license (marketing efforts, etc.), is nothing more than the obligations it had as manager under the PMA, for which it claims a right to a 20% commission.   HSP has admitted lying about the post-PMA distribution of PBS' creative works, the unauthorized use of Defendants' email list, the receipt of numerous streams of revenue derived from the commercial exploitation of Defendants' creative works, and simply ignores all of that in their brief.  Again, HSP has not offered any factual findings worthy or merit, nor supported by record testimony.

**9.    Alleged Non-reporting**

Lastly, HSP's argument regarding the alleged failure to report certain earnings is not only not true, but is not factually supported to any degree which would allow for

calculation for any alleged indebtedness.  The argument fails.

Respectfully Submitted,

  /s/ Ronnie Glynn Penton__          /s/ John O. Pieksen, Jr._____
Ronnie G. Penton (#10462)          John O. Pieksen, Jr. (#21023)
The Penton Law Firm                John Pieksen & Associates, LLC
209 Hoppen Place                   829 Baronne Street
Bogalusa, LA  70427                New Orleans, LA  70113
Phone:  (985) 732-5651             Phone:  (504) 581-9322
Telecopier:  (985) 735-5579        Telecopier (504) 324-4844
E-Mail:  fedcourtmail@rgplaw.com E-Mail:  jpieksen@cox.net

**Counsel for AP Defendants and the U.S. Bankruptcy Trustee,
Wilbur "Bill" Babin**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served upon all
counsel of record by ECF filing, facsimile, electronic transmission, and/or by depositing
same in the United States mail, properly addressed and postage prepaid, this 31st day of
January, 2013.

/s/ John O. Pieksen, Jr.