UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re | ) | Docket Number |
| | ) | |
| GEORGE J. PORTER, JR. and ARALEAN H. PORTER, | ) | 2:10-bk-13553 |
| | ) | |
| Debtors | ) | Chapter 7 |
| | ) | |

| | | |
|---|---|---|
| HIGHSTEPPIN' PRODUCTIONS, LLC, Plaintiff, | ) | Docket Number |
| | ) | |
| v. | ) | 2:10-ap-01130 |
| | ) | |
| GEORGE PORTER, JR., et al., Defendants | ) | |

**Administratively Consolidated for Trial With**

| | | |
|---|---|---|
| HIGHSTEPPIN' PRODUCTIONS, LLC, Plaintiff, | ) | Docket Number |
| | ) | |
| v. | ) | 2:10-ap-01131 |
| | ) | |
| BRIAN STOLTZ, et al., Defendants | ) | |

**Administratively Consolidated for Trial With**

| | | |
|---|---|---|
| HIGHSTEPPIN' PRODUCTIONS, LLC, Plaintiff, | ) | Docket Number |
| | ) | |
| v. | ) | 2:11-ap-01163 |
| | ) | |
| DAVID RUSSELL BATISTE, et al., Defendants | ) | |

## <u>HIGHSTEPPIN' AND STEPANIANS REPLY BRIEF</u>

The Plaintiff, Highsteppin' Productions, LLC ("HSP"), and the Third-Party Defendant

Philip Stepanian ("Stepanian"), (both referred to as "HSP") submit the following reply to the

Defendants' several Post-Trial Briefs.

I.      **Specific objections to the Defendants' Proposed Findings of Fact and Rulings of Law.**

Limitations of time and resources and page limitations for a reply brief prevent HSP from responding to all of the inaccuracies, bald misstatements, and misleading arguments in the Defendants' 819 Proposed Findings of Fact and 210 proposed Conclusions of Law. HSP enumerates here specific objections to those Proposed Findings of Fact and proposed Conclusions of Law HSP considers the most material to this Court's determination of the issues before it; however, HSP's failure to address a specific finding of fact or ruling of law cannot and should not be considered an indication HSP's assents to or agrees with any proposed finding or conclusion.

A.      **Statements of fact, paragraph 11.**

The PMA provided HSP the authority to hire an accountant on behalf of PBS in paragraph 3(a)(iv). (1 Ex. 1:4). Nevertheless, HSP did communicate with the Artists about Friedman Kannenberg & Co. and Mr. Friedman did personally communicate with the Artists via phone and E-mail. (Stepanian Test.); (1 Ex. 18). Furthermore, the record contains no evidence the Artists ever objected to Friedman or wanted to terminate him.

B.      **Statements of fact, paragraphs 21 through 26.**

HSP and the Artists expressly agreed in the PMA that the Artists would reimburse HSP for the pre-PMA merchandising expenditures incurred in 2005 and 2006. (1 Ex. 1:8).

C.      **Statements of fact, paragraph 32.**

This is extraneous to the trial record and should not be considered by the Court. HSP moves to strike this proposed finding and any argument based on it.

### D.      Statements of fact, paragraph 42.

HSP specifically lacked the authority to hire a business manager for PBS without the

Artists' approval under paragraph 3(a)(viii) of the PMA. (1 Ex. 1:4). The Artists failed to provide

that consent. Furthermore, HSP made known in the PMA it was not a business manager. In

fulfilling certain fiduciary obligations to the Artists, HSP undertook (reluctantly and without

compensation) some of the bookkeeping tasks of a business manager, but never acted as the

Defendant's business manager or otherwise assumed the duties of a business manager.

(Stepanian Test.); (Porter Test.); (Stoltz Test.).

### E.      Statements of fact, paragraph 61.

The PMA is a written agreement that covers the Defendants' obligation to reimburse HSP

for monies it advanced on the Defendants' behalf, regardless whether those advances funded

salaries, loans, or draws to the Artists.  PMA, paragraph 6. (1 Ex. 1:7-8).

### F.      Statements of fact, paragraphs 82-84.

HSP has accounted for all of the income it received on behalf of the Artists and credited

the artists for those funds.  See (Stepanian Test.); (Malangone Test.).  The PMA specifically

authorizes HSP "to recoup and retain of any such loans, advances, and/or expenses incurred …

from any sums Highsteppin may receive for Artist's account."  PMA, paragraph 6(a) (1 Ex. 1:8).

### G.      Statements of fact, paragraph 88.

HSP accounted for the income it received on May 2011. (1 Ex. 2); (Debiasi Test.). HSP

also provided accountings to the Court on June 22, 2012. The parties have also stipulated to the

gross amount HSP received on the Artists' behalf for their merchandise and digital sales and

cannot now raise it as an issue. (Stipulation of Facts, ¶ 1).

**H.      Statements of fact, paragraphs 90, 141.**

The allegations that "HSP… released 10 live performances of PBS shows without the

Defendants' prior knowledge and specific consent" is directly contradicted by the Stipulation of

Facts. (Stipulation of Facts, ¶ 8 and attached E-mails). The Defendants also acknowledged HSP

had a license to record the live performances in their brief. (Def. Br. 39). Furthermore, the

overwhelming testimonial and documentary evidence also confirms the existence of a license, as

outlined in HSP's brief.

**I.      Statements of fact, paragraph 122.**

Paragraph 6 of the PMA provides, "Highsteppin is not required to make any loans or

advances hereunder to Artists or for Artist's account nor to incur any expenses on Artist's behalf,

but, in the event Highsteppin does so, Artist shall reimburse Highsteppin therefore promptly…."

(1 Ex. 1:7). The accountings rendered to the Artists (including those on March 13, 2007; July

2007; and October 2007) make clear the Artists were liable for these expenditures. (Porter Test.).

**J.      Statements of fact, paragraph 128.**

Herlihy specifically testified he was not involved in any discussions regarding litigation

until the very end of December 2009, after resolution of the publishing deal. The publishing deal

did not suffer in any way because Stoltz consummated it and Herlihy withdrew.

**K.      Statements of fact, paragraph 155.**

HSP has demonstrated in its brief the license was irrevocable because it was supported by

consideration. While Herlihy at first testified to the contrary, he corrected his testimony the next

day after reviewing Lulirama Ltd., Inc., v. Axcess Broadcast Svcs., Inc., 128 F.3d 872 (5th Cir.

1997), which makes clear an implied license is irrevocable if supported by consideration.

**L.      Statements of fact, paragraphs 163-65.**

The Defendants attempt to infer Herlihy tried to mislead the Court by hiding facts.

Herlihy immediately corrected his testimony following his review of his privilege log.  It would

have been wrong for him not to revise his testimony in light of that review. Furthermore, HSP

was acting pursuant to its authority under its implied license and paragraph 6 of the PMA. (1 Ex.

1:3-4).

**M.      Statements of fact, paragraph 215.**

Malangone testified the Artists resisted setting up a separate bank account, despite

Malangone's attempts to do so. (5 Ex. 61). HSP lacked the authority to set up the bank account

without the assent of the Artists because they were the members of PBS, LLC, in whose name

the account was to be opened. (Malangone Test.).

**N.      Statements of fact, paragraph 374.**

HSP still has possession of these articles only because the Trustee specifically rejected

tender of the same.[1]

**O.      Statements of fact, paragraph 544.**

HSP has credited the Artists with the income due to them from the cost recovery model.

(1 Ex. 2:19). The parties have also stipulated to the gross amount that HSP received on the

Artists' behalf for their merchandise and digital sales and cannot now raise it as an issue.

(Stipulation of Facts, ¶ 1).

**P.      Statements of fact, paragraph 606.**

The conclusion is unsupported by the facts; the audit trail simply demonstrates when the

batch transfers were made and for what amount, not underlying accuracy of the batch transfers.

---

[1] This is the subject of ongoing discussions between HSP and the Trustee to pay for shipping,
which the Trustee has openly refused.

DeBiasi testified he reviewed an extraordinarily high percentage of the transactions entries and the supporting documentation and found the entries accurate and reliable. Nevertheless, the detail of batch transfers is in the Exhibit 146 excerpts admitted into evidence.

### Q.     Conclusions of law, paragraph 6.

The Defendants misstate the law. They suggest the Court should apply the doctrine of *contra proferentem* against HSP and interpret all ambiguities in the PMA against HSP. Massachusetts law provides where a contract term is ambiguous, it will be construed against the drafter, Bowser v. Chalifour, 334 Mass. 348, 352 (1956), but whether both parties were represented as an important factor in whether to apply *contra proferentem*. See, e.g., Leblanc v. Friedman, 438 Mass. 592, 599 n. 6 (2003). In Leblanc, it was undisputed the defendant presented the contract to the unrepresented plaintiffs who signed it in that form. Id. In this case, counsel represented both HSP and the Artists, and both suggested substantive changes to the PMA. See (1 Ex. 3). The PMA is not a contract of adhesion where the Artists had no leverage to negotiate its terms, but rather the result of the combined efforts of two sophisticated, arms-length parties represented by competent counsel over approximately five months.  The grounds for applying *contra proferentem* are absent.

### R.     Conclusions of law, paragraph 83.

The Defendants' reliance on Estate of Johnson v. Melvin Rose, Inc., 75 Mass.App.Ct. 1113 (2009), is misplaced. First, the decision is unpublished and therefore merely persuasive, not binding, authority. See Mass. App. Ct. R. 1:28. Second, the case cites only Connecticut law. Massachusetts has consistently held the burden to be preponderance of the evidence. Hanover Ins. Co. v. Sutton, 46 Mass. App. Ct. 153 (1999); see also Cleary v. Cleary, 427 Mass. 286, 290 (1998). Third, the burden of proof in Massachusetts in *estate matters* was clear and convincing

evidence, but this was changed under the Massachusetts Uniform Probate Code in 2011. M.G.L.

c. 190B, § 1-109.

### S.    Conclusions of law, paragraph 175.

The Defendants misstate <u>Lulirama</u>. While the quotation comes from the case, the

inference the Defendants wish the Court to draw is not limited to that scenario.  Other factual

circumstances giving rise to an irrevocable, non-exclusive license: the opinion goes on to state an

implied license is governed in the same manner as an implied-in-fact contract. <u>Lulirama Ltd.,</u>

<u>Inc., v. Axcess Broadcast Svcs., Inc.</u>, 128 F.3d 872, 882 (5th Cir. 1997); 3 Melville B. Nimmer

& David Nimmer, Nimmer on Copyright § 10.01[C] & n. 73.1 (1977) (observing a license can

be a form of contract in the sense it is, "in legal contemplation, merely an agreement not to sue

the licensee for infringement").

## II.    <u>The Defendants' breach of fiduciary duty claims cannot succeed.</u>

The Defendants have not proven HSP breached its fiduciary duties to the Defendants.

Their thirty-seven alleged violations of HSP's duties do not constitute breaches as a matter of

law in many instances. The Defendants' claims for breach of fiduciary duty must also fail

because they have not proven any damages or causation.

### A.    None of HSP's alleged thirty-seven breaches of fiduciary duties amount to an actionable breach of HSP's fiduciary duties.

The Defendants have alleged 37 "specific instances" where HSP allegedly breached its

fiduciary duties to the Artists. (Def. Br., pp. 17-22). Many of the Defendants' allegations

demonstrate a slipshod application of the law of fiduciary duties to facts that do not, as a matter

of law, constitute breaches of fiduciary duties. What follows are specific responses to these

allegations.

1.      Stepanian did not testify he considered PBS a success because HSP maximized its commissions. He testified it was a success because PBS increased its yearly gross revenues so quickly that HSP achieved the thresholds for increasing its commissions within one year of executing the PMA. This is a non-actionable statement.

2.      The Artists were aware of PBS's income and expenses and they were aware they were not earning sufficient funds to cover those expenses, as outlined in HSP's brief. The Artists have not demonstrated HSP abused its position of trust.  To the contrary, the Defendants participated substantively. The Artists were also fully apprised of the fact HSP was not a business manager in the PMA (1 Ex. 1:9) (¶ 9(a). HSP had no choice but to assume the task of bookkeeping because the Artists controlled the hiring of a business manager but refused hire one or to pay for one. (Stepanian Test.); (Stoltz Test.). As HSP argued in its motion for summary judgment, damages are authorized by statute for the filing of an *involuntary* bankruptcy petition in bad faith, but Congress did not permit damages for the filing of a *voluntary* petition. See 11 U.S.C. § 303(i). This was a tactical decision consciously chosen by the Artists to secure a change in venue.

3.      The charts filed by HSP in the district court action were based on the information available to HSP in a relatively short time frame, as Stepanian testified, and were identified in HSP's pleadings as preliminary and incomplete. As soon as the litigation began, Stepanian commissioned a more thorough calculation of the amount the Artists owed. In fact, those charts mitigate *in favor* of the Artists because the final claim that HSP calculated exceeded the conservative amount claimed in those initial pleadings by approximately $100,000. Furthermore, the accountings were identified as interim and subject to change. (See Complaint generally). Even though HSP filed a motion for an *ex parte* temporary restraining order—which requires a

stringent standard of judicial review—the Artists still had the opportunity to be heard on two separate occasions in the district court before it granted preliminary injunctive relief.

4.      This statement contains a logical fallacy. Stepanian discharged his affirmative obligation to discuss the financial status of PBS in the numerous telephone conferences and accountings he had with the Artists throughout the term of the PMA. Furthermore, the Artists directly participated in the salaries, tour reporting, and recording expenses. Stepanian's expression of "willingness" does not prove he ever failed to produce any information.

5.      The Defendants knew HSP lacked the skills of a business manager, but were content with HSP providing bookkeeping services regardless. Additionally, the mere state of HSP's accounting does not damage the Artists because they cannot demonstrate any deficiencies in HSP's accounting caused them any losses whatsoever, as they and their accounting expert conceded . This overarching and overreaching accusation demonstrates the fundamental lack of causation in the Defendants' case.

6.      The evidence admitted into the record establishes numerous instances where HSP informed the Artists about the increasing magnitude of the debt. The Artists themselves mentioned it on numerous occasions. Porter E-mailed Stepanian on March 3, 2007, saying "My Wife is asking ?'s [sic] that I can not answer…. My head was about to blow off so I called You…." (3 Ex. 60:1787-88). Among those questions "this band as she look's at it because she has seen it before is now in over a $100,000.00 of debt and how will we pay for all of this…. She's asking how are We/PBS going to pay for all his debt that has been made in our behalf." (3 Ex. 60:1787-88).  This occurred over one year earlier than the Defendants suggest.

7.      HSP was under no affirmative obligation to provide Chabaud with any information regarding PBS. That obligation flowed to PBS and the individual Artists. At no time

did any of the professionals associated with the Artists object to any information HSP provided, if they asked for it at all. Additionally, Porter signed the 2006 tax return regardless of whether Chabaud received the information.

8.      The record contains no evidence the information in the 2007 return was erroneous.  Any errors were addressed before the tax returns were finalized. (Dyer Test.); (Friedman Test.). Furthermore, the Artists failed to demonstrate any alleged errors in the tax returns damaged the Artists. They have neither filed amended returns, nor have they faced any actions by the IRS arising out of those returns. Moreover, when the revised P&L information was given to them, they amended nothing with the IRS.

9.      HSP was under no obligation to fix errors in PBS's *own* tax returns; that responsibility is on PBS and its members. To the contrary, the members of PBS have failed to fix any of the information on their tax returns since the inception of this litigation after receiving amended 1099's and P&L statements.

10.     This allegation repeats allegation 2. The Artists  were fully aware of PBS's income and expenses and were aware they were not earning sufficient funds to cover those expenses, as outlined in HSP's brief. The Artists have not demonstrated HSP abused its position of trust.  To the contrary, the Defendants participated materially, substantively, and continuously. The Artists were also fully apprised of the fact HSP was not a business manager in the PMA (1 Ex. 1:9) (¶ 9(a). HSP had no choice but to undertake bookkeeping tasks because the Artists controlled the hiring of a business manager but refused to hire or pay for one. (Stepanian Test.); (Stoltz Test.). As HSP argued in its motion for summary judgment, damages are authorized by statute for the filing of an *involuntary* bankruptcy petition in bad faith, but Congress did not

permit damages for the filing of a *voluntary* petition. See 11 U.S.C. § 303(i). This was a tactical

decision consciously chosen by the Artists.

11.     HSP has no fiduciary obligation to the Artists to provide an accurate proof of

claim. HSP's obligation to provide an accurate proof of claim is for the benefit of the bankruptcy

estate and the Court. Moreover, this is a demand for payment of monies due and owing pursuant

to the express terms of the PMA that does not arise out of the fiduciary relationship of the

parties.

12.     Malangone and Dyer both testified the batch transfers were made to the PBS

Quickbooks files based on expenses classed to PBS in HSP's Quickbooks file. The underlying

transactions were presented to the Court in Exhibit 146. The Defendants have presented no

evidence of any inaccuracies in the entries.  To the contrary, DiBiasi's uncontradicted testimony

establish their reliability.

13.     Dyer testified this was an accounting misstep that was rectified when it was

discovered and fixed *before the return was filed*. Friedman testified he informed HSP about the

misclassification, and it was immediately rectified. HSP once again states it did not willingly

assume the role of business manager but undertook bookkeeping as best as it could in light of its

lack of business management skills. Regardless, the Artists knew about the cost of the Clinch

photo-shoot before they received the accounting (regardless of whether they knew it before the

shoot or after the shoot when Porter phoned Stepanian to discuss the photo-shoot, see (5 Ex.

60:1787); (4 Ex. 44)).

14.     The Artists have failed to demonstrate they were unaware of the non-tour

expenses that HSP was incurring. The record overwhelmingly demonstrates the Artists were

experienced professional touring musicians with nearly 70 years of experience who managed

their tours and understood the costs and incomes of the tours. Knowing costs slightly exceeded expenses, they were well aware from that alone (in addition to the accounting HSP provided), there was deficit spending. Nevertheless, HSP routinely informed the Defendants about the deficit spending on their behalf.

15.     This misstates the law. Breaches of an agreement are not compensable as breaches of fiduciary duty, but in actions on the agreement.

16.     HSP has the right to collect revenues under the PMA and the right to retain revenues received to recoup advances made on the Artists' behalf. The Artists have not demonstrated HSP converted any of the funds it received on the Artists' behalf. HSP has produced all documents—including its accounting documents—demonstrating the payments received from the respective digital vendors. Furthermore, the Defendants conclusively ceded any challenge to this issue when they stipulated to the amount HSP collected on the Artists' behalf. (Stipulation of Facts, ¶ 1). Schimmel testified he could find no harm to the Artists based on HSP's accounting.

17.     HSP had no obligation as a fiduciary to register the Artists' individual works. Nowhere in the PMA is there an affirmative obligation on HSP to register the copyrights generally. Furthermore, the Artists know that they need to copyright their own works because they did so for decades prior to the PMA. (Stoltz Test.); (Porter Test). The Artists were represented by an entertainment lawyer, Eveline. Lastly, Jaccodine testified that he did not do copyright registration for his artists. This was always a responsibility of the Artist.

18.     HSP has not usurped any of the Artists' intellectual property rights. With respect to Morrison and the other Non-HSP Part Number, HSP was not involved in the distribution of those recordings, and the Defendants have never demonstrated otherwise. To the extent HSP

entered into agreements with vendors, it did so on the Artists' behalf pursuant to its authority in the PMA. See (1 Ex. 1:3-4) (¶ 3). HSP has also accounted for all of the income it received on the Artists' behalf.

19.    To the extent any breach of fiduciary duty exists, it is Porter's breach to his partners because Porter insisted the amount he wanted was "for your eyes only." The Artists hid from each other their disparate salaries. This constitutes unclean hands by the Artists, which is an equitable defense to the breach of fiduciary duty claim in this instance.  Furthermore, the tax return for 2007 disclosed the unequal distribution.

20.    HSP cannot be held liable for entering into agreements it had no obligation to execute. To the contrary, the Artists assented to HSP's exploitation of the HSP Part Numbers, as the Artists specifically stipulated. (Stipulation of Facts, ¶ 8).

21.    To the extent a breach of fiduciary duty exists, it is Porter's breach to his partners because he insisted the amount he wanted was "for your eyes only." The Artists hid from each other their disparate salaries. This constitutes unclean hands by the Artists, which is an equitable defense to the breach of fiduciary duty claim in this instance.  Furthermore, the tax return for 2007 disclosed the unequal distribution.

22.    The Artists knew the purpose of the salary program was to even out their salaries and provide them with regular distributions from their gig income. (Stepanian Test.). These were distributions of PBS's funds from its own accounts to its members, regardless of the mechanism by which they were accomplished.

23.    Debiasi, Dyer, and Friedman each testified the 1099's were erroneous and HSP had an obligation any error in the 1099's so that they accurately reflected what had occurred.

24.     HSP cannot be held liable for entering into agreements it had no obligation to execute. To the contrary, the Artists assented to HSP's exploitation of the discs, as they participated in their creation and intended they would be profitable.

25.     The Defendants cannot allege HSP violated 17 U.S.C. § 1101 because at no time did HSP record PBS's shows without the Artists' knowledge, an essential element of any claim under that statute. (Stipulation of Facts, ¶ 8); see also the discussion *infra* regarding the Defendants' § 1101 claim.

26.     HSP did not receive compulsory licenses pursuant to § 115 because they had licenses with the Artists. A compulsory license under 17 U.S.C. § 115 is required only when an Artist refuses to grant a license under any circumstances, as discussed in detail below.

27.     HSP did not pay the Artists royalties because the Artists were self-publishing their music, HSP's license to distribute was gratis because of or in addition to this agency relationship, and HSP paid to or on behalf of the Defendants *all* of the monies it collected (other than its commissions).

28.     HSP accounted for all of the income it received from the Artists' merchandise sales. The Defendants have ceded any objection to the calculation of those amounts in the stipulation of facts. (Stipulation of Facts, ¶ 1).

29.     As an executory obligation under the PMA (which is not a fiduciary breach) to trigger upon termination of the PMA, the Artists' material breach of the PMA excused HSP from further performance.

30.     HSP attempted to do so following the termination of the PMA. Following the termination of the PMA, Attorneys Herlihy and Eveline held some discussions regarding the

monies Porter owed to HSP. (3 Ex. 62:1854-71). However, these discussions quickly stonewalled, and HSP filed suit soon thereafter.

31.    The Defendants have not proven any agreements with vendors regarding the Non-HSP Part Numbers exist. With respect to the other vendors, HSP has produced all of the documents in its possession, custody, and control and the Defendants have subpoenaed the third party vendors. If the third party vendors did not produce them, the inescapable conclusion is these alleged agreements do not exist.

32.    The Defendants cannot argue this because they stipulated to the amount HSP received on behalf of the Artists for the sales of merchandise. (Stipulation of Facts, ¶ 1). Furthermore, HSP had an irrevocable license to distribute these works.

33.    Any distributions HSP made after the termination of the PMA were made pursuant to the irrevocable implied licenses the Defendants granted HSP throughout the term of the PMA.

34.    HSP denies that Stepanian ever provided false testimony. This is not a breach of fiduciary duty, because by that time HSP owed no fiduciary duties to the Artists. Furthermore, perjury is an offense against the Court arising in criminal law, not an individual party.

35.    Herlihy never represented himself as working for anyone other than HSP. The alteration of the NUGS contract was undertaken pursuant to HSP's authority under ¶ 3 of the PMA. (1 Ex. 1). The privilege log that Herlihy prepared demonstrates at no time did he act for Stoltz as an attorney or as an agent of HSP while helping HSP prepare for its suit against the Artists.

36.    This is not a breach of fiduciary duty. To the extent Batiste's testimony and faulty memory can even be credited, this is an offense addressed under criminal and not civil tort law.

Moreover, as the record clearly indicates, Batiste was arrested for possession of marijuana in Idaho and the record contains no evidence Stepanian provided drugs to Batiste.

37.     This allegation is patently false. This knowledge was also readily available to the Defendants during this litigation, had they chosen to search for it. HSP presented Trial Exhibits 146, 147, 148, and 149 to the Defendants at the end of November 2011, more than six months before trial. Exhibit 146 comprises all the entries into HSP books that are classified as PBS expenses or expenses for the individual Artists (these are the Charts that the Court received). For each of the transactions in those detail reports, HSP identified every deposit slip, check, invoice, receipt, and other document that supported the transaction detail. Each of the documents identified in Exhibit 146 were included in the proposed exhibits as Exhibit 149.

**B.     The Defendants cannot demonstrate the burden should shift to HSP because they have proven no causation between any alleged breach and any damages they sustained.**

Under Massachusetts law, even if the burden of proof shifts to a fiduciary to prove fair dealing, a plaintiff still must demonstrate the losses they claim were proximately caused by the fiduciary's alleged breaches of its duties. O'Brien v. Pearson, 449 Mass. 377, 388 (2007); see also Lux v. Environmental Warranty, Inc., 59 Conn. App. 26, 38 (2000) (prohibiting recovery for breach of fiduciary duty where "none of the allegations of injury to the defendant had been quantified or priced out"). The Defendants have made no such showing here.

When asked what harm the Defendants suffered, the Defendants' accounting expert, Stuart Schimmel, testified he could not calculate any such damages. At no time have the Defendants provided an itemization of the nature or magnitude of their alleged damages (either the nature of their damages or the magnitude). They each testified they could not quantify their

damages[2]. Furthermore, even though the Defendants had access to over 25,000 pages of documents, Exhibit 146, over one dozen third-party subpoenas, and personal access to many of the vendors themselves, they have failed to identify one penny that HSP failed to pay or credit to the Defendants. Furthermore, the Defendants have failed to put HSP on any reasonable notice whatsoever in writing of any alleged breaches in accordance with paragraph 15 of the PMA. (1 Ex. 1:11).

In their post-trial memorandum, the Defendants suggest the Court should hold a post-decision hearing to establish the Defendants' damages.  This suggestion alone constitutes a concession the record fails to establish any damages suffered by the Defendants.  In the absence of evidence establishing an essential element of the Defendants' claims, those claims should be dismissed.

**III.    The Defendants' arguments regarding their copyright claims do not rehabilitate their failed claims.**

The Defendants make a number of arguments—some of them new, most of them frivolous, all of them specious—in support of their consistently dysfunctional copyright claims. Their arguments notwithstanding, the Defendants failed to produce the copyrighted works into evidence, and their copyright claims fail on that basis alone. Their Exhibit A to the brief should be disregarded in whole because this evidence was not presented at trial, and proving the songs were distributed would require submission into evidence of the deposits with the copyright office and the allegedly infringed works. The contents of the allegedly infringed sound recordings cannot be proven via testimony or (yet another) chart. See Fed. R. Evid. 1001. Setting that issue aside for the moment, HSP responds to the Defendants' specific arguments as follows.

---

[2] It is important to note that the Defendants had the opportunity during discovery to conduct a complete audit of HSP's accounting but never did so. They had the same opportunity throughout the term of the PMA, which gave them the right to view HSP's accounting at any time. (1 Ex. 1:8) (¶ 6(f)).

**A.      The Defendants' newest arguments in support of copyright infringement are unsupported by the law.**

The Defendants' argument on pages 38-39 of their brief illustrates their continuing misunderstanding of copyright infringement law. They argue, essentially, HSP infringed on the Artists' copyrights because it collected the fees it received on the Artists' behalf and failed to pay mechanical royalties. Neither of these allegations demonstrates copyright infringement.

**1.      17 U.S.C. § 115 is inapplicable because the parties had their own license agreement; therefore, HSP had no obligation to pay mechanical royalties to the Artists as provided in 17 U.S.C. § 115.**

The Defendants allege HSP infringed on the Artists' copyrights because it failed to pay mechanical royalties to the Artists; however, they fail to recognize the compulsory license of 17 U.S.C. § 115 is an alternative to a negotiated (i.e., implied) license and is a specific license granted **only** if a licensee applies for it from the Copyright Office. Section 115 merely provides a "default" license a licensee can receive if the creator of the work refuses to grant a license under any terms. No limitation exists on the right of a licensee or an artist to negotiate the terms of a license among themselves for the distribution or copying of the artists' musical work. Most companies, such as the Harry Fox Agency, that handle royalty payments to artists do not operate under the strictures of § 115, but rather pursuant to the agreements they enter into with individual artists/record labels. The standard Harry Fox Agency agreement contain provisions that diverge from § 115 (e.g., quarterly accountings rather than monthly accountings), and are not governed by § 115 but by the licenses granted by negotiation, including by implied licenses.

In light of this observation, it is immediately apparent why the Defendants' arguments regarding § 115 do not apply: HSP was acting under the gratis, implied, nonexclusive license it received from the Artists. **This license did not require the payment of royalties because the Artists were credited with the entire income from the composition excluding HSP's**

**commissions**. The license under which HSP was acting is completely separate from the compulsory license of § 115, and therefore any alleged violation of the terms of that license cannot be the basis for imposing liability on HSP.

**2.    The Defendants wrongly surmise receiving the funds on behalf of the Artists constitutes copyright infringement.**

The Defendants argue HSP infringed on the Artists' copyrights because it collected the fees it received on the Artists' behalf and failed to pay mechanical royalties. To prove infringement, a plaintiff must show (1) ownership of a valid copyright and (2) unauthorized copying. Peel & Company Inc. v The Rug Market, 238 F.3d 391, 394 (5th Cir. 2001); Positive Black Talk Inc. v. Cash Money Records, Inc., 394 F.3d 357, 367 (5th Cir. 2004). "'Copying' in this context is a term of art that requires the plaintiff to "prove (1) factual copying and (2) substantial similarity." Positive Black Talk, 394 F.3d at 367-68; Bridgmon v. Array Sys. Corp., 325 F.3d 572, 576 (5th Cir. 2003). The Defendants assume because HSP has received funds on behalf of the Artists, it is therefore liable for copyright infringement, but receiving funds is not one of the enumerated rights set forth in §106 of the Copyright Act and does not constitute copyright infringement. Even assuming HSP had received the funds on the Artists' behalf and not turned it over to the Artists (which HSP denies and which the evidence disproves), it would not constitute copyright infringement, which requires an action in violation of one of enumerated exclusive rights set forth in  §106 of the Copyright Act. Defalcation of funds may be a component of damages, but it does not demonstrate the essential copying or distribution that comprises an infringement claim.

**B.    The Defendants cannot receive statutory damages.**

The Defendants have asked this Court to award $7.95 million dollars in statutory damages to the Artists. This is predicated on a deliberate misreading of the law: Congress

explicitly intended, "A plaintiff can only recover a single minimum or maximum statutory

damage recovery regardless of how many times a defendant has infringed the work or whether

the infringing acts were separate, simultaneous, or occurred sequentially." <u>See</u> H.R. Rep. No. 94-

1476, at 162 (1976); <u>N.A.S Imp. Corp. v. Chenson Enters. Inc</u>. 968 F.2d 250, 252 (2nd Cir.

1992). The Defendants' <u>Exhibit A</u> to their brief—the fourth such chart produced during this

litigation—identifies 53 works that have allegedly been infringed, some of which are duplicates[3].

Regardless, the chart attached to and incorporated into the Stipulation of Facts directly

contradicts this newest chart.

Second, the statutory damages provided in 17 U.S.C. § 504 are subject to 17 U.S.C.

§ 412, which states in relevant part:

> no award of statutory damages or of attorney's fees, as provided by sections 504
> and 505, shall be made for—
>
> (1) any infringement of copyright in an unpublished work commenced before the
> effective date of its registration; or
>
> (2) any infringement of copyright commenced after first publication of the work
> and before the effective date of its registration, unless such registration is made
> within three months after the first publication of the work.

This language essentially makes registration of a work a prerequisite to the receipt of statutory

damages. A plaintiff cannot be awarded statutory damages or attorneys' fees for infringement of

an unpublished work before its publication. 17 U.S.C. § 412(1). Statutory damages and fees and

costs are also proscribed when the infringement commences after first publication but before its

effective registration date, unless registration is made within three months after first publication

of the work. 17 U.S.C. § 412(2); <u>see also</u> 17 U.S.C. § 408(f)(4). Looking at the chart appended to

the Stipulation of Facts, most of the works identified therein were copyrighted later than three

---

[3] For example, according to the chart, the Stoltz composition "I Been Up All Night" is on both
the Up All Night and East of Rampart Street playlists.

months (in some cases, years) after the date of first publication. The Defendants cannot

demonstrate they can be awarded statutory damages.

### C. The Defendants have failed to demonstrate contributory or vicarious infringement.

The Defendants argue the Plaintiffs are liable for contributory and vicarious

infringement. The Ninth Circuit has said:

> vicarious liability extends beyond an employer/employee relationship to cases in
> which a defendant "has the right and ability to supervise the infringing activity
> and also has a direct financial interest in such activities." [Fonovisa, Inc. v. Cherry
> Auction, Inc., 76 F.3d 259, 262 (9th Cir. 1996)] (quoting Gershwin, 443 F.2d at
> 1162); see also Polygram Int'l Publ'g, Inc. v. Nevada/TIG, Inc., 855 F.Supp. 1314,
> 1325-26 (D. Mass. 1994) (describing vicarious liability as a form of risk
> allocation).

A&M Records v. Napster, 239 F.3d 1004 (9th Cir. 2001). Similarly, a defendant may be liable

for contributory infringement when it, "with knowledge of the infringing activity, induces,

causes or materially contributes to infringing conduct of another." Alcatel USA, Inc. v. DGI

Technologies, Inc., 166 F.3d 772, 790 (5th Cir. 1999) (quoting Gershwin Publishing Corp. v.

Columbia Artists Management, Inc., 443 F.2d 1159, 1162 (2nd Cir. 1971) (footnote omitted)). A

necessary prerequisite for both contributory and vicarious infringement is proof the primary

infringer is actually infringing a copyright. See id. Stated another way, absent direct copyright

infringement, there can be no secondary liability.

The Defendants cannot succeed on their claims because they failed to demonstrate the

direct infringement that is necessary for secondary infringement to exist. The Defendants allege

that HSP is secondarily liable for infringement by "Dave Morrison, NUGS, Nimbit, Rhapsody, I-

Tunes [sic], Lee's Homegrown Music Network, Louisiana Music Factory, MunckMix, All Good

Festival/FestivalLinks, Kufala, and Buffalo records"; however, they have never presented one

iota of evidence even suggesting these entities infringed on the Artists' copyrights—they instead

have stipulated they knew that Dave Morrison and MunckMix, for example—were distributing

their works. (Stipulation of Facts, ¶ 8). While they have produced sales records from these

entities demonstrating sales of PBS music, does not establish infringement because the Artists

may have authorized that distribution, as they did with Digital Dave. They have never produced

one cease and desist letter or other communication objecting to this ongoing distribution. They

have simply tried in slapdash fashion to leverage it into another alleged instance of infringement

by HSP, but they have not proven the elements of their claims.

> **D.      Section 1101 does not apply to this action.**

The Defendants attempt to rehabilitate their copyright claims by alleging violations of 17

U.S.C. § 1101. Under 17 U.S.C. § 1101(a),

> Unauthorized Acts.— Anyone who, without the consent of the performer or performers involved—
>
> (1) fixes the sounds or sounds and images of a live musical performance in a copy or phonorecord, or reproduces copies or phonorecords of such a performance from an unauthorized fixation,
>
> (2) transmits or otherwise communicates to the public the sounds or sounds and images of a live musical performance, or
>
> (3) distributes or offers to distribute, sells or offers to sell, rents or offers to rent, or traffics in any copy or phonorecord fixed as described in paragraph (1), regardless of whether the fixations occurred in the United States,
>
> shall be subject to the remedies provided in sections 502 through 505, to the same extent as an infringer of copyright.

This section is inapplicable to this action[4]. Subsections (1) and (3) require the fixation of the

sounds or reproductions be "unauthorized" by the performers. **The Defendants have specifically**

**stipulated they knew that HSP was making the recordings of the performances and they**

---

[4] It is apparent from this section, moreover, it is intended to apply to the situation where an infringer, for example, uses an iPhone to record a concert and then distributes the concert on YouTube or sells copies of it.

**consented to those recordings for commercial purposes**. (Stipulation of Facts, ¶ 8). They

conceded this point on pages 38-39 of their own brief. Subsection (2) requires a *transmission* of

the *live* musical performance itself, not a transmission of the fixation. This statute is therefore

wholly inapplicable to this matter.

> E.     **The Defendants' Alice-in-Wonderland arguments justify the imposition of
> attorneys' fees and costs under 17 U.S.C. § 505.**

That the Defendants would make arguments directly belied by the parties' Stipulation of

Facts provides further support for HSP's contention they are knowingly and intentionally

creating "make-work" for HSP and the Court and therefore should be held liable for costs and

fees under 17 U.S.C. § 506.

For the foregoing reasons, HSP asks that this Court reject the Defendants' proposed

findings of fact and conclusions of law.

Respectfully submitted,

HIGHSTEPPIN' PRODUCTIONS, LLC,

By its attorneys,

/s/ Jeffrey S. Baker
Jeffrey S. Baker
Baker & Assoc., PC
Two West Hill Place, Suite 100
Boston, MA 02114
Admitted *Pro Hac Vice*
Ph: (617) 573-9505
Fax: (617) 573-9503
E-mail: bakerlaw@aol.com

and

/s/ Patrick M. Groulx
Patrick M. Groulx
Polis Legal
P.O. Box 45504
Somerville, MA 02143
Admitted *Pro Hac Vice*
Ph: (978) 549-3124
Fax: (617) 500-9955
E-mail: pgroulx@polislegal.com

Date: September 26, 2012

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that this document along with any attachments was

served by first class mail or E-mail on this day upon all interested parties and all parties who

have filed their appearances and requested service of all pleadings filed in this case.

/s/ Jeffrey S. Baker
Jeffrey S. Baker, Esq.

Date: September 26, 2012