UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF:                                    NO. 10-13553

GEORGE JOSEPH PORTER, JR.
ARALEAN H. PORTER                                    SECTION "A"

   *Debtors*                                         CHAPTER 7
*************************************************************************
HIGHSTEPPIN' PRODUCTIONS, LLC                        ADVERSARY NUMBER
        PLAINTIFF                                    10-1130 A

VERSUS

GEORGE JOSEPH PORTER, JR., ET AL
        DEFENDANTS

ADMINISTRATIVELY CONSOLIDATED FOR TRIAL WITH

HIGHSTEPPIN' PRODUCTIONS, LLC                        ADVERSARY NUMBER
        PLAINTIFF                                    10-1131 A

VERSUS

BRIAN HERBERT STOLTZ, ET AL
        DEFENDANTS

*************************************************************************

DEFENDANTS' REPLY TO HSP AND STEPANIAN'S POST-TRIAL BRIEF

   NOW INTO COURT, through undersigned counsel, come Debtors and Adversary

Proceeding Defendants, George Porter, Jr. ("Porter"), Brian Stoltz ("Stoltz"), David Russell

Batiste, Jr. ("Batiste") (collectively and/or individually "Artists" or "Debtors") and PBS, LLC

("PBS") (collectively "Defendants"), who hereby submit this Reply Memorandum ("Reply") and

respond to Highsteppin' Productions LLC, ("HSP") and Philip Stepanian's ("Stepanian") Post-

Trial Brief ("HSP PTB").  In so doing, Defendants would point out that despite six (6) weeks of

trial testimony, HSP's PTB (and companion proposed Findings of Fact ("FOFs")) are utterly

devoid of any specific citation to trial transcripts of any witness testimony.  Rather, HSP's pleadings distort, misconstrue, and blatantly misrepresent the Defendants' and other trial testimony, and completely ignore the plethora of damaging and unassailable testimony offered by its own witnesses such as Stepanian himself, Donna Malangone, Shelly Dyer, David Herlihy, Lewis Weinstein and Ralph Jaccodine, while also shying away from, and failing to negate, the testimony of Stuart Schimmel, Alan Freidman, and others..

In all candor, it certainly appears that HSP and Stepanian have given up the ghost: despite professing entitlement to reimbursement in excess of $600,000.00, they either consciously elected not to expend less than $1/5^{th}$ of 1% of the amount of their claim to obtain the transcripts necessary to "support" the vast bulk of their proposed factual findings, or bought them, but could not find any useful passasge.  That decision is not at all surprising, however, for the obvious reasons that the transcripts would not support HSP's proposed findings of fact[1] nor presentation of purported trial testimony.  As set forth below, Defendants offer specific citation to trial testimony and exhibits to rebut the arguments asserted in HSP's PTB, which lack both legal and factual efficacy.

## I.     HSP'S RESPONSES TO THE COURT' SPECIFIC ISSUES

### A.     Fiduciary duties under Massachusetts Law

HPS provides some general legal citation regarding various fiduciary duties and some generic citation for the proposition that the PMA allegedly supersedes any general fiduciary duties.  *HSP PTB, pp. 5-7*. However, HSP makes no cogent argument as to specifically how the PMA defines the scope of, or obviates any, fiduciary duties.  In any event, the PMA clearly does

---

[1] Due to pecuniary constraints, Defendants were only able to purchase certain components of the trial transcripts, including portions of Stepanian, Herlihy, Malangone, Schimmel, DeBiasi and Batiste's testimony.

[2] In the NUGS agreement, HSP unlawfully transferred Defendants' exclusive copyrights to NUGS, without

not absolve HSP of its responsibilities to understand and comply with those fiduciary duties. *Tr. Exh. 1.* As more fully set forth in Defendants' Post-Trial Brief ("PBS' PTB"), HSP contractually undertook, and functioned in, a fiduciary capacity, and as such, owed the duties of care, loyalty, full disclosure and full accounting to the Defendants. HSP failed miserably in that capacity.

### B.      Does a conflict of interest automatically terminate a fiduciary relationship?

As correctly noted by HSP, in a potential conflict situation, it is the fiduciary's burden of proof to establish that his actions did not violate his fiduciary duties, including the affirmative duty to fully account for all monies received by the fiduciary and to prove that those sums were properly handled and accounted for. Defendants maintain that HSP clearly failed to do that on a regular and timely basis, as shown at trial and as set forth in PBS' PTB (Defendants' FOF #626, 631, 631). Additionally, Defendants maintain that HSP's burden of proof in this case is not a preponderance of the evidence but rather, is clear and convincing, but either way, HSP has failed to meet its burden (Defendants' COL #22).

### C.      How does the fiduciary act when confronted with a conflict of interest vis-à-vis multiple clients and joint and several liability?

Defendants generally concur with HSP's statement that fiduciary duties do not automatically terminate simply because of a potential or actual conflict of interest, and that the fiduciary always bear the burden of proving that it did not violate its fiduciary obligations. However, HSP then cites two Louisiana decisions, even though Louisiana law does not apply pursuant to the terms of the PMA. In essence, the only argument HSP puts forth regarding its failure to keep each and every member of PBS fully apprised of all aspects of HSP's relationship with the Defendants is the fact that a 2007 P&L purportedly provided sufficient information to the Defendants that HSP "was paying the different amounts on behalf of the individual Artist for which they were all liable." *HSP PTB, pp. 8-9.* However, at trial HSP put forth no evidence that

3

each individual member of PBS received a copy of the IRS Form 1099 sent to the other members, nor any other credible evidence of complete and contemporaneous disclosure of the differing amounts of salary. Further, in 2007, Stepanian only paid salary for about 6 weeks.

HSP then seeks to shift its burden of proof, claiming that the Defendants had "an unparallel opportunity to discuss the minutiae of their business dealings and disclose whether they are being treated differently." *Id.* That assertion is not supported by citation to the record, and in completely negated by the testimony of each individual defendant, as all three defendants testified that they did not know how much salary the other members were receiving until after Stepanian terminated the salary program in November 2008 (Batiste Trial Transcript Pages 56 - 60; 67 - 68); Porter and Stoltz testimony generally. Also, both Stepanian and Malangone testified that HSP did not send estimates, invoices or other contemporaneous accountings of various expenses related each member's solo project to the other members (Defendants' FOF #222 - 225; 293; 663; 703).

More to the point, it is ludicrous for HSP to claim that Defendants are estopped from "foisting concealment upon HSP's shoulders," while at the same time both tacitly and explicitly admitting that HSP did not provide information to the Defendants: 1) which the Defendants had a contractual and legal right to receive; 2) which HSP had a contractual and legal affirmation obligation to provide; and 3) which was known only to HSP but nobody else. Once again, HPS trots out its hackneyed excuse for its pitiful lack of disclosure; namely, if the Defendants had asked, HSP would have told them. However, HSP had an undeniable affirmative duty to disclose to all aspects of its interaction with each and every Defendant to all members of PBS and HSP failed to do that.

**D.    Does a personal manager need a license to publish or distribute copyrighted works if merely acting as an agent for the artist?**

HSP gives this issue short shrift and essentially claims that it was the Defendants' agent and thus did not need a license, which assumes, without proof, that in this case, the scope of agency automatically included undisclosed publishing and distribution of Defendants' creative works. However, as more fully set forth in Defendants' PTB, HSP was not acting "merely as an agent of the artist," but rather, secretly exceeded the scope of its agency by acting unilaterally, and without disclosure, in many instances regarding the reproduction, publishing and/or distribution of Defendants' copyrighted creative works. Examples of that unilateral and clandestine conduct can be seen in the NUGS agreement[2], the Nimbit agreement, CD Baby (other than Brian Stoltz' solo records), Kufala, Lee's Home Grown Music, Buffalo Music, iTunes, Rhapsody, and Dave Morrisson's company, Digitalsoundboard.net.

By way of contrast, the contracts and payment structure used by Ann Blonston and FestivaLinks regarding the release of PBS' performance at All Good Festival are essentially the only arrangement where HSP may be able to plausibly claim it was acting merely as an agent and not as a record company or distributor, as that deal was directly between FestivalLinks and the Defendants. In that situation, mechanical royalties were paid to the authors of various songs "off the top", and then Artist's royalties were paid (Trial Exhibit 237 with attachments). As is amply supported by the trial record, HSP unilaterally acted as a record company, by virtue of its undisclosed dealings (NUGS, Nimbit, etc.) and the use of HSP catalog numbers on a number of PBS' releases (as opposed to a PBS catalog number), as well as actually placing an HSP copyright marker on the MooDoo release.

     **E.**    **What obligations did HSP have, assuming an implied license existed and was validly terminated, with regard to future distribution.**

---

[2] In the NUGS agreement, HSP unlawfully transferred Defendants' exclusive copyrights to NUGS, without Defendants' consent, knowledge or written documentation, in violation of 17 U.S.C. § 106.

HSP erroneously claims it had a *gratis* (free) irrevocable implied license, while also claiming that said "free" license was nonetheless alleged granted by the Defendants in exchange for consideration.  This argument is specious at best, as more fully set forth herein below in the section responding to HSP's specific arguments on this issue.  In any event, given that a fiduciary's obligation can continue past termination (wind-up for partnership, etc.), HSP's argument is disingenuous, especially because Defendants were unaware of the bulk of the third-party distribution agreements HSP had surreptitiously crafted, although HSP was fully aware of those agreements, if for no other reason than because HSP was receiving the revenues.  Trial exhibits 197A-J.  HSP, at a minimum, certainly had an obligation to inform the Defendants of all third-party agreements HSP was either a party to or received revenue from, as well as an obligation to protect (at at least instruct Defendants to protect) Defendants' intellectual property rights (Defendants' COL 85).  HSP did not do so, and in fact, entered into a secret arrangement with NUGS which unlawfully transferred Defendants' exclusive copyrights without consent or a proper writing under § 106, and which placed the onus on the Defendants to register and protect their own copyrights: a responsibility HSP never even told the Defendants about (Trial Exhibits 169, 170, 245).

HSP also claims that the Defendants should have somehow mitigated their damages, but that argument ignores the fact that the Defendants were not even aware of the extent of most of HSP's undisclosed distribution, and also ignores the fact the HSP was receiving, and still receives, all of the revenues from that distribution.  At a minimum, HSP should have informed the Defendants of all distribution arrangements, provided a full and accurate accounting, and provided contact information, so that the Defendants could make an informed decision on how to handle the sale of their creative works and merchandise.

HSP also argues that if it had attempted to stop distribution, it would have failed to minimize the Defendants' damages because there would have been no additional sales, and because Defendants would have allegedly accused HSP of interfering in the Defendants' relationships with the various vendors.    These arguments are specious, especially because Defendants did not even know about most of the "various vendors, let alone have a direct relationship with them."    The same is true for HSP's argument regarding the alleged *de minimis* nature of any infringement.  HSP offers no legal citation for its novel proposition that the receipt (undisclosed at that) of more than $76,000 in revenues derived from the commercial exploitation of 26 live performances is merely *de minimis*.  *Trial exhibit 237*.    Common sense alone dictates otherwise.

Lastly, HSP claims, albeit incorrectly, that the Defendants are not entitled to statutory damages due to an alleged failure to timely register their copyrights.    That is the same unsuccessful argument HSP asserted in its summary-judgment motion which the Court denied. The argument is also belied by the record evidence, including Exhibits 150, 201, 202 and 237, which clearly establish that a number of Defendants' creative works were undeniably registered prior to the confection of PMA, prior to any involvement with HSP, and prior to any infringement.    That fallacious argument also ignores HSP's fiduciary duty to protect, and/or advise Defendants to protect, their intellectual properties (Defendants' COL #85).    To the contrary, Defendants maintain that they are entitled to an award at or near the statutory maximum for each separate creative works (authored compositions and sound recordings) whose 17 U.S.C. §§106 and 115 copyrights were infringed, as well as for all of their live performances whose 17 U.S.C. § 1101 anti-bootlegging protections were violated.

### F.    How Are HSP's Commissions Calculated Under the PMA?

HSP contends that the commission threshold does not reset annually.   In response, Defendants assert (as HSP conveniently ignores) that any PMA ambiguity should be construed against HSP.   Further, HSP incorrectly states that no one questioned HSP's calculations of its commissions.   *HSP PTB, pp. 10-11.*   Nothing could be further from the truth.   Mr. Stepanian was questioned regarding the calculation of the commissions, and specifically, the extent to which reasonable tour expenses were to be deducted from gross earnings prior to calculations of any commissions.   Moreover, as set forth in Defendants' PTB, this is arguably a moot issue, due to HSP and Stepanian's multiple, willful breaches of the PMA and fiduciary duties, which obviate entitlement to any commissions.   In contrast, Defendants assert that any commission should have reset on a twelve months basis, in accordance with a more reasonable interpretation of the language of the PMA.

### G.    Mr. Stoltz's testimony regarding mechanical royalties.

HSP's PTB does not accurately address this issue.   There is no doubt that the PMA defines gross earnings to include royalties.   However, as set forth in Defendants' PTB, to put a sharper point on it, the issue is really whether or not HSP was entitled to receive commissions on mechanical royalties for the Defendants' controlled compositions, or whether those royalties should have been paid "off the top" as was done with the All Good Festival recording and by Rhapsody (Trial Exhibits 237 with attachments; 242, 243).   Moreover, as also set forth in Defendants' PTB, Stoltz was attempting to explain that mechanical royalties are compulsory, pursuant to 17 U.S.C. § 115, and must be paid in full, absent an agreement to the contrary.   Thus, while the parties are free to negotiate a rate of mechanical royalties that differs from the compulsory statutory rate, no such agreement is present in this case.   As stated in its PTB, HSP asserts that it is somehow legally entitled to a free, irrevocable, implied license for time

everlasting.  That simply is not the case.  HSP was never a member of PBS, and HSP is not

entitled to stand in the Defendants' shoes, absent a specific agreement to that effect, which is not

present in this case.

HSP is undoubtedly a separate legal entity, distinct and apart from PBS, LLC, and was

merely Defendants' agent.  As such, HSP lacked the legal authority to unilaterally elect not to

pay mechanical royalties, and was never authorized by the Defendants not to pay mechanical

royalties.  In fact, the contrary is true as can be seen in the FestivaLinks agreement regarding the

All Goods Festival recordings, as well as the subpoena return information received from CD

Baby/Rhapsody and other third-party vendors pursuant to the subpoenas issued mid-trial, which

clearly show payment of mechanical royalties separate and apart from artist royalties (Trial

Exhibits 237 with attachments; 239-246).  Again, absent a written agreement which specifically

changes the compulsory statutory mechanical license regime set forth in 17 U.S.C. § 115, HSP

was statutorily required to pay mechanical royalties off the top directly to the relevant copyright

holder, absent a contrary agreement.  However, HSP chose not to do so and thus, violated § 115.

## II.   HSP'S ARGUMENTS REGARDING VARIOUS LEGAL CLAIMS

HSP next posits arguments pertaining to its alleged causes of action for "enforcement of

the PMA", fraud, and violation of Massachusetts Unfair Trade Practices Act ("MUTPA"),

M.G.L.c.93A.  HSP also notes that Defendants alleged violations for breach of contract, breach

of fiduciary duties, copyright infringement, MUPTA.  HSP ignores Defendants' claims for

promissory estoppel, unjust enrichment, and the other legal theories addressed in Defendants'

PTB.  Defendants will address HSP's arguments *in seriatim*.

### A.   HSP Did Not Prove Entitlement To Any Specific Amount Of Reimbursement

HSP's argument in this regard is wholly fanciful.  As an initial matter, HSP's Proof of

Claim ("POC") contains numerous errors and thus, was neither accurate nor reliable (Trial Exhibit 2). In fact, a review of the POC shows that it fails to include any performance fees earned by the Defendants in 2009, and incorrectly states gross revenues from performance fees for other years (Trial Exhibit 2, 6, 8-30). A simple comparison of all the various financials prepared by HSP for PBS indicates that PBS generated in excess of $556,333.00 in gross performance fees, not the $308,667.99 HSP claims (See Trial Exhibits 2, 6-30; HSP PTB pp. 12-14, Schimmel report and testimony). Once again, HSP is trying to talk out of both side of its mouth at the same time.

On the one hand, the POC gives Defendants zero credit for any performance income in 2009, but the financials prepared by HSP shows that Defendants grossed $159,519.00 in performance-related income for 2009 (Trial Exhibit 29 and 36). That number never made it to the POC (Trial Exhibit 2). In contrast, if one simply adds that $159,519 to the gross earnings amounts reflected on the PBS P&Ls for 2006, 2007 and 2008 (Trial Exhibits 8, 13, 20), the performance-related revenues generated by PBS approximate $556,333.00. Additionally, HSP claims that PBS only earned $1,723.00 in "other income." (HSP PTB page 12). However, HSP is once again talking out of both sides of its mouth. HSP entered into a stipulation (Trial Exhibit 237), which specifically states that PBS earned $76,387.15 in gross merchandise/download revenue (Trial Exhibit 237). Nowhere in the POC (or on any other financials prepared for PBS by HSP) are Defendants credited for that amount of non-performance revenue (Trial Exhibit 2). In fact, when the $76,387.15 is added to the $556,333.00 in gross performance-related revenue, Defendants generated about $625,000.00 in gross revenues during the course of the PMA and thereafter, almost twice the amount attributed to them by HSP in its POC.

HSP next claims that Defendants conceded liability for $321,303.81 in tour expenses.

Again, that is not accurate.  Defendants did not challenge the authenticity of those expenses but did challenge the reasonableness thereof, especially the overstaffing of crew which was done by HSP/Stepanian, not PBS.  Many tour expenses were not reasonable, as tacitly admitted by HSP; in 2009, when HSP finally began using realistic tour budget, the tour-related expenses decreased dramatically, and the Defendants made about a $72,000.00 profit (Trial Exhibits 26, and 29).  By simple math, in that year, it is fair to say that reasonable tour expenses averaged approximately forty-five (45%) percent of gross performance revenues.  *Id.*  Thus, Defendants assert that at best, HSP would be entitled to a 45%-50% offset against Defendants' gross performance revenues for tour-related expenses[3].

HSP also asserts that non-tour expenses total $245,919.17.  However, except for limited expenses related to It's Life, Up All Night and MooDoo, there is absolutely no proof that Defendants approved any other non-tour expenses, prior to HSP's expenditures.  As established by Trial Exhibit 159, HSP is not entitled to reimbursement of approximately $215,000.00 in non-tour expenses; HSP should only be credited for approximately $30,000 in approved, non-tour expenses (which may need to be adjusted to factor in any recouped expenses listed in HSP's COGS).

HSP also claims that it "disbursed" $323,719.97 to the band, and seeks reimbursement of that full amount.  However, HSP fails to adequately support that figure, which does not comport with the various K-1s HSP prepared on PBS' behalf, and fails to provide a legal basis mandating Defendants' reimbursement of all the compensation it earned and paid taxes on (as reflected in the 2007 and 2008 1099s HSP issued and then voided, mid-litigation), which totals right at

---

[3]The actual amount of the deduction would vary, obviously, depending on whether one uses HSP's gross revenue number of $309,000 or PBS' number of roughly $625,000.

$204,000.00[4].   In addition to ignoring the legal implications of the "salary" regime HSP unilaterally instituted (as opposed to instituting lines of credit or other types of *bona fide* loans), HSP also ignores its erroneous accounting, wherein the Defendants' 2006 earnings (pre-salary) were erroneous subsumed into a "musicians" expense, which distorts an accurate calculation, as testified to by Mr. Schimmel.   Because the salary payments totaled approximately $204,000.00, it is unclear where HSP derives an additional $120,000.00 in band disbursement, and it can only be assumed that that number is comprised of the 2009 PBS profit ($72,000.00) as well as the 2006 profit ($52,000.00) as per the 2006 PBS tax return.   If HSP's argument were to be given any credence, HSP would have the Defendants working for free, for 3.5 years, despite grossing over $556,333 in performance revenue during that same timeframe.   HSP also fails to factor in the $400,000 or so in merchandise/CD/performance fee/royalty income reflected on its books as per HSP P&Ls.   *Trial Exhibit 197A-J.*

The last category HSP claims reimbursement for is its management fees, which HSP claims totals $70,640.40.   Again, HSP's math does not add up, as a simple comparison of that number to a twenty (20%) percent calculation on the total performance fees and other income HSP attributed (albeit erroneously) to the Defendants (totaling $310,390.99) does not yield a $70,000.00 figure, even assuming entitlement to twenty (20%) percent across the board. Moreover, HSP's assertion that the Defendants are entitled to a credit from merchandise sales in the amount of $19,174.71 is erroneous, as the cost of goods sold has never been accurately established, and a simple review of the POC reveals the inadequacy of HSP's calculations, as annual starting and ending inventory numbers are not consistent.   Also, as set forth in Defendants' PTB, HSP has forfeited any right to its commissions due to its willful breaches of

---

[4] HSP paid $17,000 per month in salary ($10K to Porter, $4K to Stoltz and $3K to Batiste) for a little more than 12 months (mid-November 2007 thru the end of November 2008), totaling right at $204,000.00.

the PMA and its fiduciary duties.

Just as HSP's math does not add up correctly, its assertion that James DeBiasi, CPA verified the POC is also incorrect. DeBiasi did not substantiate the POC, and concomitantly, could not verify the accuracy of HSP's data entry and numbers (Defendants' FOF #600-640). In fact, HSP claims that DeBiasi verified the numbers on the POC, without any reference whatsoever to the financial reports furnished by HSP to the Defendants and without reference to the set of books HSP eventually set up for PSB, opting instead to rely on the raw data underlying its journal entries. That's simply not what DeBiasi said and his "expert report" did not even mention the POC, nor any specific discussion of any specific dollar amounts derived from any transactions or reports. *Id*. In contrast, DeBiasi admitted that the conclusions in his "expert report" could not be substantiated (Defendants' FOF #603, 619, 627).

**B.      HSP Did Not Prove That The Defendants Committed Fraud**

HSP next claims that the Defendants acted fraudulently during their entire course of dealing with HSP and Stepanian, which simply is not true. In essence, HSP claims that Defendants made fraudulent representations to HSP regarding their intent to repay any monies advanced by HSP/Stepanian, and that the Defendants lacked any intent to repay any monies, ever. In contrast, Russell Batiste testified that if he had received any "advance" from HSP, the advance was against playing future gigs, and he intended to repay that money by playing the gigs and allowing HSP to recoup any monies it was owed from Batiste's share of the gig revenue. *Batiste Trial Transcript, pp. 34-35*. Batiste also testified that if he had received an advance against the gig, he intended to play the gig, and he never intended "to beat Phil out of - - or High Steppin' out any monies that [he] w[as] advanced." *Id.*, pgs. 71-72. Thus, as the Court noted, Batiste intended to pay any advances out of gig money. *Id.*, pgs. 80-81. Porter and Stoltz also testified that although they had not seen any adequate accounting establishing a specific amount

13

of alleged indebtedness, if they truly owed HSP any money, they intended to repay that money. *See Porter and Stoltz' testimony generally.*

HSP ignores Batiste's testimony, and mischaracterizes Porter and Stoltz' testimony (without bothering to obtain the transcripts, most likely because the transcripts would conclusively negate HSP's mischaracterizations). Instead, HSP relies, incorrectly, on the *Melancon* case. However, the facts of *Melancon* differs significantly from this case. *Melancon* involved cash advances from a credit card which the debtor had obtained, and the court's decision hinged on the debtor's intention at the time she acquired the credit card and all the advances she received. In contrast, Defendants were never given a credit card, or even a line of credit, by HSP, and many times, each individual Defendant had no idea how much money HSP was allegedly spending, either *in globo*, or on any particular member of PBS.

In addition to its misplaced reliance on *Melancon*, HSP claims, without any record citation, that none of the Defendants had any intention at any time to repay any monies they received from HSP or Stepanian. Again, had Defendants actually testify that way, HSP should be able to cite to the trial transcript of that testimony. However, as we know, HSP did not get the transcript, and a more accurate depiction of Defendants' testimony indicates that each Defendant clearly did not have any fraudulent intent.

With regard to the salaries, the Defendants' testimony was that the salaries were given in exchange for more availability, which Stepanian admitted was correct (i.e., the willingness to forego other forms of revenue on the hope that HSP would somehow increase PBS' number of performances and related income, which as we know, did not happen). Thus, to now claim that those salaries were "advances," given in a vacuum, which allegedly entitles HSP to reimbursement, ignores the relevant facts of this case. A more accurate depiction of Defendants'

testimony would be that Batiste, as noted by the Court, clearly stated that he expected any advances to be repaid from gig money (Batiste Trial Transcript pp. 80-81).  Porter testified that he did not believed that the salary was recoupable, but again, if there was a legitimate debt owed to HSP, he intended to repay whatever was owed.  Likewise, Stoltz testified that his understanding of the PMA would be that if he owed some money for incidentals like plane tickets or the like, at the end of the PMA, that HSP could recoup that expense.  Stoltz also testified that if he owed any monies he would repay them, but he had not seen proof of indebtedness.  Thus, there is simply no testimony, and certainly no admission, that the Defendants never had any intent to repay any monies to HSP.

By way of example, if the Defendants had no intention to pay HSP any money, why did the Defendants allow HSP to control the money; they simply would have kept it all and refused to send any money to Boston or otherwise provide monies to HSP.  As we know, HSP does not dispute, and Stepanian actually averred, that most, if not all, monies ran through HSP's bank accounts and/or hands (See USDC-MASS PACER Document Number 46-2, Docket Number 09-12208; Trial Exhibit 174C).  Moreover, *Melancon* differentiated between a manifestation of intent to repay, and a hope or belief to be able to repay.  Defendants manifestation of intent, initially, was the signing of the PMA, which is neither a hope or belief, but the establishment of a contractual obligation.  Likewise, Porter repeatedly asked, during the course of the PMA, about expenses and who would be responsible for payment of those expenses (Trial Exhibits 18, 60, 80, 109, 127, 157, 160, and 200G).

It is disingenuous to ignore Porter's numerous, specific requests for Stepanian's input regarding whose responsibility repayment of various expenses would be, and simply claim that Defendants acted fraudulently because they had the unmitigated gall to question HSP's

15

accounting accuracy.  Again, Stoltz and Porter testified they were routinely told by Stepanian that they would not be responsible for many of the expenses HSP/Stepanian now seeks reimbursement for (including his 2005 expenses, his 2006 pre-PMA expenses, the salaries, the Clinch photo shoot, etc.).  Porter's written e-mail inquiries were never met with a written response, and at minimum, do not indicate the communications of a person with no intent to repay, but rather, indicate the frustration of an individual who was not being provided with timely and accurate information.

Moreover, in *Melancon*, the debtor requested cash advances when she was insolvent, a salient fact from which the court inferred an intent not to repay.  However, those are not the facts of this case.  To the extent that there were legitimate advances made by HSP against PBS' future revenues, the Defendants generated, according to HSP, in excess of $150,000.00 for each of the last three years of the PMA, which is pretty far from insolvent.  *Melancon* simply does not pertain.  Thus, despite HSP's "woe-is-me" characterization, it was not viewed as an ATM, and the Defendants did not ask for the salary; to the contrary, Mr. Stepanian admitted that it was his suggestion and his idea, and his emails show that he had been lobbying the Defendants for approximately nine months to agree to accept the salaries, which began nineteen (9) months into the term of the PMA.  (Defendants' FOF #733, 734, 761; See also Trial Exhibit 106).

Lastly, the emails between Greg Eveline and David Herlihy, post-PMA termination, again do not exhibit any intent to defraud.  Porter, as he should have, asked for a detailed accounting substantiating the monies HSP claimed it was owed.  HSP never provided an accurate response, and apparently grew quite weary of having to demonstrate its entitlement, as HSP simply hauled Defendants into federal court, less than sixty days after the termination of the PMA, and obtained a federal injunction against all their assets and future earnings based on what

HSP later admitted were incorrect and hastily prepared exhibits (Defendants' FOF #549-596; 700). HSP was fully aware of the extent of revenues earned by PBS, and fully aware of the extent of expenditures it allegedly made on behalf of the Defendants.

Given this sole possession of relevant financial data, any reliance by HSP on the alleged representations (or alleged misrepresentations) of the Defendants is not justifiable, as it should have been very obvious to HSP that its expenditures vastly outstripped revenues. What is more reasonable to infer is that Stepanian had designs on Porter's Meters catalog, likely from before the execution of the PMA, and viewed that asset as "potential collateral" or an "insurance policy", and that the "advances", recharacterized as loans, and the failure to adequately keep Defendants informed of the financial details of the project, were geared towards fostering the Defendants' dependence on HSP, with an eye towards knowing that if the Defendants were forced to declare bankruptcy, Stepanian would be able to then make a grab for the Meters catalog. Whatever HSP and Stepanian's true motives were, they have not established fraud and as such, have not proven nondischargeability.

### C. HSP Has Not Proven Any MUTPA Violations By Defendants

HSP next claims that that Defendants engaged in unfair and deceptive trade practices, and by way of purported support, offers the same flawed arguments, and relies on the "same facts giving rise to HSP's counts for breach of contract and fraud." *HSP PTB, pp. 21-25*. Essentially, HPS's argument is that because Defendants allegedly always had the intent to defraud HSP, Defendants also violated MUPTA. That claim is devoid of merit. The bulk of HSP's argument in this regard is a rehash of the allegations of fraud against the Defendants, which, as set forth above, cannot be factually nor legally sustained. Additionally, despite the Court's comments, during trial and during hearing on the competing motions for summary judgment, to the effect

that Porter's signing of a 2007 PBS tax return was not tantamount to an admission of liability, nor an acknowledgement of any alleged debt, HSP continues to try and rely on the 2007 PBS tax return as adequate proof, when it is not.  HSP simply has not established any basis for any MUTPA violations against the Defendants, especially because a legitimate dispute over an alleged debt, which is essentially what this claim boils down to, is not sufficient grounds to establish a MUTPA violation.[5] (Defendants' COL #138).

### D.    Post-PMA Commission Entitlement

HSP, without significant argument or authority, claims that it is entitled to commission post-PMA termination.  It is impossible to respond to the paucity of argument posited by HSP, other than to indicate that HSP's breaches of the PMA and its fiduciary duties obviate any entitlement to commission, even if HSP has accurately quantified that amount, which it has not.

### E.    Breach Of Fiduciary Duty By HSP

HSP blithely claims that it did not breach any fiduciary duties because it accounted for all monies it received and paid on behalf of PBS.  HSP also apparently asserts that Defendants suffered no damage, even though HSP breached its fiduciary duties, and thus, HSP should be absolved.  HPS is once again incorrect.  HSP nonsensically claims that it did not use its position as a creditor against the Defendants while it was a fiduciary, because it did not sue Defendants during the term of the PMA, and thus, HSP satisfied its fiduciary obligations.  As set forth in Defendants' PTB, there were at least 36 separate breaches of fiduciary duties by HSP and Stepanian.  More to the point, HSP's accounting expert, James DeBiaisi, admitted to HSP and Stepanian's breach of fiduciary duties (Defendants' FOF #626, 631, 632).  As such, HSP's

---

[5] HSP claimed that Defendants failed to demonstrate HPS's violations of MUTPA, fraud or breach of fiduciary duty. *HSP PTB, p. 25.*  Apparently HSP has chosen to ignore Stepanian's admissions regarding the breach of the PMA and fiduciary duties, as well as Dyer's testimony and DeBiasi's confirmation of HSP's breach of fiduciary duty, as more fully set forth herein and in Defendants' PTB.

argument falls flat on its face.

Equally specious is HSP's claim that it cannot be held liable for a breach of fiduciary duty because the PMA allowed it to advance monies on Defendants' behalf. *HSP PTB, p. 27.* Apparently, HSP did not believe that it was a breach of fiduciary duty to knowingly misrepresent PBS' annual income and expenses to Alan Friedman, or to subsequently fail to inform PBS or Freidman of this deficiency so that HSP's mistakes could be corrected. Likewise, apparently HSP claims that it was not a breach of fiduciary duty to fail to fully and adequately disclose the NUGS agreement, which unlawfully transferred Defendants' exclusive copyrights without disclosure, consent or writing, or to fail to account for all the merchandise and intellectual property sales revenue HSP received throughout the term of the PMA and thereafter. Nowhere in the PMA does it jettison HSP's fiduciary obligations. HSP's argument fails.

HSP then claims that it correctly and accurately accounted for all the monies it took in and spent on Defendants' behalf. HSP cannot plausibly deny that it did not correctly and accurately account to the Defendants for all the monies it handled during the PMA, or even thereafter: the closest thing to an accurate accounting, at least according to HSP, is Trial Exhibit 147, which was not provided to the Defendants until November 2011, after HSP was ordered to do so by the Court. As detailed at trial, and in Defendants' PTB, HSP's accountings and financial documents prepared and provided to Defendants were incomplete, inconsistent, inaccurate, not timely provided, not comprehensive enough, and are plagued by a whole litany of deficiencies (Defendants' FOF #244-283; 284-412; 413-460; 461-565; 603; 627).

HPS admitted co-mingling its revenue, PBS' revenue, Bonerama's revenue and Stepanian's personal revenue in one bank account until late 2007 or early 2008, and admitted using one QuickBooks account for all four entities until mid-2008 (Defendants' FOF #476-479;

521-524; 529).  When HSP finally set up a separate PBS QuickBooks file, it just used batch journal entries, and never had any witness verify the accuracy of those entries, as neither Dyer nor DeBiasi provided direct testimony, with reference to specific source documentation, that verified those batch journal entries (Defendants' FOF #461-565).

Astonishingly, even though HSP assumed the role of business manager, and essentially took control of every aspect of PBS' financial operations, HSP now claims it should not be held to the same to standard as a business manager, because it was not actually a business manager. *HSP PTB, p. 27, ftnt. 11*.  The only response that comes to mind, to use the vernacular, is **REALLY**?  With regards to business management, once again, the proof is in the pudding.  PBS, when operating as its own business manager, consistently made a profit, albeit modest (Trial Exhibit 151 A-C).  With HSP at the helm, Defendants allegedly went more than $600,000.00 in debt (Trial Exhibits 2; 6-30).  HSP makes fanciful and unsupported assertions such as the assertion that "HSP reluctantly assumed some of the duties that otherwise would have been performed by a separate business manager," and that "Marie Kircshberger…presumably designed the system based on the assumption PBS would have a separate business manager." (HSP PTB p. 28).  No such proof was ever produced at trial.  To the contrary, HSP specifically represented to the Defendants' booking agent, Blue Mountain Artist ("BMA"), as well as Dave Morrison, that HSP was bringing on a business manager for PBS and thus, needed all of the financial information to flow through HSP's offices (Trial Exhibits 165A and 165B).  Even if HSP did reluctantly assume the role of business manager, it assumed the role, and thus, was bound to honor the concomitant fiduciary obligations.  It failed miserably.

Further, both Porter and Stoltz testified that they never rejected a business manager because Stepanian never broached that issue with them.  Moreover, HSP's assertion that

"Defendants never expressed their desire for more formal information," *HSP PTB, p. 28,* is of no moment; HSP had an affirmative fiduciary duty to fully and timely disclose, on a monthly, quarterly and/or annual basis, but failed woefully in that capacity.   In fact, HSP admits that Exhibit 146 is incomplete, because it does not include merchandise or cost recovery reports (*Id.*). Also, HSP's assertion that DeBiasi fully audited HSP's batch journal entries and verified the total claim reflected in the POC by matching each of the charges to the underlying accounting documents is incorrect[6].  (Defendants' FOF #606).  In contrast, as mentioned above, Defendants assert that HSP and Stepanian breached fiduciary duties many ways many times.  HSP has not refuted the evidence establishing those breaches.

### F.   HSP'S WILLFUL DIRECT/VICARIOUS COPYRIGHT VIOLATIONS

HSP maintains that Defendants have not proven copyright violations.  *HSP PTB, pp. 30-45.*  The linchpin to HSP's argument is the fallacious assertion that HSP had a free (*gratis*) implied license that purportedly was irrevocable due to HSP's alleged provision of consideration to the Defendants for said implied license.  As such, HSP claims, erroneously, that its *gratis* implied license never terminated, and thus, HSP asserts, erroneously, it could never be an infringer (although HSP concedes that it could be liable for conversion and/or breach of fiduciary duty).  *Id., p. 45.*

HSP also devotes a considerable amount of its PTB to superfluous discussions regarding red-herring issues such as a discussion about "copying" (there is no legitimate dispute that all creative works at issue were created by PBS and/or its individual members; there is no competing claim of authorship involved here).  Lastly, HSP generally ignores the impact of Trial

---

[6] As Mr. Schimmel pointed out, it would be neigh unto impossible to believe that DeBiasi was humanly capable of putting in the sheer number of man-hours needed to accomplish that daunting    task, at the height of tax season, with hundreds, if not thousands, of tax returns to prepare all by himself, without any additional CPA staff.  Further, DeBiasi's report made zero mention of the POC, and thus, he was not allowed to testify about the accuracy of the POC to any appreciable degree.

21

Exhibit 237, the Joint Stipulation regarding copyright issues, which moots many of HSP's digressive arguments.  As shown below, Defendants' claims of direct and vicarious/contributory infringement are meritorious, and they should receive an award of the maximum level of statutory damages, attorney's fees, costs and injunctive relief, as previously set forth in Defendants' PTB.  Defendants now respond *in seriatim* to the copyright arguments set forth in HSP's PTB.

### 1.      Copying Is Not At Issue

HSP claims that Defendants must, but cannot, prove "copying" to prevail on their claim of direct infringement.  *HSP PTB, pp. 30-35, 42-45.*  Copying is a non-issue, as no one is claiming joint authorship of Defendants' creative works or otherwise disputing Defendants' sole ownership and authorship of the creative works at issue.  Moreover, the better way to state the applicable analysis regarding establishing a *prima facie* case of direct infringement is that a plaintiff (Defendants) must show: (1) ownership of the allegedly infringed material (which is not disputed); and (2) that the alleged infringers violated at least one exclusive rights granted to copyright holders under 17 U.S.C. §§ 106, 501(a) (in this case, the rights of recording, reproduction/manufacture and distribution).  *See* 17 U.S.C. §§ 106, 501(a) (infringement occurs when alleged infringer engages in activity listed in § 106); *see, e.g., S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081, 1085 n. 3 (9th Cir.1989) ("The word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights....").

These exclusive rights include the rights to record, reproduce and distribute the copyrighted work and/or to create a derivative work based on it. 17 U.S.C. § 106(1). Downloading and uploading copyrighted music, or **receiving revenue from such activity**, without paying royalties, constitutes direct infringement of plaintiffs' musical compositions,

recordings." *A & M Records, Inc. v. Napster, Inc.,* Nos. 99–5183, 00–0074, 2000 WL 1009483, at *1 (N.D.Cal. July 26, 2000). As such, there is no dispute that Defendants are the sole authors of the creative works at issue; the only germane issue is the extent to which HSP and Stepanian violated Defendants' exclusive copyrights.

## 2. HSP Not Entitled To Attorney's Fees Due To Frivolousness Or Bad Faith

HSP claims it is entitled to an award of attorney's fees due to the alleged frivolousness, bad faith and unreasonableness of Defendants' copyright claims. *HSP PTB, pp. 30-33.* HSP is sorely mistaken. HSP apparently claims that there were procedural errors in Defendants' claim due to an alleged lack of production of the infringed works, a lack of copyright registrations, and a lack of expert testimony. *Id.* First, as previously demonstrated to the Court in pre-trial pleadings, and as discussed between the Court and counsel at the summary-judgment motion hearing, all of the infringed recordings (live performances and studio releases) were produced to HSP and specifically reviewed by HSP and its counsel, at David Herlihy's deposition. Moreover, HSP cannot credibly argue that it was unaware of all the releases that bear an HSP-catalog number, as it was involved in the direct distribution of those works, and it received all the revenues from the non-HSP catalog numbered releases. *Trial Exhibit 237.*

Second, HSP's argument regarding an alleged failure to register copyrights (and thus, a lack of eligibility for statutory damages) is flatly refuted by the trial record, the public record available on-line at the U.S. Copyright Office, and Trial Exhibits 201 and 202, which are the copyright registrations for the recordings/songs on Porter's "It's Life" CD, as well as Stoltz' pre-PMA registrations on a number of specific songs, and registrations on Up All Nite ("UAN"), God,Guns and Money ("GGM"), East of Rampart Street ("ERS"), and Expanding the Funkin' Universe ("EFU"). In fact, HSP's counsel erroneous averred, in a sworn affidavit submitted to

the Court in connection with HSP's opposition to Defendants' summary-judgment motion, that Defendants had not registered any of their copyrights (LAEB Pacer Docket # 10-AP-1130, Document Number 187).  Apparently, as shown by Trial Exhibits 201 and 202, counsel never bothered to actually check with the Copyright Office before submitting a factual incorrect affidavit, or he should have been able to discern the extent of Defendants' registrations.

Third, HSP claims a lack of expert testimony on "probative similarity" somehow renders Defendants' claim frivolous.  In response, Defendants point out that "probative similarity" is not at issue in this case because there are no competing claims of authorship, and the Court specifically stated that expert testimony on copyright law would not be particularly helpful nor necessary (as it was up to counsel to set forth the applicable law).  Either way, HSP put on no expert testimony of its own regard this non-issue.  Likewise, despite protestations to the contrary, HSP has not fully produced all relevant source documents related to third-party agreements, as revealed by a cursory review of Trial Exhibits 239-246, the mid-trial subpoena duces tecum returns obtained by Defendants.

HSP also fails to address, let alone offer cogent argument, why the following examples of HSP's conduct are not colorable claims for infringement: 1) last-minute, undisclosed substitution of HSP for PBS in the NUGS agreement which unlawfully give NUGS an exclusive license to distribute HSP-catalog numbered releases of Defendants' performances ("SRs") and controlled compositions ("PAs"); 2) retention, commingling, conversion of, and lack of timely and accurate accounting for, all revenues HSP received from numerous third-party vendors; and 3) unmitigated and brazen post-PMA use of Defendants' e-mail list, without authority, to effect the distribution of Defendants' creative works post-termination of the PMA, post-filing of litigation, post-filing of Defendants' counterclaim, and even after Defendants had filed for bankruptcy

protection.

Likewise, HSP fails to posit any credible argument regarding its claim of an alleged irrevocable implied license (which is a truly frivolous claim), and fails to accept that its own furtive distribution system (replete with a lack of accountings and conversion/commingling of revenues) was the reason why "the number of allegedly copyrighted works undulated" from 13 works to 27 works; Defendants were simply unaware of the extent of HSP's clandestine distribution when they first filed their counterclaim, as the full contours of that violative conduct did not emerge until during discovery[7]. Defendants submit that HSP has not, and cannot, establish any appreciable degree of frivolousness, bad faith or unreasonableness.

### 3.    HSP's Claim For Indemnification Fails

HSP next claims an entitlement to indemnification, pursuant to paragraphs 10 and 11 of the PMA, in the event HSP released recordings that contained works that were not properly licensed.  *HSP PTB, pp. 33-34.*  As an initial matter, the more reasonable interpretation of paragraph 10 of the PMA is that it would apply in situations where the Defendants released a recording which included non-controlled compositions (cover songs).  Also, there are no third-party claims for infringement, so the only possible basis for indemnification would be the convoluted claim that Defendants should somehow indemnify HSP because HSP released recordings of Defendants' creative works which Defendants did not properly license.  How this assertion could possibly comport with HSP's irrevocable implied license theory defies logic, especially given that the NUGS agreement (and other 3rd-party agreements) placed the onus on Defendants to register their own works and obtain all proper licenses, but the Defendants were

---

[7] HSP tries to use the Joint Stipulation to establish frivolousness but that ruse should not be countenanced; Defendants entered into the Joint Stipulation to streamline issues for trial, and as that document shows, Defendants became aware of many releases after the fact, but during the PMA.  *Tr. Exh. 237.*

not even aware of that agreement because HSP did not disclose it until well after the proverbial

"horse had left the barn."  *Tr. Ex. 169, 170, 245*.  This argument fails.

### 4.  Substantial Similarity Is A Non-Issue

HSP next argues that Defendants have not proven substantial similarity.  *HSP PTB, pp. 34-35*.  Once again, this is a red herring, as there are no competing claims of authorship or ownership involved in this case.  The cases cited by HSP have vastly different fact patterns, and also involve a disputed right of ownership; ergo, the substantial similarity analysis.  That simply is not the case here, and this "issue" is of no moment.

### 5.  Mechanical Licenses

HSP next assert that Defendants were solely responsible for securing and paying mechanical licenses and related royalties.  *HSP PTB, pp. 35-38*.  This fallacious claim is the epitome of hypocrisy.  As an initial observation, how can an artist secure a mechanical license on an authored work or performance if the artist does not even know that the work/performance has been released?  Again, using the NUGS agreement as an example, Defendants were undeniably unaware (for good reason; HSP never told them) of that agreement until well after the fact[8], obviating any opportunity to obtain mechanical licenses before the performances were released commercially.  By way of comparison, the FestivaLinks agreement, in place regarding the release of PBS' All Good Festival performance, while not a particularly "artist-friendly" deal, is an example of a record label/distributor that at least paid both mechanical royalties and artist's royalties to the Defendants, and HSP clearly knew of this better way of structuring a release, as it was involved in the entire process, received all the revenues, and had a physical copy of the applicable agreement to use as a template if it had wanted to treat its clients fairly.  *Tr. Exh. 237*

---

[8] HSP did not produce the NUGS agreements in discovery; Stoltz found out about that agreement on his own during litigation, and got a copy in late May/early June 2011.

*and attachments.*

HSP then claims that it does not owe mechanical royalties to the Defendants, because Defendants had a practice of granting each other free (*gratis)* mechanical licenses, and thus, by some form of cosmic extrapolation, HSP is purportedly entitled to morph into the Defendants shoes and become one with the Defendants' pre-PMA method of doing business (at least as far as mechanical licenses go; too bad HSP did not employ this thought process when electing to unilaterally deficient spend PBS into bankruptcy). Putting aside (for later discussion below) the inherent contradiction imposed by a *gratis*, irrevocable license (how can the license be free, and still be the subject of consideration?), HSP fails to grasp that it was not a member of PBS, was not a co-writer of any controlled compositions, and was not a joint owner of any copyrights in PBS' live performances.

When PBS, or its individual members, self-released a CD or download, it received 100% of all revenues, and thus, there was no need to negotiate the normal aspects of a recording or distribution agreement, such as the mechanical royalty rate (statutory or some other amount?), whether mechanicals were to be paid off the top before recoupment of production expenses, who would be responsible for production expenses, how long would the distribution agreement last, and what would be the rate of the artist' royalty, etc. However, HSP is not PBS, never was, and will never be (despite its predilection for entering into 3rd-party agreements as if it were one and the same as PBS). Again, by comparison, the FestivaLinks Agreement is a better example, albeit with plenty of room for improvement, of how a recording/distribution agreement should be structured to be more beneficial to, and upfront with, the copyright owner. This aspect of HSP' argument fails.

HSP also (for the third time) professes entitlement to an award of attorney's fees and

costs, again improperly relying on paragraph 11 of the PMA.  As set forth above, paragraph 11 was not designed or intended to apply in cases where HSP committed the copyright violations underlying a legal action.   HSP's circular argument is little more than tail-chasing; any reasonable interpretation of the PMA should not yield a result where the Defendants have to indemnify HSP for its defense against a copyright infringement suit by Defendants.

### 6.      Mechanical Licenses For Non-Controlled Compositions Are Not At Issue

HSP next claims that it obtained all necessary 3rd-party mechanical licenses.  Proceeding with the assumption that HSP's definition of 3rd-parties does NOT include PBS or its individual members, this is a non-issue as no 3rd-party claims for infringement by PBS are present in this case.  Further, even though HSP claims it allegedly was not obligated to obtain any 3rd-party licenses, due to the warranties contained in paragraph 10 of the PMA, HSP acknowledges that it did, indeed, get a number of 3rd-party licenses for the non-controlled compositions (cover tunes) found on the various releases of PBS' live performances.  If it knew to get those licenses, and if the Court declines to sanction HSP's professed entitlement to a *gratis*, yet irrevocable implied license, HSP would be hard-pressed to deny, if not outright foreclosed from denying, that its infringement was willful.

### 7.      HSP Falsely Claims Its *Gratis* Implied License is Irrevocable For HSP-Catalog Numbered  Releases

HSP claims that it had a free implied license, which is not factually correct, and that said license is irrevocable due to HSP's provision of consideration.  Both arguments fail, as a matter of fact and law.  First, the test for an implied license is set forth in Lulirama and Cohen, and requires: 1) that the licensor request the creation of a work; 2) that the licensee create said requested work and deliver it to the licensee; and 3) that the work be delivered with the understanding that the licensee will reproduce and distribute the requested creation.  Further, in

all the cases cited by HSP, the licensee actually paid considerable monies for the creation of the requested work.  In this case, HSP never requested that PBS or its members create anything, nor did it pay PBS to create any works.  PBS played gigs booked by Blue Mountain Artists, and allowed those performances to be recorded, based on the Defendants understanding that the recordings were for archival purposes only.  *See Porter and Stoltz' testimony generally.*  Thus, the request for the creation of a specific work was never made by HSP, nor honored by PBS, nor delivered for the specific purpose of commercial exploitation.

Moreover, other than two recordings of live performances delivered by Porter (as reflected in Tr. Exh 237), all the recordings that bear an HSP-catalog number were originally recordings made for archival purposes; they were **not recorded with permission to unilaterally release them commercially.**  *Id.; Porter and Stoltz' testimony generally.*  As such, the scope of any implied license was initially restricted to archival purposes only.  However, mindful that Defendants admittedly became gradually aware of the various HSP-catalog numbered releases at various times after initial release but during the term of the PMA, and due to trial practicalities, the parties entered into a Joint Stipulation regarding the copyright violations, and stipulated that HSP had been granted at least some type of license to reproduce and distribute the HSP-catalog numbered releases of PBS' creative works, during the term of the PMA[9].  *Tr. Exh 237, passim.*

However, the Defendants did **not** stipulate that the HSP-catalog numbered recordings were recorded for commercial purposes; to the contrary, the HSP-numbered recordings were specifically exclude from the sub-set of recordings that were made with the Defendants' specific authority to release commercially.  *Tr. Exh 237, ¶ 8.*  HSP's recitation to the contrary, *HSP PTB, p. 39,* is decidedly deceptive and flatly refuted by the language of Trial Exhibit 237.  Also, Stoltz

---

[9] Contrary to HSP's assertions, selling CDs at a merch table is not tantamount to permission to enter into numerous undisclosed 3rd-party distribution agreements, nor permission to retain all revenues, without timely and adequate accountings.

testified that he gave HSP copies of his solo projects so that HSP could simply provide those to various fulfillment companies.   The point here is that the exact contours of any transfer of copyrights or oral/implied license were never reduced to writing, despite 17 U.S.C. § 204(a)'s requirement that transfer of copyright ownership (**including exclusive licenses)** be in writing, and the public policy favoring writings, so as to avoid misunderstandings.   *Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 557 (9th Cir. 1990), *cert. denied*, 498 U.S. 1103 (1991); *Lulirama Ltd., Inc. v. Axcess Broad. Servs.,* 128 F.3d 872, 879 (5th Cir. 1997).   Thus, HSP never had the right or authority to enter into the NUGS agreement, which was an exclusive licensing of Defendants' creative works, because HSP never secured Defendants' written permission to do so.

Also, the scope of said stipulated-to, implied/oral license has never been delineated. Porter and Stoltz testified that they expected, at a minimum, to receive mechanical royalties for their controlled compositions, and artists' royalties for the sale of their creative works, as well as regular accountings.   *Porter and Stoltz' testimony generally.*   They received neither, as HSP admittedly received the revenues, commingled and converted those funds into HSP's operating account, and spent the money (Defendants' FOF #232, 285, 288).   Moreover, the bulk of the HSP-catalog numbered releases were disclosed to Defendants **after the fact,** and not prior to release.   As such, any implied or oral license arguably terminated as of the termination of the PMA, or, at the latest, as of the filing of Defendants' Counterclaim, filed on September 27, 2010, as admitted by HSP's copyright guru, David Herlihy (Defendants' FOF #154; Trial Exhibit 237*, ¶* 3).   Despite that admission, HSP and Stepanian consciously sold and distributed PBS merchandise and creative works non-stop after termination of the PMA, despite Stepanian's false testimony at trial to the contrary, which he was forced to admit and retract (Defendants' FOF #332, 338-340; 345-352; 704; 723-727, 731; 788-791).   Thus, at a minimum, HSP exceeded the

scope of any license, be it implied, oral, revocable or non-revocable, by virtue of its post-PMA

termination conduct.  *See Atkins v. Fischer,* 331 F.3d 988*,* 989-991 (D.C. Cir. 2003); *MacLean*

*Asssoc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.,* 952 F.2d 769, 779 (3rd Cir. 1991) (holding

that a licensor can still bring suit for infringement if the licensee's use exceeds the scope of the

license).  In this case, both the NUGS agreement, as an exclusive transfer, and the FestivalLinks

agreement exceed the scope of any implied or oral license that may have existed.

In addition to HSP's rampant exploitation of Defendants' creative works, and Stepanian's

defiant (yet thoroughly debunked) denials to the contrary, HSP's claim that it gave consideration

for its "free" implied license is astounding.  To be charitable, even if its argument is to be taken

at face value, HSP is sadly confused.  HSP cites to no caselaw wherein a court found an implied

license without a corollary payment of money to the licensor by the licensee.  In *Lulirama,* 29

jingles were created and licensed by the licensor, in exchange for payment of more than $65,000

by the licensee.  *Lulirama,* 128 F.3d at 872-879.  In *Cohen,* special effects footage was

specifically created upon request by the licensee, who paid about $54,000 to the licensor for that

footage.  *Cohen*, 908 F.2d at 555-558.  No such payments were ever made in this case.  Thus,

although HSP claims that it paid production and marketing costs, engaged in marketing efforts,

and accounted to Defendants, and that those actions constitute consideration, HSP forgets that it

is also seeking reimbursement of all production and marketing costs, and it charged a

commission pursuant to the PMA for those activities.

The truth is that HSP never paid or provided any consideration for an implied license.  To

the contrary, HSP's POC seeks reimbursement of the very monies it claims was "consideration"

it paid Defendants, and conversely, has charged Defendants a 20% commission for the very same

activities it now seeks to recast as consideration.  No irrevocable license ever existed, and even if

it did, HSP has grossly exceeded the scope of any such license, warranting termination of any license, and exposing HSP and Stepanian to liability for copyright infringement for all reproduction and distribution that occurred after September 27, 2010.

### 8.     HSP Vicariously Infringed Upon PBS' Non-HSP Catalog Numbered Releases

HSP next offers an irrelevant argument regarding the non-HSP catalog numbered releases HSP received revenues from but failed to account or pay Defendants.  Again, copying is not at issue here (as copying is only relevant to claims of direct infringement), and HSP is simply trying to deflect attention from its acts of vicarious and contributory infringement.  Defendants are claiming that HSP directly and indirectly infringed their copyrights with the non-HSP-catalog numbered releases.  Thus, Defendants are claiming, *inter alia*, that HSP is liable for vicarious and/or contributory infringement, as set forth in Defendants' PTB, because of how HSP received revenues, but failed to account timely and fully, failed to segregate those funds, failed to pay those funds to Defendants, and because HSP admittedly put those revenues into its operating account and spent them; a classic case of commingling and conversion.

### 9.     HSP's Agency Does Not Absolve Its Infringement

HSP's last gasp at avoiding its comeuppance and "just desserts" can be found in the argument it posited regarding agency; namely, that regardless of the existence (and/or termination) of any implied license, HSP was acting as Defendants' agent, and thus is somehow miraculously absolved of any actionable infringement.  *HSP PTB, pp. 44-45.*  That argument ignores both the Joint Stipulation, which stipulated to some type of amorphous implied/oral license, and the fact that once the PMA terminated, so did any claim of agency, but HSP's wanton distribution and commercial exploitation did not stop.  Had HSP simply provided all accountings, contact info and 3rd-party agreements, and redirected all revenues directly to

Defendants (presumably with an invoice for a commission), then HSP's argument might have a modicum of reasonableness.  However, those simply are not the facts of this case, as fully set forth herein and in Defendants' PTB.  This claim also fails.

### 10.   HSP Has Not Fully Accounted For All Of The PBS Revenues It Received

HSP actually claims that it fully and accurately accounted for all revenues it received from the sale (by HSP or 3rd-parties) of Defendants creative works.  Well, not quite so.  First, as seen at trial, the Cost Recovery Models and Ubuntu meeting-specific reports were incomplete.  Moreover, Trial Exhibit 146 was not admitted, except pages 4515 and 4516, and contrary to HSP's assertion, it does not contain original source documentation or information: rather, it is simply a compilation of "batch journal" type entries of generic description that does not indicate which specific song or CD recording was actually downloaded or bought.  In fact, as recently as early January 2013, HSP has received revenue related to Stoltz' creative works, but failed to account for those monies, as reflected in the Motion To Compel recently filed by Defendants (LAEB 10-AP-1130, PACER Document Number 265).  Defendants have never received an adequate accounting for merchandise and intellectual property sales (more than $300,000.00) reflected on HSP's P&Ls (Trial Exhibit 197A-197J).  The Court may also recall that HSP did not voluntarily produce those reports, but instead, filed a motion trying to quash the subpoena issued to Mr. Weinstein (LAEB 10-AP-1130, PACER Document Number 121).  HSP's argument has no merit.

### G.   BREACH OF CONTRACT

As mentioned above, the court granted summary judgment against HSP regarding its breach of contract claims, except for its claim for reimbursement.  As set forth above and shown at trial, HSP has never adequately verified the dollar amount of its alleged claim for

reimbursement, and thus, until that amount is conclusively established and Defendants refuse to repay that amount, no breach of the PMA has occurred.  As set forth in Defendants' PTB, HSP and Stepanian engaged in numerous breaches of the PMA.  HSP has failed to negate those arguments.  Specifically, HSP claims that it obtained prior approval for all expenses paid on behalf of Defendants, offering the moving target of "hundreds if not thousands of emails", and then, claiming to have had phone conversations due to various alleged inadequacies of the Defendants.  However, that simply is not true.

For example, HSP received an estimate regarding the cost of the Danny Clinch photoshoot (nearly $40,000.00 for pictures that could have been obtained for around $2,000.00 in New Orleans) but admits that it never sent that estimate, or even the invoice, to the Defendants (Defendants' FOF #223-225).  Instead, HSP tried to hide that expense on the 2007 financials, and although it booked it as a loan to HSP on HSP's books (Trial Exhibits 197A-197J), it tried to bury it in marketing on the PBS' 2007 tax returns (Trial Exhibits 200J; 6I; Defendants' FOF #514, 533-534).  One must wonder why.  Moreover, if Stepanian did specifically discuss these matters with the Defendants verbally, it is curious that he did not respond to Porter's emails, in writing, refreshing  Porter's memory and reminding him of their conversation(s).  The reality is that Mr. Stepanian did as he pleased, without input or authorization from the band, and once Mr. Porter decided not to renew the PMA, HSP hauled off and sued the Defendants in less than sixty (60) days on admittedly, inaccurate and incomplete financial data (Defendants' FOF #549-553).  Just like Stepanian's testimony at trial, HSP's PTB is long on polemic, but short on substance.  Knowing about certain expenses, in general, is not the same as approving the specific cost of those expenses, especially when that specific cost was not disclosed, upfront, prior to incurring the expense (such as Madison House, various trade advertisements, MooDoo artwork, Danny

Clinch photoshoot, cost of trinkets, etc.).

Moreover, HSP's argument regarding waiver does not hold water. Essentially, HSP claims that Defendants did not complain about HSP's profligate spending, knew what HSP was spending on their behalf, and did not object thereto. Again, HSP conveniently distorts the record in this case. It was not until October 2008, at the earliest, that HSP ever informed Defendants of the alleged $227,000.00 debt, despite a number of inquiries from Porter in March of '07 and thereafter as to who was going to pay for the debt and how much it was, etc., etc. (Trial Exhibits 18 (page 180); 60; 80; 109; 127; 157; 160; 200G). Moreover, Mr. Stepanian routinely stated to the Defendants, upon inquiry, that they would not be responsible for repayment of expenses because Stepanian was building his company (HSP's) brand. Likewise, HSP's argument regarding the inability to obtain prior consent to expenses rings hollow. In today's day and age with cell phones, text and emails, it's certainly practicable to obtain consent regarding non-emergency expenses, especially non-tour expenses. There Is no valid reason why HSP could not have told PBS, upfront, the cost of the Danny Clinch photoshoot and obtain their prior consent, which, as Mr. Stepanian ultimately admitted at trial, would have been a better way of handling things (Defendants' FOF #651, 707).

HSP also claims it cannot be held in material breach because it was never given notice and an opportunity to cure said breach. That argument assumes that Defendants had contemporaneous knowledge of the breach, and as we saw at trial, many of the alleged breaches were not known until the discovery phase of this litigation. Failing to disclose facts which support a claim for breach of contract, and then arguing that it was never given an opportunity cure said breach, is the ultimate hypocrisy.

### H.    Remaining Claims

HSP gives short shrift to Defendants' arguments regarding piercing the corporate veil and the failure to provide accurate accountings.  In so doing, HSP argues that there is no cause of action recognized under Massachusetts law for failing to provide accountings, and that HSP was "always forthright with the artist."  First of all Defendants would point out that HSP's complaint contained a cause of action for accounting (USDC-MASS PACER Docket # 09-12208, Document Number 1, p. 15 ("Count VI")).  Moreover, accountings were required under the PMA, under any interpretation of the scope of HSP's fiduciary duties, and pursuant to 17 U.S.C. § 106 and §115.  Additionally, as set forth in Defendants' PTB, there is ample evidence that the corporate veil should be pierced and Stepanian should be held personally liable for his breaches of contract, breaches of fiduciary duty, copyright infringement, fraud, negligent misrepresentation, and promissory estoppel, both as a matter of law and as a matter of fact.  HSP's failure to address those breaches, and failure to posit any meaningful resistance to Defendants' veil-piercing claim, is a silence of deafening proportion.

## I.   Prejudgment Interest

HSP also argues that prejudgment interest at twelve (12%) percent should be applied to an award of damages in HSP's favor.  Defendants agree with the percent, as per applicable Massachusetts law, but contest HSP's eligibility.  HSP's argument is nonsensical as it claims that Porter breached the PMA by officially resigning from HSP (perhaps a typo?), despite Stepanian's admission that Defendants did not breach the PMA, and that Porter had every right to elect not to renew the PMA.   Also, Porter never resigned from HSP, as Mr. Porter was never a member of HSP.  Suffice it to say that for purposes of this litigation, Defendants will accept a twelve (12%) percent interest award on any and all damages they are entitled to.

## J.   Entitlement To Attorney's Fees and Costs Under The PMA.

HSP claims it is entitled to an award of attorney's fees and costs under the PMA. *HSP PTB, p. 52*. Again, this argument is nonsensical as it appears that HSP is arguing that Defendants must indemnify HSP for the cost it incurred in bringing its lawsuit against the Defendants and in defending the counterclaim. Again, as set forth above, HSP has admitted that PBS did not breach the PMA, and the only germane issue is whether or not HSP is entitled to recover attorney's fees incurred as a result of the reimbursement efforts. However, it is disingenuous to fail to adequately substantiate a claim for reimbursement, and then profess entitlement to attorney's fees and costs when that professed "entitlement" is challenged, especially given that HSP's POC has not, and cannot, be substantiated.

Also, it was not until November, 2011, that HSP allegedly produced all of the underlying documentation (which Defendants dispute and do not admit). Moreover, with regard to Defendants' copyright claim, the clandestine NUGS agreement alone constitutes actionable copyright infringement (as HSP gave NUGS an exclusive license to intellectual properties HSP did not own, while making PBS responsible for protecting its own copyrights, all without disclosure to Defendants). Further, Trial Exhibit 237 establishes at least $76,000.00 of PBS' gross revenue received by HSP, but the tax returns and P&Ls prepared by HSP (or at their request) only attribute less than $2,000 in revenue to PBS for the sale of that same merchandise and creative works (Trial Exhibits 6, 8, 13, 20, 29). HSP's argument fails.

## III.   CONCLUSION

Defendants respectfully submit that HSP and Stepanian have not shown entitlement to any specific amount of reimbursement, have not shown any basis to impose liability against the Defendants, and have failed to negate the overwhelming evidence of HSP and Stepanian's breaches of the PMA and their fiduciary duties, liability for business torts, liability for copyright

infringement, and an overwhelming basis to pierce the corporate veil and impose personal liability on Mr. Stepanian.

Defendants also wish to respectfully stress to the Court the very real, entertainment industry-wide impact this Court's decision will have on the overarching copyright issues *sub judice*, as this case has ramifications that go well beyond these particular litigants and these particular defendants' creative works.  Defendants respectfully submit that the type of willful, predatory commercial exploitation exhibited by HSP and Stepanian raise legitimate and serious social concerns, which require this Court's action to safeguard the centuries-old copyright protections that apply not only these Defendants' copyrights, but to the scope of copyright protection that will be available for future artists.

As can be seen in the recent judicial pronouncements in this area of copyright law (17 U.S.C. §§106, 204, 115, 412) such as *Napster, Tennebaum* and *Thomas-Rassert*, as well as the concerns voiced at the Uruguay Trade Talks and embodied in 17 U.S.C. § 1101, protection of an artist's creative process and output has been stalwart, including the imposition of willful, statutory damages for just run-of-the-mill non-commercial file-swapping among peers.  Because this case presents factual circumstances which are even more egregious than *Tennebaum* and its ilk, as HSP and Stepanian's conduct constituting unlawful infringement occurred in a commercial context, this Court's decision has the potential to reverberate across all future cases of unlawful commercial infringement.  Also, the "bootlegging" analysis required by the 17 U.S.C. § 1101 claims present issues of first impression regarding the scope of protection an artist is entitled to for their recorded live performances, and the extent to which a limited grant of authority to record for one specific purpose can be expanded and usurped for financial gain.

Thus, in sum, Defendants respectfully submit that they are entitled to an award of treble

damages, attorney's fees and costs due to HSP and Stepanian's breaches of the PMA, breaches

of their fiduciary duties, and MUTPA violations.  Defendants further respectfully submit that

they are entitled to an award of the statutory maximum for each of HSP and Stepanian's willful

violations of Defendants' copyrights, plus attorney's fees, costs and injunctive relief, all as more

fully set forth hereinabove and in the Post-Trial Brief, previously submitted to the Court.


Respectfully Submitted,


_/s/ Ronnie Glynn Penton__            _/s/ John O. Pieksen, Jr._
Ronnie G. Penton (#10462)         John O. Pieksen, Jr. (#21023)
The Penton Law Firm               John Pieksen & Associates, LLC
209 Hoppen Place                  829 Baronne Street
Bogalusa, LA  70427              New Orleans, LA  70113
Phone:  (985) 732-5651           Phone:  (504) 581-9322
Telecopier:  (985) 735-5579       Telecopier (504) 324-4844
E-Mail:  fedcourtmail@rgplaw.com    E-Mail:  jpieksen@cox.net

**Counsel for AP Defendants and the U.S. Bankruptcy Trustee, Wilbur "Bill" Babin**


**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served upon all counsel of record by ECF filing, facsimile, electronic transmission, and/or by depositing same in the United States mail, properly addressed and postage prepaid, this 31st day of January, 2013.


/s/ John O. Pieksen, Jr.