UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF                                    NO. 10-1130

GEORGE JOSEPH PORTER, JR.                           SECTION "A"
ARALEAN H. PORTER                                   CHAPTER 7

## OPINION

### I.     Procedural History

#### A.     Highsteppin Productions, L.L.C. v. George Porter, Jr., et al[1]

Highsteppin Productions, L.L.C. ("HSP") filed suit against Porter, Batiste, Stoltz, L.L.C. ("PBS") and its individual members on December 29, 2009, in the United States District Court for the Eastern District of Massachusetts.  In its Complaint, HSP demanded reimbursement in the amount of $527,000.00.[2]  The Massachusetts court entered a prejudgment writ of attachment requiring each defendant to escrow portions of their income.[3]  George Porter, Jr. ("Porter") and Brian Stoltz ("Stoltz") escrowed money in connection with the Massachusetts proceeding prior to seeking Chapter 7 relief.[4]

#### B.     Bankruptcy Filings, HSP's Proof of Claim and Adversary Proceedings

---

[1]  HSP filed suit against George Porter, Jr., d/b/a Ora's Publishing, Inc.; David Russell Batiste, Jr., d/b/a Not So Serious Music; Brian Stoltz, d/b/a Long Overdue Music; Porter, Batiste, Stoltz, L.L.C., a Louisiana Limited Liability Company; Bugaloo Music, a California Corporation; Screen Gems-EMI Music, Inc, a New York Corporation; Bug Music, a California Corporation; and Cabbage Alley Music, a California Corporation.

[2]  Docket No. 10-1130, P-1.

[3]  *Id.*

[4]  As of each Debtors' petition date, amounts collected totaled $25,279.12 for Porter; $1,004.88 for Stoltz and $0 for Batiste.

1

Porter, Stoltz and their wives filed Chapter 7 bankruptcy petitions on September 27, 2010.[5]

They scheduled HSP as an unsecured creditor with a disputed debt of $504,040.06.[6]  On December

17, 2010, HSP filed a proof of claim for $608,878.28 in both cases.[7]  On December 29, 2010, HSP

filed a Complaint to Determine Dischargeability of Debt against Porter and Stoltz.[8]

David R. Batiste, Jr. ("Batiste") filed a Chapter 7 petition on September 28, 2011 also

scheduling HSP as an unsecured creditor holding a disputed claim of $504,040.06.[9]  HSP did not

file a proof of claim in Batiste's bankruptcy but did file a Complaint to Determine Dischargeability

of Debt on December 30, 2011.[10]  The two (2) Complaints filed by HSP were substantively

consolidated by this Court on February 23, 2011.[11]

Porter, Stoltz and Batiste filed Counterclaims against HSP.  They asserted claims for breach

of contract and fiduciary duties, unfair and deceptive trade practices in violation of M.G.L. c. 93A

§§ 2 and 11, copyright infringement and alter ego.[12]

HSP's Complaint seeks $527,000 for personal advances made to Porter, Stoltz or Batiste,

---

[5]  Case No. 10-13553 (Porter) and Case No. 10-13554 (Stoltz).

[6]  P-8 (Porter) and P-6 (Stoltz).

[7]  POC No. 11 (Porter) and POC No. 2 (Stoltz).

[8]  P-56, Adv. 10-1130 and 10-1139 (Porter) and P-34, Adv. 10-1131 and 10-1139 (Stoltz).

[9]  Case No. 11-13158, P-1.

[10]  P-1, Adv. 11-00163.

[11]  P-11, Adv. 10-1130.

[12]  *Id.*

2

deferred commissions earned on the Artists' Gross Earnings (as defined below) and PBS expenses

paid by HSP during the term of their Personal Management Agreement ("PMA").[13] It also alleges

the debt is nondischargeable.[14]

Trial on the merits of this matter began on June 13, 2012 and ended on September 27, 2012.

Post-trial briefs were filed on January 31, 2013.[15] After submission of post-trial briefs, the Court

took the matter under advisement.

## II.     Findings of Fact

### A.     The PMA

On June 2, 2003, Porter, Stoltz and  Batiste formed PBS (collectively Porter, Stoltz, Batiste

and PBS are referred to as "Artists").  For three (3) years, PBS handled its financial and business

arrangements, paying expenses from performance revenue, then splitting the net profit in equal one-

third shares.[16]  PBS had no outstanding debt prior to May of 2006.[17]

In 2005, Phillip Stepanian ("Stepanian") owned a direct marketing company, Resort

---

[13]  The Court notes that HSP's Massachusetts Complaint demanded $527,000, its post-trial brief requests $632,017.59, and its proof of claim $608,878.28.   Variances in HSP's demand are partially due to variations in its claim for nontour expenses.  *E.g.* Exh. 159 reflects $245,919.17 in non-tour expenses.   At trial, counsel for HSP represented that many of the itemized charges were neither part of HSP's claim nor were actually owed by the Artists.   However, even in post-trial briefing, HSP utilizes the full amount claimed on Exh. 159 in the calculation of the amounts owed.

[14]  P-1, Adv. 10-1130.

[15]  P-268 and 269, Adv. 10-1130.

[16]  T.T. Porter, Stoltz; Exh. 151 A-C.

[17]  T.T. Porter, Stoltz, Chabaud.

Discovery, which marketed travel packages.[18] Although not involved in the entertainment business, in January 2005, Stepanian emailed Porter to discuss a merchandising and marketing proposal for Porter's music and image.[19]

The Artists met with Stepanian on or about April 20, 2005, at Porter's house in New Orleans.[20] Stepanian presented a basic concept for producing and selling merchandise, including a rough outline of different products he wanted to sell.[21] Throughout 2005, Stepanian continued to discuss a merchandising and marketing deal with the Artists, circulating merchandising agreements in June and July 2005.[22] Although the Artists never executed a merchandising agreement, Stepanian followed PBS through its tour schedule, attending performances and selling mainly Porter-related T-shirts and merchandise Stepanian had purchased.[23]

Occasionally, music CDs owned, produced and paid for by Porter, Stoltz or Batiste were also placed on Stepanian's merchandise table and sold.[24] Stepanian gave the artist any amounts he collected from sales of their individual merchandise but kept any revenues from the sale of the merchandise Stepanian personally purchased.[25] The Artists were neither paid a share of Stepanian's

---

[18]  T.T. Stepanian.

[19]  T.T. Stepanian; Exh. 62 at 1809.

[20]  Porter included Stoltz and Batiste rather than meet with Stepanian alone because he was interested in Stepanian's ideas to promote PBS.

[21]  T.T. Stepanian.

[22]  *Id.*

[23]  *Id.*

[24]  T.T. Stepanian, Porter, Stoltz.

[25]  T.T. Stepanian.

sales, nor were they given any costs to satisfy.[26]

As Stepanian became comfortable with the Artists, he suggested becoming PBS' personal manager.[27]  Stepanian believed his company, HSP, would free the Artists from having to exercise day to day management duties, thereby allowing PBS to focus on its music.[28]  HSP offered to create an "artist-controlled environment," allowing the musicians to decide when and where they played, as well as the content of their music.[29]  Although PBS was operating at a profit, Stepanian argued that with professional management, PBS could increase its exposure, play more venues for higher fees and make significantly more money.[30]

The Artists signed the PMA with HSP on May 8, 2006.[31]  The PMA had an initial 2-year term with an automatic 18-month renewal, after which PBS or its members could terminate the PMA without cause.[32] The PMA was governed by Massachusetts law.[33]

Under the PMA, HSP is entitled to a commission on all "Gross Earnings" received by the Artists during its term with some exceptions.  Paragraph 4 of the PMA defines "Gross Earnings" and sets forth the formula for calculating commissions:

> (a)      Except as otherwise provided herein, as compensation for Highsteppin's

---

[26]  T.T. Stepanian, Malangone.

[27]  T.T. Stepanian.

[28]  *Id.*

[29]  T.T. Stepanian, Porter, Stoltz, Malangone.

[30]  T.T. Stepanian, Porter, Stoltz.

[31]  Exh. 1.

[32]  *Id.* at ¶ 1.

[33]  *Id.* at ¶ 21.

covenants and services,...[HSP will receive] fifteen (15%) percent (hereinafter "Commission") of Artists's Gross Earnings (as hereinafter defined)....in the event Artist's Gross Earnings during any consecutive twelve (12) month period during the Term increase by at least fifty percent (50%) above the Gross Earnings Baseline (i.e., increasing to a total amount of money equal to $108,000.00 (one hundred eight thousand dollars) during such twelve month period), the Commission shall increase to seventeen and one half percent (17.5%) of Artist's Gross Earnings... in the event Artist's Gross Earnings during any consecutive twelve (12) month period during the Term increase by at least sixty five percent (65%) above the Gross Earnings Baseline (i.e., increasing to a total amount of money equal to $118,800.00 (one hundred eighteen thousand eight hundred dollars) during such twelve month period), the Commission shall increase to twenty percent (20%) of Artist's Gross Earnings.

(b)     The term "Gross Earnings," as used herein, shall mean and include the total of all earnings...provided however all monies derived from the preexisting compositions...shall only be deemed Gross Earnings to the extent that such monies are derived from exploitation of the preexisting compositions pursuant to agreements entered into and/or licenses granted during the Term.

(c)     Notwithstanding anything to the contrary contained herein, Artist and Highsteppin hereby agree that Gross Earnings shall specifically exclude monies... advanced by third parties and actually expended on audio and video recordings..., reasonable "tour expenses" actually paid to third parties in connection with Artist's concerts and other live engagements, namely booking agency fees, the costs of self-produced merchandise, reasonable so-called "sounds and lights" reimbursement and/or the costs of opening acts.[34]

With regard to expenses, HSP was allowed to incur expenses for performances and to promote or further the career of an individual artist or PBS.  Specifically, the PMA states in relevant part:

(a)     Artist shall be solely responsible for payment of all booking, theatrical or employment agency fees, union dues, publicity costs, promotion or exploitation costs, traveling expenses and/or wardrobe expenses and all other expenses, fees and costs incurred by Artist.  Highsteppin is not required to make any loans or advances hereunder to Artists or for Artist's account nor to incur any expenses on Artist's behalf...(including, without limitation, all long distance telephone charges, cellular phone charges, charges for couriers, messengers, facsimile and telex transmissions, accountants fees, attorney's

_____

[34] *Id.* at ¶ 4.

6

fees and costs incurred on the Artist's behalf (excluding the fees and costs associated with the preparation and negotiation of this Agreement), photocopying and postage expenses, air and ground transportation, lodging, meals and other living expenses for Highsteppin while traveling), ...[35]

HSP's authority to incur expenses without the Artists' approval was limited by the amount of any individual charge or aggregate monthly expenses. The PMA provides in relevant part:

> (b)    Artist (or Business Manager) will reimburse Highsteppin for any and all expenses incurred by Highsteppin on Artist's behalf in connection with Highsteppin's services performed hereunder, provided that: (i) Artist will not be responsible for any portion of Highsteppin's overhead expenses; (ii) subject to paragraph 6(b)(iii) of this Agreement, if Highsteppin incurs travel expenses on behalf of both Artist and other of Highsteppin's clients, Artist shall be responsible only for Artist's pro rata share of such expenses; and (iii) Highsteppin shall not incur without Artist's prior consent (A) any single expense in excess of Seven Hundred Fifty ($750) Dollars or (B) aggregate monthly expenses in excess of Two Thousand ($2,000) Dollars.[36]

The PMA contemplates that Artists' revenue would be collected by a business manager.[37] PBS did not hire a business manager as anticipated in the PMA[38] and HSP began filling the void in August of 2006.[39]

On August 1, 2006, Stepanian requested that PBS' booking agent, Blue Mountain Artists ("Blue Mountain"), forward all executed contracts, checks, paperwork, reports, monthly statements

---

[35]  *Id.* at ¶ 6(b).

[36]  *Id.* at ¶ 6(a).

[37]  *Id.* at ¶¶ 3(a)(iv), 7, 8.

[38]  T.T. Porter, Stepanian, Stoltz.

[39]  T.T. Stepanian, Malangone.

or other mailings to HSP.[40]  HSP began receiving amounts payable to PBS from Blue Mountain and

all related accountings in August 2006.[41]  HSP also collected the amounts due after completed

performances through HSP personnel traveling with the band.[42]  All sales of merchandise and music

were funneled into HSP accounts.[43]

### B.    Commingling of Funds

Throughout 2006 and 2007, revenues and expenses of the Artists, Bonerama (HSP's other

client) and HSP were commingled in a single checking account.[44]  It was not until October 2006 that

HSP electronically sorted the deposits and withdrawals made on behalf of the Artists, HSP, or

Bonerama into separate accounting records.[45]

On December 7, 2007, HSP established separate checking accounts for PBS and Bonerama

in an effort to segregate the deposits and withdrawals of HSP, Bonerama, and PBS  electronically

and physically.[46]  Stepanian was the sole signatory on both the HSP account and PBS checking

account.[47]  In January 2008, the income and expenses of HSP, PBS and Bonerama were split into

---

[40]  Exh. 66 at  2007; T.T. Porter.

[41]   T.T. Malangone.

[42]  T.T. Stepanian.

[43]  T.T. Stepanian, Dyer.

[44]  T.T. Stepanian, Malangone, Dyer; Exh. 61 at 1798.

[45]  T.T. Malangone, Dyer.  Although electronically separated, the various deposits and withdrawals of HSP, the Artists and Bonerama were still physically combined.

[46]   *Id.* (PBS' account contained deposits and withdrawals for PBS as well as expenses of the individual artists.  Porter, Stoltz and Batiste's individual earnings were still deposited into HSP's checking account as were some earnings and withdrawals of PBS).  Exh. 61 at 1798.

[47]  T.T. Malangone.

8

their respective bank accounts, and HSP started paying some PBS related invoices out of PBS'
checking account.[48]   However, HSP continued to pay most of PBS' expenses from and deposited
PBS' revenue into HSP's checking account.[49]

### C.    Payments to the Artists

During 2006, the Artists collected performance fees on the road, paid tour expenses and
divided the remaining cash in equal shares.  In 2007, HSP began collecting revenues and remitting
payments to the Artists.   Before December 2007, the Artists paid for tour expenses and crew
directly when on tour, then sent reconciliations to HSP for entry into HSP's accounting system.[50]
In November 2007, HSP began sending the Artists bi-weekly payments in set amounts.[51]  HSP also
paid the majority of expenses,[52] including crew members' payroll while on tour, out of its checking
account.[53]  This practice continued through November 2008.

### 1.    1099 and K-1 Tax Forms for 2007

HSP issued 1099 tax forms to the Artists for payments made to them in 2007 through HSP's

---

[48]  Exh. 61; T.T. Dyer 89:13-25, 90, 92:11-23.

[49]  *E.g.* Exh. 20.  Most entries reflected on PBS's Journal for 2008 are by batch transfer from HSP's
accounts.

[50]  T.T. Porter, Malangone.

[51]  T.T. Porter, Stepanian, Stoltz, Batiste.

[52]  T.T. Dyer.

[53]  T.T. Stoltz, Porter, Stepanian, Malangone.

payroll system.[54]  HSP voided the 1099s in September or October 2008 and substituted PBS K-1s

to the Artist members.[55]  The 2007 tax return of PBS, which Porter signed on October 20, 2008,

reflected K-1 income to Stoltz of $32,500.00, Porter for $40,570.00, and Batiste for $27,570.00.[56]

### 2.    1099 and K-1 Tax Forms for 2008

After the end of 2008, HSP again issued 1099s to the Artists for payments made by HSP

through its payroll or checking account during 2008.[57]  This time the 1099s were not voided, and

PBS' 2008 tax return does not reflect any amounts paid to the Artists.[58]   Instead, HSP took a

deduction for the payments it made to the Artists on its tax return as an expense of HSP and

transmitted the 1099s to the IRS on September 10, 2009.[59]  Nevertheless, after suit was instituted,

HSP "corrected" the 1099s by reducing the amounts paid to zero ($0) and issuing K-1s in PBS'

name.[60]  HSP then booked the amounts paid as loans due from PBS.[61]

---

[54]  *E.g.*. Exh. 163.

[55]  Exh. 25 at 382-384, 200(H) .

[56]  Exhs. 17,19 at 230, 234, 236, 238. HSP's proof of claim reflects payments to Stoltz of $32,520.00; to
Porter of $40,589.99 and to Batiste for $25,570.00.

[57]  Exh. 25 at 387-388.   HSP took expense deductions for the salary payments on its books.

[58]  Exh. 24 at 370.  (HSP asserts that Porter resigned before HSP was able to correct the 2008 1099's.  HSP
avers that it would have corrected the 1099's before October 15, 2009 if Porter had not resigned on September 29,
2009.  (P-263, HSP's Proposed Findings of Fact at 23).  The Court finds this odd because Porter signed the 2008 tax
return on September 14, 2009 (two weeks before he sent his official termination letter, which was not effective until
November 7, 2009).  HSP should have provided PBS' tax preparer with the corrected information.  Instead, HSP did
not reissue the 1099's to reflect zero income until advised to do so by its tax accountant in 2011.  (P-263, HSP's
Proposed Findings of Fact at 23).

[59]  Exh. 25 at 387-388; Tax year 1099 forms for 2008 were issued to Porter for $115,700.00; Stoltz for
$46,400.00 and Batiste for $34,900.00.  Exh. 200M; T.T. Debiasi at 164.

[60]  Exh. 25 at 382-384; Exh. 163; T.T. Malangone.

[61]  T.T. Debiasi.

### 3.    1099 and K-1 Tax Forms for 2009

In 2009, many of PBS' revenues and expenses were itemized on its QuickBooks account,
rather than transferred from HSP's accounts through batch entry.[62] However, HSP also continued
to book revenues and expenses, particularly those associated with merchandise and music sales, on
its books.[63]   HSP made no payments to the Artists, and therefore did not issue 1099s, for 2009.
Neither PBS nor HSP have filed a tax return for 2009, and K-1s have not been issued.

### D.    HSP's Accounting of Expenses and Revenues for the Artists

### 1.    Calendar Year 2005

HSP did not have a relationship with PBS in 2005, and Stepanian did not account to the
Artists for the merchandise he purchased and sold during 2005.[64]

### 2.    Calendar Year 2006

HSP's only method of accounting was through hand notes.[65]  In the summer of 2006, Bonnie
Stockdale was hired to load a QuickBooks program onto HSP's computers and enter revenue and
expense data, from Malangone's notes, for PBS.[66]  It took Stockdale until October 2006 to complete
the data entry.[67]

During 2006, Blue Mountain began sending the deposits it collected on behalf of PBS to

---

[62]  Exh. 26.

[63]  Exh. 146.

[64]  T.T. Stepanian, Porter, Stoltz; Exh. 209.

[65]  T.T. Malangone.

[66]  *Id.*

[67]  *Id.*

HSP.  Porter collected any residual revenues after completed performances.[68]  Porter acted as tour manager, paid tour expenses from the cash collected and provided HSP with reconciliation reports during this period.[69]

After the payment of direct expenses, any remaining cash was distributed evenly between Porter, Stoltz and Batiste.  HSP began incurring expenses on behalf of PBS during 2006,[70] and most of its costs were directly related to touring.[71]  During 2006, HSP failed to provide copies of any expenses it paid or revenues it received on behalf of PBS.[72]  It also failed to provide copies of Blue Mountain performance fee reports, merchandise or music sales.[73]

PBS utilized Shannon Chabaud as its CPA, who was also Porter's personal accountant.[74] HSP failed to provide an accounting of PBS' 2006 revenues or expenditures.[75]  Because HSP did not provide expense and revenue information, Chabaud filed the 2006 tax return without input from HSP.[76]  Based on Porter's accountings of performance fees collected and tour expenses paid, Chaubaud calculated PBS' profit for 2006 at $54,457.00.[77]  HSP ultimately calculated a loss of

---

[68]  T.T. Porter.

[69]  Exh. 65 at 1957, 1961; T.T. Porter.

[70]  Exh. 8.

[71]  *Id.*  (PBS' Profit and Loss indicates $9,010.00 in non-tour related costs).

[72]  T.T. Stepanian, Dyer, Malangone, Porter, Stoltz.

[73]  *Id.*

[74]  T.T. Porter, Chabaud; Exh. 12.

[75]  *Id.*

[76]  *Id.*

[77]  Exh. 12.

$26,698.78 for 2006.[78]

### 3.   Calendar Year 2007

No one at HSP prepared budgets for nontour expenses nor were tour budgets prepared prior to commencing a tour or its booking.[79]  Throughout most of 2007, Porter or HSP collected performance revenues and paid performance related expenses.[80]  Porter accounted for his collections and expenses noting on reports the amounts charged on the PBS American Express card.[81]  He also noted amounts sent directly to HSP by Blue Mountain as deposits and deducted for booking agent and HSP commissions.[82]  Due to expenditures paid for by HSP and unaccounted for to PBS, HSP deferred its commissions without PBS' knowledge.[83]  As a result, although Porter attempted to split the true net profit out of remaining cash between PBS' members, unaccounted for expenditures incurred and paid by HSP meant his calculations were inaccurate.[84]

In 2007, HSP began booking hotels and flights for PBS through a travel agent and paid the

---

[78]  Exh. 8.  PBS profit and loss statement for 2006 was not prepared until at least May of 2011.  All other financial statements were accompanied by an email transmittal and in accord with the trial testimony, the Court finds that this statement was not sent to PBS prior to the institution of this suit.

[79]  T.T. Stepanian and Malangone.

[80]  T.T. Malangone.

[81]  *E.g.*. Exh. 37, 65 at 1924-1925, 140.

[82]  *E.g.*. Exh. 65 at 1924-1925, 1928, 1930.

[83]  T.T. Stepanian.  Blue Mountain commissions were deducted from deposits Blue Mountain collected for the Artists before any amounts were sent to HSP.

[84]  T.T. Malangone (The Artists were on the road and settled expenses after each show.  In 2006, the Artists disbursed money to crew and themselves.  HSP then received the net money in house.   In 2007, HSP received PBS' gross performance fees, which went into HSP's checking account.  In some instances, HSP made disbursements through HSP's checking account to the Artists and crew.  In other instances, the Artists paid the crew in cash.)

expenses directly.[85]   HSP also incurred significant nontour expenses on PBS' behalf but did not

forward contracts or invoices for these services or goods to the Artists.[86]  Stepanian handled the

expenses for promotion, sales of music and merchandise, and was only the person to authorize a

nontour expense on behalf of PBS.[87]

As detailed below, HSP did not send the Artists a copy of PBS' 2007 profit and loss

statement ("P/L") until October 2008.[88]  During 2007 it also failed to give the Artists any accounting

of what expenses it was incurring or satisfying,[89] provide copies of Blue Mountain performance fee

reports, or account for merchandise and music sales.[90]

Stepanian testified that he offered his resources to help Artists pay for items needed to "grow

the band," including additional crew which he believed necessary to project the image of a "well

respected larger paid band."[91]   The crew for PBS from November 2007 to November 2008 was

hired and paid by HSP.[92]

### 4.    Calendar Year 2008

---

[85]  T.T. Stepanian.

[86]  T.T. Stepanian, Dyer, Malangone, Porter, Stoltz.

[87]  T.T.Dyer at 161-162; Malangone, Stepanian.

[88]  Exh. 19.

[89]  T.T. Porter, Stoltz, Stepanian, and Malangone.

[90]  Exh. 19 at 301, 320, 326.  Dyer did send all three members a four-page report including PBS
merchandise and music sales, as well as a partial P/L reflecting January through August 2007 figures in March 2008.
The partial P/L is illegible and there was no evidence that a legible copy was forwarded to the Artists.  In any event,
assuming the Artists could read the document, it reflected a year to date loss of only $13,000.  Exh. 19 at 186-190,
paginated with email transmitted as pgs. 1-5, versus Exh. 19 at 195 not marked with email transmittal pages on
following documents (at 196-198).

[91]  T.T.Stepanian at 218.

[92]  T.T. Stepanian, Porter.

14

In 2008, HSP convinced PBS to terminate Chabaud's services in favor of a tax preparer HSP hired, Alan Friedman.[93] Although Friedman was located in Boston near HSP, he did not verify or audit the financial information delivered to him by HSP.[94] HSP acted as the direct liaison to Friedman and provided him with documents and work papers to prepare PBS' 2007 tax return.[95]

In July of 2008, HSP produced a 2007 P/L for PBS. The P/L reflected a loss of $62,741.57.[96] It was withdrawn shortly thereafter by Stepanian due to inaccuracies.[97] In October 2008, HSP delivered a 2007 P/L to Friedman also reflecting a loss of $62,074.57 for 2007. In addition, it prepared and forwarded a 2007 balance sheet ("B/S") on which it booked directly to equity a 2006 loss of $62,244 and cash disbursements in 2007 to Porter ($40,569), Batiste ($27,569) and Stoltz ($32,519).[98] This created a negative retained earnings balance of $225,646 which was offset by a loan from HSP in the amount of $227,660.[99]

The tax return for 2007 was adjusted by Freidman because the 2007 P/L did not contain several large expenditures incurred by HSP. For example, a photography bill for $37,673.00 was omitted and instead booked directly to retained earnings on PBS' B/S.[100] In addition, losses for 2006

---

[93] T. T. Stepanian.

[94] T.T. Freidmann.

[95] T.T. Dyer at 191.

[96] Exh. 14.

[97] Exh. 19 at 206-208.

[98] Exh. 14.

[99] *Id.*

[100] Exh. 200.

were booked into retained earnings in 2007 without any accounting being given to PBS.[101]  Music and merchandise sales were not included on PBS' P/L nor were costs associated with music or merchandise production.[102]  Freidman adjusted the losses on PBS' return and forwarded it to Porter for signature and filing on or about October 2, 2008.[103]  The 2007 tax return reflected a loss of $225,933.00.[104]

Once Porter received the draft return, he met with Chabaud in an effort to understand its content.  On October 2, 2008, Porter wrote Friedman with several questions, including the existence of the $227,660 loan.[105]  Freidman and Dyer explained that PBS had incurred losses of $227,661.00 in 2007, which were funded by HSP, creating a loan due to HSP by PBS.[106]  Porter signed the return on October 20, 2008.

With regard to revenues collected and expenses paid in 2008, HSP again failed to provide any accounting, invoices or reports to PBS throughout 2008.  Despite the existence of a separate checking account for PBS,  HSP continued to put PBS' revenues into its checking account and book

---

[101]  *Id.*

[102]  T.T. Dyer, Friedman.

[103]  Exh. 200; T.T. Friedman.

[104]  T.T. Exh. 200(b) and Exh. 17.

[105]  Exh. 18.

[106]  *Id.* at 181.

16

expenses on HSP's records.[107]   HSP transferred the individual revenue and expense entries by batch

or lump sum to PBS' QuickBooks account sometime after this suit was instituted.[108]

   In November of 2008, Stepanian wrote an extensive email to the Artists admitting that he

had never actually accounted to PBS on its financial status.  Stepanian also admitted that  because

of the recession, he could no longer fund PBS' costs.[109]  Following this email, the discovery of the

2007

losses  and  the  previously  unknown  $227,000  "loan"  to  PBS  by  HSP,  the  Artists  returned  to

managing their expenses and performance revenues.[110]  Expenditures for promotion and merchandise

or  music  sales  virtually  ceased.[111]   HSP's  claim  includes  only  $9,103.65  for  expenses  incurred

between November 2008 and November 2009**.**[112]

###   5.   Calendar Year 2009

   HSP called a meeting with the Artists in August 2009  to examine "where they were and

where they could go.[113] The Artists believed the meeting would produce the accounting for expenses

and revenues missing over the last three (3) years.[114]  HSP used the day to reintroduce each of its

---

[107]   Exh. 20 at 344-346 (HSP used batch journal entries to move expenses taken on its books to PBS' Quickbooks Journal); T.T.Dyer at 227:10-25, 228-230: 1-13; T.T. Malangone.

[108]   T.T. Dyer.

[109]   Exh. 182.

[110]   T.T. Porter.

[111]   T.T. Stepanian, Porter, Stoltz.

[112]   Exh. 159.

[113]   Exh. 35.

[114]   T.T. Porter, Stoltz.

employees to PBS. It also presented its future vision for promotion centered on music sales and an increase in PBS' average performance rate.[115] No explanation of the outstanding losses was given.[116] Frustrated by the perceived lack of financial information, Porter stormed out of the meeting.[117] Pursuant to Paragraph 1(a) of the PMA, Porter sent notice of his intention to terminate the PMA.[118]

The PMA terminated on November 7, 2009.[119]   The revised financial documents for the previous years were not delivered to PBS until May 2011.[120]   The 2009 B/S dated May 6, 2011 reflects a loan payable to HSP of $534,222.54, including draws given to Batiste ($76,278.80); Porter ($170,078.78); and Stoltz ($92,728.78).[121]   Retained earnings had a negative balance of $263,053.61, and net income was $72,648.63.[122]   Neither HSP nor PBS has filed a tax return for 2009.[123]

### E.   HSP's Claim

#### 1.   Touring Revenues and Expenses

HSP claims that it is owed reimbursement for $321,303.81 in tour expenses HSP paid on

---

[115]  T.T. Stepanian.

[116]  T.T. Porter.

[117]  T.T. Porter, Stepanian, Stoltz, Malangone.

[118]  Exh. 62 at 1831-1833.

[119]  *Id*. and Exh. 1.

[120]  T.T. Debaisi at 168, Dyer. As of May 2011, Stepanian had not filed tax returns for 2008, 2009 or 2010. HSP filed its 2008 tax return on October 15, 2011. T.T.Weinstein at 12; Debiasi at167.

[121]  Exh. 26.

[122]  *Id.*

[123]  T.T. Porter, Stepanian.

behalf of PBS.[124]  HSP's tour expense claim is composed of costs for travel, crew wages, hotels and

other costs.  The Court finds the following sums were incurred and are associated with touring:

| TOUR EXPENSES | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Crew | 2,896 | 29,284 | 56,490 | 4,230 |
| Airfare | 3,991 | 26,959 | 16,482 | 11,918 |
| Gas | 1,563 | 4,576 | 8,377 | 1,136 |
| Van Rental | 7,638 | 12,093 | 8,581 | 4,662 |
| Tolls/Parking | 911 | 207 | 1682 | 555 |
| Hotel | 10,244 | 11,772 | 29,536 | 6057 |
| Per Diem Payments | 4,346 | 12,225 | 6,750 | 5,430 |
| Equipment Rental/Musical Supplies | 534 | 977 | 1581 | 2554 |
| Venue Fees | --- | 132 | 540 | --- |
| **TOTAL** | 32,123 | 98,227 | 130,019 | 36,543[125] |

Tour revenue earned through performance fees for years 2006 and 2009 is:

2006:  $92,605[126]

---

[124]  P-262 at 12.

[125]  In order to ascertain the debts due to and from each of the parties, a review of the source documents and contemporaneous booking entries has been made.  The Court has calculated tour expenses from source documentation or individual book entries when verifiable.  Batch or lump sum entries from HSP's books without any detail as to the dates, amounts or sources of the expenses comprising the total have been eliminated.

[126]  Exh. 8; Exh. 34.

2007:  $150,647[127]
2008:  $152,379[128]
2009:  $159,512[129]

### 2.    Merchandise Costs

#### (a)    April 2005 through May 2006

Prior to the execution of the PMA in 2006, Stepanian incurred costs to produce merchandise promoting Porter.[130]  Stepanian also traveled with PBS and/or Porter when on tour in 2005 and 2006 selling merchandise at each venue.[131]  Although the Artists saw the merchandise, Stepanian never provided the Artists with an invoice or statement for any costs incurred, never discussed the costs or quantities associated with acquiring any merchandise Stepanian was selling, nor did PBS or the Artists individually pay any of these costs. Stepanian ordered all the merchandise and paid for the items through his checking account or personal credit card.  Sales revenue was collected by Stepanian and kept by him.  The Artists did not receive any share of sales.[132]

Paragraph 6(c) of the PMA provides the following with regard to expenses incurred in 2005 and early 2006, prior to execution of the PMA:

(c)    Reference is made to that certain merchandising agreement entered

---

[127]  Exh. 13 ($150,647.00); Exh. 34 ($150,109.89).

[128]  Exh. 20; Exh. 34.

[129]  Exh. 29; Exh. 24.

[130]  Exh. 5.

[131]  HSP claims $22,637.65 for Stepanian's travel costs in 2005 and through April 2006.  *Cf:* Exh. 2 which reduces HSP's claim for Stepanian's personal travel to $18,404.87. It also alleges $10,363.78 in merchandise purchases during the same period are reimbursable under the PMA. Exh. 159; Exh. 5, T.T. Stepanian.

[132]  T.T. Stepanian, Porter.

20

> into by and between Artist and Highsteppin before the effective
> date of this Agreement ("Previous Merchandising Agreement")
> which granted Highsteppin the exclusive right to develop, produce,
> manufacture, package, ship, distribute, market, promote and sell
> merchandise embodying the name and likeness of each member of
> Artist and the professional names, group names, logos, trademarks
> and servicemarks of the Artist.  Upon full execution of this
> Agreement, the Previous Merchandising Agreement shall be
> terminated, any and all expenses incurred by Highsteppin pursuant
> to the Previous Merchandising Agreement shall be deemed
> Expenses hereunder, and all income derived from the sale of
> merchandise shall be deemed Gross Earnings hereunder."[133]

Prior to the PMA, drafts of a merchandising agreement were exchanged between the Artists and Stepanian however, no contract was executed.  Prior to the execution of the PMA, Stepanian did not disclose the extent of amounts expended for Artist related merchandise during 2005 or 2006.[134]

(b)     **May 2006 through November 2009**

After the execution of the PMA, Marie Kirschberger, a HSP employee, set up a "cost recovery" formula to allow HSP to track the sales of Stepanian's merchandise and its cost basis on HSP's books.  A similar system was not added to track PBS or the individual Artists' previously owned merchandise, including music.[135]  New merchandise for the Artists was ordered and sold by HSP.[136]  Except for a general comment by Stepanian to the Artists indicating that merchandise purchased for sale and promotion would cost roughly $1.00 to $1.50 per piece, HSP never discussed the cost of any particular item, the quantities being ordered or the total cost of a merchandise

---

[133]   Exh. 1 ¶ 6(c).

[134]   T.T. Stepanian, Porter.

[135]   T.T. Malangone; Exh. 172 at 6216.

[136]   Exh. 159.

order.[137]  HSP neither gave the Artists an invoice nor statement for any costs incurred nor did the

Artists pay any charges.[138]      The Court finds that the following amounts were incurred by HSP for

PBS or Porter related merchandise:

| VENDOR | ITEM | DATE | QUANTITY | CHARGE | EXH. NO. |
|---|---|---|---|---|---|
| Nimbit | CDs | 7/6/06 | 1000 | 1,499 | 159(R) |
| Armydogtags | Dog tags | 6/29/06 | 1000 | 1,640 | 159(C) |
| **TOTAL 2006** | | | | **$3,139** | |
| All American Advertising Specialities | Bic Lighters | 4/23/07 | 500 | 657.33 | 159(B), p. 5045/5039 |
| All American Advertising Specialities | Black Koozies | 4/23/07 | 2500 | 1,709.93 | 159(B), p. 5047, 5041 |
| All American Advertising Specialities | Black Koozies | 4/26/07 | 1500 | 1,031.83 | 159(B), p. 5049, 5043. |
| Extreme Glow | Circle Pendant | 11/18/07 | 1000 | 1,641 | 159(I), p. 5101, 5103 |
| Fred Cox Merchandising | GPJ tshirts | 12/29/07 | 186 | 1,519 | 159(K) |
| Foster's Promotional Goods, Inc. | Apparel | 11/15/07 | various | 11,866.85 | 159(J) |
| **TOTAL 2007** | | | | **$18,425.94** | |

---

[137]  T.T. Stepanian, Porter, Stoltz.

[138]  *Id.*

22

| Nugs.net | CDs | 12/28/08 | 366 | 2,196 | 159(S) |
|---|---|---|---|---|---|
| NKC Custom Apparel | Apparel | 6/17/08 | 0 | 2,576 | 159(D) |
| QRST | T-shirts | 9/3/08 | 300 | 2,017.80 | 159(V), p. 5253. |
| **TOTAL 2008** | | | | **$6,789.80** | |
| **TOTAL ALL PURCHASES** | | | | **$28,354.74** | |

All merchandise costs were paid through HSP's checking account and deducted on its tax returns.[139]   All income was also deposited into HSP's account and declared as revenue on its books.[140] Only revenue derived from sales of music owned or merchandise paid for by the Artists prior to the PMA was credited into PBS' account and reflected on P/Ls.[141]   On occasion, the Artists were asked their thoughts on the selection of items HSP offered for sale.[142] The Artists were also aware that HSP was running merchandise tables offering their music and merchandise at each venue.[143]   The Artists and HSP have stipulated that $76,387.15 in sales revenue was received for PBS merchandise, CDs and downloads of music.[144]

---

[139]   Exh. 197, 198, and 212; T.T. Stepanian.

[140]   *Id.*

[141]   *Id.*

[142]   Exh. 87; T.T. Stoltz.

[143]   T.T. Porter, Stoltz.

[144]   Exh. 237. Stipulation is for sales data through July 2012.

HSP also funded the production of several albums both for the Artists individually and as a group. Production costs associated with PBS' *MooDoo* release in 2008 were $14,161.24.[145] Production costs for Stoltz's *Up All Night* were $8,309.20[146] and $18,871.26[147] for Porter's *It's Life*.[148] Revenue from the sale of Porter's personal CDs and digital downloads was $22,455.67 through June 30, 2009.[149] Revenue from the sale of Stoltz's personal CDs and digital downloads was $10,042.36 through June 30, 2009.[150] Revenue from sale of Batiste's merchandise was $1,387.38 for the same period.[151]

### 3.    Nontour or Promotional Expenses

HSP's claim seeks reimbursement for several expenditures related to promotion or outside services incurred on behalf of PBS. Specifically:

| | | |
|---|---|---|
| 1. Danny Clinch Photography | 2/26/07 | $37,673.00[152] |
| 2. Freidman Kannenberg | 10/4/08 & 9/10/09 | $ 1,800.00[153] |
| 3. Leeway's HGMN | 1/9/08 | $ 1,520.00[154] |

---

[145] Exh. 36 at 810. This amount does not include fees of $14,000.00 paid to Page McConnell, which have been added to the costs of Moodoo's production. *See* Exh. B.

[146] *Id.* at 828.

[147] Exh. 26 at 827.

[148] Exh. 36 at 144.

[149] *Id.* at 824.

[150] *Id.* at 828.

[151] *Id.* at 836.

[152] Originally claimed for $41,400 but adjusted during trial. The total expenditures for the photography session, airfare, hotels, etc. are $39,891.24. Exh. 164 at 5624.

[153] Exh. 46, 159(L)

[154] Exh. 50, 159(P). Stoltz forwarded, without comment, a solicitation email from Leeways to Stepanian on August 28, 2006. Stoltz forwarded another solicitation email from Leeways to Stepanian on September 10, 2007. Stoltz added that he was "just passing this along in case you don't have it."

| | | |
|---|---|---|
| 4.  Madison House Publicity | 7/6/07-3/4/09 | $53,910.10[155] |
| 5.  Nimbit, Inc. | 1/31/08-5/29/08 | $     855.00[156] |
| 6.  OffBeat | 4/7/08 | $  1,600.00[157] |
| 7.  Powderfinger Promotions | 9/07 & 9/08 | $  5,625.00[158] |
| 8.  Richard Quindry | 7/07 | $     652.53[159] |
| 9.  Relix Magazine | 2/07, 7/07, 10/07, 12/07 | $12,166.00[160] |
| 10. David Stocker | 2/21/08 | $  2,000.00[161] |
| 11. Domenick Tucci | 1/07-11/08 | $12,000.00[162] |
| 12. Zenbu Magazines, LLC | 8/08-9/08 | $  1,850.00[163] |

For every month of the PMA, expenses in excess of $2,000.00 per month were incurred.[164]

All of the amounts in question also exceed $750.00 and require the consent of PBS.[165]

---

[155] Exh. 51, 159(Q).  Madison House Publicity charges are reflected on twenty (20) invoices beginning in June 2007 and charged in August - December 2007, January - December 2008, January and February 2009.  The charges were paid from HSP's checking account and booked into promotional, advertising or publicity expenses.

[156] Exh. 52, 53, 159(R).  Nimbit charges are for website maintenance and production of CDs.

[157] Exh. 55, 159(T).  Although an invoice for only $1,600 in advertising charges is included, HSP's records reflect seven (7) ads placed in 2007 in Offbeat for a total of $7,575.00 and five (5) more in 2008 for $2,650.00.

[158] Exh. 56, 159(U).  Two (2) charges of $1,350.00 were paid through HSP's checking account in 2007 and booked into promotions.  Exh. 56 at 1681, 1683.

[159] Exh. 159(W).  Richard Quindry was used by HSP as a photographer for advertising on internet websites.  Actual charges booked to PBS for 2007 are $3,702.90 and $369.00 in 2008.

[160] Exh. 57, 159(X).  HSP's books reflect six (6) ads were placed in Relix for a total cost of $12,316.00.

[161] Exh. 159(Y).  Stocker was used by HSP for the Artists' web page design.  Although HSP produced only one (1) invoice for $2,000.00 dated October 2006, according to HSP's books, Stocker charged $2,352 in 2007 and $2,218.00 in 2008.  All expenses were paid by HSP through its checking account and booked to PBS website design.

[162] Exh. 159(Z).  Domenick Tucci was employed by HSP to maintain the Artists' MySpace pages.  (Bills from January 21, 2008 through November 24, 2008.)

[163] Exh. 57, 159(AA).  Zenbu Magazines charged $550.00 to place a skyscraper banner ad on www.jambands.com from 9/23 to 10/23/08.  Exh. 57 at 1734.  Documents produced at trial also include a check from HSP to Zenbu for $1,300 on a bill dated 8/15/08.  Exh. 57, at 1736.

[164] Exh. 8, 13, 20, 26.

[165] Expenses claimed for the services of Karen Stella Consultants are omitted by admission at trial.  T.T. Malangone.  Regardless, Karen Stella represented to the Artists that she worked at HSP, not that she was a consultant independently charging the Artists for travel arrangements.  Exh. 116 at 2695-2696.  The Court finds that the Artists were not aware of any charges by Stella and did not approve them in advance.  Therefore, under the terms of the PMA they are disallowed.   HSP's post-trial proposed findings of fact (P-263) states that "Karen Stella does not appear on the PBS or HSP Profit and Loss Details. In fact, Stepanian sent an email to Batiste on August 7, 2007,

III.    **Law and analysis**

A.    **Background**

In the music industry, booking agents serve as a broker or liaison between musicians and venues.  Booking agents regularly field calls for a musician's services and will verify availability of the artist.  They then contact the artist or his personal manager if one exists, regarding the inquiry. If approval is given, the booking agent sends a standard form contract to the venue and collects a deposit.  The musician signs the contract, but the deposit is retained by the booking agent until the performance is given.  If all goes as planned, the balance of the contract is paid to the booking agent, musician or business manager at the conclusion of the performance.  The booking agent's fee is typically ten percent (10%) of the gross revenues received under the contract.

PBS' booking agent both before, during and after the PMA was Blue Mountain, and its relationship with PBS never varied.  Blue Mountain collected deposits in advance of performances it booked, deducted its commission out of the deposit after the performance occurred and sent the residual, if any, to PBS or HSP as directed.[166]  On a monthly basis, it itemized the amounts received on behalf of PBS and commissions deducted in a report originally delivered to PBS.  After July 2006, the reports were delivered to HSP.

B.    **HSP's Claim for Reimbursement and PBS' Claim for Breach of Contract and Duty**

HSP claims it is owed approximately $600,000.00 for funds advanced to pay tour, promotional, merchandise, music production and living expenses of the Artists.  The Artists challenge the claim on the basis that HSP failed to provide account detail on revenues received and

---

stating Karen Stella was not the Artists' agent and she was being paid directly by HSP. Exh. 117 at 3696 ."

[166]  T.T. Stepanian, Porter.

expenses paid during the PMA.  As such, the Artists assert that HSP breached its contract and fiduciary duties in addition to engaging in negligent and unfair trade practices.  Because the Court finds that HSP did not properly account to the Artists during the PMA, calculation of HSP's claim requires an analysis of all revenues received and expenses paid during its term.

### 1.    Conduct of the Parties

From May 2006 to August 2006, Blue Mountain collected deposits and transmitted any residual amounts directly to PBS after its commission was deducted.[167]  All reporting by Blue Mountain went to PBS.  The remaining sums due under performance contracts were collected by PBS after the completion of the performance.  From these sums, PBS paid its travel expenses, including hotel rooms, side musician fees, rental car, gas expenses, etc. The difference or "profit" was divided between Porter, Stoltz and Batiste equally.

Because PBS could not afford personal and business managers, HSP began filling the void.[168]  HSP admits that it had no experience as a business manager, a fact known by the Artists.  HSP alleges it had no choice but to assume responsibility for "bookkeeping" because the Artists refused to hire or to pay for a business manager.  Nevertheless, the Court finds that HSP purposefully and willingly assumed the role of business manager and began taking control of the Artists' revenue streams in August 2006.[169]

In August 2006, HSP requested Blue Mountain send all, paperwork, reports and monthly

---

[167]  T.T. Malangone.

[168]  T.T. Stepanian, Malangone.

[169]  HSP exerted increasing control over expenses beginning in February of 2007.  T.T. Malangone, Porter.

statements to HSP.  HSP also instructed Blue Mountain to forward amounts payable to PBS by

check made payable to HSP.[170]  Whenever possible, HSP collected the amounts due after completed

performances through HSP personnel traveling with the band.[171]   Merchandise and music sales

revenue belonging to the Artists was deposited into HSP's checking and QuickBoods accounts.[172]

Performance fees were reported to the Artists in gross terms, at best annually, if done at all, and

typically shortly prior to the extended deadline for filing tax returns.[173]   Revenues from music or

merchandise sales were placed in reports delivered to the Artists only twice during the entire

relationship.[174]

In February of 2007, HSP began promoting PBS and its members.  As a result, it began

incurring substantial nontour or promotional expenses.  By November of 2007, HSP insisted on

controlling all tour expenses as well.  This included contracting for and paying band crew.[175] Airfare,

hotel rooms, meals, side musician fees, gas, etc. were incurred and paid by HSP.[176]  If the expense

was invoiced, HSP paid the charge from its accounts.[177]  If it was paid on the road, generally it was

---

[170]  T.T. Dyer; Exh. 66 at 2007.

[171]  T.T. Stepanian.

[172]  T.T. Stepanian, Malangone, Dyer.

[173]  An accounting of 2007 gross performance fees was not delivered until October 2008.  An accounting of gross performance fees for 2008 and 2009 was not delivered until May 2011.

[174]  Merchandise and music sales reports were delivered in March of 2008 and August of 2009.  Exh. 19 at 301, 320, 326 and Exh 36.  Porter also received an individual merchandise report in July 2008.  Exh. 19.  Each was materially incomplete as it failed to reflect substantial sales deposited into HSP's checking account.

[175]  T.T. Stepanian, Porter.

[176]  *E.g..* Exh. 37.

[177]  T.T. Stepanian, Malangone.

paid out of cash given to the Artists prior to the start of a tour or through the use of PBS' credit card,[178] which HSP paid.[179] At the end of each tour, the Artists gave an accounting to HSP of all tour expenses they paid and cash on hand.[180] The remaining cash was either split between the Artists as a share of their profits or held as starting cash for the next tour.[181]

Conversely, HSP accounted for its expenditures in at most a general, haphazard fashion, and dilatory manner. Nevertheless, HSP avers that it performed its duties under the PMA and is owed reimbursement for all amounts it incurred on the Artists' behalf. The Artists disagree citing breach of contract, MUTPA, and fiduciary duty claims.

## 2.    Claims for Breach of Contract And Duty By HSP

Breach of contract is a failure to perform a material term for which no legal excuse exists.[182] Under Massachusetts law, a plaintiff must demonstrate (1) a valid contract exists, (2) the defendant breached the contract, and (3) the plaintiff was damaged as a result.[183] Damages in a breach of contract action attempt to place the plaintiff in the position it would have been in had the contract been performed.[184] It is undisputed that the PMA is a valid contract. Questions remain as to whether or not HSP breached its obligations under the PMA and the extent of the Artists' damages.

---

[178] Exh. 37 at 917 *et. seq.*

[179] T.T. Malangone.

[180] Exh. 65 at 1926, 1927, 1933, 1935, 1939, 1961, 1968-71, 1976, 1977-1978.

[181] Exh. 65, 140.

[182] *Guckenberger v. Boston University*, 957 F.Supp. 306, 316 (D.Mass 1997); *Sterlite Corp. v. Continental Casualty Co.*, 479 N.E.2d 205, 208 (Mass. App. Ct. (1985), superseded on other grounds, 494 N.E.2d 1008 (Mass. 1986).

[183] *Michelson v. Digital Financial Services*, 167 F.3d 715, 720 (1st Cir. 1999).

[184] *Situation Management Systems, Inc. v. Malouf, Inc.*, 724 N.E.2d 699, 704 (Mass. 2000).

As discussed in greater detail below, the PMA required HSP to perform its obligations with a standard of care it failed to achieve. As a business manager, HSP was required to exercise a fiduciary duty of loyalty and care in the exercise of its profession.[185]

> ### a. Failure of HSP to Obtain Prior Consent for Expenses Paid on Artists' Behalf (PMA, Paragraph 6)

HSP's expenditures can be divided into three (3) groups, those directly related to touring, those related to promotion and those related to production of music and product. The Artists do not dispute that HSP spent its funds to satisfy tour related expenses incurred on behalf of PBS. However, they argue that the tour expenses were not reasonable and HSP failed to obtain their consent to any of the charges. The Artists also allege that HSP was grossly negligent and breached its fiduciary duties to them when it incurred the charges.

The Artists object to reimbursement of HSP's nontour expenses because 1) they were not proven at trial, and 2) they were not approved by the Artists in advance as required by the PMA.

Paragraph 6(b) of the PMA sets forth the parameters under which HSP is entitled to reimbursement for "Expenses, Loans, Advances and Statement" incurred by HSP on PBS' behalf. According to Paragraph 6(b):

> (a)    Artist shall be solely responsible for payment of all booking, theatrical or employment agency fees, union dues, publicity costs, promotion or exploitation costs, traveling expenses and/or wardrobe expenses and all other expenses, fees and costs incurred by Artist. Highsteppin is not required to make any loans or advances hereunder to Artists or for Artist's account not to incur any expenses on Artist's behalf, but, in the event Highsteppin does so, Artist shall reimburse Highsteppin therefore promptly... Artist hereby irrevocably authorizes Highsteppin to recoup and retain the amount of any such loans, advances, and/or expenses incurred (including, without limitation, all long distance telephone charges, cellular phone charges, charges for couriers, messengers, facsimile and telex transmissions, accountants fees,

---

[185] Opinion at 68-75; T.T. Stepanian, Jacodine, Resnick at 102-103,Templeman.

attorney's fees and costs incurred on the Artist's behalf ..., photocopying and postage expenses, air and ground transportation, lodging, meals and other living expenses for Highsteppin while traveling), and all other expenses relating to Highsteppin's services in accordance with this Agreement from any sums Highsteppin may receive for Artist's account.

(b)    Artist ... will reimburse Highsteppin for any and all expenses incurred by Highsteppin on Artist's behalf in connection with Highsteppin's services performed hereunder, provided that: (i) Artist will not be responsible for any portion of Highsteppin's overhead expenses; (ii) subject to paragraph 6(b)(iii) of this Agreement, if Highsteppin incurs travel expenses on behalf of both Artist and other of Highsteppin's clients, Artist shall be responsible only for Artist's pro rata share of such expenses; and **(iii) Highsteppin shall not incur without Artist's prior consent (A) any single expense in excess of Seven Hundred Fifty ($750) Dollars or (B) aggregate monthly expenses in excess of Two Thousand ($2,000) Dollars.** (Emphasis added).

HSP argues that every tour expense was reasonable, incurred within the scope of its authority and in the proper discharge of its duty. HSP also argues that it received oral approval for each of the nontour expenses and that HSP engaged in discussions with the Artists prior to incurring any expense.

### (1)    Tour Related Expenses

Before HSP took control over tour related expenses, the Artists were their own tour manager. Although far from wealthy, the Artists had managed to be profitable and support themselves.[186] Costs were paid primarily in cash, and although not sophisticated, this method of bookkeeping had the distinct advantage of being immediate and largely accurate.

During 2007, HSP gradually assumed payment and contracted for more and more of the tour related expenses. HSP also took control over the collection of performance fees on the road. By October 2007, HSP's control over all revenue and expenditures was almost complete. This divorced

---

[186]    Exh. 151(A-C).

the Artists from the day-to-day cash accounting they were accustomed to practicing.[187]  The Artists

complain that HSP incurred unreasonable costs and expenses in connection with touring.  They also

assert that they were unaware of these costs and did not give HSP permission to incur them.  Finally,

they claim the costs are excessive in relation to their income.

HSP avers that the Artists were clearly aware that additional crew and associated costs were

being incurred and never asked HSP to "stop spending."[188]  For example, HSP points to Porter's

email dated March 4, 2008 asking HSP "to pay one of the road workers" as a preapproval of tour

expenses.[189]  The email notes that the van driver for a seven-day tour called Porter because the driver

had not received payment.   In the email Porter noted "...I don't know what kind of deal You (sic)

have made with these guys or should I say Patrick Bell, as no other crew member has called me

looking for his money..."   Malangone's explanation on March 4, 2008 only lends credibility to the

Artists' assertions that they were not consulted with regard to the tour expenses during 2007 and

2008.  She explained:

> Phil has made financial arrangements with each and every guy who went out this tour
> and they will without doubt all be paid by Highsteppin' Productions in a timely
> manner.  Patrick is the only guy who is repeatedly a problem.  I asked both him and
> Stretch to ensure Patrick was paid in cash at the conclusion of this run because we
> knew it would be a problem if he wasn't.  This unfortunately did not happen.  We
> have a payroll system in place now as you know.  Like everyone else, I'd prefer to see
> him being paid under the same guidelines.  Patrick was only able to supply me today
> with his new bank account information even though on Sunday when we spoke he
> was going to have it to me for Monday.  I left a message for him just a few minutes
> ago and suggested he would have money in his account tomorrow afternoon.[190]

---

[187]  T.T. Malangone, Porter.

[188]  T.T. Stepanian.

[189]  Exh. 116 at 3680.

[190]  Exh. 116 at 3680.

Further, even Stepanian claimed he (HSP) was paying crew, not PBS.[191]

HSP also alleges that tour expenses were relatively large in relation to touring income because the Artists were unavailable for performances due to outside projects and participation in other musical groups. HSP avers that PBS' lack of revenue in relation to its touring expenses is directly attributable to the unavailability of the Artists.[192]   In support of its position, HSP points to the stipend program it was forced to implement in favor of the Artists.

In November 2007, Stepanian wanted PBS to play more venues on the road.[193]  Despite his efforts, PBS had played only ninety-six (96) shows in each of the years 2006 and 2007, roughly the same number of shows it had performed before hiring HSP.[194]  The revenue generated from these performances was wholly inadequate to support the expenses HSP was incurring, much less the commissions HSP was owed.[195]  HSP blamed the lack of revenue on its inability to book PBS into venues. It also believed that this problem was caused by the Artists' commitments to other bands or projects.  In HSP's view, conflicts in scheduling were the root cause of PBS's lack of success.[196]  The Artists' claim that HSP failed to generate new performance opportunities and was slow to remit any

---

[191]  Exh. 116 at 3707 (Stepanian corrects Porter when Porter indicates PBS is paying crew.)

[192]  T.T. Stepanian; Exh. 106.

[193]  T.T. Stepanian.

[194]  Exh. 36 at 805; Exh. 34, flowcharts for performances.

[195]  In response to insufficient income from PBS, the Artists began taking side performances and split performance revenue they received on the road to pay living expenses. Exh. 7 at 68-78. Although accounted for by PBS, Stepanian objected to this practice and insisted on the deposit of all revenues into HSP's account.  The Artists were unaware that all of the monies received by HSP were being consumed by HSP's expenditures leaving nothing for them to share.  The Artists assumed that HSP was holding profits because from May 2006 to July 2008, it never explained or attempted to account to the Artists for revenues earned and expenses incurred.  T.T. Porter, Batiste, Stepanian.

[196]  T.T. Stepanian.

profits being generated.[197]  As a result, the Artists were forced to seek out other avenues for revenue in order to support themselves.[198]

At trial, Coran Capshaw ("Capshaw"), an expert professional manager of musicians, explained that a personal manager's principal duty is to acquire performance opportunities through his contacts with venues or festivals.[199] Ralph Jacodine ("Jacodine"), HSP's expert, also explained that the personal manager is responsible for scheduling tours that will generate profits.  While Jacodine acknowledged that some tours or venues might be played for a loss, he opined that this should be a rare occurrence and undertaken only if the exposure for the artist outweighed the monetary loss.  Even if advisable, the artist should be made aware of the trade-off long before any commitment to the tour or venue was given.  The evidence offered at trial established that the Artists were available to HSP in all material respects.[200]  Because it is the personal manager's responsibility to secure performance opportunities and the Artists were willing and able to perform, the Court concludes that HSP's lack of experience and connections in the industry were the reasons more venues were not booked.

Until 2009, HSP never prepared much less presented the Artists with a preview or forecast of the revenues and expenses  anticipated with any tour or performance.  It also failed to keep them

---

[197]  T.T. Porter, Stoltz.

[198]  T.T. Porter, Stoltz.

[199]  Bernard Resnick also testified that a business manager should prepare tour budgets and analyze particular offers to make sure the performance  is financially sound, viable and something the artist should undertake.  Resnick at 97.

[200]  The only evidence of a conflict between PBS and its members regarding venue dates was in relation to a festival performance.  The conflict involved the Funky Meters, a band comprised of Porter, Batiste and Stoltz, along with others. Exh. 81 at 2205-2206.  The Court notes that the PMA recognized the Artists' right to perform with the Funky Meters.  No other evidence of conflicts was presented. Exh. 1.

informed as to whether or not any particular tour was profitable.[201]  Although HSP admitted that only

by playing 120 venues per year could PBS obtain profitability, it never acquired 120 opportunities

for them to perform, nor were many of the opportunities secured profitable.

PBS' gross performance income did not vary substantially between May 2006 and November

2009.[202]  Yet PBS's touring expenses climbed exponentially under HSP's watch.  During the PMA's

term, annual touring costs were $32,123 (2006); $98,227 (2007);  $130,019 (2008); and $36,547

(2009).

In 2006 and 2009, PBS largely controlled its touring costs. For this reason, the Court finds

that the touring expenses in the amounts of $32,123 for 2006 and $36,547 for 2009 were authorized

by PBS.  In each of these years, costs were within $5,000 of each other on gross revenues of

approximately $92,000 and $159,000 respectively.  Thus, the Court concludes that increased touring

costs were not necessary to generate increased income.  For this reason, HSP has failed to show that

its expenditures were reasonable in light of the band's performance revenue.  As Jacodine, HSP's

own expert,  opined, it is the duty of personal managers to secure profitable venues and manage tour

costs based on the anticipated revenue available.  Because HSP failed to consider tour expenses in

light of revenues, it breached its contract and duty to the Artists.

HSP also failed to produce any evidence that the exponential increase in touring costs was

approved by PBS.  The record contains unsupported assertions by HSP that PBS "knew" of HSP's

increased tour spending.  However, it failed to produce any evidence that PBS was aware of the

---

[201]  Exh. 132.

[202]  The gross performance fees were: (2006) $92,605 (8 months/annualized $138,906); (2007) $150,647;
(2008) $152,379; and (2009) $159,512.50.

amount or extent of its spending and particularly the losses HSP was generating.[203]   For this reason, tour expenses for 2007 and 2008 will be reduced to $36,000 per year to correct for HSP's failure to exercise reasonable care in the performance of its duties.

### (2)      Nontour or Promotional Expenses

The music industry is filled with professionals paid to handle parts of a musician's image, music production, touring, personal life or business affairs.   Public relations professionals secure interviews on radio and television, in print and internet to promote the release of new music, tour dates or the artist generally.  Photographers, graphic artists, mixing engineers and other professionals design, package or  produce the music of an artist for sale.  Stylists dress, coif and otherwise refine the physical appearance of an artist for performances, interviews, public appearances or any occasion of note.

Stepanian's vision included surrounding the Artists with top professionals in their fields in an effort to elevate PBS' profile and profits.  In 2007 and 2008, Stepanian secured the services of publicists, web designers, photographers, travel agents, internet tracking services, graphic artists, music production experts and other musicians.  In many cases, the services of these parties were not discussed with PBS.  In some cases PBS did not know, until discovery was conducted in this litigation, these individuals or companies existed much less the expenses associated with their services.  In other cases, PBS was aware of the services being provided but was not told of the cost. In still other circumstances, HSP gave PBS the impression that it was covering the expense as an

---

[203]  Given that the Artists had always been profitable in touring and they continued to play the same number of venues for the same or better terms, they had little reason to expect that touring was also losing money.  In addition, HSP was also promoting music and merchandise sales in an effort to generate additional income for the Artists.  PBS was also in the dark as to the size of HSP's spending on nontour related items.

investment in its own business.

Nontour or promotional expenses were typically incurred by HSP and paid through its account.  The Artists never saw the invoices or statements reflecting the amounts incurred although PBS was aware that some of the expenditures had been incurred on its behalf.[204]  The Artists uniformly and consistently testified that they believed HSP was either taking personal responsibility for promotional expenses or that the expenses were being paid through revenues.  It was clear that Porter, Stoltz and Batiste had no indication until October 2008 that HSP was advancing money on PBS' behalf.[205]  Stepanian aided in this apparent misconception by giving the Artists vague assurances or representing the costs as investments in HSP.[206]

PBS' success was directly linked with HSP, and in order to elevate HSP's profile, Stepanian led the Artists to believe that HSP was absorbing some promotional expenses.[207]  Because HSP kept its spending hidden, failed to account to the Artists for revenues or expenditures, and made its expectations for repayment purposefully vague, the Artists reasonably assumed this position.

For instance, Stepanian sent an email to Porter's daughter on June 11, 2007 discussing plans for Porter's 60th birthday party.  In the email, Stepanian represented that he had:

> ...[P]ersonally invested over a million dollars into Highsteppin' Productions, with the sole purpose of helping your father's career and that of a few others.  This event, in

---

[204]  T.T. Stepanian, Malanagone, Porter, Batiste, Stoltz.

[205]  T.T. Porter, Stoltz.

[206]  T.T. Porter, Stoltz, Stepanian.  Stepanian testified that he never used the words "personally liable" with the Artists.  His statements indicated that he would personally provide the Artists with the resources to advance their careers.  Stepanian used similarly vague words during trial.  For instance, he stated that he would help the band survive while building an infrastructure.  He admitted to telling Porter than the cost of the Clinch photos were not coming out of "gig money."  Stepanian also testified that Porter and Stoltz were seriously concerned about not creating losses.

[207]  T.T. Stepanian, Porter, Stoltz; Exh. 60.

fact all events, that include your dad, Russell Batiste, Brian Stoltz and Bonerama are what this million dollars has gone toward representing. ... I'm sorry, but I just feel it's an insult to me to have to even ask that I be involved in all of this.  And I can give you a million reasons why.  Really hoping we can get on the same page now and forever.  Because I too, am doing all of this out of the goodness of my heart.[208]

Similarly, in a letter dated November 14, 2008 to the Artists Stepanian stated, "...[O]ver the past few years I have made enormous investments in everything that is HSP."[209]

Although Stepanian claimed to have discussed expenditures with the band, if done at all, it was only in the most general of ways.  For example, on March 3, 2007, Porter sent an email to his fellow Artists and to Stepanian stating that his wife was asking him questions about expenses that he could not answer.[210]  Specially, Porter questioned whether PBS and the Artists would be financially responsible for a van Stepanian had recently purchased and whether the Artists would be paying for the Danny Clinch photography session.[211]  Stoltz responded to Porter's email, "[My] understanding of it all is that Phil [Stepanian] is absorbing much of the cost and is looking at it as an investment into Highsteppin' Productions."[212]  Stoltz's understanding was based on his prior conversation with Stepanian.  Stoltz testified that upon arriving at the photography session, he realized the scale of the production and was immediately concerned about costs.  When he raised the issue with Stepanian, he was told not to worry about it, that HSP "had it."[213]  HSP offered no credible proof that it provided any other explanation to Stoltz or responded to Porter's inquiry.

---

[208]  Exh. 184.

[209]  Exh. 132.

[210]  Exh. 60.

[211]  Capshaw testified that common sense was lacking in this case.

[212]  Exh. 60.

[213]  T.T. Porter, Stoltz.

The testimony of Stepanian, Porter and Stoltz supports a finding that Stepanian linked the success of his new company, HSP, to the fortunes of PBS. Throughout the relationship, Stepanian acknowledged that the success of PBS would establish HSP in the industry of personal management. As a result, Stepanian characterized much of what he did with or for PBS as an "investment" in HSP. Rightly or wrongly, when coupled with the lack of routine accounting, requests for payment and disclosure of nontour costs, PBS was given the justifiable belief that it was not responsible for most, if not all, of these charges.

Although Stepanian testified that the Artists "knew" of several large expenditures, there is no evidence that Stepanian informed PBS of specific nontour costs. The first attempt to provide PBS with an accounting did not occur until July 2008 when a 2007 P/L was forwarded to PBS. However, it was quickly withdrawn due to inaccuracies. It was not until October 2008 when the P/L for 2007 and draft tax return arrived that the Artists first learned of HSP's deficit spending. By this time, HSP had incurred large deficits for both 2007 and 2008 funded by HSP through loans PBS was expected to repay.[214]

This Court is also unconvinced that HSP was aware of its own runaway spending. Stepanian himself testified that he did not know how fiscal year 2007's $227,661.00 deficit was calculated.[215] The Court finds Stepanian's testimony regarding his lack of knowledge about the particulars of

---

[214] Exh. 19 at 334-335; T.T. Dyer, Porter, Stoltz. It is worth noting that the 2007 P/L produced in October 2008 incorrectly reflected approximately $62,000 in losses, while actual losses were closer to $200,000 as of 2007 year end.

[215] T.T. Stepanian.

HSP's loans credible because of HSP's atrocious bookkeeping methods.  For example, at the start of the PMA, HSP commingled all transactions for the Artists, itself and Bonerama in an single checking account.  While HSP attempted to keep track of the individual transactions by client, it was not until October 2006, some seven (7) months after the PMA was executed, that the transactions were electronically mapped between the parties.

HSP's  acquisition of a QuickBooks program to segregate, at least on paper, the revenues and expenses attributable to itself, the Artists and its other clients was a good first start even if tardily taken.  However, this too proved problematic for HSP. While QuickBooks will maintain an internal separation of accounts, it is dependent on the correct input of data.  HSP employed Dyer for this purpose.  She was assisted by Malangone and Stepanian.  Unfortunately, these individuals had a minimal  understanding of accounting or the legal relationship between the parties.  As a result, revenues owed to PBS were included in HSP's account, expenses HSP claims are owed by PBS were not booked into PBS' account and many costs were improperly booked after the close of a fiscal year through adjusting entries in some cases entered years later.  HSP employed batch or lump sum adjustments to "move" expenses entered on its books to PBS' books.  While this placed the expense with PBS, it failed to give the Court or PBS the detail necessary to verify the amounts being charged.

In addition, even after establishing separate checking accounts for HSP, PBS and Bonerama, HSP continued to commingle funds and pay PBS expenses from HSP's account.   HSP also paid Bonerama and HSP expenses out of the account into which it deposited PBS revenue.  Not only did this practice allow HSP to use client funds at will, it clouded HSP's ability to determine what it was advancing on behalf of the Artists versus what they were paying.

Based on the condition of its accounting, HSP cannot support a claim that the Artists knew

40

HSP was advancing funds on their behalf and that negative balances were mounting in their account. This finding is supported by the minimal accountings actually delivered.  For example, in 2006, the Artists were still handling their own tour expenses and collecting performance fees on the road. Based on their records, a profit of $54,457.00 had been earned,  which they split evenly.[216]  However, because they lacked an accounting of revenues and expenses for 2006 incurred or collected by HSP, they were unaware that HSP's books reflected losses in excess of $26,000.00 a difference of $75,000.00.[217]  As late as October of 2008, HSP delivered a 2007 P/L for PBS showing a $62,000 loss.  In fact, the loss was $227,000.[218]

After receiving this information, Porter responded with an email to Dyer, Chabaud, Stepanian and Stoltz that owing money to HSP was "NOT THE DEAL."[219]  Porter's reaction was vehement. He testified that he believed HSP was spending HSP's money to build HSP's professional brand as a personal management group.  It is clear to the Court that the amounts claimed by HSP were both a surprise and did not comport with Porter's understanding of the PMA or the current state of affairs.

Following the revelations made in October 2008, HSP began its own period of reflection.  On November 14, 2008, Stepanian sent an email to the Artists indicating that he needed to "make some very hard decisions in order to stay in the game."[220]  He stated that "*over the past few years I have made enormous investment in everything that is Highsteppin' Productions*....my current financial

---

[216]  Exh. 12.

[217]  Exh. 151(D) (2006 PBS Tax Return); Exh. 8 (2006 P/L prepared May 2011).

[218]  Exh. 13 (2007 P/L); Exh. 17 (2007 PBS Tax Return).

[219]  Exh. 18 at 183.

[220]  Exh. 132.

41

situation requires that I make some immediate changes."  Most damning for Stepanian's position is his recognition that "[*i*]*t has been quite awhile (if ever) since we have sat down and discussed all of the band's financial details*, but it is clearly time that we do so.  We have compiled many detailed reports that will provide a complete insight into where we have been and where we need to go."  In closing, Stepanian stated that "going forward, we will need to take each gig and tour based on a realistic budget.  While I will continue to 'financially help' the situation where necessary, we will need to decide the travel arrangements, hotel stays and crew based on our guaranteed income."[221]

As a result of Stepanian's email and the huge amounts claimed by HSP, PBS reasserted control over revenues and expenses.  Beginning in November 2008 and continuing through 2009, PBS did not take an engagement without a budget reflecting anticipated tour revenue and expenses.[222]

The PMA contained very specific limitations on HSP's ability to incur debt on PBS' behalf.  In part this was because the Artists feared exactly the situation HSP created, runaway costs, failure to disclose expenses and lack of accountability for revenues.[223]

The Artists' expert, Capshaw, testified that many expenses incurred by HSP on behalf of PBS were inappropriate for this particular group.  For instance, Capshaw stated that incurring approximately $40,000 on photographs was a mistake based on the bands' baseline income.  Spending on Madison House Publicity ("Madison House") for publicity also was out of line with the

---

[221]  *Id.*; T.T.Stepanian.

[222]  T.T. Malangone; E.g.. Exh. 35 at 773.

[223]  T.T. Porter, Stoltz.

band's income.  Finally, he believed that an intern could have handled the band's internet presence. In Capshaw's opinion, the nontour expenses were unreasonable and imprudent given the level of the Artists' careers.  Jacodine, HSP's expert, testified that while HSP's performance as a personal manager was consistent with custom, practice and the standard of care, a reasonable business manager should provide a plan tailored to an Artists' individual needs.  He also opined that no expense should ever be incurred by a manager without it first being discussed in detail with the artist, including details as to the amount of the expenditure and the benefit it might provide.  Further, once a charge was incurred, the artist should receive, at least monthly, a detailed and itemized listing of each expense along with the individual revenue deposits.  HSP did none of these things.

### (a)    Individual Expenses

### (i)    Danny Clinch Photography

Stepanian began the process of promoting PBS with the retention of a professional photographer, Danny Clinch, in February 2007.[224]  Clinch is a photographer of some renown. Evidently, the mere mention of his name signals a level of seriousness for his subject.  Stepanian determined that  Danny Clinch was just what PBS needed to establish itself on a national level.[225]

Although Stepanian explained to the Artists who Danny Clinch was and why he thought photographs by him could help their careers, he neglected to mention what a photography session with Clinch would cost.  The record reflects that an estimate of Clinch's fees ($41,700.00) was sent

---

[224] T.T. Stepanian.

[225] *Id.*

to HSP on February 2, 2007.[226]  HSP booked flights on February 3, 2007.[227]  HSP was billed for a

deposit on February 21, 2007.[228]  The photography session occurred on February 26, 2007.  The final

bill of $37,673.02 was delivered on March 3, 2007.[229]  HSP produced no evidence of PBS' approval

to incur almost $40,000.00 in fees.  In fact, HSP lacked proof that it even discussed the fee with the

Artists.[230]  In contrast, Stoltz testified that upon arriving at the session he became concerned over its

costs.   He asked Stepanian what the photography session was costing and who was paying for it.

Stepanian reassured Stoltz that he (HSP) had this one.[231]  Following the photography session, Porter

also sent an email to Stoltz and Stepanian asking about the costs associated with the photography

session and who was paying for it and other expenses.[232]  Stoltz replied that it was his understanding

that HSP was covering the costs as an investment in HSP.[233]  Stepanian was copied on Stotlz's

response but made no effort to correct or respond to the email chain between Stoltz and Porter.[234]

Further, the Clinch expense was never presented to PBS.  It was booked as an expense of HSP, and

it was not included in the 2007 P/L produced to PBS in 2008.  Based on these facts, the Court

concludes that HSP failed to obtain consent to incur the expense associated with the Clinch

---

[226]  Exh. 96 at 1670.

[227]  Exh. 47.

[228]  Exh 159(G).

[229]  Exh 159(G).

[230]  T.T. Porter, Stoltz.

[231]  T.T. Stepanian, Stoltz.

[232]  Exh. 60.

[233]  T.T. Stepanian, Stoltz.

[234]  T.T. Stepanian, Porter, Stoltz. Exh. 60.  HSP offered no credible proof that it provided any other
explanation to Stoltz or responded to Porter's inquiry.

photographs and instead assumed responsibility for this expenditure as a cost of promoting itself.

### (ii)   Madison House

Stepanian also introduced the Artists to Madison House, a public relations firm located in Colorado. Porter, Stoltz and Stepanian met with Madison House representatives for about two (2) hours in July 2006 and went over promotional ideas. The Madison House representatives were enthusiastic about working with the Artists[235] but did not discuss the cost of their services or even their scope.[236] Madison House worked for the Artists on a month-to-month basis for a flat fee.[237] Stepanian did not forward the Artists the monthly invoices HSP received and paid.[238]

Porter and Stoltz acknowledged talking to Madison House employees and participating in interviews set up by Madison House. They denied knowing how much the services cost, however. At trial, Stoltz testified that in his experience, a personal manager handled publicity in house. Although he was at the meeting with Madison House, Stoltz believed that HSP was looking for a publicist for itself or for Madison House to handle this function as part of HSP's overhead. Because PBS never received a statement for Madison House's services, nor were the costs of Madison House discussed, Porter and Stoltz were not aware that Madison House was charging them for its services.[239] Madison House billed $1,800.00 per month from June 2007 to February 2009. Additional charges were added each month for clipping services, graphic design, postage, web design, fan mail, press

---

[235]  T.T. Stepanian.

[236]  *Id.*

[237]  *Id.*

[238]  *Id.*

[239]  T.T. Porter and Stoltz.

45

releases, etc.  The total charges paid to Madison House were $53,910.10, averaging $2,343.92 a month.[240]

While Madison House's services in 2007 were included in the P/L for that year, they were lumped in with other charges.[241]  In addition, since the 2007 P/L was not delivered to PBS until October of 2008, charges for Madison House for 2007 and 2008 had been incurred before PBS realized the enormity of the losses HSP was mounting.  Madison House's services terminated in February 2009 some four (4) months after Porter made it clear that losses were not acceptable.

Based on the facts of this case, HSP has failed to provide proof that it obtained the consent of PBS to incur expenses of $53,910.10 with Madison House.

### (iii)    Freidman Kannenberg

The professional fees of Freidman Kannenberg are not disputed by PBS and are allowed in the amounts of $1,000.00 for services performed in 2008 and $800.00 for services performed in 2009.[242]

### (iv)    Nimbit, Inc., David Stocker, Domenick Tucci, Richard Quindry, JamBands, and Fan Marketing

Stepanian advised the Artists on multiple occasions that he intended to increase profits through internet sales, website access and email contact with their fans.  To accomplish this result, HSP hired Nimbit, Inc. ("Nimbit") and David Stocker ("Stocker") to assist with website design and

---

[240]  Exh. 159.  Madison House fees were included in publicity, promotion and advertising.

[241]  T.T. Dyer.

[242]  Exh. 159(L).

maintenance at a cost in excess of $5,000.00.[243]   In addition, Domenick Tucci ("Tucci") was paid $500 per month from February 2007 through November 2008 to maintain the Artists' Myspace pages.  None of the invoices for these services were forwarded to the Artists nor were any bills, statements or detailed accountings reflecting  charges given to it.  As a result, the Artists had no idea these individuals or companies were working on their internet presence as outside consultants.  The testimony of Stoltz was to the effect that Tucci worked in HSP's offices and he believed he was an employee of HSP rather than an independent contractor billing the Artists for his services.[244]  The Artists had no contact with Nimbit and had no idea it was charging them for web maintenance until discovery revealed Nimbit charges included in HSP's claim.[245]   PBS was aware that Stocker was working for HSP but thought his services were limited to album design, not their website.[246]  Richard Quindry, JamBands and Fan Marketing were also complete unknowns.  Based on these facts, HSP failed to establish that it obtained approval to incur these charges from the Artists and they are disallowed.

### (v)      Powderfinger Promotion

Powderfinger Promotions ("Powderfinger") was retained by Stepanian to track and promote play of PBS' *MooDoo* release.  It charged  $5,625.00 for its services.[247]  The Artists had no idea who Powderfinger was or what it did, and HSP failed to provide bills, statements or a detailed accounting

---

[243]   From 2006 through 2009 HSP utilized Fort Point, David Stocker, Nimbit, Richard Quindry, Domenick Tucci, JamBase and Fan Marketing to promote PBS through its website.

[244]   T.T. Stoltz.

[245]   T.T. Porter, Stoltz, Batiste.

[246]   T.T. Stoltz.

[247]   Exh. 159(U).

of Powderfinger's costs to the Artists after the fact.[248]  Under these facts, the Court finds that HSP

failed to obtain the consent of the Artists to incur expenses related to Powderfinger and they are

disallowed.

### (vi)    Advertising

Ads for PBS, their upcoming performance dates and new releases also began appearing in

publications with and without the Artists' advance knowledge.  However, the cost of the ads was not

discussed with the Artists.  Exhibit D-159 includes advertising costs:

|   |   |   |
|---|---|---|
| a. | Graphic Therapy | $    940.00 |
| b. | Off Beat | $  1,600.00 |
| c. | Relix Magazine | $20,500.00 |
| d. | Zenbu Magazine | $  1,850.00[249] |

Stoltz admitted to seeing a 2007 ad placed in OffBeat promoting PBS' upcoming performance at Jazz

Fest and Porter also saw an ad promoting him individually.[250]  However, the cost of either ad was not

discussed prior to its placement.[251]  None of the Artists saw any of the other ads or discussed them

with HSP.    Stoltz and Porter testified that they often suggested advertising or promotional

opportunities for PBS but expected HSP to discuss with them the costs in advance.[252]  For example,

Stoltz did request that an ad be considered for Leeway's Home Grown Music Network ("LHGMN"),

---

[248] T.T. Porter.

[249] Exh. 159(M), (T), (X), (AA).  The Court notes that HSP actually spent $31,172 in advertising costs none of which were approved by the Artists.  Only these invoices were produced.

[250]  T.T. Stoltz; Exh. 55.

[251]  T.T. Stoltz.  *See also* Exh. 128 at 3796 (email from Porter regarding an inquiry from Zumbu Media regarding Relix).  Again, the email is a general solicitation without specific pricing.  It is also worth noting that the email dated October 1, 2007 cannot support ads placed previously in Relix on February 2007 and April/May 2007.

[252] T.T. Porter and Stoltz.

which HSP immediately placed without talking to the Artists about its cost.[253]   The Court finds the

testimony of Stoltz and Porter credible.  The mere suggestion of an opportunity for PBS promotion

is not a blank check authorizing HSP to proceed regardless of cost.  Under these facts, the Court finds

that HSP failed to carry its burden of proof regarding the Artists' consent.  Therefore, the costs are

disallowed.

### (vii)    Merchandising and Music Production

According to the invoices HSP produced at trial, HSP incurred various expenses associated

with the purchase of merchandise and music production.  The costs were incurred from differing

vendors and at various dates.  Some of the charges were only attributable to an individual artist rather

than the group.

In 2005, Stepanian acquired $10,363.78 in merchandise to promote Porter.[254]  Stepanian also

claims $18,404.87 in travel expenses associated with selling this merchandise.  The acquisitions were

prior to the execution of the PMA and done at a time when Stepanian had no formal permission to

either produce or sell anything associated with Porter or PBS.  Nevertheless, Porter knew Stepanian

had purchased the items because Stepanian was following Porter along his tour and selling them *ad

hoc* at concerts.  Stepanian pocketed all proceeds and never discussed the costs, revenues or any

reimbursement with Porter.

In May of 2006, Stepanian inserted a clause in the PMA to capture the costs or expenses of

this merchandise as an expense of PBS.  The clause was never discussed with the Artists nor did

---

[253]  Exh. 50 at 1565.  The Leeway's ad cost $1,520.00.

[254]  T.T. Stepanian.

Stepanian disclose the expenses or revenues he had incurred prior to the PMA's execution.[255]

Nothing in the relationship between Porter and Stepanian supports Stepanian's demand for reimbursement of these costs.  In 2005 and early 2006, Porter knew that Stepanian was selling merchandise at his concerts.  It is clear that Porter did not object to Stepanian's activities.  However, it is equally clear that Porter never expected to be responsible for Stepanian's costs nor did he ever make a claim for the sales revenue Stepanian was receiving.[256]  At best Porter allowed Stepanian to use his image and reputation to sell items, presumably to make a profit.  This was an arrangement similar to one Porter had with Tripp Billings.[257]  There is no evidence to support an agreement between Porter and Stepanian or HSP[258] regarding the reimbursement of merchandise costs or travel expenses.  There is no evidence to support any allegation that Stepanian requested or received permission to obligate Porter for these costs.

Prior to the PMA, the Court finds that there was no agreement between the Artists and HSP granting Stepanian "[T]he exclusive right to develop, produce, manufacture, package, ship, distribute, market, promote and sell merchandise embodying the name and likeness of each member of Artist and the professional names, group names, logos, trademarks and servicemarks of the Artist."[259]  Because no agreement existed, the sums cannot be absorbed into the  PMA.

In 2006, 2007, 2008 and 2009 HSP ordered various small items to promote PBS or Porter

---

[255] T.T. Stepanian, Porter, Stoltz.

[256] T.T. Porter.

[257] T.T. Porter, Stepanian.

[258]  T.T. Stepanian, Porter.

[259] Exh. 1 ¶ 6(c).

along with t-shirts, hoodies and other items of apparel.[260]   Although the Artists were aware of HSP's

activities and were consulted on some of the items to purchase, they were never advised as to the cost

or quantities ordered.[261]  The only testimony adduced was that Stepanian told Porter that merchandise

would cost $1.00 to $1.50 to produce.[262]   HSP kept all costs and revenues for these items off PBS'

books, posting expenses and receipts to its own account.[263]  It was not until trial that HSP attempted

to account for the amounts it spent and also the amounts it received.  HSP's failure to properly

account or submit purchase orders for merchandise to PBS establishes that it never received approval

to expend more than the contract limitations for merchandise.  However, because the revenues HSP

derived from these items exceed their cost, HSP may claim reimbursement under a theory of quantum

meriut.   The total cost of merchandise purchased from May 2006 through November 2009 is

$28,354.74.  Of this amount, $1,519.00 is an expense of Porter alone because it represents t-shirts

produced for his 60th birthday.

### (viii)    Costs of CD Production

Stepanian also funded the production of several albums or CDs, both for the Artists

individually and as a group.  HSP's claim includes $14,161.24 for production costs associated with

*MooDoo*, a joint PBS work.[264]  HSP claims expenditures of $8,309.20 for the production of *Up All*

---

[260]  Exh. 159 (B, C, D, I, J, K, R, S, V) summarized at 23-24, *supra*.

[261]  *E.g..,* Exh. 87.  (Stoltz email suggesting HSP inquire as to PBS hooded sweatshirts dated March 2006).
The Court notes that while sweatshirts were ordered, HSP did not do so until October of 2007 or nineteen (19)
months later.

[262]  T.T. Stepanian.

[263]  T.T. Dyer, Malangone, Stepanian.

[264]  Exh. 36 at 132.  Costs incurred in connection with the production of PBS *Universe*, *Live from
Providence, RI, Live from Burlington, VT, CD and MP3 for Burlington, VT, Live from Troy, N.Y., Live from New
York, N.Y., Live from Savannah, GA, Live Boulder, Co., Live Charlotte, N.C.* are included in merchandise costs.  As

*Night* for Stoltz, individually,[265] and $18,871.26 for the production of *It's Life*, an individual work of Porter.[266]

Each of the Artists participated in the production of the joint work, and they are responsible for its costs.[267]  Stoltz and Porter are individually liable for the costs associated with the production of their albums as well.[268]   For the reasons specifically detailed below, none of the Artists are responsible for the costs associated with another artist's individual recording because none were consulted regarding the solo expenditures.[269]

### (4)   Payments to the Artists

Another sizeable portion of HSP's claim seeks reimbursement for amounts it paid directly to the Artists.  HSP claims $309,470.31, but the evidence admitted at trial established that $204,000.00 was advanced to the Artists individually rather than as a share of PBS profits.[270]   The Artists assert

---

previously indicated, costs for performance fees paid to Page McConnell have also been added.  *Infra* at fn 147.

[265] Stoltz's *Up All Night* recording cost $8,309.20 to duplicate, produce, mix and master.  Exh. 36 at 155.

[266]  Production costs for the *It's Life* recording by Porter individually are $18,871.26  Exh. 36 at 144, 147.

[267] Exh. 94 (*MooDoo* invoices for mixing, studio, editing, cover charges).

[268] Exh. 40, 88, 94, 117 at 3746.  (Porter advising of musician, studio, mastering, cover expenses.)  Exh. 85 at 2949, 2951, 2952, 2962, 2972, 2978 (Stoltz reporting musician, mixing, studio charges).

[269]  Opinion at 68-75.

[270]  HSP seeks reimbursement of the $323,719.97 it "advanced " to the band members between November 2007 and November 2008.  The actual amounts distributed to the Artists are reconciled after the calculation of revenue and expenses.  However, a portion of the amounts delivered to the Artists, collectively $204,000.00 received between November 2007 and November 2008 are separately discussed because the Court finds they were delivered under distinguishing circumstances.

that these sums were never intended to be a loan from HSP and that they were unaware that HSP was funding these payments through loans. They also aver that they did not authorize HSP to advance sums to them over and above what they were earning and certainly did not expect to pay living expenses through HSP loans.

HSP first delivered a money stipend to each Artist in November 2007. As previously explained, HSP believed that the Artists needed to play more venues in order to be profitable. HSP was convinced that the Artists' other business endeavors conflicted with this goal by reducing their availability to HSP. In addition, since HSP had taken over collecting performance revenue, the Artists were complaining that HSP was not sending them PBS' profits timely and they were having trouble paying living expenses.

In order to secure more of the Artists' time and provide a steady predictable income stream, HSP proposed to send regular bi-weekly amounts to the Artists. HSP separately negotiated the amount it would sent to each Artist based on their living expenses rather than the anticipated profits of PBS. Specifically, Porter was paid $10,000 per month, Stoltz $4,000 per month and Batiste $3,000 per month. At trial, HSP argued that the payments were always intended to be advances on future PBS income.

In 2008, HSP provided 1099s to the Artists for payments received in 2007.[271] A 1099 is used to account for independent contract employment by the issuer to the recipient. An employer does not pay payroll tax or withhold income taxes on 1099 employees. Instead, the employee pays all associated taxes on his individual return. Generally, a limited liability company's profits are taxed

---

[271] Exh. 17, 19 at 230, 234, 236, 238; HSP POC No. 11

to its members as reflected on K-1s.[272]  Porter, Stoltz and Batiste are equal members of PBS and are entitled to an equal share of PBS profits.

The separate payments to each of the PBS members were based on their living expenses rather than PBS' anticipated profits.[273] Porter and Stoltz testified it was based on what they needed to live or "get by."  The payments not only deviated from equal distribution to Porter, Batiste and Stoltz, they were made from HSP's payroll account and deducted on its books as a HSP expense.

The issuance of 1099s is consistent with the intention to treat the payments as an HSP expense.  However, in October of 2008 when the tax returns were being prepared, PBS' own accountant, Friedman, noticed the 1099s for each of the musicians reflecting the amounts paid in 2007.  Without consulting his clients, Friedman assumed this was a mistake and directed HSP to void the 1099s and issue K-1s from PBS to the Artists in the same amounts.  The amounts were classified as "guaranteed payments" to each Artist.  Unfortunately, Freidman failed to note that the limited liability company's operating agreement treated each member equally and did not authorize unequal distributions.  Nevertheless, at Freidman's suggestion,  Dyer voided the 1099s and issued K-1s.[274] These accounting adjustments support the intention to treat the payments as distributions from PBS and not expenditures of HSP.  Further, since PBS was not profitable, they increased its losses and by correlation, increased the amounts HSP had to advance to cover the losses.

In 2009, HSP again provided 1099s to the Artists reflecting  the amounts paid in 2008.  Consistent with this accounting method, the PBS P/L for 2008 did not include the amounts as

---

[272]  The Court acknowledges that some exceptions to this rule exist, but are inapplicable to the facts of this case.

[273]  T.T. Stepanian, Stoltz, Porter and Batiste.

[274]  Exh. 17, 19 at 230, 234, 236, 238; HSP POC No. 11.

advances to PBS or distributions to its members, nor did the B/S include these amounts as debt to HSP.[275]   HSP also paid the advances from its account and deducted the payments on its tax return. This conduct is consistent with the Artists' position that HSP was responsible for the payments.

Then in May 2011, after the 2008 returns were filed and this lawsuit was instituted by HSP, HSP reversed course, "correcting" the 1099s.[276]  The new amended 1099s cancelled any income to the Artists allowing HSP to claim the advances as loans. It also booked adjusting entries to both its books and those of PBS increasing the due to affiliate account for the amounts previously paid as 1099 income.

For the following reasons, the Court finds that the amounts paid to the Artists by HSP from November 2007 to November 2008 are not properly loans to PBS or its members.  The disbursement of funds to the Artists was an effort to provide a steady stream of income to each artist. However, HSP ignored the fact that each Artist was an equal member of PBS and entitled to an equal share of its profits. Instead, HSP paid a different amount to Porter, Stoltz and Batiste without informing the others of this arrangement.  The payments varied widely, particularly between Porter and the others.[277]  Stepanian not only failed to get the approval to vary the payments to the members, he instructed Porter not to discuss what he was being paid out of fear that the others would become dissatisfied.[278]

Under these facts, it is clear that HSP was not making the distributions to the Artists based

---

[275]  Exh. 20 at  342, 347.

[276]  Exh. 163.

[277]  Exh. 25 at 388.

[278]  T.T. Porter.

on the PBS Operating Agreement. Instead, HSP was making individual payments to each Artist directly. While the PMA contemplates advancing funds on behalf of an individual artist to further that artist's career, it also requires the approval of the artists for any expenditure over $750.00. Given the inherent conflict of interest between the PBS members in this situation, the Court does not read the agreement to allow one (1) member to self deal at the expense of another. Further, since HSP admitted that it was a fiduciary of the Artists, it cannot rely on the singular approval of one (1) member to bind the others when the approving member was the only beneficiary of the transaction.

Because the Court finds that the Artists would not have accepted funds in excess of their profits and particularly, if from loans, HSP's claim for these advances will be limited up to the level of PBS' profits. Thus, to the extent each artist received a benefit, HSP may offset the amounts it may owe to that Artist against the stipends advanced to that Artist.

### b.    No Waiver

HSP alternatively asks this Court to find that the Artists' waived the PMA's prior consent provision. A waiver excuses a party from fully performing some term of a contract.[279] Whether a defendant has waived performance of a contractual obligation is a question of fact. "Waiver may be manifested by words...It would be unconscionable to permit the defendants, in view of their conduct, without notice or warning to insist upon strict performance of the contract and to forfeit all rights of the plaintiff."[280]

HSP alleges that the "Artists' knowledge of HSP's spending coupled with their silence" constitutes a waiver of HSP's contractual obligations. The trial testimony is replete with questions

---

[279]  *Porter v. Harrington*, 159 N.E. 530 (Mass. 1928).

[280]  *Porter v. Harrington,* 159 N.E. 530 (Mass. 1928).

from the Artists' regarding spending[281] and HSP's failure to comply.  The testimony also includes

attestations by Stepanian that HSP would pay for expenses because doing so would establish HSP.

The Court has found the Artists' recollection of Stepanian's "I got this" responses to their questions

regarding expenses to be credible.  The record also supports a pattern of expenditure beyond the

Artists' awareness.   This Court finds no waiver on the part of the Artists.

### c.    Additional Claims by The Artists for Breach Of The PMA

### (1)    Breach of Paragraph 2

The Artists assert that HSP breached the contract by failing to "adequately and effectively

'advise, counsel and assist'" Artists.   The Artists claim that HSP's breach of the contract lies in its

> 1) wanton deficit spending; 2) without prior approval or disclosure; 3) that outstripped
> revenues on a 2-to-1 basis; 3) overstaffing tour support to create the illusion of a "big-time"
> act; 4) the lack of income/expense projections; 5) the lack of tour budgets until 2009 (the first
> year the band turned a profit under Stepanian's 'tutelage'); 6) the abject failure of HSP as a
> business manager; 7) the lack of non-tour budgets; 8) the failure of disclosure on just about
> every front; 9) the failure to increase the number of PBS' gigs or gross revenue to any
> appreciable degree; 10) the failure to protect and/or advise Defendants to protect, their
> intellectual properties; 11) the failure to disclose 3rd-party distribution and vendor
> agreements and the revenues derived from those deals; 12) the failure to advise Defendants
> of actual and/or potential conflicts of interest; 13) the failure to instruct Defendants to get
> independent legal advice; and 14) the breaches of fiduciary duty, good faith and fair
> dealing.[282]

The Court has already found that HSP breached the contract as to the expenditures and will

not allow reimbursement except for the amounts listed above.   The Court has also found that HSP

breached its duties of loyalty and the standard of care owed the Artists.   Damages for these

---

[281]  *E.g..,* Exh. 41 at 1418 (February 2008 email from Stoltz regarding accounting); Exh. 109 (September 2008 email from Porter requesting accounting); Exh. 116 at 3706 (March 2008 Porter complaining that HSP must be spending more than PBS is earning and demanding to know details.)

[282]  AP Defendants' Post-Trial Memorandum. P-259 at 3, 4.

infractions will be discussed in connection with the Artists' claim for unfair trade practice.[283]

### (2)  Breach of Paragraph 3

Artists argue that HSP breached Paragraph 3 of the PMA in because HSP did not properly

engage and direct a business manager.

### (a)  Paragraph 3(a)(iv)

Paragraph 3(a)(iv) required that HSP:

[E]ngage, discharge and/or direct for Artist and in Artist's name, accountants, business managers, auditors, talent agents, attorneys, publicists and others ("Artist's Agents") in connection with Artist's career; provided, however, that Artist and Highsteppin shall mutually agree upon the selection of a business manager ("Business Manager"), which Business Manager shall be engaged at Artist's sole expense, and provided further that Highsteppin may not discharge the Business Manager or Artist's attorney without Artist's approval...[284]

The Court finds that HSP did not breach its obligation to secure a business manager for the

Artists.  The record reflects that Stepanian suggested managers to Porter and Stoltz, but they were

uninterested or opposed retaining a business manager due to the additional cost.[285] The employment

of a business manager was at the Artists' discretion.  Therefore, HSP did not breach any obligation

on this point.

### (b)  Paragraph 3(c)

Paragraph 3(c) provides:

Artist and Highsteppin hereby acknowledge and agree that before the effective date of this Agreement, Artist had granted Highsteppin and Highsteppin had accepted from Artist, the sole and exclusive right and license... to supervise, manage, develop and maintain all of Artist's fan email addresses and fan data ... ("Email List")... provided,

---

[283]  Opinion at 62.

[284]  Exh. 1 ¶ 3(a)(iv).

[285]  T.T. Stepanian, Porter and Stoltz.

however, *that Highsteppin will not use the Email List in connection with Artist after the expiration or termination of the Term of this Agreement without Artist's consent.* Upon the expiration or termination of this Agreement, Highsteppin shall provide Artist with a true and complete electronic copy of the then-current Email List for Artist's use, at no cost to Artist....[286]

The Artists allege that HSP breached Paragraph 3(c) by the unauthorized and undisclosed use of the Artists' Email List after termination of the PMA and the admitted failure to deliver a copy of the Email List to Artists at the conclusion of the PMA.

The Court finds that HSP breached the PMA by utilizing the Email List after the termination of the PMA without authorization.[287]  HSP also failed to deliver a copy of the Email List to the Artists.  The damages recoverable for breach of Paragraph 3(c) will be discussed in connection with the Artists' unfair practices claim.[288]

### (3)    Breach of Paragraph 8

Paragraph 8 of the PMA pertains to the requisite accounting. It provides:

Artist shall cause Business Manager to prepare and maintain books and records relating to monies received by Business Manager on Artist's behalf, to *remit on a monthly basis to Artist or Artist's designee any sums due Artist hereunder, and to remit on a monthly basis to Highsteppin any sums due to Highsteppin hereunder.* Artist and Highsteppin shall each have the right hereunder to inspect Business Manager's books and records with regards to monies received on Artist's behalf upon thirty (30) days notice during reasonable business hours, twice per calendar year.  If Artist receives monies commissionable hereunder directly, Artist shall remit such monies to Business Manager within five (5) days of receipt.  During and after the Term hereof, Highsteppin shall have the right to inspect Artist's books and records with respect to Artist's Gross Earnings.  *Notwithstanding the foregoing, if and during such times as no Business Manager is engaged on Artist's behalf, then Highsteppin*

---

[286]  (Emphasis added).  Exh. 1.

[287]  *E.g..*, Exh. 208.

[288]  Opinion at 62.

*shall hereby be authorized to assume the rights of Business Manager hereunder.* [289]

Although the PMA specifically provides that HSP is not the Artists' business manager, HSP voluntarily assumed the role.  The Artists assert that HSP breached paragraph 8 of the PMA because it failed to 1) set up bank accounts for HSP, Stepanian, PBS, the Artists and Bonerama upon commencement of the PMA;  2) set up separate QuickBooks files for HSP, Stepanian, PBS, the Artists and Bonerama upon commencement of the PMA; 3) avoid commingling the funds of HSP, Stepanian, PBS, the Artists and Bonerama; 4) avoid conversion of the funds of HSP, Stepanian, PBS, the Artists  and Bonerama; and 5) provide monthly and/or quarterly accountings.

While every accounting witness opined at trial that the complained of deficiencies were a material deviation from good accounting practices and/or Generally Accepted Accounting Principles.[290] The PMA does not require a business manager to deliver records except on reasonable demand.  Additionally, the PMA does not require a business managers to follow Generally Accepted Accounting Principles or a proscribed accounting method.  Therefore, this Court cannot find that HSP breached the PMA in either of these regards.

Instead, HSP's assumption of the role of business manager is outside the terms of the PMA and its duties are determined by the standard of care required by its fiduciary position.  For the reasons set forth below, the Court does find that HSP's conduct fell so far below the standard of care required by a business manager that its conduct is actionable.  The damages associated with this claim

---

[289] (Emphasis added)  Exh.1.

[290] *E.g..,* T.T. Schimmel at 255-294; Debiasi at 600-640.  *See also* generally T.T. Dyer, Friedman and Weinstein.

will be discussed in connection with the Artists unfair trade practices action. [291]

### (4)      Breach of Paragraph 16(b)

The Artists assert that HSP breached Paragraph 16(b) by failing to make any effort to comply

with the Leaving Member/Key Person clause.  Paragraph 16(b) provides:

> (b) In the event any one or more of the individuals who comprise Artist intend to depart from Artist, such individual or individuals shall notify Highsteppin of such a departure; Highsteppin shall then make an election within thirty (30) days of notification as to whether Highsteppin shall continue to act hereunder for the Term as Highsteppin for (i) Artist (without the departing individual or individuals), (ii) the departing individual or individuals (but not the Artist); or (iii) both Artist and the departing individual or individuals.  If Highsteppin chooses to act as personal manager for Artist (without the departing individual or individuals), or for the departing individual or individuals (but not Artist), the term "Artist", as used in this Agreement, shall be deemed to refer to the persons as to whom Highsteppin chooses to act as personal manager.  In the event that Highsteppin chooses to act hereunder for both Artist and the departing individual or individuals, this Agreement shall apply separately to the Artist and the departing individual or individuals.

The Artists complain that failed to replace Porter once his termination notice was delivered.

HSP admittedly made no effort to replace Porter but the PMA does not require that it do so.  Further,

Batiste acquiesced in the termination of the PMA and offered nothing at trial to this claim.  Without

evidence of a desire to continue the relationship, Batiste waived any demand under this provision of

the PMA.   As for Stoltz, while he continued to work individually with HSP and its employees, he

made no demand to continue the PMA and terminated further business dealings on or about

December 29, 2009 when he was sued by HSP.   Thus, he too waived any claim based on HSP's

failure to substitute another musician for Porter.

### C.      Violation of Massachusetts Unfair Trade Practices Act

---

[291]  Opinion at 62.

Both HSP and the Artists brought actions against each other under the Massachusetts Unfair Trade Practices Act ("MUPTA"), specifically M.G.L. c. 93A, §§ 2 and 11.  The parties agree that they are "engaged in trade and commerce in Massachusetts" pursuant to the PMA.  Therefore, the Court will not discuss eligibility under the statute.

MUTPA creates a private cause of action to remedy damages sustained as a result of unfair or deceptive acts or practices.  The law originally was enacted to improve the commercial relationship between consumers and businessmen.  "By requiring proper disclosure of relevant information and proscribing unfair and deceptive acts or practices, the Legislature strove to encourage more equitable behavior in the marketplace."[292]  Section 11 of MUTPA extended the statute's coverage to individuals engaged in trade or commerce in business transactions with others engaged in trade or commerce.[293]

---

[292]  *Planned Parenthood Federation of America, Inc. v . Problem Pregnancy of Worcester, Inc.*, 498 N.E.2d 1044, 1051 (Mass. 1986) (quoting *Manning v. Zuckerman*, 444 N.E.2d 1262 (1983)).

[293]  *Id.* at 1051. Section 11 of MUTPA provides:

Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an *unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two may*, as hereinafter provided, bring an action ....for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper.

If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a *willful or knowing* violation of said section two. For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence regardless of the existence or nonexistence of insurance coverage available in payment of the claim. In addition, the court shall award such other equitable relief, including an injunction, as it deems to be necessary and proper. The respondent may tender with his answer in any such action a written offer of settlement for single damages. If such tender or settlement is rejected by the petitioner, and if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner, then the court shall not award more than single damages.

If the court finds in any action commenced hereunder, that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in

Section 2 of MUTPA prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.  The statute does not define "unfair" or "deceptive acts or practices."   The existence of an unfair practice is determined on a case-by-case basis depending on the circumstances.[294]  "The circumstances of each case must be analyzed, and unfairness is to be measured not simply by determining whether particular conduct is lawful apart from c. 93A but also by analyzing the effect of the conduct on the public."[295]

### 1.    Unfairness

Whether a practice is permitted by law may be considered when determining unfairness, but the legality of the act is not determinative.  Likewise, the fact that an act is authorized by contract does not exempt it from scrutiny.[296]  "Just as every lawful act is not thereby automatically free from scrutiny as to its unfairness under c. 93A, so not every unlawful act is automatically an unfair (or deceptive) one under G.L. c. 93A."[297] A court may, however, look at both statutory and common law for established notions of fairness.

An action is "unfair" if it is "(1) within the penumbra of a common law, statutory or other

---

controversy, be awarded reasonable attorneys' fees and costs incurred in said action.

In any action brought under this section, in addition  to the provisions of paragraph (b) of section two, the court shall also be guided in its interpretation of unfair methods of competition by those provisions of chapter ninety-three known as the Massachusetts Antitrust Act. ...

(Emphasis added)

[294]  Peter J. Wied, *Patently Unfair: State Unfair Competition Laws and Patent Enforcement*, 12 Harv. J.L. & Tech. 469, 1999), (citing *Fraser Eng'g Co. v. Desmond*, 524 N.E. 2d 110, 112 (Mass.App.Ct. 1988)).

[295]  *Mechanics Nat'l Bank of Worcester v. Killeen*, 384 N.E.2d 1231, 1237 (Mass. 1979).

[296]  Peter J. Wied, *Patently Unfair: State Unfair Competition Laws and Patent Enforcement*, 12 Harv. J.L. & Tech. 469, 1999) (citing *Penney v. First Nat'l Bank*, 433 N.E.2d 901, 905 (Mass. 1982).

[297]  *Mechanics Nat'l, supra,* at 1237.

established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes

substantial injury to competitors or other business people."[298]  Massachusetts courts have looked at

MUTPA as an expression of public notions of fairness.

In determining whether a practice is unfair, one must evaluate the equities between the parties

and their relative position and sophistication.  What a defendant knew or should have known may be

relevant in determining unfairness.  Similarly, a plaintiff's conduct, his knowledge and what he

reasonably should have known may be factors in determining whether an act or practice is unfair.[299]

In an arms-length transaction between two (2) business entities, the plaintiff must show a

greater degree of "rascality" to establish an act is unfair within the meaning of G.L. c. 93A.[300]  The

fairness of an act in a commercial transaction is judged by the standards of a businessman rather than

those of an average individual.[301]  The heightened standard remains fairly liberal:

> [P]ractices involving even worldly-wise business people do not have to attain the
> antiherioc proportions of immoral, unethical, oppressive, or unscrupulous conduct,
> but need only be within any recognized or established proportions of immoral,
> unethical, oppressive or unscrupulous conduct, but need only be within any
> recognized or established common law or statutory concept of unfairness." [302]

An unfair commercial practice must also result in "substantial injury ... to competitors or other

---

[298]  *Heller Fin. v. Ins. Co. of North Am.*, 573 N.E.2d 8, 12 (Mass. 1991).  See also  *Milliken & Co. v. Duro Textiles, LLC*, 887 N.E. 2d 244 (2008), (quoting *Morrison v. Toys "R" Us, Inc.*, 806 N.E.2d 832 (1993)).

[299]  *Swanson v. Bankers Life Co.*, 450 N.E. 2d 577, 580 (Mass. 1983).

[300]  *Anthony's Pier Four, Inc. v. HBS Assoc.*, 583 N.E.2d 806, 822 (Mas. 1991).

[301]  *Den Norsky Bank AS v. First Nat'l Bank of Boston*, N.A., 838 F.Supp. 19, 28 (D. Mass 1993) ("[A] section 11 claimant must show that the objectionable conduct attained 'a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce'").

[302]  *Vmark Software, Inc. v. EMC Corp.*, 642 N.E.2d 587, 595 (Mass.App.Ct. 1994).

businessmen."[303]

## 2. Deception

The question of whether a practice is deceptive is separate from that of fairness.[304] Deceptive

acts are defined as those which "could reasonably be found to have caused a person to act differently

from the way he otherwise would have acted." [305]  The standard is an objective test of whether the

general public would be deceived.[306]  But the plaintiff must allege that he would have behaved

differently but for the deceptive act.[307]  It should be noted that reliance is not a prerequisite for

recovery under the statute,[308]  but may be necessary to prove the required causal link between the

deception and the injury.[309]  To prevail, there is no need to prove intention to deceive or that the

unfair or deceptive act is intentional or wilful.[310]

Even if a plaintiff has not suffered an injury, it may bring a suit to obtain an injunction upon

showing that the unfair business practice may cause a loss.  In addition to equitable relief, an injured

plaintiff may seek actual damages and is entitled to attorneys fees and costs if a violation is found,

whether or not other relief is awarded.[311]  Damages must be casually linked to and a foreseeable result

---

[303]   *Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc.*, 884 F.2d 1510, 1513 (1st Cir. 1989).

[304]   *Massachusetts Farm Bureau Fed'n, Inc. v. Blue Cross of Mass., Inc.*, 532 N.E.2d 660, 664 (Mass. 1989).

[305]   *Tagliente v. Himmer*, 949 F.2d 1, 7 (1st Cir. 1991).

[306]   *Aspinall v. Philip Morris Co.*, 813 N.E.2d 476 (2004).

[307]   *Herring v. Vadala*, 670 F.Supp. 1082, 1087 (D.Mass. 1987).

[308]   *Zayre Corp. v. Computer Sys. Of Am., Inc.*, 511 N.E.2d 23, 30 (Mass.Ct.App. 1987).

[309]   *Trifiro v. New York Life Ins. Co.*, 845 F.2d 30, 33 n. 1 (1st Cir. 1988).

[310]   *Giannasca v. Everett Aluminum, Inc.*, 431 N.E. 2d 596, 599 (Mass. App. Ct. 1982).

[311]   *Canal Elec. Co. v. Westinghouse Elec. Corp.*, 756 F. Supp. 620 (D. Mass. 1990).

of the unlawful practice.[312]   The court may award up to treble damages, but no less than double

damages, if it finds the violation was "knowing and wilful."

A mere breach of contract without more, is not a violation of Chapter 93A.[313]   A party that

has not breached a contract, may nevertheless be held liable under MUTPA.[314]   To rise to the level

of a MUTPA violation, a breach must be both knowing and intended to secure "unbargained-for

benefits" to the detriment of the other party.[315]

### 3.      No Violation by Artists

In addition to a claim in contract and fraud, HSP asserts the Artists violated MUTPA.   The

facts upon which HSP relies are the same ones as those giving rise to HSP's claims for breach of

contract and fraud.  The Court incorporates those facts as set forth above.  Generally, HSP argues that

the Artists never intended to repay the expenses incurred and induced HSP to incur losses through

this deception.  It also argues that the Artists' refusal to pay outstanding loans constitutes a MUTPA

violation.

A party's breach of contract violates MUTPA when the party withholds payment without a

good faith basis in an attempt to gain an unfair advantage.[316]   Conversely, a refusal to pay for goods

or services because of a dispute over the amount of the bill does not give rise to a MUTPA action.[317]

---

[312]   *Rhodes v. AIG Domestic Claims, Inc.*, 961 N.E.2d 1067 (2012).

[313]   *Madan v. Royal Indemnity Co.*, 532 N.E.2d 1214 (Mass.App.Ct. (1989).

[314]   *NASCO, Inc. v. Pub. Storage, Inc.*, 29 F.3d 28, 34 (1st Cir. 1994).

[315]   *Id.* at 34.

[316]   *Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc.*, 754 F.2d 10 (1st Cir. 1985) (a debtor who willfully withholds payments on a properly owed debt to attempt to obtain an advantage in negotiations regarding future sales commits an unfair practice violative of chapter 93A).

[317]   *Levings v. Forces & Wallace, Inc.*, 396 N.E.2d 149 (Mass.App. 1979).

HSP argues that Artists deceived HSP into believing they would repay the mounting debts.  Under the PMA, the Artists promised to pay HSP commissions and reimburse HSP for loans to the Artists and for expenditures made on the Artists' behalf.  HSP argues that the Artists knew of their obligation to reimburse HSP.  For purposes of its MUTPA claim, HSP asserts that despite this knowledge, the Artists continued to incur debt that they had no intention to repay.  In support of its claims, HSP cites the acceptance of various sums paid by HSP directly to the Artists whether as stipends for living expenses or personal bills.  For the reasons set forth below, this Court finds the Artists did not engage in unfair or deceptive trade practices.  Furthermore, the Court finds no merit in HSP's assertion that receipt of a stipend or cash to pay small personal expenses evidences a pattern of deceit.

The record is absolutely devoid of "numerous ongoing representations that [the Artists] would repay HSP."[318]  Although HSP claims that by accepting direct payments the Artists committed to repay the amounts, this is not the case.  While HSP attempts to equate the receipt of funds with a promise of repayment, it omits any proof that the recipient knew the funds were a loan rather than a distribution of profits.  In order for the Artists to have deceived HSP, HSP must prove that they knew that PBS was unprofitable and the payments were loans.  The record is totally lacking on this point.  Given HSP's 1) failure to account or provide status reports on profitability; 2) assurances that expenses were "investments in HSP;" 3) characterization of direct payments as "salaries;" 4) failure to include significant costs on PBS' books; and 5) failure to obtain consent from the Artists prior to incurring an expense, the evidence is sufficient to establish that the Artists had insufficient facts to understand that HSP was lending them funds or that it would  demand repayment for the amounts it now claims.

---

[318]  HSP's Post-Trial Brief, P-262 at 16.

HSP's claims against Artists are, at their core, a simple contract dispute. The Artists' refusal to repay the debt claimed by HSP is not a violation of MUPTA because they possess legitimate defenses to payment.

### 4.    Violations by HSP

The Artists also seek damages against HSP for violations of MUTPA and request a finding of wilfulness. The Artists argue that HSP and Stepanian committed multiple breaches of fiduciary duty during the term of the PMA, and those breaches were sufficiently severe and pervasive enough to constitute MUTPA violations as a matter of law.

### (a)    Breach of Fiduciary Duty

A fiduciary relationship is established whether the relationship is one of pure agency, attorney in fact, trustee, escrow agent, partner, attorney at law or corporate director of a closely held corporation. A fiduciary holds a time-honored, selfless and hallowed position of trust. According to the Supreme Judicial Court of Massachusetts:

> A fiduciary duty exists "when one reposes faith, confidence, and trust in another's judgment and advice." *Van Brode Group, Inc. v. Bowditch & Dewey*, 36 Mass. App. Ct. 509, 516 (1994); quoting *Fassihi v. Sommers, Schwartz, Silver & Tyler, P.C.*, 107 Mich. App. 509, 515 (1981). Its central tenet is the "duty on the party of the fiduciary to act for the benefit of the other party to the relation as to matters within the scope of the relation." 1 A.W. Scott & W.F. Fratcher, Trusts Sect. 2.4 (4th ed. 19871). *See* Restatement (Second of Trusts Sect. 2 comment b (1959). Although some fiduciary relationships, such as that between guardian and ward, are created by law, others arise from the nature of the parties' interactions. The "circumstances which may create a fiduciary relationship are so varied that it would be unwise to attempt the formulation of any comprehensive definition that could be uniformly applied in every case." *Warsofskyv. Sherman*, 326 Mass. 290, 292 (1950) (and listing examples of fiduciary relationships). *See Patsos v. First Albany Corp.*, 433 Mass. 323, 335-336 (2001). [319]

---

[319]    *Doe v. Harbor Schools, Inc.*, 843 N.E.2d 1058, 1064 (Mass. 2006).

A fiduciary duty may arise when one party reposes trust and confidence in the integrity of another and the other party knows of this reliance and voluntarily assumes and accepts the confidence.[320]  Whether there is a relation of trust and confidence under particular circumstances is a question of fact.[321]  A fiduciary is a person to whom property or power is entrusted for the benefit of another.[322]  When HSP undertook the collection and disbursement of all revenues obtained by PBS, it became a fiduciary of those funds.  At trial, Stepanian , HSP's experts and those offered by PBS all agreed that HSP held a fiduciary position with the Artists.[323]  The actions of the parties and the testimony of the witnesses leads to the inescapable conclusion that the Artists put their complete "faith, confidence and trust" in HSP's judgment, advice, counsel and guidance with regard to the collection and expenditure of funds.  This Court finds a fiduciary relationship existed between HSP and the Artists.

HSP argues that the provision allowing HSP to advance money on the Artists' behalf modifies any fiduciary duty to the Artists.  It argues that HSP's failure to acquire the Artists' approval constitutes a breach of contract, not fiduciary duty.[324]  The two (2) claims presented by the Artists are not mutually exclusive.  A breach of duty may or may not be a breach of contract.  Similarly, a breach

---

[320]  *Karal v. Marken*, 133 N.E.2d 476 (Mass. 1956); *Rood  v. Newberg*, 718 N.E.2d 886 (Mass.App.Ct. 1999), rev. denied, 133 N.E.2d 126 (Mass. 2000).

[321]  *Collins v. Hulculak*, 783 N.E.2d 834 (Mass.App.Ct. 2003).

[322]  *Peerless Ins. v. Swanson (In re Swanson)*, 231 B.R. 145, 149 (Bankr.D.N.H. 1999); *S.E.C. v. Sargent*, 229 F.3d 68 (1st Cir. 2000) (citing *U.S. v. Chestman*, 947 F.2d 551, 569 (2d Cir. 1991) (en banc) ("in relying on a fiduciary to act for his benefit, the beneficiary of the relation may entrust the fiduciary with ... property ... Because the fiduciary obtains access to this property to serve the ends of the fiduciary relationship, he becomes duty-bound not to appropriate the property for his own use"); *Baker v. Friedman (In re Friedman)*, 298 B.R. 487 (Bkrtcy.D.Mass 2003).

[323]  T.T. Stepanian, Porter, Stoltz, experts.

[324]  HSP's post-trial brief (P-262) at 6.

69

of contract may or may not be a breach of duty.  In this case, HSP breached the terms of its personal

management contract by incurring charges without their approval and by failing to exercise proper

judgment as to the expenses it incurred.  It also breached an independent fiduciary duty to the Artists

as their *business manager* by failing to account for revenues it collected and expenditures it paid on

their behalf.

HSP had two basic fiduciary duties as business manager, honesty and loyalty.  Those duties

have been judicially construed to include the expansive duty of full disclosure, including full

disclosure of all facts related to the subject-matter of the fiduciary relationship, full accountings,

disclosure of conflicts of interest, disclosure of opportunities available to the principal, disclosure of

the fiduciary's desire to take advantage of such opportunities, mistakes and errors in performance by

the fiduciary and the avoidance of self-dealing, commingling and conversion.[325]

---

[325] Restatement (Third) of Agency Sect. 8.11 (2006) ("an agent has a duty to use reasonable effort to provide the principal with facts that the agent knows, has reason to know, or should know when (1) subject to any manifestation by the principal, the agent knows or has reason to know that the principal would wish to have the facts or the facts are material to the agent's duties to the principal; and (2) the facts can be provided to the principal without violating a superior duty owed by the agent to another person."); *Restatement (Third) of Agency Sect. 8.01* (an agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship); 3 Am.Jr. 2d Agency Sect. 205 (An agent is a fiduciary with respect to the matters within the scope of the agency.  The agent or employee is bound to exercise the utmost good faith, loyalty, and honesty toward the principal or employer, regardless of whether the agency is one coupled with an interest, or the compensation given the agent is small or nominal, or that it is a gratuitous agency.  An agent is not in a fiduciary relationship to the principal in matters in which the agent is not employed unless the nature of the agency is such as to create a confidential relationship in all matters."; *Ball v. Hopkins*, 268 Mass. 260 (1929) (duty of utmost good faith)*; Jerlyn Yacht Sales, Inc. v. Wayne R. Roman Yacht Brokerage*, 950 F.2d 60 (1ˢᵗ Cir. 1991) ("As for even more basic affirmative duty of a fiduciary to disclose to his principal all material facts concerning the transaction with which he is entrusted...  Absent an agreement to the contrary, a broker must put his principal's interest first and refrain from competing with the principal as to the subject matter of the agency.  Restatement (Second) of Agency, Sect. 393.  He must be 'up front' with his principal at all times."); *Neuro -Rehab Associates, Inc. v. Amresco Commercial Finance, LLC*, 2009 WL 649584 (D. Mass) ("A duty to disclose may arise when (a) a party to a business transaction in a fiduciary relationship [or other similar relationship of trust and confidence] with the other party; or (b) disclosure would be necessary to prevent a partial or ambiguous statement of act from becoming misleading; or (c) subsequent information has been acquired which a party knows will make a previously representation untrue or misleading; or (d) a party knows a false representation is about to be relied upon; or (e) a party knows the opposing party is about to enter into the transaction under a mistake of fact and because of the relationship between them or the customs of trade or other objective circumstances would reasonably expect a disclosure of the facts."  (citing *Watts v. Krebs*, 131 Idaho 616, 962 P.2d 387 (Idaho 1998); and  *Ho Myung Moolsan Co., Ltd v. Manitou Mineral Water, Inc*., 665

By not keeping the Artists apprised of their financial situation including the receipt of income from merchandise and digital sales, HSP breached a fiduciary duty to the Artists. HSP's failure to properly segregate the Artists' funds was a breach of duty. Commingling the Artists' funds with its own and that of other HSP clients is also a classic breach of duty. HSP's failure to account in a timely and accurate manner for all revenues and expenditures constitutes another breach of duty. Its abject failure to provide detailed accountings of revenues and expenses has led to this very suit. Even as the trial progressed, this Court was shocked and dismayed by HSP's lack of transparency and the inaccuracy in its accounting. Its experts were poorly prepared and unable to address basic questions regarding expenses or revenues. Its principal and employees were wholly deficient in their understanding of proper bookkeeping methods or the legal relationship between the parties under the PMA. Its records were inconsistent, inaccurate and ever shifting. In short, HSP failed to address the core issue of this dispute: what was earned and what was spent.

It is beyond explanation why this was necessary. Stepanian admitted his own problems to the Artists in his email of November 2008.[326] The Complaint and Counterclaims clearly required HSP to prove its claims and to do so, an accounting of the revenues and expenses during the PMA's term was required. For reasons unknown, HSP failed to provide that accounting. As a result, the Court was required to reconstitute from source documents, where available, the revenues earned and

---

F.Supp.2d 239 (S.D. N.Y. 2009) ("it is settled law that an agent owes his principal a duty of loyalty, and must account for any profits realized in connection with his representation of the principal" (citing *United States v. Miller*, 997 F.3d 1010, 1018 (2d Cir. 1993).

[326] Exh. 132 at 3907. Stepanian wrote, ".. "It's been quite awhile (if ever) since we have sat down and discussed all of the band's financial details, but it is clearly time that we do so. We have complied many detailed reports that will provide a complete insight into where we have been and where we need to go."

expenses incurred during the PMA.  Ultimately, HSP is responsible to the Artists because a client should not have to sue his fiduciary in order to obtain a full and complete accounting.

In addition, the Court finds that HSP's performance as the Artists' personal manager falls so far below the standard of care required as to be actionable under the MUTPA.  Stepanian was an ardent fan, particularly of Porter, and idolized PBS' talents.  Stepanian possessed infinite enthusiasm for PBS' potential but sorely lacked experience and training.  Stepanian took on a task well above his abilities at a severe cost to himself and the Artists.  HSP argues that all of its expenditures were for the Artists' benefit, but neglects to acknowledge that its actions also bankrupted PBS' principals. It fails to accept responsibility for its lack of transparency or reporting to the Artists either during the relationship or after suit was filed.  HSP may not hide behind the best of intentions when its conduct falls so far below the standard of care as to be  actionable.   HSP fails to concede that its advice and counsel were so poor as to be grossly negligent.

HSP's conduct also breached its duty to the Artists individually.  According to the PMA, the Artists are liable *in solido* for the aggregate amount of salaries and solo-project related expenses paid regardless of the specific amount received by each individual.  *In solido* liability for the Artists may be sanctioned by the PMA, but HSP's practice of advancing funds for the benefit of a single artist without the consent of the others, crosses a fiduciary line.   For example, HSP is claiming reimbursement from all three (3) Artists for Porter related merchandise and travel expenses incurred by Stepanian prior to the execution of the PMA.  Those costs were incurred by Stepanian without any agreement for reimbursement by either Porter or the Artists.

The testimony reflects that Stepanian incurred the costs while he followed Porter throughout his tours.  While Porter did not object to Stepanian's presence or sale of merchandise, there was

72

absolutely no evidence to support a finding that he agreed to be responsible for Stepanian's costs. It is also critical that Stepanian never mentioned the existence or amount of this "debt" before, during or after the execution of the PMA.  To obligate Porter, much less Stoltz and Batiste, to undisclosed pre-PMA expenditures that none were obligated to pay before the PMA is a breach of loyalty to all concerned.

HSP also claims reimbursement from all three (3) Artists for expenses related to solo projects incurred by Stoltz and Porter.  HSP failed to disclose any of the costs incurred with the other Artists, a clear breach of loyalty to those who did not benefit.  But these charges pale in comparison to HSP's actions in connection with its "salary" program.

From late 2007 to late 2008, HSP advanced $204,000.00 to the Artists through stipends. Significantly, Stepanian separately negotiated with each Artist and agreed to pay each substantially differing amounts.  HSP also instructed Porter not to discuss the amount he was being paid with the others.

HSP deliberately did not inform the Artists of its inequitable distributions because doing so would have caused a rift between the Artists.[327]  As a fiduciary of each artist, HSP owed Porter, Stoltz and Batiste an independent duty of loyalty.  As such, to obligate each artist for differing amounts without disclosure and their express consent constituted a breach of loyalty.  Causation is established if the deception could reasonably be found to have caused a person to act differently.[328]  The causal connection between HSP's actions and the Artists' loss is glaring.  Without HSP's nondisclosure, the

---

[327]  T.T. Porter.

[328]  *Bellerman v. Fitchburg Gas and Elec. Light Co.,* 31 Mass.L.Rptr. 123 (Mass.Super.2013) (citing *Rhodes v. AIG Domestic Claims, Inc.*, 961 N.E.2d 1067 (Mass. 2012).

court finds that the Artists would have reasserted control over their finances and limited the damage much sooner.

While success can never be guaranteed, HSP created a financial disaster for these Artists without their knowledge or consent. The losses sustained were a result of HSP's folly. The magnitude of HSP's incompetence and its failure to supplement its critical weakness with competent help constitutes a breach of duty for which it must answer. Regardless of good intentions, as a fiduciary, HSP cannot expect its mistakes to be covered by its clients. As such, this Court will enjoin HSP from claiming joint and several or *in solido* liability for any amounts paid that only benefitted a single artist.

Because HSP's discharge of its duties was substantially below the standard of care owed and it failed to disclose conflicts of interest between itself or the Artists in the management of their affairs, the Court finds that its conduct constitutes a wilful violation of MUTPA and awards the injunctive relief set froth below; and attorney's fees and costs associated with the litigation over the relative claims between the parties.

In addition and for the reasons set forth above, the Court awards the following relief:

1. HSP must account for any and all proceeds received from the sale, license, or use of merchandise or music of the Artists after June 2012 and remit the gross proceeds to the Artists' Trustee within fourteen (14) days.

2. HSP must immediately notify all parties with whom it contracted or authorized any distribution, sale, license or use of the Artists' works of the termination of its nonexclusive license in same and the corresponding termination of the third party's rights. It must also instruct the

addressees to contact Trustee should they possess any property or revenue belonging to Porter, Batiste Stoltz, or PBS. Copies of confirming correspondence should be provided to the Artists within fourteen (14) days of this ruling.

3. HSP must deliver all merchandise, CDs or other product purchased or produced during the term of the PMA to the Trustee. To the extent a the merchandise or music is in the hands of a third party, HSP must recover said property and deliver it to the Trustee.

4. This ruling may require the amendment of the Artists' tax returns for tax years 2006, 2007, 2008 or 2009. To the extent amendments are possible, the Artists will be reimbursed for all fees and costs associated with the preparation of amended tax returns, as well as any penalties or interest payable on any taxes owed due to late filing or change in the amounts originally due. To the extent an amendment generates a refund, HSP is responsible for the payment of interest on the refund generated by the amended return at the federal rate from the date of the original tax return's filing through the date of receipt of the refund. To the extent an amendment cannot be filed due to the intervention of time, HSP will be responsible for the additional refund amount which might otherwise be claimed with interest at the federal rate until paid.

### D.    HSP's Commission Claim

#### 1.    Performance Fees

In its post-trial brief, HSP alleges commissions of $70,640.40 based on a rate of twenty- three percent (23%). The Artists assert that HSP breached Paragraph 4 of the PMA by improperly calculating its commissions. The Artists also request a forfeiture of commissions as damages for HSP's breach of fiduciary duties. The Court has already denied reimbursement of substantial costs

incurred as a result of HSP's failure to obtain consent and properly discharge its responsibilities as

a personal manager.  Compensatory damages, attorneys fees and costs, as well as injunctive relief

have been separately awarded for violations of MUTPA and HSP's breach of fiduciary duty.  In light

of these substantial awards and because HSP did not self deal or personally profit from its

transgressions, forfeiture of its commissions is not warranted.

### 2.    Definition of Gross Earnings and Calculation of Commissions

Paragraph 4 defines "Gross Earnings" and sets forth how commissions are to be calculated.

It provides:

(a)    Except as otherwise provided herein, as compensation for Highsteppin's covenants
and services, Highsteppin is and shall be entitled to receive from Artist or directly
from third parties pursuant to paragraph 3 hereof, throughout the Term and thereafter
as set forth in this Agreement, fifteen (15 %) percent (hereinafter "Commission") of
Artists's Gross Earnings (as hereinafter defined).   Notwithstanding the immediately
preceding sentence, in the event Artist's Gross Earnings during any consecutive
twelve (12) month period during the Term increase by at least fifty percent (50%)
above the Gross Earnings Baseline (i.e., increasing to a total amount of money equal
to $108,000.00 (one hundred eight thousand dollars) during such twelve month
period), the Commission shall increase to seventeen and one half percent (17.5%) of
Artist's Gross Earnings on a prospective basis.  Notwithstanding the first sentence of
this paragraph 3(a), in the event Artist's Gross Earnings during any consecutive
twelve (12) month period during the Term increase by at least sixty five percent
(65%) above the Gross Earnings Baseline (i.e., increasing to a total amount of money
equal to $118,800.00 (one hundred eighteen thousand eight hundred dollars) during
such twelve month period), the Commission shall increase to twenty percent (20%)
of Artist's Gross Earnings on a prospective basis.

(d)    Notwithstanding anything to the contrary contained herein, Artist and Highsteppin
hereby agree that *Gross Earnings shall specifically exclude* monies advanced by third
parties and actually expended on audio and video recordings (except to the extent that
Artist receives such monies in the form of a personal advance pursuant to any
recording agreement and such personal advance is not paid to third parties),
*reasonable "tour expenses" actually paid to third parties in connection with Artist's
concerts and other live engagements, namely booking agency fees, the costs of self-
produced merchandise, reasonable so-called "sounds and lights" reimbursement
and/or the costs of opening acts.* (Emphasis added.)

76

### 3.     Deduction of Reasonable Tour Expenses

The Artists' allege that HSP failed to back out "reasonable tour expenses" when calculating its commission.  HSP maintains that the "reasonable tour expenses" definition is limited to the laundry list of examples.  The Artists assert that the laundry list is not exclusive.  The Court finds that a plain reading of the contract results in the deduction of normal and reasonable costs of touring from the gross revenues before calculating the commission.[329]

### 4.     Commission Schedule

Artists also argue that paragraph 4(a) requires PBS' revenues to reach base levels each calendar year before the commission rate is increased.  HSP argues that a plain reading of paragraph 4(a) provides that once the historical aggregate earnings reach a higher commission level, that level is charged on all future earnings until earnings increase to the next plateau. The Court disagrees with both interpretations.

Under Paragraph 4(a), commissions are owed monthly in arrears and the commission rate is based on the aggregate earnings for the preceding twelve (12) month period.  Thus, the commission rate rolls up or down each month based on the total earnings of the preceding twelve (12) month period.  For example, if from May 2006 to April 2007 PBS' Gross Earnings were $108,000, HSP's commission rate for May 2007 would be seventeen point five percent (17.5%).  In June 2007, the calculation would be based on Gross Earnings from June 2006 to May 2007.  If that calculation produced Gross Earnings equal to $118,800, the commission rate on June 2007's earnings would be twenty percent (20%).  If instead the earnings dropped to $100,000, the commission rate for June

---

[329] Opinion at 27-36.

2007 would drop to fifteen percent (15%).  Based on the evidence presented at trial, the Court has

calculated Gross Earnings for each month by averaging revenues and expenses incurred for each year

over the twelve (12) months.    Exhibits A and B to this Opinion reflect the revenue and expense

calculations, commission rate and commission earned by month.[330]  The total commissions due to

HSP are $54,496.[331]

## F.    Discharageability of Debts Owed by Debtors to HSP

HSP argues that all debts owed to it by PBS and its members are nondischargeable under

section 523(a)(2)(A) of the Bankruptcy Code.  The facts of this case do not support

nondischargeability.

### 1.    Elements of Nondischargeability Finding

Section 523 of the United States Bankruptcy Code provides:

---

[330]  The PMA provides for commission to continue after expiration or termination under certain circumstances.  Exh. 1, ¶ 17 provides that (a) Subject to the provisions of section 17(b) hereof, upon the expiration or other termination of the Term of this Agreement for any reason, Artist shall continue to be responsible for obligations under Paragraph 6 above and Highsteppin shall continue to receive its full Commission hereunder in perpetuity with respect to gross monies and other considerations earned or received by Artist after the Term hereof pursuant to or in connection with any and all engagements, agreements, and contracts which Artist enters into during the Term, or substantially negotiates during the Term and enters into within six (6) months after the Term, and including any renewals, substitutions, extensions and any resumptions of such engagements, agreements, or contracts and any repeat of engagements that occurred during the Term, which occur within six (6) months after the Term hereof."  Paragraph (b) provides that "[w]ith respect to all musical and/or lyrical compositions written, published and/or exploited during the Term, for a period of five years after the expiration or other termination of the Term of this Agreement for any reason ("Post Termination Period"), Artist shall pay in cash to Manager the Commission hereunder from Gross Earnings generated in such reduced amount as equals the applicable percentage of all monies paid, earned, accrued, received or applied for Artist's benefit during such yearly period, as follows: For the fist full year of the Post Termination Period, One Hundred Percent (100%) of the Commission rate in effect at the end of the Term...").   HSP failed to prove or provide this Court with any information relative to commissions due for the period between termination of the PMA and trial or of revenues received.  The Court denies any claim for post-termination commissions.

[331]  Commissions on merchandise an music sales have been awarded based on stipulated revenues through June 2012.  However, the Court declines to award commissions on any other revenues earned beyond those stipulated because they were not proven at trial.  The Court also notes that commissions are only due, post-termination, on sales of musical compositions authored and produced during the PMA.  This would only include revenues generated by *MooDoo*, *Up All Night*, and *It's Life*.  Exh. 1, ¶ 17(b).

(a) A discharge...does not discharge an individual debtor from any debt –

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition...

A creditor must prove nondischargeability by a preponderance of the evidence.[332] All exceptions to discharge under Section 523 "must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." [333] As set forth in *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005):

> Debts that satisfy the third element, the scienter requirement, are debts obtained by frauds involving "moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made." *In re Martin*, 963 F.2d 809, 813 (5th Cir. 1992). An intent to deceive may be inferred from "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation." *In re Norris*, 70 F.3d 27, 30 n. 12 (5th Cir. 1995), citing *In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994).

Courts may not render debts nondischargeable unless they are presented with proof that the debtor had an "intent" to deceive when the actual fraud, fraudulent representations or false pretenses occurred.[334]   However, "an honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive."[335]

### a.       False Pretenses, False Representations and Actual Fraud

---

[332]  *In re Mercer*, 246 F.3d 391, 403 (5th Cir.2001).

[333] *In re Hudson*, 107 F.3d 355, 356 (5th Cir. 1997).

[334] Sect. 523(a)(2)(A).  *Turbo Aleae Investments, Inc v. Borschow (In re Borshow)*, 454 B.R. 374 (W.D. Tex. Bankr. 2011).

[335] *Acosta*, 406 F.3d at 273.

The Fifth Circuit has distinguished the elements of false pretenses, false representations and actual fraud.[336] The distinction hinges on whether a debtor's representation is made with reference to a future event, a past or existing fact.[337]

In order for a debtor's representation to constitute a false pretense or a false representation, it "must have been: (1)[a] knowing and fraudulent falsehood, (2) describing past or current facts, (3) that [was] relied upon by the other party."[338] While "false pretenses" and "false representations" both involve intentional conduct intended to create and foster a false impression, a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement.[339]

To have a debt excepted from discharge based on actual fraud, an objecting creditor must prove that the debtor (1) made representations; (2) which he knew at the time were false; (3) with the intent and purpose to deceive the creditor; (4) who actually and justifiably relied on the representation; and (5) sustained losses as a proximate result.[340] Actual fraud also focuses on future

---

[336] *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir.1995).

[337] *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir.1991) (A debtor's promise ... related to a future action which does not purport to depict current or past facts ... cannot be defined as a false representation or a false pretense).

[338] Emphasis added. *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir. 1992); *see also In re Bercier*, 934 F.2d at 692 ("to be a false representation or false pretense under §523(a)(2), the false representations and false pretenses must encompass statements that falsely purport to depict current or past facts").

[339] *See Wallace v. Davis (In re Davis)*; 377 B.R. 827, 834 (Bankr. E.D. Tex. 2007); and *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003).

[340] See, *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir.1995) (citing *Keeling v. Roeder (In re Roeder)*, 61 B.R. 179, 181 (Bankr.W.D.Ky. 1986), quoted in *In re Bercier*, 934 F.2d at 692). *See also In re Acosta*, 406 F.3d 367, 372 (5th Cir.2005); *In re Mercer*, 246 F.3d 391, 403 (5th Cir. 2001); *Pentecost*, 44 F.3d at 1293, as modified by the United States Supreme Court decision of *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) [regarding the proper standard of reliance]; *Gateway One Lending and Finance v. Fuller (In re Fuller)*, 2012 WL5989241 (Bankr.E.D.La. 2012).

events, thus it is designed to entice or commit another to an act based on false representations of future events.

Fraud under Section 523(a)(2)(A) is the "positive" type of fraud as opposed to constructive fraud.[341] The Fifth Circuit in *Mercer* reasoned that "[t]he appropriate focus with respect to a debtor's intent is whether she acted in bad faith by knowingly making a false representation."[342] Actual fraud by definition consists of "any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another, something said, done or omitted with the design of perpetrating what is known to be a cheat or deception."[343]

HSP alleges that the debts owed by Porter, Stoltz, Batiste and PBS are nondischargeable under 11 U.S.C. § 523(a)(2)(A). Specifically, HSP avers that the Artists never intended to repay HSP for the advances it incurred under the PMA even though they were contractually required to do so. Based on the Artists' allegedly false promise to repay, HSP argues that it advanced funds and incurred substantial losses.

The Artists' initial promise to repay HSP for its advances is contained in the PMA. Thus, in order for this to constitute a fraud, HSP must show that at the time the PMA was executed, the Artists had no intention of ever repaying any amount owed to HSP regardless of the circumstance. In support of its position, HSP argues that in October of 2008, after first learning of the debt to HSP, the Artists, specifically Porter, evidenced their intention not to repay. HSP points to the October

---

[341] *See In re Mercer,* 246 F.3d 391, 407 (5th Cir.2001) (citing *Ames v. Moir,* 138 U.S. 306, 311, 11 S.Ct. 311, 34 L.Ed. 951 (1891)).

[342] *Id.*

[343] 3 *Collier on Bankruptcy* ¶523.08[1][e] at 52345 (15th Ed.).

2008 email exchange between Porter, Dyer and Friedman during which Porter screams in text that the amounts advanced to the Artists for the year were not supposed to be loans. HSP alleges this supports nondischargeability.

HSP also argues that the Artists were aware of the mounting debts and made no effort to stop expenditures or repay HSP. HSP relies heavily on *In re Melancon*[344] to support its claim. The *Melancon* Court held that a misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be; (b) does not have the confidence in the accuracy of his representation; or (c) knows that he does not have a basis for the representation.[345] More particularly HSP relies on the following:

> It is insufficient for a debtor to simply state that he always planned to pay the money back 'somehow' (we have a mental image of cash suddenly falling from the skies, like manna from heaven.) If the debtor has no idea how the money will get paid back, or if it will get paid back, then he may hope to repay – he may even want to repay – but he certainly does not intend to repay. *Melancon* at 320.

The *Melancon* case is wholly distinguishable from the case at hand for many reasons. In *Melancon*, the debtor, who was a loan officer for a bank, took cash advances from her credit card to support her gambling habit. The *Melancon* Court denied discharge of the cash advances after finding that Mrs. Melancon had an accurate understanding of her financial position, was fully capable of properly analyzing her circumstances to determine whether she could pay additional debts, and presented no evidence concerning any prospect of repayment. As a result, when Mrs. Melancon requested cash advances, she knew she would not be able to repay them and made no attempt to cut

---

[344] *In re Melancon*, 223 B.R. 300 (M.D. La. 1998).

[345] *Id.* at 319.

her losses.

HSP alleges the Artists both anticipated and actually expected  HSP to advance large sums of HSP's money to satisfy expenses incurred on behalf of the Artists.  The Artists' state of mind is crucial to HSP's case.  Due to the incredible lack of information and dearth of disclosure by HPS regarding PBS' financial status, the Court concludes that the Artists were unable to form an intent to deceive.  The Artists were unaware that HSP was advancing monies to pay for the Artists' tour and professional expenditures.  Based on what they knew and when they knew it,  they simply did not have enough information to form an accurate understanding of their financial position or to properly analyze their ability to repay HSP's alleged claims.

For example, Porter's March 3, 2007, email to his fellow Artists and Stepanian posed several questions regarding responsibility for certain expenses.[346]  Specifically, Porter questioned whether PBS and the Artists would be financially responsible for a van Stepanian had recently purchased and whether the Artists would be paying for the recent photography session.  Stepanian responded that the van was owned by HSP and the Artists would not be responsible for its purchase or modifications. Stepanian did not address the photography session and let Stoltz's explanation that it was an investment in HSP go uncorrected.

In July 2008 the first P/L, as well as a B/S was provided to PBS by HSP.  Although the documents reflected 2007 transactions, they also reflected a loss for 2006 of $26,698.78 through a negative equity entry.[347]  Because PBS had handled and paid most tour expenses during 2006, the

---

[346] Exh. 60.

[347] Exh. 9.  The loss was reflected in retained earnings on the 2007 B/S rather than through a separate 2006 P/L.

losses were principally due to nontour promotional costs incurred by HSP.   These statements also
reflected substantial losses incurred in 2007 ( $62,747.57[348]) and a loan outstanding of 227,660.75.[349]
The outstanding loan did not balance to the P/L because HSP had booked entries directly to retained
earnings rather than through expense accounts for 2006 or 2007.  It is doubtful the Artists understood
the significance of these documents.  In any event, they were quickly withdrawn by Stepanian due
to "inaccuracies" without detailed explanation.

It was not until October 2008 that the full extent of HSP's deficient spending became apparent
to PBS.  In October 2008, the Artists received their draft 2007 tax return, which showed a loss of
$225,655 and a loan payable of $227,661.[350]  Prior to October 2008, PBS could not have known that
HSP was spending them into bankruptcy.  Further, because they did not know, they could not have
made any representations to the contrary to HSP.  Following October 2008, PBS reasserted control
over its finances and losses incurred by HSP stopped.

This Court concludes that prior to October 2008, the Artists clearly believed, albeit
erroneously, that certain nontour promotional expenses (e.g.. Danny Clinch) were being subsidized
by HSP as an investment in HSP's future.  This assumption was not created out of thin air.
Stepanian's own vague assurances and failure to account  allowed this impression to take hold.  His
emails of July 2007 and November 2008 also provide support for the Artists' position.[351]  Finally,
HSP's own bookkeeping indicates that it accepted revenues and took certain expenses on its own

---

[348]  Exh. 13.

[349]  Exh. 19 at 208.

[350]  *Id.* at 210.

[351]  Exh. 132, 184.

books rather than charge PBS, even after PBS' separate checking account had been established. Only after suit was filed did HSP "correct" its accounting. The Court finds that the facts lead to the inescapable conclusion that Stepanian was acting in great hope that the expenses incurred would propel the Artists into superstardom, thus benefitting both PBS and HSP.

While the PMA clearly contemplates that the Artists will be personally responsible for reimbursement of losses incurred by HSP, it also places significant restraints on HSP's ability to incur losses. As explained earlier, under the PMA, HSP was prohibited from incurring a single expense in excess of $750.00 or aggregate monthly expenses of over $2,000.00 without the express consent of the Artists. The limitations on spending in the PMA were designed to protect the Artists from runaway costs incurred by HSP without their knowledge and consent. The PMA also contemplated that all expenses incurred would be submitted monthly for payment to the Artists' business manager. Again, this provision was designed to protect the Artists against unknown and unaccounted for bills incurred by HSP on their behalf. Timely accountings were designed to avoid exactly what HSP did, incur substantial costs which it presented for payment years later.

Jacodine confirmed that industry practice required personal managers to submit invoices for services rendered and costs incurred on a monthly basis. He also confirmed that monthly accountings for all revenues received by date, amount and source were also standard practice.[352] None of this was done by HSP.

HSP was unable to provide evidence that a single expenditure was presented to the Artists either before it was incurred or when it was paid. Instead, it argued the Artists' general knowledge

---

[352] T.T. Jacodine. Jacodine testified that he informs his clients whenever a check is received on the artist's behalf and reports monthly for all expenditures.

85

that the service providers *existed* constituted both knowledge of the charge and consent to incur expenses on their behalf.  HSP's position fails because most of the nontour expenditures and services were performed by companies or individuals that the Artists had never heard of or did not know had been retained (*e.g.,* Nimbit, Inc.; *Leeway's HGMN*,[353] Stocker, Powderfinger).  Finally, Stepanian's constant assurances that he was investing in HSP through promotion of PBS supports the Artists' belief that the services of which they were aware were being subsidized by HSP.

HSP's proof of claim also itemizes payments to the Artists from November 2007 to November 2008.  Referred to as "salaries" or "draws," Stepanian admitted proposing to pay the Artists bi-weekly, instead of after each performance.  HSP claims these advances are nondischargeable because, like its other claims, PBS lured HSP into advancing funds with no intention of repayment.

HSP alleges that after learning about the deficit spending in October 2008, Porter claimed in an email that repayment to HSP was "NOT THE DEAL."[354]  HSP alleges that this is evidence of the Atists' bad faith.  The Court finds that Porter's obvious disagreement with HSP's demands does not rise to the level of deceit nor does it indicate a pattern of luring HSP into deficit spending.  PBS did not know that any deficits existed prior to October of 2008.  HSP had failed to deliver an accounting for 2006, and the tax return prepared by the Artists showed a profit for that year.  The results of 2007 were not delivered until October 2008, and there is no proof that HSP warned the Artists that deficits were mounting.  It is exactly at this time that the bi-weekly payments ceased.  Thus, HSP could not have been lured into making the bi-weekly payments on a false promise of repayment because the

---

[353] *See* Exh. 50 at 1565 in 8/28/06, (Leeways).  Exh. 52 at 1643 (Nimbit).

[354] Exh. 18.

Artists did not understand the amounts were being made through HSP loans.  When it became clear, the payments stopped and the Artists reasserted control to avoid additional losses or HSP advances.[355]

HSP has failed to prove that the debts allegedly owed to it are the result of false pretenses, false representations or actual fraud.

### b.      No Reliance by HSP on Representations by Artists

HSP must also prove justifiable or actual reliance upon a statement by PBS in order to carry its burden of proof.  HSP argues that it relied on the Artists' "fraudulent misrepresentations" because "HSP advanced the monies to build PBS' brand, and HSP relied on the Artists putting their efforts into making PBS successful."  HSP argues that it justifiably believed the Artists were working to "maximize PBS' success."

There is no evidence that the Artists did not work to maximize PBS' success. The Artists continued to play live shows as directed by HSP and PBS' booking agent.  The situation continued until Porter's notice of intent to terminate was effective.[356]  Although HSP claims the Artists asked "for cash advances from the HSP ATM,"  HSP had total control of PBS' funds and total control regarding whether or not any request could or should be granted.

The PMA sets forth strict limitations on HSP's authority to incur expenses for PBS.  It also requires regular, monthly submission of bills and statements of account.  HSP also had fiduciary

---

[355]  Exh. 17. (The 2007 tax return reflected a $227,000 loss which Porter assumed was attributable to HSP's demand for repayment of the payments during 2007/2008.  In fact, the losses were principally due to nontour expenses paid in 2007 and increased touring overhead.  The payments in 2008 and the expenses for 2008 were yet to be revealed.).

[356]  Exh 162 at 5374-5376; T.T. Stolz and Porter.

duties to PBS.[357]   The Court finds that if the Artists had known of the deficit spending and HSP's

intention to seek reimbursement, they would have stopped the spending and taken back the reigns of

their business sooner than November 2008.  Both the PMA and the Artists' testimony establish that

making money was a goal, but not losing money was paramount.  Therefore, HSP has failed to

establish a justifiable reliance on any representation by the Artists.  For this and the additional

reasons set forth above the amounts owed by Artists are dischargeable.

### E.    Claims of Violation of Copyrights

The Artists allege that HSP and Stepanian infringed upon their copyrights and should be cast

in judgment for damages stemming from infringement.  Specifically, the Artists' claim HSP violated

17 U.S.C. § 1101, more commonly known as the "Anti-Bootlegging Statute."  The statute broadly

prohibits unauthorized creation and trafficking in sound recordings and music videos.[358]  The Artists

also allege violations of 17 U.S.C. §§ 106 and 115.[359]  This Court finds that the Artists granted a

nonexclusive license to HSP and Stepanian to commercially exploit recordings of PBS' live

---

[357]   Stepanian testified that he accepted the duty to hold in trust the business of PBS and that he knew that
he owed a fiduciary responsibility to the Artists.

[358]   17 U.S.C. § 1101 provides:
(a) Unauthorized acts.  Anyone who, without the consent of the performer [and performers] involved -
        (1) fixes the sounds or sounds and images of a live musical performance in a copy or
        phonorecord...[or]
        (2) transmits or otherwise communicates to the public the sounds or sounds and images of a live
        musical performance...shall be subject to the remedies in sections 502 through 505, to the same
        extent as an infringer of copyright.

[359]   17 U.S.C. § 1115 provides: "[I]n the case of nondramatic musical works, the exclusive rights provided
by clauses (1) and (3) of section 106, to make and to distribute phonorecords of such works, are subject to
compulsory licensing under the conditions specified in this section."

performances.   Therefore, no violation occurred.[360]

### 1.   Background

Under the Copyright Act, copyright ownership automatically vests in the author or authors of an original work.[361]  "The author is the party who actually creates the work, that is, or the person who translates an idea into a fixed, tangible expression entitled to copyright protection."[362]  Copyright laws protect the authors of literary, dramatic, musical, artistic and certain other intellectual works. The protection is available to both published and unpublished works.  Under section 106 of the 1976 Copyright Act, the owner of a copyright has the exclusive right:

1.  To reproduce the copyrighted work in copies or phonorecords;

2.  To prepare derivative works based upon the copyrighted work;

3.  To distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending;

4.  To publicly perform literary, musical, dramatic, and choreographic works, pantomines, and motion pictures and other audiovisual works;

5.  To publicly display literary, musical, dramatic, and choreographic works, pantomines, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work; and

6.  To publicly perform by means of a digital audio transmission, a sound recording.[363]

---

[360]  Because this Court finds that the Artists granted an oral nonexclusive license to HSP to record and release performances, an analysis of whether HSP copied constituent elements of the Artists' work or whether the Artists properly and timely filed the copyrights with the Copyright Office with respect to this litigation is unnecessary.

[361]  17 U.S.C. § 210(a).

[362]  *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737, 109 S.Ct. 2166, 2171, 104 L.Ed.2d 811 (1989).

[363]  17 U.S.C.A. § 106; *See also*, *Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 621 (6th Cir. 2004).

Copyright law grants authors the right to control the work, including the decision to make the work available or withhold it from the public.[364] Ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law. An owner may also grant a license for its use, production or distribution. An exclusive license must be in writing. Nonexclusive licenses can be granted by operation of law under a totality of the circumstances test.[365]

### a.      Authors

Under copyright law, reproduction and distribution of copyrighted musical works is allowed by mechanical license. Once a copyrighted work has been performed publically, a third party is not required to obtain a mechanical license to simply perform the work. A mechanical license is only required if a person wishes to reproduce and distribute copyrighted musical compositions (songs) on phonorecords (*i.e.* CDs, records, tapes and certain digital configurations). Thus, if a musician wants to record and distribute a song that was written by someone else, a mechanical license is necessary.[366] Authors of original works may always perform their works without necessity of mechanical licenses.

### b.      Performers

A sound recording is owned by the person whose performance is reflected on the recording. The sound recording itself constitutes a property right in favor of the musicians and is in addition to the author's right in the musical composition. The right to exploit a sound recording is owned by the recording artist (voice) and musicians performing the work unless a written agreement transfers those

---

[364]   *Laws v. Sony Music Entertainment, Inc.*, 448 F.3d 1134 (9th Cir. 2006).

[365]   Section 101 of the Copyright Act expressly excludes nonexclusive licenses from Sect. 204(a)'s writing requirement. *Lulirama Ltd., Inc. v. Axcess Broad Servs. Inc.*, 128 F.3d 872, 879 (5th Cir. 1997).

[366]   Section 115 of the 1976 U.S. Copyright Act grants a compulsory mechanical license once a composition has been commercially recorded and released to the general public.

rights to a third party.  Session musicians generally relinquish and assign their performance rights to the label or band owner for a flat fee or royalty.  It is also common for the main artist to have an agreement with the label regarding their relative rights in the recording.

### c.    Producer or Publisher

Generally, a producer or publisher of a work is the person who pays for its production.  This may be the artist, composer or a third party.  If the producer or publisher is someone other than the artist or if the work is one "for hire," the right of a producer or publisher in the work or performance is acquired by contract.[367]    Merely paying the costs of production does not entitle the producer to rights in the music.  However, as explained below, it may grant the paying party a nonexclusive license under the totality of the circumstances.[368]  The owner of the recording (initially the performer unless a transfer or license of the right has occurred) usually has the right to and is responsible for the exclusive rights set forth in Section 106.

### d.    Compensation

Songwriters are compensated when their work is included on a recording. When someone

---

[367] 17 U.S.C. Sect 101, *et seq.*

[368]   *Baisden v. I'm Ready Productions, Inc.,* 693 F.3d 491 (5th Cir. 2012) (*cert denied*, 133 S.Ct. 1585 (March 18, 2013)); *Davis v. Tampa Bay Arena, Ltd,* 2013 WL 3285278 (M.D. Fla. 2013) (An implied license was created.  Licensee's failure to abide by the terms of the implied license constituted a breach of contract, not copyright infringement.); *Jacob Maxwell, Inc. v. Veeck,* 110 F.3d 749, 753-54 (11th Cir. 1997)  ("[Artist] agreed to write the song free of charge, to provide the Miracle with the Digital Audio Tape master, and to grant the Miracle an exclusive license... In return, Miracle had to pay his out-of-pocket production costs and give him credit as the author any time the song was played at games or distributed on cassette tape. ... [Artist] delivered the song to the Miracle, and the team proceeded to play it at many games during the course of a summer. [Artist], however, was never given the promised authorship credit, and he sued the team, alleging copyright infringement and breach of contract."  The court held that breach of a covenant in a copyright license does no more than provide licensor an opportunity to seek rescission of the license, but does not constitute an *ab initio* rescission of the licensee's permission to use a copyrighted work.")

91

produces a CD, he owes the songwriter a royalty for every CD printed regardless of the number sold.[369]  If a prerecorded performance is re-pressed, mechanical royalties are also due to the original publisher or artist, if self-published.

Songwriters and publishers are also paid when their works are used in a commercial, television show, movie, digitally simulcast, webcasted, streamed, downloaded, provided by an on line demand service, performed live or broadcasted.  Airplay or public performance royalties are derived from money collected by Performance Rights Organizations ("PROs").  PROs collect flat or negotiated royalties from restaurants, bars, television stations and performance venues and allocate the amounts collected among musical works based on the frequency and nature of use.[370]  Use of PROs allows a commercial establishment to play various original works without having to separately negotiate with every artist or songwriter.

Performers receive revenue from the sale of their music and concert appearances.  A recording artist currently does not receive any revenue for play of his or her hit song on the radio unless he or she was also the songwriter or publisher.

## 2.    The Artist's Claim Against HSP for Unauthorized Distribution

The Artists' allege that HSP distributed their works through various internet companies and PBS' own website without the Artists' permission.  As the PMA did not give HSP a right to distribute the Artists' works, HSP claims an irrevocable, nonexclusive license to distribute based on the Artists'

---

[369] In the United States, mechanical royalties are paid on a negotiated rate, usually a reduced percentage of the rate established by the Copyright Royalty Board. If no agreement is reached, songs of 5 minutes or less require payment of 9.1 cents per item produced.  If a work is greater than 5 minutes, a royalty of 14 cents is owed. (http://www.copyright/gov/carp/m2002.html).

[370] Typically, flat rates are paid to one of three (3) major organizations, BMI, ASCAP or SESAC.  If an artist registers with one (1) of these firms, he will receive a portion of the flat rate fees.

knowledge and consent.

Copyright owners are free to grant multiple nonexclusive licenses for different uses of the same material.[371]   Under federal law, a nonexclusive license may be granted orally or may be implied from conduct.[372]   In *Lulirama Ltd., Inc. v. Axcess Broad Servs. Inc.*, *supra*,  the Fifth Circuit held, "[w]hen the totality of the parties' conduct indicates an intent to grant such permission, the result is a legal nonexclusive license..." [373]   Other circuits have limited the granting of an implied nonexclusive license to situations when: (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the person who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work.[374]   However, the Fifth Circuit has dismissed this limitation.

In *Baisden v. I'm Ready Prods., Inc.*, the Fifth Circuit held that an implied license could arise when the totality of the parties' conduct supported such an outcome.[375]   The *Baisden* Court reasoned

---

[371]   *Buffalo Broad. Co., Inc. v. American Soc'y of Composers, Authors and Publishers*, 744 F.2d 917, 920 (2d.Cir. 1984).  See also, *Daggs v. Bass*, 2012 WL 5878670 (D. Mass 2012) ("An implied license is a valid defense to copyright infringement; a copyright owner can make an oral grant of a nonexclusive license, or such a grant can be implied from conduct which indicates the owner's intent to allow a license to use the work.")

[372]   3 NIMMER, supra.  Sect. 10.03(A), at 10-40.  *See also, I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996); and *Effects Assocs. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990).

[373]   *Lulirama*, 128 F.3d at 879 (quoting 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 10.03[A], at 10-41 (1997)).

[374]   *I.A.E.*, 74 F.3d at 776 (citing *Effects*, 908 F.2d at 558-59).

[375]   693 F.3d 491 (5th Cir. 2012), *cert denied*, 133 S.Ct. 1585 (2013)).

that consent for an implied license may take the form of permission or lack of objection.[376]  HSP argues that the Artists' conduct and documentary evidence demonstrate the existence of a nonexclusive mechanical license allowing HSP the right to release and distribute the Artists' music.

After several weeks of testimony, the parties entered into a Joint Stipulation of Facts Regarding the Defendants' Copyright Infringement Claims ("Stipulation").[377]  The parties stipulated that all of the live recordings were made with the Artists' consent for commercial distribution.[378]  Further, HSP and the Artists stipulated that the Artists had consented in the distribution of the studio recordings at issue.[379]  Based on the Stipulation, this Court finds that a nonexclusive license to distribute the works in question was granted to HSP.  As such, HSP was authorized to distribute the Artists' live performance and studio recordings for their benefit.  Nevertheless, the Artists continue to complain that HSP has violated even a nonexclusive license by granting third parties exclusive distribution rights.

During litigation, the Artists learned that HSP entered into a Letter of Agreement ("Agreement") with Nugs.Net Enterprises, LLC ("nugs.net").[380]  Under the Agreement, HSP provided audio recordings of PBS songs, concerts and other performances, as well as recordings from the

---

[376]  *Food Consulting Grp., Inc. v. Azzalino,* 270 F.3d 821, 826 n. 9 (9th Cir. 2001) (correctly stating test in Fifth Circuit).  Other decisions support this conclusion.  See *Carson* v. Dynegy, Inc., 344 F.3d 446, 451-53 (considering whether nonexclusive license was created despite defendant not having asked plaintiff to create a product) and *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.,* 322 F.3d 26, 41 (1st Cir. 2003) (considering nonexclusive license defense where third party, not defendant, requested production of copyrighted work).

[377]  Exh. 237.

[378]  *Id.* at ¶ 8.

[379]  *Id.* at ¶9, 11.

[380]  Exh. 169. The Nugs.net Agreement was executed by HSP and Nugs.  Importantly, HSP signed the Agreement in its own name and not as agent for the Artists.

Artists' other group, solo and side projects as content ("Content").  Nugs.net then released the

Content through its on demand service.[381]  The Artists complain that the Agreement creates an

exclusive license in the live performances and studio recordings and impairs the Artists' ability to

license their own works to other parties.

> The Agreement provides:
>
> During the Term of this Agreement, nugs.net shall be the exclusive distributor, without limitation, of Artists' digital music content via Internet Protocol (IP) networks for the following Content items:
>
> a.   Select recordings from Artist's live concert archive to be mutually determined by the Parties and distributed through the COD service during the Term of this Agreement.
>
> b.   Select studio recordings and albums from Artist's archive and catalog to be mutually determined by the Parties and distributed through the COD service during the Term of this Agreement.  It is agreed by the Parties that select mutually determined studio recordings and albums from Artist's archive and catalog shall also be released through the COD service on a non-exclusive basis.[382]

The Agreement also provided that catalog works released through the COD service would be on a

nonexclusive basis.[383]

HSP provided Content to nugs.net for distribution.  Having already concluded that HSP held

a nonexclusive license over the works in question, mere distribution is not a violation.  However,

the Artists assert that by contracting for an exclusive right of distribution, HSP has impaired their

rights.  Licensees are allowed to enter into exclusive or nonexclusive agreements for distribution of

---

[381]   The Agreement was for a one (1) year term followed by successive ninety (90) day extensions. Either party could terminate the Agreement after thirty (30) days written notice.  Exh. 169 at 6128.

[382]   Exh. 169 at 6128.

[383]   *Id.*

95

the works they license.  The right to exclusive distribution from a nonexclusive licensee does not bind

the owner of the work nor does it prohibit the owner from granting additional nonexclusive licenses

to others.[384]  HSP's ability to grant a distribution contract is limited by the terms of its own license.

As the holder of a nonexclusive right to distribute, HSP can limit its own right to distribute through

others, but it cannot limit the owner from granting additional licenses.   The Court reads the

Agreement to limit HSP's right to grant additional distribution licenses in favor of Nugs' exclusive

right.  It does not limit the Artists from granting additional rights to distribution; it can only convey

the right to nonexclusive distribution.

### 3.        Revocation of the Nonexclusive License

A nonexclusive license may be revocable or irrevocable, depending on whether the license

is supported by consideration.[385]  HSP argues that its nonexclusive license is irrevocable because it

was acquired for consideration.

HSP avers that it advanced marketing and production expenses in connection with the

Content; therefore, consideration was given to the Artists.  In its proof of claim and as part of this

suit, HSP has demanded repayment of all advances for production costs and marketing given in

connection with the Artists' works.  If the payments are loans repayable by the Artists, HSP did not

give consideration for the production costs and the Artists did not receive any consideration.  The

repayment of the production expenses makes the works self-published.

---

[384]   *Saregama India Ltd. v. Mosley*, 635 F.3d 1284 (11th Cir. 2011).

[385]   *See,* 3 NIMMER, *supra;* Sect. 10.02(B)(5)(Nonexclusive licenses are revocable absent consideration).
*Avtec Sys. Inc. v. Peiffer*, 21 F.3d 568, 574 n. 12 (4th Cir. 1994); *Keane Dealer Servs., Inc. v. Harts*, 968 F.Supp.
944, 947 (S.D.N.Y., 1997); and *Johnson v. Jones*, 885 F.Supp. 1008, 1013 n. 6 (E.D.Mich. 1995).

HSP also argues that accounting to the Artists for revenues received and expenses paid in connection with the production and sale of music constitutes additional consideration. Pretermitting the fact HSP failed to account to the Artists for the costs and revenues derived from music sales until trial, the Court finds simply accounting for revenue or a loan is not consideration because both are part of HSP's obligation under its status as a business manager.

As previously held, HSP assumed the responsibility of business manager. As such, it insisted on collecting all revenues for digital and CD sales. Under this authority, it also controlled and paid the expenses of production. Accounting to the Artists for expenses and revenues was part and parcel of its duties as a business manager. Thus performance of accounting services in this context does not constitute additional consideration for the license because HSP already owed the Artists a duty to account. The discharge of a duty one is already bound to perform is not consideration.[386]

For the above stated reasons, the Court finds that the license is revocable at will because it was granted without consideration. When the Artists terminated the PMA, they evidenced a desire to end their relationship with HSP. HSP's license to distribute was terminated effective November 7, 2009.

### 4.       Copyright Infringement for Non-PBS Works

During the course of their relationship, HSP frequently sold, online and through merchandise tables, works of the Artists generated before the PMA was signed. The Artists complain that HSP had no right to sell their works. As previously held, the Artists were aware of HSP's sale of merchandise on tables during performances. The Artists admitted at trial they both knew and accepted HSP's activities without objection. They also testified to providing music CDs for HSP to

---

[386] *Mims v. Fidelity Funding, Inc.*, 275 B.R. 789 (Bkrtcy.N.D. Tex. 2002); (aff'd in part and rev'd in part, 307 B.R. 849 (N.D.Tex. 2002)).

sell along side its merchandise.  Therefore, the Court concludes the Artists granted HSP an implied license to sell both merchandise and music prior to the execution of the PMA.

After the execution of the PMA, HSP also sold non PBS works.  Because the Stipulation does not address this issue, the Artists complain that HSP violated their copyrights on these works.  HSP argues it sold merchandise and music it received from the Artists on their behalf and with the Artists' authority and knowledge.  The evidence supports a finding that the Artists delivered music and merchandise to HSP to market and sell through the internet and at performance venues.[387] As a result, this Court finds the Artists were fully aware of HSP's actions and authorized HSP to sell their individual works.

### 5.        The Artists' Claim for Royalties

Royalties were paid to all third party songwriters for works used by the Artists.  This includes the Artists if the work predated the PMA.  In addition, royalties were also paid to third party publishers for re-pressed works.  What is at issue are unpaid royalties claimed by the Artists as songwriters on works written after the PMA was signed, as well as publishing royalties for works produced by the Artists and digital royalties owed to the Artists as performers.

Because the Court has found the Artists incurred the costs of production for all works created during the PMA, the Artists are entitled to the revenues derived from their sale.  While royalties to the Artists as songwriters might be owed if the works were performed by another, because they were performed by the Artists, no royalties are due.  The Court also finds the Artists, as both self-

---

[387]  T.T. Porter, Stepanian, Stoltz.

publishers and performers, are entitled to revenues obtained through digital downloads of their music.

Because the Court finds that all revenues for works written or performed by the Artists during the PMA belonged to the Artists, claims for royalties are duplicative and denied.

### G.    Interest on Award

HSP raised two (2) independent grounds for its interest claim, 28 U.S.C. §1961[388]; and M.G.L. c. 231 §§ 6B and 6C.[389]  The Artists also requested interest in their Counterclaim against HSP.

### 1.    Interest Claims under 28 U.S.C. § 1961 (Post-Judgment Interest)

HSP's claim includes $81,482.63 in interest for the period of January 1, 2010 to November 26, 2010.  Federal law authorizes bankruptcy courts to award post-judgment interest on any money judgment in a civil case recovered in a district court.[390]  The statute  provides that interest is

---

[388] *See* HSP's Proof of Claim, which calculates interest under 28 U.S.C. § 1961 from January 1, 2010 to November 26, 201 in the amount of $81,482.63.

[389] HSP's Post-Trial Brief at 53, 54. P-262.

[390] 28 U.S.C. § 1961(a) reads as follows:

(a)  Interest shall be allowed on any money judgment in a civil case recovered in a district court.  Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.

(b)  Interest shall be computed daily to the date of payment except as provided in section 2516(b) of this title and section 1304(b) of title 31, and shall be compounded annually.

(c) (1)  This section shall not apply in any judgment of any court with respect to any internal revenue tax case. Interest shall be allowed in such cases at the underpayment rate or overpayment rate (whichever is appropriate) established under section 6621 of the Internal Revenue Code of 1986.

(2)  Except as otherwise provided in paragraph (1) of this subsection, interest shall be allowed on all final judgments against the United States in the United States Court of Appeals for the Federal circuit,[2] at the

calculated from the date of the entry of the judgment.   Once a judgment is obtained, it bears interest

without regard to the elements for relief composing the judgment.[391]   Federal courts have routinely

held that a bankruptcy proceeding is a "civil case" under 28 U.S.C. §1961(a) and judgments in

bankruptcy proceedings accrue post-judgment interest.[392]

Under the plain language of 28 U.S.C. §1961, interest on the amount awarded accrues from

the entry of this judgment, not before.[393]   The prevailing party is only entitled to post-petition interest

from the date of judgment. The $81,482.63 claimed by HSP in its proof of claim is not post-judgment

interest and cannot be allowed.

HSP and the Artists may be entitled to post-judgment interest on their awards upon entry this

Court's ruling.

2.    **Prejudgment, Prepetition Interest Claims under M.G.L. c. 231, § 6B and 6C**

(a)    **HSP Prepetition, Prejudgment Interest**

Although the PMA does not contain an interest provision, HSP argues that Massachusetts law

---

rate provided in subsection (a) and as provided in subsection (b).

(3)  Interest shall be allowed, computed, and paid on judgments of the United States Court of Federal Claims only as provided in paragraph (1) of this subsection or in any other provision of law.

(4) This section shall not be construed to affect the interest on any judgment of any court not specified in this section.

[391]  *La. & Ark. Ry v. Pratt*, 142 F.2d 847, 849 (5th Cir. 1944) and *Endeavour GP, L.L.C. v. Endeavour Highride, L.P. (In re Endeavour Highrise, L.P.)*, 432 B.R. 583 (Bankr.S.D.Tex. 2010), (quoting *Laffey v. Northwest Airlines, Inc.*, 740 F.2d 1071, 1103 (D.C.Cir. 1984)).

[392]  *Pester Refining Co. v. Ethyl Corp (In Re Pester Refining Co.)*, 964 F.2d 842 (8th Cir. 1992) (because a bankruptcy court is part of the district court, the statute applies to bankruptcy proceedings).

[393]  *In re Gulfport Pilot's Ass'n, Inc.*, 434 B.R. 380 (Bkrtcy.S.D.Miss. 2010); *Wise v. Peterson (In re Peterson)*, 452 B.R. 203 (Bkrtcy.S.D.Tex 2011); *Bilger Terminals, LP v. Brazos M&E, Ltd. (In re Bigler), LP*, 458 B.R. 345 (Bkrtpcy.S.D.Tex. 2011).

mandates the imposition of prejudgment interest.[394]  M.G.L. c. 231, § 6B reads:

> In any action in which a *verdict is rendered or a finding made or an order for judgment made for pecuniary damages for personal injuries to the plaintiff or for consequential damages, or for damage to property*, there shall be added by the clerk of court to the amount of damages interest thereon at the rate of twelve per cent per annum from the *date of commencement of the action* even though such interest brings the amount of the verdict or finding beyond the maximum liability imposed by law. M.G.L. c. 231, § 6B. (emphasis added).

M.G.L. c. 231, § 6C, which deals with contract actions, similarly provides:

> In all actions *based on contractual obligations*, *upon a verdict, finding or order for judgment for pecuniary damages*, interest shall be added by the clerk of the court to the amount of damages, at the contract rate, if established, or at the rate of twelve per cent per annum from the date of the breach or demand.  If the date of the breach or demand is not established, interest shall be added by the clerk of the court, at such contractual rate, or at the rate of twelve per cent per annum from the date of the commencement of the action...M.G.L. c. 231, § 6C (*emphasis added*).

M.G.L. c. 231, § 6B is inapplicable in this case because Porter, Batiste and Stoltz did not commit a tort against HSP.    M.G.L. c. 231, § 6C also is inapplicable with regard to prepetition interest owed to HSP because neither PBS nor Porter, Batiste or Stoltz individually breached the PMA.

As explained below, even if this Court's ruling can be construed as a finding that the Artists' non-payment of HSP's reimbursement demand[395] constitutes a breach of the PMA for purposes of

---

[394]   Federal court cases that are based on state law, such as the one before this Court, are controlled by state rights to judicial interest.  *Travelers Ins. Co.v . Liljeberg Enterprises, Inc.,* 7 F.3d 1203 (5th Cir. 1993).

[395]   Exh. 62 (Herlihy email to Eveline – "please find a summary of George Porter's account with Highsteppin Productions". ) HSP demanded paid from Porter on November 20, 2009 of $256,280.97. (Exh. 62 at 1821 - 1829).   No evidence was presented that a similar demand was made of Stoltz or Batiste before December 29, 2009, when HSP filed the lawsuit.    The November 2009 demand only was sent to Porter.  For purposes of the interest calculation, this Court finds that the November 2009 was a demand under the Massachusetts statute. *McGarrigle v. Bachand*, 1999 Mass. App. Div. 57. ("Massachusetts case law is clear that a 'demand' for purposes of G.L.c. 231, Sect. 6C is established if the party has been informed of the extent of the obligation and that payment is

101

M.G.L. c. 231, § 6C, HSP's claim for prejudgment interest can only extend until the dates Porter,

Batiste and Stoltz filed their bankruptcy petitions.  Specifically, the claim from Porter can only be

allowed for the ten (10) month period between HSP's November 20, 2009 demand and the date Porter

filed his bankruptcy petition.  Prejudgment interest can only accrue against Stoltz for the nine (9)

month period between the filing of HSP's Complaint against Stoltz and the date Stoltz filed his

bankruptcy petition. Prejudgment interest can only accrue against Batiste for the twenty-one (21)

month period between the filing of HSP's Complaint and Batiste's bankruptcy filing.[396]

Section 502(a) of the Bankruptcy Code provides that "a claim or interest, proof of which is

filed under section 501 of this title, is deemed allowed, unless a party in interest. . . objects."

However, Section 502(b)(2) provides that "except as provided in subsections(e)(2), (f), (g), (h) and

(i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall

determine the amount of such claim in lawful currency of the United States as of the date of the filing

of the petition, and shall allow such claim in such amount, except to the extent that– (2) such claim

is for underlined unmatured interest."  (Emphasis added).

Pursuant to section 502(b)(2), the accrual of interest on prepetition claims are suspended when

a bankruptcy petition is filed.[397]  Section 502(b)(2) provides that the claim is disallowed to the extent

---

due. A bill is sufficient to establish a demand.")  The applicable date from which to calculate interest for Stoltz and
Batiste is the day HSP filed its Complaint.  *Fratus v. Republic Western Ins. Co.*, 147 F.3d 25 (1st Cir. 1998)
(prejudgment interest began to accrue on the date plaintiffs filed their complaint and demand for payment in the
district court); *Siegel v. Kepa Homes Corp.*, 2000 Mass.App.Div. 170 (in the absence of a specific finding as to the
date of breach, interest in calculated from the date the complaint was filed).

[396]  HSP filed suit on December 29, 2009.  Porter and Stoltz filed for bankruptcy on September 27, 2010
(nine (9) months after HSP filed suit in Massachusetts.)  Batiste filed on September 28, 2011.

[397]  In applying 502(b)(2), the Fifth Circuit Court of Appeals has stated that "interest stops accruing at the
date of the filing of the petition."  *Matter of West Texas Marketing Corp.*, 54 F.3d 1194, 1197 (5th Cir. 1995) ("post-
petition accumulation of interest on claims against a bankruptcy's estate are suspended.")  *In re Brints Cotton*

that "such claim is for unmatured interest." Thus, section 502(b)(2) prohibits payment of postpetition interest on prepetition unsecured claims.[398]

The Fifth Circuit Court of Appeals has found that "allowing the accrual of postpetition interest in favor of one (1) creditor would be "inequitable" to other creditors.[399] Ultimately, 502(b)(2) "protects the debtor and its other creditors from the assertion of claims for amounts in excess of the benefit actually conveyed to the debtor."[400]

Similarly, a Massachusetts bankruptcy court ruled that prepetition, prejudgment interest might be contingent, disputed or unliquidated, but not unmatured.[401]  The court noted that while section 502(b)(2) prohibits the allowance of unmatured interest claims, the amounts accruing prepetition are allowed.  It opined that "if Congress intended that contingent claims for interest be disallowed, the language of section 502(b)(2) would have included both the words "contingent" and "unliquidated."[402]

---

*Marketing, Inc.*, 737 F.2d 1338, 1341 (5th Cir. 1984).

[398]  "Although different methods of considering and computing interest in bankruptcy cases are conceivable, fixing the cutoff point for the accrual of interest of the date of the filing of the petition is a rule of convenience providing for equity in distribution."  4 *Collier on Bankruptcy*, Sect. 502.03 (Allan N. Resnick & Henry J. Sommers eds., 16th ed.).  This rule combines the advantage of practicability with equality of distribution.  To take into account contractual interest would not only entail considerable administrative inconvenience but also violate the equitable principle that delay in liquidation and subsequent distribution necessitated by the bankruptcy process should result in neither gain nor loss for similarly situated creditors.  Interest on debts is to be computed as of the date of the filing of the petition."  4 *Collier on Bankruptcy*, Sect. 502.03 (Allan N. Resnick & Henry J. Sommers eds., 16th ed.).

[399]  *Louisiana Public Serv. Comm'n v. Mabey (In re Cajun Electric Power Co-Op, Inc.*, 185 F.3d 446, 457 (5th Cir. 1999).

[400]  *Brown v. Sayyah (In re ICH Corp.)*, 230 B.R. 88, 94 (N.D. Tex. 1999) (quoting Nicholas P. Saggese, et al., *A Practitioner's Guide to Exchange Offers and Consent Solicitations*, 24 Loy. La. L.Rev. 527, 550 (1991)).

[401]  *In re Lamarre*, 269 B.R. 266 (Bankr.D.Mass. 2001).

[402]  *See also* 11 U.S.C. § 303(b)(1).

103

In the *Lamarr*e decision, the claim for breach of contract was, as of the petition date, disputed and unliquidated. During the bankruptcy it became fixed and liquidated. At that time, the amount of interest accruing under state law also became a fixed and liquidated amount.

> Section 502(b)(2) does not require the exclusion of so much of the interest as accrued up to the petition date simply because the amount was unliquidated and disputed on the petition date. It requires that, once the amount of interest that accrued became fixed and liquidated, only that portion that accrued on or before the petition date can be allowed. This result is in keeping with the one case that expressly considered and discussed the issue. [403]

Under Massachusetts law, HSP is entitled to prejudgment interest.[404] However, since the Court has allowed HSP's quantum meruit claim only as an offset against any amount due the Artists, HSP is not entitled to a judgment and its entire claim is disallowed.

## 2.    Interest on PBS' Claims Against HSP

Section 502(b)(2) does not prohibit the imposition of prejudgment interest for claims by debtors against third parties. The purpose of awarding prejudgment interest is to compensate a party for the loss of the use of his money in order to make the party whole.[405] Prejudgment interest in contract actions is to be calculated from the date of "breach or demand." *In Sargeant v. Commission of Public Welfare*, 423 N.E.2d 755 (Mass. 1981), the Supreme Judicial Court held that where the record establishes the date of demand in a contract action, prejudgment interest should be awarded

---

[403] *Lamarre, supra* at 269, (citing *In re United States Lines*, Inc., 199 B.R. 476 (Bankr. S.D. N.Y. 1996)).

[404] On the bankruptcy petition date, interest ceases to accrue on an unsecured claim. *In re United States Lines, Inc.*, 199 B.R. 476, 481 (Bankr. S.D. N.Y. 1996). Interest accruing prepetition is not "unmatured" just because it is "unliquidated." *Id.* at 482; 11 U.S.C. Sect. 502(b)(2). *See Diggs v. Guarantee Service Team of Prof. (In re Digg),* 2008 WL 5096008 (Bkrtcy. E.D. La. 2008).

[405] *Perkins School for the Blind v. Rate Setting Commission*, 423 N.E.2d 765 (Mass. 1981).

from that date.[406]   However, since the Artists are not entitled to a compensatory award other than

attorney's fees, costs, and those associated with the injunctive relief, no interest is due at this time.

## IV.  Conclusion

For the reasons set forth above:

1.  HSP's proofs of claim in the bankruptcy cases of Porter and Stoltz are disallowed in their

entirely;

2.  HSP's claims for breach of contract, violation of MUTPA and nondischargeability are

Denied;

3.  The Artists' claims for breach of contract, breach of fiduciary duty, and MUTPA violations

are GRANTED in part and denied in part;

4.  The Artists' claims for copyright infringement are DENIED.

Based on the findings of this Court:

1.  Neither HSP nor the Artists are owed sums under the PMA due to offsetting claims;

2.  HSP must account for any and all proceeds received from the sale, license, or use of

merchandise or music of the Artists after June 2012 and remit the gross proceeds to the Artists'

Trustee within fourteen (14) days.

3.  HSP must immediately notify all parties with whom it contracted or authorized any

distribution, sale, license or use of the Artists' works of the termination of its nonexclusive license

in same and the corresponding termination of the third party's rights. It must also instruct the

---

[406]  *Id*. at 822.

105

addressees to contact Trustee should they possess any property or revenue belonging to Porter, Batiste Stoltz, or PBS. Copies of confirming correspondence should be provided to the Artists within fourteen (14) days of this ruling.

4. HSP must deliver all merchandise, CDs or other product purchased or produced during the term of the PMA to the Trustee. To the extent the merchandise or music is in the hands of a third party, HSP must recover said property and deliver it to the Trustee.

5. This ruling may require the amendment of the Artists' tax returns for tax years 2006, 2007, 2008 or 2009. To the extent amendments are possible, the Artists will be reimbursed for all fees and costs associated with the preparation of amended tax returns, as well as any penalties or interest payable on any taxes owed due to late filing or change in the amounts originally due. To the extent an amendment generates a refund, HSP is responsible for the payment of interest on the refund generated by the amended return at the federal rate from the date of the original tax return's filing through the date of receipt of the refund. To the extent an amendment cannot be filed due to the intervention of time, HSP will be responsible for the additional refund amount which might otherwise be claimed with interest at the federal rate until paid. All amended returns or calculations in the event an amended return cannot be filed, are to be submitted to the Court and delivered to HSP no later than October 1, 2013.

6. This is a partial ruling and specifically reserves for later determination and after evidentiary hearing on award for the Artists' attorneys' fees and costs, as well as any amounts due under paragraph 4 above. The Court will notice a status conference between the parties to set the necessary pretrial deadlines and hearing date. This ruling will not be final until after these amounts have been determined and a judgment in accord with this Opinion and any later ruling is entered.

106

A judgment in accord with this Opinion will be separately rendered.

New Orleans, this 16 day of August, 2013.


_____

Judge Elizabeth W. Magner