UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. |
| **GEORGE JOSEPH PORTER, JR.** | **10-13553** |
| **ARALEAN H. PORTER** | |
| | SECTION A |
| DEBTORS | CHAPTER 7 |
| | |
| **HIGHSTEPPIN PRODUCTIONS, LLC** | ADVERSARY NO. |
| PLAINTIFF | **10-1130** |
| VERSUS | |
| **GEORGE JOSEPH PORTER, JR. ET AL** | |
| DEFENDANTS | |
| ADMINISTRATIVELY CONSOLIDATED FOR TRIAL WITH | |
| **HIGHSTEPPIN PRODUCTIONS, LLC** | ADVESARY NO. |
| PLAINTIFF | **10-1131** |
| VERSUS | |
| **BRIAN HERBERT STOLTZ, ET AL** | |
| DEFENDANTS | |

**REASONS FOR PARTIAL JUDGMENT**

On August 16, 2013 an Opinion and Partial Judgment were entered on the above captioned adversarial proceeding granting in part and denying in part defendants' counterclaims and denying plaintiffs' demands. Specifically, George Porter, Jr. ("Porter"), Brian H. Stoltz ("Stoltz"), David Russell Batiste ("Batiste") and Porter, Batiste, Stolz, L.L.C. ("PBS") (collectively referred to as "Artists"), prevailed against HighSteppin Productions, L.L.C. ("HSP") and Philip Stepanian ("Stepanian"), with respect to their claims for breach of contract, violation of the Massachusetts

Unfair Trade Practices Act ("MUTPA"), negligence, and breach of fiduciary duty. The Court denied the Artists' claims for copyright infringement as well as HSP's claims for breach of contract and damages. The Partial Judgment reserved for later determination the Artists' claim for attorneys fees and costs associated with its claims.

On January 17, 2014, the Court ordered the Artists to submit evidence of fees and costs for which it sought damages. Briefs on the issue were submitted on January 24, 2014, following which the matter was taken under advisement.

## I. Entitlement to Attorneys' Fees

Under MUTPA, specifically, Chapter 93A, Section 11, a prevailing party is entitled to an award of reasonable attorneys' fees and costs.[1] Stepanian, the owner of HSP, argues that the Artists were not the prevailing party and, as such, are not entitled to attorneys' fees and costs, because they suffered "no actual injury" from a violation of MUTPA.[2] In support, Stepanian relies on the Court's finding that "[n]either HSP nor the Artists are owed sums under the PMA due to offsetting claims."[3]

In its Partial Judgment this Court awarded the following:

Because HSP's discharge of its duties was substantially below the standard of care owed and it failed to disclose conflicts of interest between itself or the Artists in the management of their affairs, the Court finds that *its conduct constitutes a wilful violation of MUTPA and awards the injunctive relief set forth below* . . . .

    1. HSP must account for any and all proceeds received from the sale, license, or use of merchandise or music of the Artists after June 2012 and remit the gross proceeds to the Artists' Trustee within fourteen (14) days.

---

[1]*See In re Porter*, 498 B.R. 609, 653 n.293 (Bankr. E.D. La. Aug. 16, 2013). The Artists concede that because they did not prevail on the claim, they are not entitled to compensation for the time "devoted solely to legal copyright issues . . . ." (Pleading 337, p. 6).

[2]Pleading 336, p. 2.

[3]Pleading 336, p. 2. *In re Porter*, 498 B.R. at 678.

2. HSP must immediately notify all parties with whom it contracted or authorized any distribution, sale, license or use of the Artists' works of the termination of its nonexclusive license in same and the corresponding termination of the third party's rights. It must also instruct the addressees to contact Trustee should they possess any property or revenue belonging to Porter, Batiste Stoltz, or PBS. Copies of confirming correspondence should be provided to the Artists within fourteen (14) days of this ruling.

3. HSP must deliver all merchandise, CDs or other product purchased or produced during the term of the PMA to the Trustee. To the extent a the merchandise or music is in the hands of a third party, HSP must recover said property and deliver it to the Trustee.

4. This ruling may require the amendment of the Artists' tax returns for tax years 2006, 2007, 2008 or 2009. To the extent amendments are possible, the Artists will be reimbursed for all fees and costs associated with the preparation of amended tax returns, as well as any penalties or interest payable on any taxes owed due to late filing or change in the amounts originally due. To the extent an amendment generates a refund, HSP is responsible for the payment of interest on the refund generated by the amended return at the federal rate from the date of the original tax return's filing through the date of receipt of the refund. To the extent an amendment cannot be filed due to the intervention of time, HSP will be responsible for the additional refund amount which might otherwise be claimed with interest at the federal rate until paid.[4]

Chapter 93A, Section 11 of MUTPA provides, in pertinent part: "If the court finds in any action commenced hereunder, that there has been a violation . . . , the petitioner shall, in addition to *other relief . . .,* be awarded reasonable attorneys' fees and costs . . . ." (Emphasis added). The above provision "says nothing explicitly about proof of a loss of money or property as a condition to a right to recover attorneys' fees," but rather, provides that a prevailing party, *i.e.*, one that has shown a violation of MUTPA, must be entitled to "other relief" in order to be eligible for attorneys' fees and costs. *Jet Line Services, Inc. v. American Employers Insurance Co.*, 537 N.E.2d 107, 115 (Mass. 1989). The Artists established that HSP violated MUTPA and the Artists were awarded

---

[4]*Porter*, 498 B.R. at 660-61 (emphasis added).

relief. The Artists satisfied the above prerequisites and, as such, are entitled to attorneys' fees and costs.

## II. Apportionment of Attorneys' Fees

It is well-established that when a party prevails on both its common law claim and its MUTPA claim and both claims arise from the same series of events or single chain of events, it is not necessary, for purposes of awarding attorneys' fees, to "cull out" the time spent on the non-MUTPA claim.[5] Stepanian argues that there has been no showing that the Artists' common law breach of contract and breach of fiduciary duty claims were so related and interconnected to the MUTPA claims that apportionment is not warranted.[6] A review of the Court's Opinion supports just

---

[5]*See Incase, Inc. v. Timex Corporation*, 421 F.Supp.2d 226, 244 (D. Mass. Feb. 10, 2006), *aff'd,* 488 F.3d 46 (1st Cir. 2007) (where chapter 93A claim and accompanying common law claims are largely based on the same facts, a court need not cull out the time that plaintiff's counsel spent to develop and prove the non-93A claims); *Clamp-All Corp. v. Foresta,* 763 N.E.2d 60, 74 (Mass. App. Ct. Feb. 15, 2002) (quotation omitted) (where a single chain of events gives rise to both a common law and a Chapter 93A claim, apportionment of legal effort between the two claims is not necessary); *Hanover Ins. Co. v. Sutton,* 705 N.E.2d 279, 296 (Mass. App. Ct. Jan. 15, 1999) (same); *DiMarzo v. American Mutual Insurance Company*, 449 N.E.2d 1189, 1202 (Mass. May 4, 1983) (same). Similarly, time is not culled out based on whether the legal efforts were spent defending against allegations or pursuing a counterclaim. *See Brooks Automation, Inc. v. Blueshift Technologies, Inc.*, 2006 WL 1537520, *2 (Mass. Super. Apr. 6, 2006) (where a single chain of events gave rise to both common law and Chapter 93A claims, party was entitled to reasonable attorneys' fees incurred in defending itself against allegations and in prosecuting its counterclaim).
    In an attempt to contradict this well-established law, Stepanian cites two MUTPA cases, *McDonough v. Ferrari Pool 'n Patio, Inc.*, 2000 WL 420621, *2-3 (Mass. App. Div. Apr. 14, 2000) and *Downes v. Peczka*, 1996 WL 242955, *1 (Mass. App. Div. May 7, 1996), in which the respective courts strictly limited attorneys' fees to the time spent on the 93A claims. However, the courts' rulings in this regard were based upon the fact that the respective parties *only prevailed on their 93A claims*.

[6]Pleading 336, p. 3. Interestingly, Stepanian, earlier in his brief, seemingly contradicts his argument in this regard, acknowledging that "the claimed MUTPA violations for breaches of fiduciary duty *unquestionably flow*" from "the claims based on the [PMA]." Pleading 336, p. 2 (emphasis added).

4

such a finding.

The Court, in addressing the MUTPA issue, specifically observed that the same facts served to support both the breach of contract claim, breach of fiduciary duty and the MUTPA claim. "In addition to a claim in contract and fraud, HSP asserts the Artists violated MUTPA. *The facts upon which HSP relies are the same ones as those giving rise to HSP's claims for breach of contract and fraud. The Court incorporates those facts as set forth above.*"[7]

Broadly speaking, the basis for the Artists' breach of contract claims was HSP's failure to properly account for the expenses incurred and the revenue received, in addition to its failure and to obtain the Artists' consent to expenses or charges.[8] The Court specifically rejected the notion that this basis served only to support a breach of contract claim.

> [HSP] argues that [its] failure to acquire the Artists' approval [of charges] constitutes a breach of contract, not fiduciary duty. The two (2) claims presented by the Artists are not mutually exclusive. A breach of duty may or may not be a breach of contract. Similarly, a breach of contract may or may not be a breach of duty. In this case, *HSP breached the terms of its personal management contract by incurring charges without [the Artists'] approval and by failing to exercise proper judgment as to the expenses it incurred. It also breached an independent fiduciary duty to the Artists . . . by failing to account for revenues it collected and expenditures it paid on their behalf.*[9]

Stepanian also argues that because the other claims and the defense of HSP's affirmative claims "were the major part of the case, while MUTPA claims were a minor part," the attorneys'

---

[7]*Porter*, 498 B.R. at 655 (emphasis added).

[8]*Id.* at 635.

[9]*Id.* at 657 (emphasis added).

5

fees devoted to MUTPA should be culled out.[10] When Stepanian refers to "other claims," he is including not only the claims related to breach of contract, but also the claims related to copyright infringement. As noted earlier, the Artists concede that they are not entitled to attorneys' fees related to their claims of copyright infringement. However, Stepanian has failed to identify any specific entries of time spent in connection with the Artists' copyright claim. Based on this Courts' observation at trial, a reduction of 15% will be taken from the total hours billed to account for the time spent on the copyright claim.

Finally, and most importantly, a review of this Court's opinion reflects that the claims based upon a violation of MUTPA cannot properly be characterized as a "minor part" of the case. Indeed, both parties claimed that the other violated MUTPA. Much of the Court's lengthy opinion was devoted to setting forth the applicable provisions and parameters of MUTPA,[11] enumerating each parties' claims and explaining the basis of its finding that HSP violated MUTPA and the Artists did not,[12] as well as allocating the relief to which the prevailing party was entitled.[13]

Accordingly, the Court finds that because the Artists were injured and, correspondingly, were awarded relief, the Artists are entitled to be awarded reasonable attorneys' fees and costs. The Court also finds that because the breach of contract claims and MUTPA claims arise from a single chain of events, the efforts devoted to the breach of contract claims need not be culled out from the efforts expended on the MUTPA claims.

---

[10]Pleading 336, p. 4.

[11]*Porter*, 498 B.R. at 652-55.

[12]Id. at 655-60.

[13]*Id*. at 660-61.

**III. Basis of Attorneys' Fees**

Stepanian suggests that the amount of damages recovered by the Artists should serve as the basis for ascertaining the amount of attorneys' fees to which the Artists are entitled. "Here, the claimed fees . . . dwarf the comparatively small benefit [the Artists] stand to receive . . . ."[14] Thus, under Stepanian's reasoning, if a prevailing party was awarded only nominal relief, he would be entitled to only nominal attorneys' fees.

Stepanian's suggestion in this regard is specifically refuted by the pertinent provisions of MUTPA itself. Chapter 93A, Section 11 provides that a successful MUTPA litigant is entitled to attorneys' fees "*irrespective of the amount in controversy* . . . [emphasis added]." The amount recovered is not the fundamental factor in determining attorneys' fees. If such were the case, it "would render nugatory the statutory directive which provides for a reasonable fee 'irrespective of the amount in controversy.'"[15] "[T]he purpose of a fee-shifting provision in a consumer statute is to ensure that plaintiffs with bona fide claims are able to find lawyers to represent them. Chapter 93A provides that the attorneys' fee must be reasonable but that it should not be limited by the amount of damages."[16] Thus, in determining reasonable attorneys' fees, a court may take into account the amount in controversy "as one factor," but the starting point should be the lodestar approach whereby a court considers the amount of hours reasonably expended times a reasonable hourly rate.[17]

---

[14] Pleading 336, p. 5.

[15] *Homsi v. C.H. Babb Co., Inc.*, 409 N.E.2d 219, 225 (Mass. App. Ct. Aug. 29, 1980).

[16] *Garcia v. L&R Realty, Inc.*, 790 A.2d 936, 942 (N.J. Super. A.D. Feb. 7, 2002).

[17] *Id.* at 943.

**IV. Calculation of Attorneys' Fees**

The Fifth Circuit uses the "lodestar" method to calculate attorneys' fees. *Shipes v. Trinity Industries*, 987 F.2d 311, 319–20 (5th Cir.), *cert. denied*, 510 U.S. 991, 114 S.Ct. 548, 126 L.Ed.2d 450 (1993). The lodestar method seeks to award "a fee sufficient to induce a capable attorney to undertake the representation of a meritorious ...case." *Perdue v Kenny A.*, 559 U.S. 542, 552, 130 S.Ct. 1662, 1672, 176 L.Ed.2d 494 (2010) "The lodestar includes most, if not all of the relevant factors constituting a reasonable attorney's fee." *Pennsylvania v. Delaware Valley Citizens' Council For Clean Air*, 478 U.S. 546, 566, 106 S.Ct. 3088, 92 L.Ed.2. 439. There is a strong presumption that the lodestar method yields a sufficient fee. *Id.* at 564.

Enhancements to the lodestar may be appropriate where the method used to determine the hourly rate does not adequately measure the attorney's true market value. *Perdue* at 554-55. "Enhancement may also be appropriate if the attorney's performance includes an extraordinary outlay of expenses and the litigation is exceptionally protracted." *Id*. at 555. Enhancement may also be appropriate where "an attorney's performance involves exceptional delay in the payment of fees." *Id.* at 556.

    A. Reasonable Hourly Rates

Stepanian objects to the rate of $450 per hour requested by John Pieksen ("Pieksen"). HSP filed suit against the Artists on December 6, 2010. Porter, who had known Pieksen for a number of years, retained Pieksen to represent him in connection with this matter. Pursuant to Pieksen's representation, the two agreed to an hourly rate of $200.00 per hour. Following Porter's bankruptcy

filing, the trustee employed Pieksen on a contingency fee basis.[18] Pieksen testified that his normal customary rate ranged from $175-225 per hour.

Based on Pieksen's customary rates of $175-225 per hour and his agreement with Porter to a rate of $200 per hour, Pieksen's personal customary rate is set at $200 per hour. The Court considers Pieksen's request for a fee based on $450 per hour to be a request for an upward departure.

Stepanian also objects to the rate of $650 per hour requested by Ronnie Penton ("Penton"). Prior to Stoltz's filing for bankruptcy relief and his employment by the estate, Penton agreed to represent Stoltz in this adversary proceeding at a rate of $500 per hour. Penton testified that he had a long standing relationship with Stoltz and had represented him in several legal matters prior to this one. He also testified that his normal and customary rate was between $400-600 per hour. Based on Penton's prior agreement with Stoltz and the customary rates he charged, his personal customary rate is $500 per hour. Again, the Court views Penton's request for a fee based on $650 per hour as a request for an upward departure of his customary rate.

B. Applicable Factors

As noted above, the customary rates or lodestar charged by counsel may be adjusted upward or downward depending on the respective weight of a few factors. "The lodestar, however, is presumptively reasonable and should be modified only in exceptional cases." *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993) (citing *City of Burlington v. Dague*, 505 U.S. 557, 562, 112 S.Ct. 2638, 2641, 120 L.Ed.2d 449 (1992)).

---

[18] A contingency fee agreement does not dictate the award to which counsel may be entitled. *See Blanchard v. Bergeron*, 489 U.S. 87, 93, 109 S.Ct. 939, 944, 102 L.Ed.2d 67 (1989) (a contingency fee contract does not impose a ceiling on an award of attorney's fees).

9

The Court may adjust the rate of counsel where the method used to determine the hourly rate does not adequately measure the attorney's true market value. Based on their prior agreements with Stoltz and Porter, Penton and Piekson's hourly rates may be presumed to be sufficient to induce a capable attorney to undertake the representation of a meritorious case. However, for the reasons set forth below, the Court finds that counsel's rate does not adequately measure true market value.

a. Preclusion of Other Employment

Pieksen described his law office as a small shop, taking in business "when it walks in the door." He explained that the instant case "monopolized" his time. At certain points in the litigation he was precluded from taking on other work. Bankruptcy related work generally consumes counsel's time and efforts while under way. For this reason, most practitioners in bankruptcy are precluded from handling multiple files at once. This is a reason why the rates charged for representations in this Court are higher than those generally charged by Mr. Pieksen. Because this matter did consume Mr. Pieksen's time and effort for over a year, and his lodestar rate is substantially lower than the rates usually charged by attorneys appearing before this Court with like experience and skill, this factor weighs in favor of an upward departure in the lodestar rate charged by Pieksen.

With regard to Penton, Penton admitted that during the course of this case, he was class counsel in the British Petroleum matter pending before the District Court in this district. In fact, during the discovery period, Penton was in trial on the issue of liability for his class. Thus, Penton's involvement in this case did not preclude other, presumably very lucrative employment, nor are his rates below those charged by others in this Court with like experience and skill. Therefore this factor does not weigh in favor of an upward departure in Penton's lodestar rate.

10

b. Customary Fee

This Court routinely reviews and approves fee applications for a wide variety of services performed by counsel and payable out of the estate. Rates are set for lawyers based on years of experience and skill. Over the course of many years comparable rates for lawyers with similar experience and skill have developed regardless of the time, preclusion of other work, or difficulty of the case. As explained above, these factors are usually incorporated into the customary rate of counsel. However, in this case, both counsel have lodestar rates that are out of compliance with those generally awarded in this district to attorneys of similar experience and skill, and whose practices must respond to the rigors and time constraints required by bankruptcy proceedings.

Based on similar awards to other counsel in both the Eastern District Court and Bankruptcy Court an attorney of Pieksen's experience and skill would be awarded an hourly rate of $325 per hour. Penton's rate would exceed the customary rates of the district which are closer to $375 per hour.

Based on the lodestar rate and factors for adjustment, the Court finds that an upward departure in the rate is warranted with regard to Pieksen because his normal rate of $200 per hour does not reflect the market rate customarily charged in this district by attorneys of like experience and skill, or compensate for the preclusion of other employment during the handling of this matter. As such, Pieksen's fee shall be based on an hourly rate of $325 per hour.

With regard to Penton, based on the lodestar rate and factors for adjustment, the Court finds that a downward departure is warranted. Based in particular on the rates customarily charged in this district for attorneys of like experience and skill and the fact that this matter did not preclude Penton's employment in other matters, the Court finds that Penton's fee shall be based on an hourly

rate of $375 per hour.

    C. Reasonable Hours Expended

Stepanian asserts that Piekson's hours are not reasonable as they were recreated after the fact and in connection with this application rather than contemporaneously.[19] This fact alone is insufficient to warrant a finding of unreasonableness *per se*. Estimated work hours may be less than contemporaneously-kept hours.[20] Based on Pieksen's testimony and the methodology he used to calculate his hours, the Court finds that the time charged is reasonable and likely to be less than that actually incurred.

For example, Pieksen testified that he went through his emails and charged two (2) minutes per email. The Court is aware that many firms "unit bill" a minimum of 1/10 to 1/25 per hour for each task on a file. Pieksen's method is substantially below this practice. Pieksen's time spent writing was tied to computer time. Research time was tied to Westlaw searches. Contemporaneous handwritten notes documented approximately 75% of time spent thinking and analyzing the matter at hand, with only 25% of such time documented after the fact. For these reasons, the Court cannot conclude that Pieksen's time is overstated.

Stepanian also complains that billing at .25 hour intervals, rather than, for example, .10 hour intervals, is unreasonable with regard to time spent reading "routine filing[s]."[21] Billing rates based on a quarter of an hour are not unusual or unreasonable in this district. While counsel are generally

---

[19] Pleading 336, p. 5.

[20] The Court, however, agrees that expenses related to recreating the time records should not be incurred by Stepanian.

[21] Pleading 336, p. 10.

12

instructed to report time in 1/10th of an hour increments based on the United States' Trustee's recommendations, in this case, Pieksen testified to grouping several tasks to amount to the 1/25 of time he charged. For example, 7 or 8 emails would be combined to justify a single 1/25th of an hour charge. As a result, the Court finds that Pieksen did not so much unit bill in 1/25ths of an hour as bunch multiple tasks until they amounted to 1/25 of an hour.

Stepanian claims that "time related to the unsuccessful claims against attorneys Herlihy and Eveline should not be included in the work for which compensation is requested."[22] The Court agrees. Counsel are not entitled to fees associated with claims that were not part of this adversary.[23] Stepanian also characterizes time related to "personal bankruptcies and discovery sanctions against [a] . . . client," as too tangential to the MUTPA claims to warrant reimbursement.[24] The Court agrees and will exclude time related to other bankruptcy matters but time spent defending requests for discovery sanctions was part and parcel of this case. Efforts in this regard are sufficiently related to counsel's successful MUTPA claims that the pertinent time should not be culled out.

Stepanian argues that there should be no reimbursement for "time spend defending the Massachusetts case before its transfer to his Court . . . ."[25] This matter was originally filed in Massachusetts by Stepanian. After the Artists filed for bankruptcy relief, it was transferred to this Court. Thus, time spent in either venue is part of counsel's representation.

---

[22] Pleading 336, p. 9.

[23] The Court finds that 100.5 hours of Pieksen's time and 60.5 hours of Penton's were spent on matters unrelated to this adversary.

[24] Pleading 336, p. 10.

[25] Pleading 336, p. 9.

Stepanian complains that time spent by Penton and Pieksen reviewing the same documents was "wasted effort." Stepanian suggests that counsel should have divided up the materials or had a paralegal perform a preliminary review to "eliminate clearly-irrelevant or duplicative materials . . . ."[26] It is not for Stepanian to dictate how counsel should prepare for and/or try their case. The fact that both counsel reviewed the documents at issue is not unreasonable.

Stepanian also objects to the rates charged for certain tasks included in the representation. Specifically, Stepanian objects to full hourly rates being applied to time spent traveling or away from Penton or Pieksen's offices but not working ("portal to portal time").

Both Penton and Pieksen billed the estate for time spent traveling to various destinations for work on this matter. The time included hours spent flying to out of state depositions or hearings, as well as driving to local hearings and depositions. Traditionally attorneys in the Eastern District of Louisiana are awarded for travel time but at half the approved rate. (*See also* United States Trustee guidelines for compensation of counsel). The exception occurs when counsel works while traveling. Neither Penton nor Pieksen testified to the amount of time they spent working while traveling. As a result, they will be compensated at half the approved rate for time spent traveling.[27]

As for portal to portal time, Penton explained that after billing for transit and working hours, when forced to remain out of town overnight, he billed for all time spent away from his home office. This time might be spent sleeping, eating or otherwise attending to personal matters. While the Court appreciates that time from home comes at some cost to counsel, it has never, and knows of

---

[26] Pleading 336, p. 9.

[27] Pieksen billed 91 hours for travel and Penton 73.

14

no instances when counsel was compensated for portal to portal time. The Court does not consider it reasonable to charge for personal time even if spent away from home. Thus, all portal to portal billings will be eliminated.[28]

The Court finds that hours expended by staff for administrative matters, such as bookkeeping of time and charges, filing electronically or otherwise, sending emails or filing pleadings are not generally allowed because they comprise overhead. Therefore they must be excluded from Penton and Pieksen's bills. However, the Court will distinguish and award the rates requested for work performed by administrative assistants when it comprised work generally performed by paralegals.

Stepanian also complains that Pieksen should not be allowed to bill for filing a pleading and then bill again for reviewing the filing. Stepanian characterizes counsel's efforts as "double-dipping," and provides that "there is no real need for an attorney to bill once for finalizing and filing a document, and a second time for reviewing the same filing."[29] Pieksen's practice is not unusual and or unreasonable particularly for sole practitioners without office assistance. Filing a document electronically is one task. Reviewing the filing to make sure it was properly received and accepted by the clerk's office is yet another. Thus two tasks are involved. Of greater concern, however, is the fact that the performance of these tasks constitutes administrative work. For this reason, the Court will reduce Pieksen's hours in this regard.

Based on these findings the Court calculates the fee due Pieksen and Penton:

Pieksen

---

[28]Pieksen did not bill portal to portal time. Penton billed 121.75 hours portal to portal.

[29]Pleading 336, pp. 6-7.

| | |
|---|---:|
| Total hours billed | 2823.50 |
| Less: | |
|     Hours billed for administration | 94.00 |
|     Hours billed for unrelated matters | 100.50 |
|     Hours billed for copyright claim | 394.00 |
|     Travel time | 91.00 |
| Adjusted hours | 2144.00 |

Billed hours of 2144. @ 325 =   696,800.00
Plus travel time 91 @ 162.5=    14,787.50

Total fee            711,457.50

Penton

| | |
|---|---:|
| Total hours billed | 2468.50 |
| Less: | |
|     Hours billed for administration | 20.00 |
|     Hours billed for unrelated matters | 60.50 |
|     Hours billed for copyright claim | 340.00 |
|     Portal to Portal time billed | 121.75 |
|     Travel time | 73.00 |
| Adjusted hours | 1853.25 |

Billed hours of 1853.25 @ 375 = 694,968.75
Plus travel time 73 @ 187.5   =   13,687.50
                                 708,656.25
Plus paralegal/assistant time:

| | |
|---|---|
| 1449.50 hours @$50 | 72,325.00 |
| 1706.00 @ $100 | <u>170,600.00</u> |
| Total fee | 951,581.25 |

## V. Calculation of Costs

Stepanian complains that Stuart Schimmel's ("Schimmel") expert fee is excessive. Schimmel, a certified public accountant ("CPA"), testified at trial regarding standard accounting procedures utilized when representing a entertainment artist. In his report, Shimmel represented that he would charge $5000 for review of materials and preparation of his report, and $500 per hour for depositions and trial appearances, with a minimum daily rate of $2000.[30] The Court finds the $5000 flat rate charge reasonable. However, the $500 per hour rate with a $2000 minimum daily rate is not reasonable and would never have been approved by this Court had Schimmel filed an application for employment by the estate. The Court takes judicial notice of the fact that the upper limit rate for services of a CPA in this district is $300 per hour. The Artists have offered nothing to support an upward departure of the customary rate in this district. Therefore, the cost of Schimmel's services will be reduced to $300 per hour with no daily minimum. Contrary to Stepanian's assertion however, Schimmel's travel costs should not be eliminated because counsel could have chosen a local CPA. Counsel is not obligated to hire experts living in the New Orleans metro area. However, Shimmel's travel time will be paid at half the hourly rate charged or $150 per hour and no time will be compensated for "portal to portal time." In addition, most of Schimmel's time was spent in the preparation of his report including the review of deposition testimony and other reports

---

[30]Pleading 336-1.

17

of HSP's experts. Therefore, Schimmel's hourly rate will only be applied to the time spent at trial or in deposition. The Court finds that Schimmel expended 72 hours and is due a fee of $21,600.00 for this time. Thus, Schimmel's total allowed fee is $26,600.

Stepanian complains about "in-house" or administrative costs, e.g., costs associated with scans and faxes, costs associated with copies and costs associated with discussions about "case funding." The Court agrees that scans and faxes constitute overhead and Stepanian is not responsible for reimbursement of same. Time spent on the matter of funding the case, however, cannot properly be characterized as an administrative costs. Such discussions were essential given the financial circumstances of the Artists. Further, the Court finds that the billed cost for copies is reasonable. Contrary to Stepanian's assertion, counsel was not obliged to go to an outside copy service to presumably have copies made at a lower rate.

Finally, Stepanian complains that Penton's travel expenses do not line up with Pieksen's expenses. For this reason, Stepanian characterizes Penton's expenses as excessive. There is no requirement that counsel's billable hours, whether for travel, research, document preparation, etc., be in sync with co-counsel's billable hours. Even when both counsel are present at the same location, differing charges for travel may exist: when individual counsel travel to a location from different starting points; when each stays at a different hotel for a different period; or by meals taken independently, by one paying for both, or by paying based on the actual amount spent rather than divided by heads.

Penton and Pieksen's offices and homes are in different parishes and there was no showing that they always took the same flight or travel routes. Further, there was no showing that they stayed at the same hotels or for the same nights. Similarly, there was no proof that they shared the same

meals or other related expenses.  Both Penton and Pieksen testified that all costs were for actual amounts incurred while traveling.  Stepanian has failed to provide any proof that this was not the case.

Costs recoverable by Penton total $111,372.72 and for Pieksen $54,176.14.

New Orleans, Louisiana, February 14, 2014.

                                          Hon. Elizabeth W. Magner
                                          U.S. Bankruptcy Judge