UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                              CASE NO.

**GEORGE JOSEPH PORTER, JR.**        **10-13553**
**ARALEAN H. PORTER**

                                                    SECTION A
DEBTORS                                             CHAPTER 7


**HIGHSTEPPIN' PRODUCTIONS, LLC**             ADVERSARY NO.

PLAINTIFF                                           **10-1130**

VERSUS

**GEORGE JOSEPH PORTER, JR. ET AL**

DEFENDANTS

ADMINISTRATIVELY CONSOLIDATED FOR TRIAL WITH

**HIGHSTEPPIN' PRODUCTIONS, LLC**             ADVERSARY NO.

PLAINTIFF                                           **10-1131**

VERSUS

**BRIAN HERBERT STOLTZ, ET AL**

DEFENDANTS

## REASONS FOR ORDER

## I.  PROCEDURAL HISTORY

Highsteppin' Productions, L.L.C. ("HSP") filed suit against Porter, Batiste, Stoltz, L.L.C. ("PBS") and its individual members, George Porter, Jr. ("Porter"), Brian Stoltz ("Stoltz"), and David Russell Batiste ("Batiste") on December 29, 2009, in the United States District Court for the Eastern District of Massachusetts (the litigation is referred to as the "Massachusetts Suit" and the Court as the "Massachusetts Court").  The Massachusetts Court entered a prejudgment writ of attachment

requiring each defendant to escrow portions of their income.  Porter and Stoltz escrowed money in connection with the Massachusetts Suit prior to seeking Chapter 7 bankruptcy relief.

Porter, Stoltz, and their wives filed voluntary petitions for relief under chapter 7 of the Bankruptcy Code on September 27, 2010.[1]  They both scheduled HSP as an unsecured creditor with a disputed debt of $504,040.06.  Batiste filed a chapter 7 bankruptcy petition on September 28, 2011,[2] also scheduling HSP as an unsecured creditor holding a disputed claim of $504,040.06. (Collectively Porter, Stoltz, and Batiste are referred to as "Debtors" and with PBS as "Artists.")

On or about December 6, 2010, the Massachusetts Suit was removed to the United States District Court for the Eastern District of Louisiana due to the pending bankruptcy proceedings.[3]  The Louisiana District Court referred the matter to this Court.[4]

HSP filed a Motion to Remand the Massachusetts Suit back to the Massachusetts Court on December 21, 2010.[5]  Debtors opposed remand,[6] and after a hearing, this Court denied remand.[7]  In response to the Massachusetts Suit, Debtors filed a Third Party Complaint and Counterclaims against David Herlihy ("Herlihy"), Phillip Stepanian ("Stepanian"), and HSP.[8]

---

[1]  Case No. 10-13553, P-1 (Porter) and Case No. 10-13554, P-1 (Stoltz).

[2]  Case No. 11-13158, P-1.

[3]  Case No. 10-13553, P-39; Case No. 10-13554, P-26.

[4]  Adv. 10-1130, P-1.  Unless otherwise referenced, the Court's citations to pleading numbers shall refer to pleadings in adversary 10-1130.

[5]  P-4.

[6]  P-8.

[7]  P-9.

[8]  P-11, 56.  Herlihy was dismissed by later Order.  P-38.

On December 29, 2010, HSP filed a Complaint to Determine Dischargeability of Debt against Porter and Stoltz.[9]  HSP's Complaint to Determine Dischargeability of Debt was filed against Batiste on December 30, 2011.[10]  In addition, HSP filed proofs of claim in the Porter and Stoltz cases.[11]  HSP's Dischargeabiltiy actions, Massachusetts Suit, all third party demands, and all counterclaims were substantively consolidated on February 23, 2011.[12]  On October 18, 2011, Debtors filed a Second Amended and Superseding Counterclaim.[13]  On October 20, 2011, the Complaints were set for trial on February 13, 2012.[14]

What followed can only be described as contentious pretrial litigation.  Seventeen (17) motions to compel discovery, for sanctions, to strike, to extend deadlines, or for protective relief were filed, opposed and heard.  Seven (7) additional motions for summary judgment, *in limine,* and to exclude experts were heard immediately before trial.  The pretrial litigation forced the resetting of the case for trial on the merits four (4) times.  The merits were heard on July 13 through 22 and September 13 through 28, 2012.  All parties affirmatively consented to trial on the merits  and entry of a final judgment as to all issues before this Court.[15]

---

[9]  Case No. 10-13553, P-56; Case No. 10-13554, P-34.

[10]  Case No. 11-13158, P-19.

[11]  Proof of Claim ("POC") No. 11 (Porter) and POC No. 2 (Stoltz).

[12]  P-12.

[13]  P-83.

[14]  P-84.

[15]  Initially, HSP's demand included a request for jury trial.  HSP voluntarily waived that request, agreeing to proceed in this Court.

At trial, counsel for Porter, Stoltz, Batiste, and PBS requested severance of the hearing on attorneys' fees and costs should Debtors be successful on the merits of their counterclaims. Severance was granted without opposition by HSP or Stepanian.

After nineteen (19) trial days, the post-trial motions and briefing were completed on January 31, 2013, and the matter was taken under advisement. Partial Judgment was rendered on August 16, 2013, reserving for later trial the issues related to attorneys' fees and costs recoverable by Debtors under the Massachusetts Unfair Trade Practices Act ("MUTPA"), M.G.L.A. c. 93A, § 11, and attorneys' fees and costs incurred by HSP in defending the copyright action.[16] A pretrial conference to set the hearing on damages was scheduled and continued twice due to HSP and Stepanian's failure to attend or their firing of counsel. The hearing on the merits of the damage claims was heard on January 15, 2014, and post-hearing briefs and amendments to evidence delayed this Court's ruling until February 14, 2014.[17]

Following entry of the judgment on attorneys' fees and costs, HSP and Stepanian appealed and filed this Motion for Stay Pending Appeal ("Motion").[18] After hearing on the Motion and additional briefing, the Court took the matter under advisement.

## II. ANALYSIS

### A. Substantive Merits of Stay Request

Granting a stay pending appeal requires consideration of four (4) well-established factors:

1. Is the applicant likely to succeed on the merits?

---

[16] P-292.

[17] P-343.

[18] P-385.

2. Will the applicant be irreparably injured absent a stay?

3. Will the issuance of a stay substantially injure the other parties? and

4. Is granting the stay in the public interest.[19]

The first two (2) factors are the most important.[20]

### 1. Likelihood of Success on the Merits

In considering the appellants' likelihood of success on the merits, appellants need not establish that they will be successful on appeal as long as the issues on appeal are serious, of first impression, or necessary to preserve the *status quo*.[21]   Movers claim they have a likelihood of success on the merits because they will assert this Court's lack of constitutional authority to enter final judgment on the counterclaims against them citing *Stern v. Marshall*," __ U.S. __, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), as authority.[22]   Movers contend that the instant case is indistinguishable from *Stern* as the resolution of Movers' claims did not require the resolution of Debtors' counterclaims.[23]

---

[19]   *Hunt v. Bankers Trust* Co., 799 F.2d 1060, 1067 (5th Cir. 1986).

[20]   *Moore v. Tangipahoa Parish School Bd.*, 507 Fed. Appx. 389, 392 (5th Cir. 2013) (quoting *Nken v. Holder*, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)).

[21]   *Peak Medical Oklahoma No. 5 v. Sebelius*, 2010 WL 4809319, *2 (N.D. Okla. Nov. 18, 2010) (likelihood of success shown where "certain issues being raised on appeal are largely matters of first impression"); *Walker v. Lockhart*, 678 F.2d 68, 71 (8th Cir. 1982) (court intervened to preserve *status quo* pending appeal where merits of appeal involved "substantial questions of law which remain to be resolved"); *Sweeney v. Bond*, 519 F.Supp. 124, 132-33 (D.C. Mo. May 19, 1981) (recognizing stay has been deemed appropriate "where such action was necessary to preserve the *status quo* or where the legal questions were substantial and matters of first impression").

[22]   On May 27, 2014, after this Opinion was substantially complete, the Court received a hand-delivered letter from HSP and Stepanian's counsel changing its position regarding *Stern*.  Counsel informed the Court that the "appellants...have not included the *Stern v. Marshall* issue in the appeal brief."  Nevertheless, because HSP and Stepanian have raised the issue, and have the right to raise it in future appeals, this Court is compelled to address it in its Opinion.

[23]   P-385 at 3.

### a. Lack of Constitutional Authority To Adjudicate Counterclaims

HSP and Stepanian have raised a challenge to this Court's constitutional authority to hear and render judgment on the claims asserted by Debtors against each of them. An analysis of the likelihood of success of Movants' appeal begins with an analysis of the claims filed against them and to which they complain.

HSP's Complaint sought repayment of personal advances allegedly made to Debtors; deferred commissions earned on Artists' earnings; and reimbursement for expenses incurred and paid by HSP on behalf of Artists. HSP's claims arose out of a Personal Management Agreement ("PMA") between HSP and Artists dated May 8, 2006. HSP requested a joint and several money judgment on its demands and a declaration that the judgment was nondischargeable.

HSP also filed proofs of claim in the Porter and Stoltz bankruptcy proceedings claiming $608,878.28 in each case. No proof of claim was filed in the Batiste case, but the Court notes that HSP's adversary complaint against Batiste sought recognition of its claim against him.[24]

Many of Debtors' counterclaims are actually defenses to HSP's claims. For example, Debtors' breach of contract and breach of fiduciary duties claims are both independent counterclaims and defenses to payment on the PMA.[25] While Debtors' MUTPA claim was an

---

[24] An adversary complaint seeking a money judgment against a debtor for prepetition conduct is an informal proof of claim when, as in this case, the following factors are met: (1) the claim is in writing; (2) the writing contains a demand by the creditor on the debtor's estate; (3) the writing evidences an intent to hold the debtor liable for the debt; (4) the writing was filed with the bankruptcy court; and (5) the equities do not weigh against treating the adversary complaint as an informal proof of claim. *Carroll v. Farooqi*, 486 B.R. 718, 722-23 (N.D. Tex. Feb. 19, 2013); *see also Nikoloutsos v. Nikoloutsos*, 199 F.3d 233, 236 (5th Cir. 2000).

[25] Often the same set of facts give rise to affirmative defenses and counterclaims. *See generally Boardwalk Apartments, L.C. v. State Auto Property and Cas. Ins. Co.*, 2013 WL 978404, *2 (D. Kan. Mar. 12, 2013) (affirmative defenses and counterclaims arose from same set of facts and were properly examined together); *Milwaukee Elec. Tool Corp. v. Hitachi Koki Co., Ltd.*, 2012 WL 1952977, *6 (E.D. Wis. May 29, 2012) (as affirmative defense and counterclaim allege same facts, court will address both); *Virginia Innovation Sciences, Inc. v. Samsung Electronics Co., Ltd.*, 2014 WL 1308699, *10 n.4 (E.D. Va. Mar. 21, 2014) (same analysis applicable to

independent cause of action, it also arose out of HSP's conduct and duties under the PMA. Finally,

Debtors' copyright infringement claim was a separate and distinct cause of action based on conduct

unrelated to the PMA but which could have offset any potential award under the PMA. In addition,

Debtors alleged various claims against Stepanian, individually.

### b. Claims Allowance, Bankruptcy Court Jurisdiction, and Constitutional Authority - Claims of HSP

The primary purpose of bankruptcy is to afford a debtor a fresh start.[26] This is accomplished

through the administration and distribution of a debtor's estate to allowed claimants. The allowance

of claims or the resolution of disputes to claims is a fundamental part of a bankruptcy court's

power.[27] Because claimants elect to participate in distributions from the estate through the filing of

claims or adversary matters, they subject themselves to the jurisdiction of the bankruptcy court at

least as to the validity of their claims. There is no question that both core jurisdiction and

constitutional authority exist in a bankruptcy court over issues surrounding the allowance of

demands against a debtor's estate.[28] As a result, this Court had jurisdiction and constitutional

authority over the claims asserted by HSP against Debtors.

---

counterclaim and affirmative defense premised on same facts).

[26] *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659 (1991).

[27] *Langenkamp v. Culp*, 498 U.S. 42, 45, 111 S.Ct. 330, 331, 112 L.Ed.2d 343 (1990) (when parties file claims against the bankruptcy estate, they bring themselves within the jurisdiction of the bankruptcy court); *In re Johns-Manville Corp.*, 600 F.3d 135, 152 (2nd Cir.), *cert. denied*, __ U.S. __, 131 S.Ct. 644, 178 L.Ed.2d 512 (2010) (bankruptcy courts have expansive jurisdiction to adjudicate claims against a debtor's estate).

[28] *Granfinanciera, S.A. v Nordberg*, 492 U.S. 33, 109 S.Ct. 2782 (1989) ("Our decision turned, rather, on the bankruptcy court's having 'actual or constructive possession' of the bankruptcy estate, [*Katchen v. Landy*,] 382 U.S. [323,] 327, 86 S.Ct. [467,] 471, [15 L.Ed.2d 391 (1966)] and its power and obligation to consider objections by the trustee in deciding whether to allow claims against the estate. *Id.* at 329-331, 86 S.Ct., at 472-474. Citing *Schoenthal v Irving Trust Co.*, [287 U.S. 92, 53 S.Ct. 50, 77 L.Ed. 185 (1932)]").

Once a claimant has made a claim, the debtor may raise an objection to its allowance either through affirmative defenses or counterclaims. The resolution of defensive positions, whether by offsetting offensive claims or affirmative defenses, will ultimately determine the amount a claimant may receive in distributions from the estate. Because a claim may be challenged not only on its merits but also by setoff, resolution over ancillary or separate counterclaims to the creditor's demand falls under the bankruptcy court's "related to jurisdiction." The challenge raised by HSP and Stepanian involves this Court's authority to render judgment on Debtors' counterclaims even if conducted in accordance with the claims allowance process.

### (1) Jurisdiction: Law versus Equity Courts

The predecessor to the Bankruptcy Code is the Bankruptcy Act ("the Act") initially enacted in 1898 to regulate the liquidation of a corporate bankrupt's property to unsecured claimants. At inception, the Act provided that a receiver collect and liquidate the bankrupt's assets distributing the proceeds to unsecured claimants. Secured assets were tendered to the secured claimant, who only participated in the case if a deficiency were owed. Eventually, receivers were allowed to administer assets subject to a secured claim provided they were "worthy of administration." Generally, this meant that equity in the property existed over and above the secured claim such that on liquidation, it might generate a return for unsecured claimants.

Over the years, the Act was amended and expanded to provide for the rehabilitation or reorganization of both legal entities and individuals. Amendments to the Act allowed the retention of assets, restructuring of repayment terms, and adjustment of creditor relationships so as to reorganize a debtor's affairs and provide greater recovery to creditors. As these new provisions took effect, the powers of the receiver (now known as the referee) expanded. For a number of years

8

leading up to the enactment of the Bankruptcy Code, courts struggled with the authority of bankruptcy courts to enforce these new powers.  At first, the distinctions were drawn based on the nature of the action as one in equity or law.

England had a long tradition of dividing its courts into those in equity and those in common law.  Generally, courts in common law provided a right to trial by jury on "'suits at common law' or "suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered."[29]  Under the United States Constitution, Article III courts are not divided into courts of equity or law.  As a result, whether an action lies in equity or law is generally irrelevant to the authority of a United States court.  Although the distinction between actions in equity and law ceased to be of particular concern in most Article III courts, it was of importance in defining the extent of power available to Article I bankruptcy courts.

From the beginning, a bankruptcy court's authority derived from their power over the *res* that comprised the bankrupt's estate, not unlike an admiralty court's power over the vessel.[30]  Congress, in an effort to provide an efficient and economical process for resolution of a bankrupt's estate, chose to resolve bankruptcy matters by summary proceeding, denying a bankruptcy court the power to conduct trials by jury.

---

[29] *Granfinanciera*, 492 U.S. at 41 (citing *Parsons v. Bedford*, 3 Pet. 433, 447, 7 L.Ed. 732 (1830)) (emphasis omitted).

[30] Kara Bruce, *The Debtor Class*, 88 Tul.L.Rev. 21, 43 (2013) (bankruptcy courts' jurisdiction has always hinged on the existence of a *res* - the debtor's estate); Stewart F. Peck, *Navigating the Murky Waters of Admiralty and Bankruptcy Law*, 87 Tul.L.Rev. 955, 960 ("filing a bankruptcy petition vests the bankruptcy court with *in rem* jurisdiction over the debtor's entire estate") (citing *In re Millennium*, 419 F.3d 83, 92 (2nd Cir. 2005)).

Under the Seventh Amendment to the United States Constitution, "suits at common law, where the value in controversy exceeds twenty dollars, the right of trial by jury shall be preserved."[31] Thus if an action was analogous to a "suit at common law," its right to trial by jury was preserved under the Constitution. Since Article I bankruptcy courts could not conduct jury trials, the nature of claims brought became the defining line for bankruptcy court authority as parties struggled to free themselves from the reach of bankruptcy tribunals.[32] Determining the nature of the cause of action required comparison to 18th century actions brought in courts of England prior to the merger of courts of law and equity. Then the remedy requested was examined to determine if it was legal or equitable in nature.[33] "If on balance these two (2) factors indicate that a party is entitled to a jury trial under the Seventh Amendment, we must decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as a factfinder."[34] Application of this process and its effect is illustrated in the decision *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). In *Katchen,* the petitioner filed a claim against a bankrupt estate. The trustee counterclaimed, arguing that the petitioner's claim constituted a voidable preference. In response, the *Katchen* petitioner demanded a jury trial objecting to the

---

[31] "Although the thrust of the Amendment was to preserve the right to jury trial as it existed in 1791, the Seventh Amendment also applies to actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty. *Curtis v. Loether*, 415 U.S. 189, 193, 94 S.Ct. 1005, 1007, 39 L.Ed.2d 260 (1974)." *Granfinanciera*, 492 U.S. at 42.

[32] If a statutory cause of action is legal in nature, the question whether the Seventh Amendment permits Congress to assign its adjudication to a tribunal that does not employ juries as factfinders requires the same answer as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal. *Granfinanciera*, 492 U.S. at 53-54.

[33] *Tull v United States*, 481 U.S. 412, 417-418, 107 S.Ct. 1831, 1835, 95 L.Ed.2d 365 (1987). "The second stage of this analysis is more important than the first, *Id.*, at 421, 107 S.Ct., at 1837." *Granfinanciera*, 492 U.S. at 42.

[34] *Granfinanciera*, 492 U.S. at 42.

bankruptcy court's right to hear the preference action.[35]   The Supreme Court held that the
bankruptcy court had both jurisdiction and constitutional authority to determine the amount of the
petitioner's claim *and* decide the preference action.   Because the bankruptcy court had actual or
constructive possession of the bankruptcy estate, it had both the power and obligation to consider
any objection to allowance of a claim against the estate.   The *Katchen* Court found:

> [A]lthough petitioner might be entitled to a jury trial on the issue of preference if he
> present no claim in the bankruptcy proceeding and awaited a federal plenary action
> by the trustee, when the same issue arises as part of the process of allowance and
> disallowance of claims, it is triable in equity [and by the bankruptcy court.][36]

The *Katchen* decision's foundation can be traced to *Alexander v Hillman*, 296 U.S. 222, 241-
242, 56 S.Ct. 204, 210-211, 80 L.Ed. 192 (1935)(citations omitted):

> By presenting their claims respondents subjected themselves to all the consequences
> that attach to an appearance.... Respondents' contention means that, while invoking
> the court's jurisdiction to establish their right to participate in the distribution, they
> may deny its power to require them to account for what they misappropriated.  *In
> behalf of creditors and stockholders, the receivers reasonably may insist that, before
> taking aught, respondents may by the receivership court be required to make
> restitution*.   That requirement is in harmony with the rule generally followed by
> courts of equity that having jurisdiction of the parties to controversies brought before
> them, they will decide all matter in dispute and decree complete relief.[37]

Years followed without change or additional Supreme Court comment on the subject.   Further
guidance was deferred until the passage of the Bankruptcy Reform Act of 1978 ("1978 Act").

---

[35]   In *Katchen,* and in response to the trustee's counterclaims, the petitioner demanded a jury trial, which
was not authorized under the Bankruptcy Act.

[36]   *Katchen,* 382 U.S. at 329-331.

[37]   *Alexander v. Hillman*, 296 U.S. 222, 241-242, 56 S.Ct. 204, 210-211, 80 L.Ed. 192 (1935)(citations
omitted) (emphasis supplied).

11

### (2) The Bankruptcy Reform Act of 1978

The 1978 Act provided bankruptcy courts with jurisdiction over core and non-core matters. Core matters were those considered essential to the administration of a bankruptcy case while non-core were those "related to," "arising out of," or "arising in" the bankruptcy case (collectively referred to as "related to" jurisdiction). For example, the allowance or disallowance of a claim against the estate was defined as core in nature, while any matter which touched on the administration of a case or could conceivably affect its outcome was considered non-core or only "related to" the case.[38]

When Congress passed the 1978 Act, it eliminated a party's right to trial by jury over any matter falling within the core or "related to" jurisdiction of the bankruptcy court. Because the Bankruptcy Act had preserved a party's right to trial by jury to the extent it ever existed, this constituted a change in the law. As previously discussed, *Hillman* and *Katchen* had already determined that courts of equity had the right and obligation to hear claims at law when done in the context of deciding a claim in equity, *e.g.,* a challenge to claim allowance without providing a right to trial by jury. Presumably then, the 1978 Act did not change anything in this context. However, to the extent only a question at law was at issue, it was at variance with precedent.

Challenge quickly followed in the case of *Northern Pipeline Construction Co., v. Marathon Pipe Line Company*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Prior to filing for bankruptcy relief, Northern Pipeline filed a breach of contract suit against Marathon in a Kentucky federal district court. While that suit was pending, Northern Pipeline filed for bankruptcy relief in Minnesota. Northern Pipeline then instituted an adversary proceeding against Marathon in the

---

[38] *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3rd Cir. 1984).

bankruptcy court on the same claims pending in the Kentucky suit.  Marathon filed a Motion to

Dismiss the adversary proceeding arguing that the 1978 Act's establishment of bankruptcy courts

violated the Constitution.[39]

    *Northern Pipeline* involved a suit at common law filed by a debtor in bankruptcy court.

Under the 1978 Act, the suit was "related to" the administration of the case because it involved the

ongoing business of the debtor and its relationship with Marathon.[40]  Because the case fell squarely

within the confines of the bankruptcy court's statutory grant of authority, the issue raised was

whether Congress could  grant this authority to a non-Article III court.

    The Supreme Court began by reviewing the historical administration of bankruptcy law:

> The jurisdiction of a court of bankruptcy under the old Bankruptcy Act was confined,
> essentially, to actions in rem and actions wherein the defendant had consented to its
> jurisdiction.  Where the Court was deemed in possession of the debtor's property and
> the case involved the actual disposition of the debtor's property, the suit was heard
> by a bankruptcy referee as a "summary proceeding."  All other matters affecting the
> debtor's assets were deemed "plenary" suits and were heard by a district court.  *See*
> Collier on Bankruptcy ¶3.01[1][b] (1980).[41]

The 1978 Act expanded the power of bankruptcy courts to those possessed by all courts "of equity,

law and admiralty...."  In so doing the 1978 Act eliminated any plenary jurisdiction in favor of

dividing matters into core and non-core designations.  The bankruptcy courts were granted

jurisdiction over both core and non-core matters.

---

[39]   These facts are omitted from the Supreme Court opinion but may be gleaned from the opinion of the
District Court, *Marathon Pipeline Co. v. Northern Pipeline Const. Co.,* 12 B.R. 946, 947 (D. Minn. Apr. 23, 1981).

[40]  It is unclear from the facts of the case, but it appears Marathon had not filed a proof of claim in Northern
Pipeline's bankruptcy proceeding and, therefore, was not a creditor.

[41]  *Marathon Pipeline Company v. Northern Pipeline Construction Co.*, 12 B.R. 946, 949 n. 7 (D. Minn.
Apr. 23, 1981).

The *Northern Pipeline* Court asserted that the question raised by the case was one not previously addressed.  On this point, the *Northern Pipeline* Court was of course correct.  The Supreme Court had not previously considered the constitutionality of the 1978 Act.  Further, decisions prior to the 1978 Act and *Northern Pipeline* had not addressed whether or not Congress could constitutionally assign the resolution of disputes within an Article III's authority to an administrative agency or specialized court of equity.[42]  However, by implication the answer was yes.  In *Hillman* and *Katchen,* the bankruptcy court was allowed to both liquidate claims against the estate and counterclaims by the estate against the creditor.  If the bankruptcy court had lacked the Constitutional authority to do so, the *Hillman* and *Katchen* cases would have had very different results.  Nevertheless, while the bankruptcy court's constitutional authority under the separation of powers doctrine was assumed based on these results, it was not specifically addressed.

Faced with a statutory scheme that clearly removed a previously protected suit at common law from the district court, the Supreme Court discussed not only the bankruptcy courts' statutory authority over the matter but Congress' authority to remove the action to a non-Article III court.  Finding that Congress had overstepped its authority, *Northern Pipeline* declared the bankruptcy courts unconstitutional.[43]

### (3) *Northern Pipeline's* Reasoning

Congress may create legislative courts to adjudicate matters that could be conclusively determined by the Executive and Legislative Branches.  However, the *Northern Pipeline* Court

---

[42]  As previously discussed, prior decisions had focused on the nature of the claim and a litigant's right to trial by jury as a proxy for the extent of bankruptcy court jurisdiction. *See, supra* at p. 10 n. 29; *see, infra* at pp. 19-20.

[43]   The Supreme Court stayed the ruling's effect for two (2) years so that Congress could correct its error.

cautioned that applicability of the principle was limited. It then delineated three (3) areas where assignment of a dispute to a non-Article III court was proper and had been recognized by the Supreme Court.

The constitutionality of non-Article III territorial courts had been recognized because their creation was grounded in the framers' intention that Congress be given general powers of governance in geographical areas where no state government operated.[44] The *Northern Pipeline* Court also recognized that non-Article III courts existed in connection with courts-martial, distinguishing both the importance and historical precedent of Executive power over the military.

Finally, the Supreme Court noted that when Congress creates new statutory "public rights," it may assign their adjudication to an administrative agency. For example, in *Murray's Lessee v. Hoboken Land & Improvement Co.*,[45] the federal government attempted to collect a debt owed from one of its customs agents without use of the court system. Because the matter was not traditionally subject to judicial determination under the law of England and the States at the time the Constitution was adopted, it was a new claim, not historically judicial in nature. Therefore, resolution outside of the Judicial Branch was allowed.[46]

The notion that "public rights" do not have to be adjudicated in the Judicial Branch stems from the doctrine of sovereign immunity. The rationale provides that when Congress creates a new or public right, it may attach, as a condition of that right, limitations on its enforcement and

---

[44] *American Ins. Co. v. Canter*, 1 Pet. 511, 7 L.Ed. 242 (1828); *Kendall v. United States*, 12 Pet. 524, 9 L.Ed. 1181 (1838)(Concerning Congress' creation of non-Article III courts for the District of Columbia); and *Wallace v. Adams*, 204 U.S. 415, 27 S.Ct. 363, 51 L.Ed.547 (1907) (regarding legislative courts in Indian territories).

[45] *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 18 How. 272, 15 L.Ed. 372 (1856).

[46] *See also Ex Parte Bakelite Corp.*, 279 U.S. 438, 49 S.Ct. 411, 43 L.Ed. 789 (1929).

governance. This includes where and how the government may be sued on that right. For example,

the granting of a patent is a right conferred by the federal government. As such, actions to require

its issuance, enforce its protection, or challenge regulation of it, may be made in a non-Article III

court.[47] Because these actions are all against the government on a right it has created and conferred,

the government may also determine how they are to be resolved.[48] At the time *Northern Pipeline*

was decided, public rights were only those asserted between the government and its citizens.

Therefore, the *Northern Pipeline* Court concluded that the "public rights" exception was

inapplicable. The Court held:

> The distinction between public rights and private rights has not been definitively
> explained in our precedents. Nor is it necessary to do so in the present cases, for it
> suffices to observe that a matter of public rights must at a minimum arise "between
> the government and others." In contrast, "the liability of one individual to another
> under the law as defined," is a matter of private rights. Our precedents clearly
> establish that *only* controversies in the former category may be removed from Art.
> III courts and delegated to legislative courts or administrative agencies for their
> determination. Private-rights disputes, on the other hand, lie at the core of the
> historically recognized judicial power.[49]

In summary, the *Northern Pipeline* Court found three (3) situations in which the assignment

of dispute resolution to non-Article III tribunals was constitutionally allowed. Only in those limited

circumstances could Congress place dispute resolution into an Article I court. As the *Northern*

*Pipeline* Court explained, "Congress cannot 'withdraw [from Article III] judicial cognizance *any*

matter which, *from its nature,* is the subject of a suit at common law, or in equity, or admiralty.'"[50]

---

[47] It is worth noting that at the time *Northern Pipeline* was decided, patent litigation was in fact resolved before Article I tribunals.

[48] *See, e.g., Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932).

[49] *Northern Pipeline*, 458 U.S. at 69-70 (citations omitted) (emphasis original).

[50] *Id.*, at 70, n. 23.

In finding the bankruptcy court system unconstitutional, the *Northern Pipeline* Court held:

> We discern no such exceptional grant of power applicable in cases before us. The courts created by the Bankruptcy Act of 1978 do not lie exclusively outside the States of the Federal Union, ...Nor do the bankruptcy courts bear any resemblance to courts-martial, which are founded upon the constitution's grant of plenary authority over the Nation's military forces to the Legislative and Executive Branches. Finally, the substantive legal rights at issue in the present action cannot be deemed "public rights." Appellants argue that a discharge in bankruptcy is indeed a "public right,"...but the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages....The former may well be a "public right," but the latter obviously is not.[51]

### (4) Post *Northern Pipeline* Reform of the 1978 Act

Following *Northern Pipeline*, Congress passed the Bankruptcy Reform Act of 1984. In 1984, amendments were designed to modify the system so as to bring it into constitutional compliance. Although bankruptcy courts remained Article I courts, they were constituted and supervised by the third branch. Specifically, bankruptcy judges were now appointed by the circuit courts and subject to their discipline. Original jurisdiction of bankruptcy remained with the district court which could by reference confer it upon the bankruptcy court. Core jurisdiction was exercised by the bankruptcy court, but non-core jurisdiction was only available with consent of the parties. Failing consent, the bankruptcy court could only provide proposed findings of fact and conclusions of law to the district court which was then free to adopt or review the matter *de novo*. In many ways, the amendments tracked the magistrate system which allowed for the district court appointment of Article I judges, supervised by the district court, and allowed to address Article III matters by consent of the parties. Test of the amended system's constitutional *bone fides* came with the 1989

---

[51] *Northern Pipeline*, 458 U.S. at 71.

Supreme Court case of *Granfinanciera v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.3d 26

(1989).

> **(5) *Granfinanciera, S.A. v. Nordberg; Langenkamp v. Clup*, 498 U.S. 42,
> 111 S.Ct. 330, 112 L.Ed.2d 343 (1990)**

In *Granfinanciera,* the defendant who had not submitted a claim against a bankruptcy estate

asserted a right to a trial by jury on a trustee's action to recover on a fraudulent conveyance,

objecting to the bankruptcy court's jurisdiction.  Although authorized by the Bankruptcy Code as

a "core" matter, the Supreme Court found that the nature of the claim was at common law.  Finding

that the Seventh Amendment entitled the defendant to a jury trial, the question became, "Could

Congress assign that action to a non-Article III tribunal?"[52]

The Supreme Court again noted that "when Congress creates new statutory 'public rights,'

it may assign their adjudication to an administrative agency with which a jury trial would be

incompatible, without violating the Seventh Amendment's injunction that jury trial is to be

'preserved' in 'suits at common law.'"[53]   Acknowledging that the power to adjudicate actions

without a jury was distinct from inquiry into whether Congress had permissibly entrusted the

resolution of disputes to a specialized court of equity, the *Granfinanciera* Court nonetheless

concluded:

---

[52] There was no question that Congress had attempted to do so as the Bankruptcy Code provided that
fraudulent conveyance actions were 'core' in nature.   28 U.S.C. §157(b)(2)(H). "The sole issue before us is whether
the Seventh Amendment confers on petitioners a right to a jury trial in the face of Congress' decision to allow a non-
Article III tribunal to adjudicate the claims against them."  *Granfinanciera*, 492 U.S. at 49.

[53] *Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n*, 430 U.S. 442, 455, 97 S.Ct. 1261,
1269, 51 L.Ed.2d 464 (1977)(footnote omitted).  This conclusion begged the question.  Through now familiar
analysis, the Supreme Court had first examined the nature of a fraudulent conveyance claim in 18th century England.
It concluded that fraudulent conveyance actions were available at common law during this period and were actions
in law.  Therefore, a fraudulent conveyance action was not a "newly created public right," nor was it an action in
equity.

[I]f a statutory cause of action is legal in nature, the question whether the Seventh Amendment permits Congress to assign its adjudication to a tribunal that does not employ juries as factfinders requires the same answer as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal.  For if a statutory cause of action, such as respondent's right to recover a fraudulent conveyance under 11 U.S.C. §548(a)(2), is not a "public right" for Article III purposes, then Congress may not assign its adjudication to a specialized non-Article III court lacking "the essential attributes of the judicial power."  *Crowell v. Benson*, (citation omitted), 285 U.S., at51, 52 S.Ct., at 292.  And if the action must be tried under the auspices of an Article III court, then the Seventh Amendment affords the parties a right to a jury trial whenever the cause of action is legal in nature.  Conversely, if Congress may assign the adjudication of a statutory cause of action to a non-Article III tribunal, then the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder.  *See, e.g. Atlas Roofing, supra*, 430 U.S., at 453-455, 460, 97 S.Ct., at 1268-1269, 1271; *Pernell v. Southall Realty, supra*, 416 U.S., at 383, 94 S.Ct., at 1733; *Block v. Hirsh, supra*, 256 U.S., at 158, 41 S.Ct., at 460.  In addition to our Seventh Amendment precedents, we therefore rely on our decisions exploring the restriction Article III places on Congress' choice of adjudicative bodies to resolve disputes over statutory rights to determine whether petitioners are entitled to a jury trial.[54]

First the Supreme Court found:

"[T]he restructuring of debtor-creditor relations, which is at the core of federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case.  The former may well be a 'public right,' but the latter obviously is not.  *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71, 102 S.Ct. 2858, 2871, 73 L.Ed.2d 598 (1982) (opinion of Brennan,J.)."[55]

The *Granfinanciera* Court then reasoned, that *because petitioners had not filed claims against the estate*, the respondent's fraudulent conveyance action did not arise "as part of the process of allowance and disallowance of claims.[56]   Nor was the action integral to the restructuring of

---

[54]  *Granfinanciera*, 492 U.S. at 53-54.

[55]  *Id.,* 492 U.S. at 55, n. 12.

[56]  Because *Granfinanciera* based its ruling in part on a defendant's refusal to consent to the bankruptcy court's jurisdiction and distinguished actions brought against parties filing proofs of claim or demands against the estate, the absence of consent to the bankruptcy court's jurisdiction became critical in subsequent challenges to bankruptcy court authority. Following *Granfinanciera*, submission to the bankruptcy court's authority was assumed if a proof of claim were filed, adversary instituted, or the defendant "participated" in the case. *See also*, *e.g.*

debtor-creditor relations."[57]   In explaining its reasoning, the *Granfinanciera* Court specifically,

"[A]dopted a rationale articulated in *Alexander v Hillman*, 296 U.S. 222, 241-242, 56 S. Ct. 204,

210-211, 80 L.Ed. 192 (1935)(citations omitted):

> "'By presenting their claims respondents subjected themselves to all the consequences that attach to an appearance.... "'Respondents' contention means that, while invoking the court's jurisdiction to establish their right to participate in the distribution, they may deny its power to require them to account for what they misappropriated.  In behalf of creditors and stockholders, the receivers reasonably may insist that, before taking aught, respondents may by the receivership court be required to make restitution.  That requirement is in harmony with the rule generally followed by courts of equity that having jurisdiction of the parties to controversies brought before them, they will decide all matter in dispute and decree complete relief.'"
>
> It warrants emphasis that this rationale differs from the notion of waiver on which the Court relied in *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 8733, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986).  The Court ruled in *Schor*...that the Commodities Futures Trading Commission could adjudicate state-law counterclaims to a federal action by investors against their broker consistent with Article III.  The Court reached this conclusion, however, not on the ground that the Commission had possession of a disputed res, to which the investors laid claim, but on the ground that Congress did not require investors to avail themselves of the remedial scheme over which with Commission presided.  The investors could have pursued their claims, albeit less expeditiously, in federal court.  By electing to use the speedier, alternative procedures Congress had created, the Court said the investors waived their right to have the state-law counterclaims against them adjudicated by an Article III court.  *See, Id.*, at 847-850, 106 S.Ct. At 3255-3257.  Parallel reasoning is unavailable in the context of bankruptcy proceedings, because creditors lack an alternative forum to the bankruptcy court in which to pursue their claims.  ***As Katchen makes clear, however, by submitting a claim against the bankruptcy estate, creditors subject themselves to the court's equitable power to disallow those claims, even though the debtor's opposing counterclaims are legal in nature....***

---

*Langenkamp v. Culp*, 498 U.S. 42, 45, 111 S.Ct. 330, 331, 112 L.Ed.2d 343 (1990)  (respondents filed claims against the estate, "thereby bringing themselves within the equitable jurisdiction of the Bankruptcy Court").  *In re Winstar Communications, Inc.* 554 F.3d 382, 406 (3rd Cir. 2009) (when creditor files a proof of claim, creditor brings itself within equitable jurisdiction of the Bankruptcy Court).  *In re S.G. Phillips Constructors,* Inc., 45 F.3d 702, 707 (2nd Cir. 1995) (same).  *Billing v. Ravin, Greenberg & Zackin, P.A.*, 22 F.3d 1242, 1248-49 (3rd Cir. 1994) (same).  This principle also finds support in the cases decided under the Bankruptcy Act and the 1964 Act that formulated the Magistrate courts.

[57] *Id.*, 492 U.S. at 58, affirming the holding in *Schoenthal v. Irving Trust Co.*, 287 U.S. 92, 53 S.Ct. 50. 77 L.Ed. 185 (1932).

> *...[O]nce a creditor has filed a claim against the estate, the bankruptcy trustee may recover, the full amount of any preference received by the creditor-claimant, even if that amount exceeds the amount of the creditor's claim.*[58]

The Supreme Court then was required to answer whether or not a Congressional assignment of such a claim to a court in equity was constitutionally permissible. Finding in the negative, the Supreme Court held that a trustee in bankruptcy may not sue in an equity court to recover alleged fraudulent conveyances because the recipients of the voidable payments had not filed claims against the bankruptcy estate. As a result, the suit had to proceed at law honoring the long-settled rule that suits in equity will not be sustained where the complete remedy exists at law.[59]

Following *Granfinanciera*, the *Langenkamp v. Culp*, 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990), case again confirmed the right of a bankruptcy court to hear both an objection to a claim and the trustee's counterclaim if done in connection with the claims allowance process. In *Langenkamp*, the trustee had objected to the allowance of a claim by asserting a preference action. Under the previous *Katchen* decision, the Supreme Court defined a preference action as one grounded in common law, existing in 18th century England, and subject to trial by jury.[60] Nevertheless, *Katchen* confirmed a referee's authority to decide the matter in connection with the claims allowance process. Thus, *Langenkamp* provided the Supreme Court with a new opportunity to restrict a bankruptcy court's authority over a counterclaim in the claims allowance process. Instead, however, *Langenkamp* confirmed the bankruptcy court's authority to decide both the validity of the claim and the preference action with little fanfare. The *Langenkamp* Court explained:

---

[58] *Id.*, 492 U.S. at 59, n. 14 (emphasis supplied).

[59] *Id., 492* U.S. at 48.

[60] *See* discussion p. 11-12, *infra*.

21

> In *Granfinanciera* we recognized that by filing a claim against a bankruptcy estate the creditor triggers the process of "allowance and disallowance of claims," thereby subjecting himself to the bankruptcy court's equitable power...If the creditor is met, in turn with a preference action from the trustee, that action becomes part of the claims-allowance process which is triable only in equity...In other words, the creditor's claim and the ensuing preference action by the trustee become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's *equity jurisdiction*.[61]

Absent from the opinion is any discussion of the constitutionality of Congressional assignment to the bankruptcy courts. Once the matter was found to be within the claims allowance process, the Court appears to have concluded assignment was proper.

The balance struck between the two (2) cases turns on the conclusion that the failure to resolve a debtor's claim against a noncreditor minimally affects the bankruptcy court's ability to administer the estate or *res*. In this context, expanding a bankruptcy court's jurisdiction into diversity cases, those based on federal law, or in common law and only tangentially related to the debtor's estate (because no claim against the estate was involved) would offend the separation of powers doctrine and the Seventh Amendment. The compromise preserved the constitutional separation of powers while not seriously undermining a bankruptcy court's ability to perform its mission.

If one harkens back to the fundamental purpose for bankruptcy relief, the holdings in *Granfinanciera* and *Langenkamp* become clear. Bankruptcy laws strive to 1) unburden a debtor from existing claims so as to ensure a fresh start; and 2) distribute a debtor's property in a orderly and fair manner. When dealing with participants in a bankruptcy case (*i.e.,* creditors, co-owners) the administration of the case requires a bankruptcy court to determine who are the creditors of the

---

[61] *Langenkamp*, 498 U.S. at 44 (citations omitted).

estate and the amount of their claims.  Both issues must be resolved in order to establish how much

each claimant will receive from the debtor's property.  When dealing with a noncreditor, neither of

these issues is implicated.  So, the Supreme Court viewed an offensive claim against a third party

as merely the liquidation of a bankruptcy asset, *i.e.,* an action to augment the estate rather than an

action to determine a claimant's right to receive distribution from the estate.  Because that process

could be handled by either state or federal courts without hampering the bankruptcy court's ability

to fulfill its mission, it was not essential to the bankruptcy court's power. As a result, a *non-creditor*

defendant could not be compelled to litigate the debtor's claim in the bankruptcy court.

 *Granfinanciera* and *Langenkamp* confirm that the claims allowance process is clearly within

the jurisdiction and constitutional authority of the bankruptcy courts.  They also confirm that

counterclaims are within that process.  The limitations imposed by *Grandfinanciera* are consigned

to cases in which distributions from the estate are not affected.  In *Grandfinanciera*, the imposed

limitations on the bankruptcy court's authority did not seriously affect other claimants or the

administrative process because the plan of reorganization had already been confirmed.  Conversely,

*Langenkamp* involved counterclaims against a creditor.  In upholding the bankruptcy courts' power

to decide the matter, the *Langenkamp* court implied a constitutional grant of authority was present

while not specifically so holding.

**(6) *Stern v. Marshall*, 131 S.Ct. 2594, 180 L.Ed.2d. 475 (2011)**

 In June  2011, the Supreme Court rendered its decision in *Stern v Marshall*.  *Stern* involved

a defamation claim against a debtor and a counterclaim by the debtor on an unrelated tortious

interference claim.  The creditor both filed a proof of claim and an adversary proceeding in the

bankruptcy court seeking liquidation of its claim.  The debtor counterclaimed with a tortious

23

interference claim on unrelated facts, including distinct conduct from that surrounding the creditor's claim.

The bankruptcy court granted summary judgment denying the creditor's defamation claim. Approximately a year after summary judgment was entered, the court tried the debtor's claim and rendered judgment in the debtor's favor. Although the alleged creditor filed a proof of claim and consented to the bankruptcy court's entry of final judgment on the objection to its claim, the Supreme Court held that jurisdiction over the tortious interference claim violated the constitutional separation of powers existing between the Legislative and Judicial Branches. As a result, the bankruptcy court lacked authority to render a final judgment on the claim. Specifically, the Supreme Court held that because the tortious interference claims of the debtor were unrelated to the resolution of the proof of claim, they fell outside of the bankruptcy court's constitutional authority. Although *Stern's* ruling was thought by the Supreme Court to be "narrow"[62] and "removal of the counterclaims...[like debtor's would not] meaningfully change the division of labor under the current statute,"[63] it has raised serious questions regarding what claims can be tried by a bankruptcy court. Why?

Under *Granfinanciera's* reasoning, the creditor, Marshall, was clearly subject to the bankruptcy court's jurisdiction and constitutional authority, at least initially. There remains no serious argument that the bankruptcy court retains jurisdiction and constitutional authority over the allowance of claims process. So, the Bankruptcy Court had authority to determine if Marshall was a creditor of the estate and in what amount. However, because the Bankruptcy Court disposed of

---

[62] *Stern*, 131 S.Ct. at 2620.

[63] *Id.*

Marshall's proof of claim by summary judgment prior to deciding the debtor's counterclaim, it was unnecessary for the Bankruptcy Court to resolve the counterclaim against Marshall in the allowance process.

*Stern's* holding has sparked a flurry of opinion as to its effect. If one reviews it in reference to the cases upon which it stands, *Stern* does not signal a significant departure from prior precedent and has no effect on the ruling in this case. At its core, *Stern* is merely a restatement of the principles espoused in *Hillman, Katchen, Northern Pipeline, Granfinanciera,* or *Langenkamp.*

Initially, *Stern* involved claims by a creditor against an estate and counterclaims by the estate against the creditor. The claims by the creditor were disposed of separately and prior to the consideration of any of the counterclaims asserted by the debtor. Therefore, when the bankruptcy court decided the debtor's counterclaims, *the defendant was not a creditor of the estate and had no pending claims against it.* Is it any wonder that an action against a disinterested third party, at common law,[64] could not be decided by the bankruptcy court? This interpretation of *Stern* is in keeping with Justice Roberts' belief that *Stern's* holding is "narrow" and of inconsequential effect. If merely a restatement of *Granfinanciera*, the *Stern* decision simply adds to the *Granfinanciera* holding by instructing that if the claims process is finally concluded prior to the consideration of counterclaims, the initial constitutional authority given the bankruptcy court over surviving causes of action is lost if no claim against the estate survives.

Remembering that courts in equity retain authority over actions in common law provided equitable relief is also invoked, the assertion of a claim against the estate provides a court in equity with authority to determine counterclaims at common law even to the extent they exceed the claims

---

[64] In *Stern*, the causes of action were based in tort and requested monetary relief.

against the estate. *Hillman, Katchen, Northern Pipeline, Granfinanciera,* and *Langenkamp,* confirm this principle making clear that the filing of a claim provides a bankruptcy court with the power and obligation to consider objections by the trustee regardless of their nature. It is only in the context of a claim brought by an estate against a *non-creditor* where Supreme Court precedents trigger limitations in a bankruptcy court's authority. None of the cases preceding *Stern* questioned or limited the bankruptcy courts' constitutional authority to decide counterclaims brought in the claims allowance process whether based in equity or law, raised under state or federal statutes.[65]

The litigation of Debtors' claims against HSP clearly fall within the confines of the claim allowance process. Until the ink was dry on its judgments, this Court did not know if HSP held a claim against Debtors or if Debtors held a claim against HSP. Thus, the resolution of the Debtors' defenses and offsetting claims was necessary in order to determine if a claim by HSP survived. As confirmed by the *Hillman, Katchen, Langenkamp* and *Granfinanciera* decisions:

> *by submitting a claim against the bankruptcy estate, creditors subject themselves to the court's equitable power to disallow those claims, even though the debtor's opposing counterclaims are legal in nature.*
>
> *...[O]nce a creditor has filed a claim against the estate, the bankruptcy trustee may recover, the full amount of any preference received by the creditor-claimant, even if that amount exceeds the amount of the creditor's claim.[66]*

In addition, portions of Debtors' claims were clearly equitable in nature. For example, Debtors demanded an accounting from HSP for all funds belonging to Debtors or their company and

---

[65] *See, e.g. Katchen, supra* (trustee's preference action subject to bankruptcy court authority when combined with objection to claim); *Hillman, supra,* and *Langenkamp, supra.* Although *Stern* characterized *Langenkamp's* facts as involving only "federal statutes," in fact *Langenkamp* and *Katchen* before it both found that preference actions were actually common law claims in 18th Century England, not newly created federal rights. As such they were not actually based in federal statute but common law.

[66] *Granfinanciera,* 492 U.S. at n. 14 (emphasis added).

collected and used by HSP. If Debtors "need equitable aid for an accounting or the like, they may invoke the equitable process, and that is beyond dispute."[67] For these reasons this Court properly exercised its constitutional authority over the issues presented.

Nevertheless, there are those who read *Stern* to only permit the resolution of defenses to a proof of claim's allowance but deny a bankruptcy court the right to consider *any* offsetting counterclaims. This view requires analysis of each cause of action contained in the litigation for separate jurisdictional and constitutional authority.

### (7) *Stern's* Alternative Reading

Support for a different interpretation of *Stern's* holding stems from its particular facts. Arguably, the *Stern* Court could have come to the same result without finding portions of a bankruptcy court's statutory authority unconstitutional. As such, the path taken by the Supreme Court can be argued to be purposeful and, therefore, broader in its effect. Why? First, the adjudication of the debtor's action in common law was made subsequent to the disallowance of the creditor's claim. It would have been simple for the Supreme Court to recognize the bankruptcy court's lack of authority on this point alone.[68]

Second, the authority of the bankruptcy court could have been denied based on the nature of the claim. Since the claim was a personal injury action, it was also possible for the Supreme Court to deny authority on the basis of 11 U.S.C. § 524 which prohibits a bankruptcy court from deciding claims based in tort. Instead, the Supreme Court found that the prohibitions contained in

---

[67] *Granfianciera*, 492 U.S. at 44 (citing 1 G. Glenn, Fraudulent Conveyances and Preferences sect. 989, pp 183-184 (rev. ed. 1940)).

[68] *See Hillman, supra, Katchen, supra, Marathon, supra, Granfinanciera, supra, Langenkamp, supra. Cf: Stern,* 131 S.Ct. at 2615 ("As an initial matter, it is hard to see why [Marshall's] decision to file a claim should make any difference with respect to the characterization of [debtor's] counterclaim."). *See also Id.* at 2598.

the Bankruptcy Code involving court authority over personal injury actions were not jurisdictional and could be waived.[69]

Third, Marshall had initially consented to allow the issuance of a final judgment by the bankruptcy court on both the challenge to his claim and the debtor's counterclaim. After the Court disallowed his claim on summary judgment, Marshall attempted to withdraw his consent to the bankruptcy court's authority. Holding that objections to the court's authority were subject to waiver and prevented "sandbagging" by the litigants, the *Stern* Court disposed of Marshall's lack of consent as a basis to reverse.[70]

Any of the above reasons could have supported *Stern's* holding. They also were consistent with prior jurisprudence. The fact that the Supreme Court did not base its ruling on any of these reasons and chose instead to select a more disruptive result supports a view that *Stern* was a departure from the prior jurisprudence.

Acknowledging that the bankruptcy court had statutory authority to hear the matter, the *Stern* Court again warned, "Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.'"[71]

Next, the *Stern* Court embarked on an analysis of Congressional power to assign the debtor's claim to an Article I court by first examining its precedents. Reviewing the now familiar exceptions: 1) issues brought in the territories; 2) issues historically tied to the Legislative or Executive Branches, *e.g.*, courts-martial; and 3) those involving public rights, the Court found that the public

---

[69]  *Stern*, 131 S.Ct. at 2606.

[70]  *Id.* at 2606-8.

[71]  *Id.* at 2597, quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 18 How. 272, 284, 15 L.Ed. 372.

rights exception could be the only one applicable to the case at hand.  The Supreme Court found that

the "plurality in *Northern Pipeline* recognized that there was a category of cases involving "public

rights" that Congress could constitutionally assign to "legislative" courts for resolution."[72]  While

admitting that the plurality in *Northern Pipeline* did not agree as to the scope of the public rights

exception, the *Northern Pipeline* Court did agree that a state law claim against a party not otherwise

participating in the bankruptcy process was beyond the exception.[73]

The Supreme Court then acknowledged that following *Northern Pipeline*, the public rights

exception had been  expanded to include not only claims against the government, but also claims

deriving from a federal regulatory scheme, or in which resolution of the claim by an expert

government agency is deemed essential to a limited regulatory objective within the agency's

authority.  "In other words, it is still the case that what makes a right "public" rather than private is

that the right is integrally related to particular federal government action."[74]    Quoting

*Granfinanciera*, the *Stern* Court maintained:

> We explained that, "[i]f a statutory right is not closely intertwined with a federal
> regulatory program Congress has power to enact, and if that right neither belongs to
> nor exists against the Federal Government, then it must be adjudicated by an Article
> III court."...We reasoned that fraudulent conveyance suits were "quintessentially
> suits at common law that more nearly resemble state law contract claims brought by
> a bankrupt corporation to augment the bankruptcy estate than they do creditor's
> hierarchically ordered claims to a pro rata share of the bankruptcy res."...As a
> consequence, we concluded that fraudulent conveyance actions were "more

---

[72] *Id.* at 2610.

[73] *Id.*

[74] *Id.* at 2613 (citing *United States v. Jicarilla Apache Nation*, 564 U.S. __, 131 S.Ct. 2313, 180 L.Ed.2d 187 (2011)).

accurately characterized as a private rather than a public right as we have used those terms in our Article III decisions. (Internal citations omitted).[75]

If a claim was between two (2) private parties, did not flow from a federal statutory scheme, was not dependent upon adjudication of a claim created by federal law, or based on a particularized area of law and did not involve the "expertise" of the bankruptcy court, the Court found the claim was not subject to bankruptcy court resolution.[76]

In *Katchen, Granfinanciera*, and *Langenkamp*, the Supreme Court held that if the debtor's claims were merely to augment the estate and would not reduce or disallow the creditor's claim, they were beyond the bankruptcy court's constitutional authority. In *Stern*, the Supreme Court held that because it was possible to rule on the creditor's claim without resolving the debtor's counterclaim and the counterclaim did not involve an action "integral to the restructuring of the debtor-creditor relationship," including resolving the disallowance process, it too was beyond the bankruptcy court's constitutional authority.[77] In particular, finding that the creditor's claim did not affect the estate's counterclaim, the *Stern* Court stated:

> The only overlap between the two claims in this case was the question whether [the creditor] had in fact tortuously taken control of his father's estate in the manner alleged by [the debtor] in her counterclaim and described in the allegedly defamatory statements. From the outset, it was clear that, even assuming the Bankruptcy Court would (as it did) rule in [the debtor]'s favor on that question, the court could not enter judgment for [the debtor] unless the court additionally ruled on the questions whether Texas recognized tortious interference with an expected gift as a valid cause of action, what the elements of the action were, and whether those elements were met in their case. Assuming Texas accepted the elements adopted by other jurisdictions, that meant [the debtor] would need to prove, above and beyond [the creditor]'s tortious interference, (1) the existence of an expectancy of a gift; (2) a reasonable

---

[75]  *Id.* at 2614 (citations omitted).

[76]  *Id.* at 2614-2615.

[77]   *Id.* at 2616-2619.

30

certainty that the expectancy would have been realized but for the interference; and (3) damages. Also, because [the debtor] sought punitive damages in connection with her counterclaim, the Bankruptcy Court could not finally dispose of the case in [the debtor]'s favor without determining whether to subject [the creditor] to the sort of "retribution," punishment[,] and deterrence, those damages are designed to impose. There thus was never reason to believe that the process of ruling, on [the creditor]'s proof of claim would necessarily result in the resolution of [the debtor]'s counterclaim.[78]

In *Stern*, the two (2) competing claims were unrelated in almost every respect. The creditor asserted claims against the debtor based on defamatory statements she allegedly made about him to the press. The debtor asserted a novel state law tort claim against the creditor for interfering with her deceased husband's alleged intent to provide for her in his will. Neither claim involved the same law or facts. In addition, because Texas had not recognized the cause of action the debtor asserted, the bankruptcy court was required to not only fashion relief, but create the requirements for its recognition. Further, having previously disposed of Marshall's claim, it was clear that resolution of the estate's counterclaim was not essential to resolution of the claims against the estate.

### (8) The Effect of *Stern* on this Case

First, it is incontrovertible that a bankruptcy court has exclusive constitutional and jurisdictional authority over the *res* that comprises the debtor's estate. That jurisdiction allows the bankruptcy court to administer not only the property of the estate, but the claims against it with the primary goal to distribute to claimants the estate's assets in accordance with the priorities for payment set forth by the bankruptcy code.

A right to distribution is dependent on a right to payment from the debtor. Although a right to payment may be reduced by defense, it can also be decreased based on counterclaims or offsetting claims. To separate an offsetting claim from the demand might allow a claimant to receive

---

[78] *Id.* at 2617-2618.

distributions from the estate even as the estate independently pursues claims against the creditor in another court. This Court submits that it does not offend the separation of powers doctrine if ruling on an independent cause of action is limited to a determination of the amount subject to offset against the creditor's claim. Allowance of a claim cannot be conducted in the dark, blind to those claims that might otherwise limit the creditor's ability to receive a distribution.

Second, assuming that *Stern* increases the limitations on a bankruptcy court's jurisdiction over counterclaims asserted in the claims allowance process, this Court does not think the claims in question are similar to those implicated by *Stern*. The various causes of action asserted by and against HSP involved both findings of fact and law that were interrelated and common.

HSP incurred expenses on behalf of PBS and Debtors individually. In addition, commissions on PBS' income were also due. HSP advanced to Porter, Stoltz and Batiste the costs of producing separate artistic works. HSP also advanced funds to Debtors for living expenses. Conversely, HSP owed Artists for revenues received from sales of merchandise and music. Revenues from touring were also collected by HSP and exceeded allowed expenditures. The PMA provided that Porter, Stoltz, Batiste, and PBS were jointly and severally responsible for the repayment of these amounts. The PMA also created fiduciary duties, and HSP assumed fiduciary duties as the Artists' business manager. In conjunction with the consideration of HSP's claims, the Court was compelled to consider Debtors' defenses and counterclaims because each arose from HSP's conduct during its relationship with Debtors. Ultimately, each was so closely intertwined with the claims asserted by HSP that severance from a determination on HSP's claims would have been impossible.[79]

---

[79] The only exception to this were the copyright infringement claims which, though separate and distinct, were also denied. HSP does not complain that the Court lacked constitutional authority to decide the copyright claims because it successfully defended those causes of action.

The entire analysis required the Court to calculate the income PBS, Porter, Stoltz, and Batiste earned from music or merchandise sales and touring. Then each expense incurred by HSP had to be separately examined both as to proof of debt and defense to payment. Because of the defenses raised by Debtors, including HSP's negligence, breach of duty, loyalty, and care, as well as breach of specific contract terms, the amounts owed were completely offset to zero. Thus, it was necessary in the claims allowance process for this Court to determine the amounts owed to Porter, Stoltz, and Batiste in order to determine what was owed to HSP. The MUTPA claim flowed from HSP's conduct in discharging its duties under the PMA and as business manager. Finally, the damages awarded Debtors were entered in tandem with those awarded under MUTPA so as to avoid double recovery.

The findings regarding the MUTPA claim were the same ones governing the PMA. Unlike *Stern*, it could be expected that the trial on this matter would resolve the issues concerning the MUTPA claim. The very conduct that limited HSP's claim against the estate also established the MUTPA claim. Thus, the MUTPA claim was both interrelated and fell within the identical facts of the HSP claim. Unlike *Stern*, the law regarding MUTPA is both known and well settled and the relief available well defined.

At the end of the initial trial on the merits, Porter, Stoltz, and Batiste successfully defended HSP's claims. In addition, HSP was successful in defending itself against claims by Porter, Stoltz, and Batiste for copyright infringement.[80] This left phase two (2), or the severed claims for attorneys' fees and costs.

---

[80] At the conclusion of the first phase of trial, Debtors were awarded injunctive relief commanding HSP to correct its accounting records, including information reported to the taxing authorities, in accordance with the Court's ruling. In addition, HSP was to satisfy any costs associated with this correction.

Although unsuccessful on its other claims, in phase two (2), HSP asserted an additional claim against the estate for the costs of defending the copyright action brought against it.[81]  This again raised the specter of a claim against the estate.  In response, Debtors pressed their counterclaim for costs and attorneys' fees in successfully bringing the MUTPA claim against HSP.  Thus, the second phase of the trial involved both the merits of HSP's claim for attorneys' fees and costs associated with defending the copyright infringement claims and Debtors' claim for attorneys' fees and costs incurred in successfully asserting the MUTPA claims.

At trial, HSP failed to provide or even introduce proof of fees or costs incurred in connection with its defense of the copyright action.[82]  However, HSP did thoroughly challenge Debtors' claim and was successful in reducing many categories of fees or costs.  In contrast, Debtors introduced extensive accountings of their claim and argued against any award in favor of HSP for fees or costs incurred in connection with defending the copyright action.  In the end, fees and costs were awarded to Debtors.  Because HSP offered no evidence, it did not receive an award and is currently appealing that decision.

Under these facts, HSP remained a potential creditor of Debtors until the final resolution of the counterclaims for attorneys' fees and costs. The determination of these actions was in conjunction with Debtors' objection to allowance of the creditor's claims.  Thus in this Court's view, neither *Granfinanciera* nor *Stern* is implicated.

---

[81]  Although less than clear from the record, at the pretrial conferences held on the issues, both HSP and Debtors were ordered to exchange evidence of claims for attorneys' fees and costs prior to trial on phase two (2). Shortly thereafter, HSP fired its counsel and separately sued them in a malpractice action. Although the issue was addressed by Debtors in briefing, subsequently enrolled counsel failed to address the claim or provide evidence at the trial, focusing instead on defenses to Debtors' claims.

[82]  This is probably because Stepanian and HSP fired trial counsel in the interim, sued them for malpractice, and substituted counsel unfamiliar with the case.  It is assumed that the transition between counsel was less than ideal.

On the other hand, if *Stern* stands for the proposition that the bankruptcy court *can never have* constitutional authority over a debtor's counterclaims if unrelated to the issues involving a claim's allowance, *i.e.*, the resolution of only the main demand, then decision involving the copyright or MUTPA claims may be beyond this Court's authority.  This would also include the later determination of fees and costs recoverable under either.  The fact that the Supreme Court did not take options less disruptive to the bankruptcy system in reversing gives credence to the claim that *Stern* is a purposeful break with prior precedent.  But such an interpretation would not be in keeping with Justice Roberts' opinion defining *Stern* as "narrow" and of little effect.

As a result, this Court does not believe this is the holding of *Stern* or a proper interpretation of its effect at least while the claims allowance process is still at issue.  The existence of both claims against and by the estate during the claims allowance process as well as the interrelationship of the facts and law surrounding those claims distinguishes this case from the *Stern* decision.

### (9)  *In re Frazin*, 732 F.3d 313 (5th Cir. 2013)

This Court must concede that a very recent Fifth Circuit opinion raises question on this point.  In the case of *In re Frazin*, the bankruptcy estate's counsel filed an application for payment of fees.  In response, the debtor asserted negligence and malpractice claims as well as a Texas Deceptive Trade Practices Act ("DTPA") claim.  The bankruptcy court approved the fee application and denied debtor's counterclaims.  On appeal, the debtor challenged the court's constitutional authority to render final judgment on its counterclaims.  The Fifth Circuit upheld the bankruptcy court's rulings regarding negligence and  malpractice because they were so closely tied to  counsel's request for payment.  However, it also held, in a plurality opinion, that a ruling on counsel's fee request did not

necessitate resolution of debtor's DTPA claims. That limited ruling resulted in two (2) separate concurrences.

Judge Owen's concurrence emphasized that a bankruptcy court could "resolve discrete issues that a core bankruptcy proceeding and a state law cause of action share in common."[83] Finding that the bankruptcy court recognized that many, if not all, of the facts Frazin alleged in support of his DTPA claim related to the quality, value, and reasonableness of the counsel's services, she wrote:

> Though a bankruptcy court cannot issue a final judgement disposing of certain claims,... this does not mean that bankruptcy courts are neutered in adjudicating core proceedings.... A bankruptcy court should examine and resolve all challenges to a [claim] even if the challenges could or do constitute one or more elements of state-law or other causes of action ...
>
> *          *          *
>
> When a fee application is filed...a party to the bankruptcy proceedings...must assert all grounds for denying or reducing the claim....A party cannot reserve those grounds for litigation in another forum simply because the grounds also may be at issue in state-law causes of action. The fact that there are many issues common to a proceeding...and to state-law causes of action does not insulate those common grounds from the requirement that they be raised in bankruptcy court....The issues necessary to adjudicate a fee application should be decided by the bankruptcy court.[84]

In the second concurrence, Judge Reavley did not believe that the DTPA claims constituted a counterclaim but voted with the majority because

> no harm is done, at least in this case and the district court will no doubt simply dismiss whatever has been remanded. However, if it were necessary, I would hold that a bankruptcy court does not lose jurisdiction [over the administration of the estate] when [deciding a state-law based counterclaim that has some] collateral effect [and cannot be] easily avoided.[85]

---

[83] *Frazin*, 732 F.3d at 325 (Owen, J., concurring).

[84] *Id.*

[85] *Frazin*, 732 F.3d at 326 (Reavley, J., concurring).

*Frazin's* holding is far from unified.  Although the panel did remand the matter to the district court to enter final judgment on the DTPA claims, all three (3) appellate judges confirmed that the bankruptcy court properly made factual findings as to the DTPA claim and those findings could be used by the district court.  At least two (2) judges found that severance of the debtor's counterclaims from trial on the underlying claims of the creditor was not required.

A requirement to sever or refrain from hearing counterclaims against a creditor that could affect the creditor's rights to distribution would impair the bankruptcy court's ability to determine claims and provide timely distributions to creditors.[86]  This specifically was noted by Judge Owen in her concurrence.

In summary, the issues presented by Debtors' causes of action under MUTPA or copyright had to be resolved in order to determine if offsetting claims existed against any judgment in HSP's favor.  The remaining claims for attorneys' fees and costs were also offsetting claims to HSP's demands for attorneys' fees and costs in connection with the successful copyright defense.  This Court firmly maintains that significant Supreme Court precedent supports its constitutional authority to decide all the issues presented in this adversary even in the face of *Stern*.  However, if *Stern* is read to limit authority over "only the counterclaims that are likely to be resolved in the claims allowance process" all claims decided by this Court (with the exception of the copyright action which is not on appeal) fall within this cautionary warning.

---

[86]  Because distributions to claimants are based both on their priority and their *pro rata* share with a total class, until objections or offsets to priming claimants or those within the creditors' class are finalized, distributions to all are withheld.

**(10)  *Executive Benefits Ins. Agency v. Bellingham Ins. Agency, Inc.*, — S.Ct. —, 2014 WL 2560461 (2014)**

On June 9, 2014, the Supreme Court released its opinion in *Executive Benefits*. In *Executive Benefits*, a chapter 7 trustee sued Executive Benefits on a fraudulent conveyance claim.  Executive Benefits was not a creditor of the debtor's estate.  It appears Executive Benefits consented (or did not object) to the trial by the bankruptcy court.  After Executive Benefits lost, it appealed.  The district court reviewed the matter *de novo* and entered judgment affirming the bankruptcy court's decision.  On appeal to the Ninth Circuit, Executive Benefits alleged for the first time, the bankruptcy court's lack of constitutional authority to render judgment on the matter.  The Ninth Circuit affirmed based on Executive Benefits consent to trial by the bankruptcy court and the Supreme Court granted *writ*.

The Supreme Court unanimously held that even if a bankruptcy court lacks constitutional authority to render judgment on a "*Stern* issue," it may try the matter and enter proposed findings of fact and conclusions of law for consideration by the district court.  The district court then reviews the matter *de novo* and renders judgment.[87]

Under the facts of *Executive Benefits*, a solitary claim by the debtor's estate against a noncreditor rooted in common law may be tried by the bankruptcy court.[88]  This appears to be a departure from the *Grandfinanciera* and *Katchen* precedents which prohibit a bankruptcy court from exercising authority over a matter at law when not done in conjunction with the claims allowance

---

[87]  The Court notes that at least one (1) Fifth Circuit panel has determined that consent to a bankruptcy court's authority does not allow the bankruptcy court to try the matter.  *See In re BP RE, L.P.*, 735 F.3d 279, 286-88 (5th Cir. 2013) (party cannot consent to proceed before bankruptcy court when court lacks constitutional authority to enter final judgment).  *Executive Benefits* appears to modify this ruling by allowing the bankruptcy court to try the matter and enter proposed findings of fact and conclusions of law.

[88]  It is unclear if this result depends on the initial consent of the parties.  However, this is a distinction that does not exist in this case.

process.  Under this most recent pronouncement, it appears this Court could be available to the District Court for a trial on the merits of claims against HSP regardless of their nature or relation to the underlying proof of claim.

### (11) Summary

*Executive Benefits* and *Frazin* provide guidance to the District Court in handling this appeal. Both instruct when dealing with an objection to this Court's constitutional authority, the District Court must first determine if this Court overstepped its constitutional bounds.  For the reasons set forth above, this Court does not believe that it did.  Nevertheless, if this Court overstepped its bounds, both cases direct the District Court to treat the rulings on the "*Stern* issues" as proposed findings of fact and conclusions of law, reviewing them *de novo*.[89]   Then the District Court is to render a decision on any *Stern* issues, reviewing other rulings on appeal.

### b.  Effect of Consent on Constitutional Authority

As previously discussed, *Granfinanciera* focused in part on the consent of a party to the bankruptcy court's jurisdiction in defining the limitation of the court's authority.  This distinction might have been called into question by the *Stern* decision.  In *Granfinanciera*, the issue was straight-forward.  The defendant was not a creditor of the estate and had never participated in its administration.  In *Stern*, the defendant was initially a creditor and had clearly participated in the case by filing both a proof of claim and adversary action.  The facts also indicate that Marshall consented to trial on the merits of both claims by him and against him on the record.  However, once Marshall's claim was disposed of by summary judgment, he attempted to withdraw his consent to the bankruptcy court's jurisdiction, arguing that bankruptcy courts lacked authority to adjudicate

---

[89]  Unlike *Frazin*, *Executive Benefits* allows this Court to make recommendations as to conclusions of law as well.

counterclaims.[90]  The question now remains can a party consent to bankruptcy court jurisdiction when a constitutional separation of power issue is present?

This issue was squarely presented by the *Executive Benefits* decision.   Like the case before this Court, the appellants clearly consented to the resolution of all issues presented between the parties by the bankruptcy court.  After losing at the trial court level, they appealed the decision based in part on the bankruptcy court's lack of constitutional authority over their claims.  Surprisingly, the effect of consent was not discussed.  Instead, the Supreme Court took the opportunity to "clarify" its ruling in *Stern*.

The *Executive Benefits* Court held that when a question of constitutional authority is involved, the bankruptcy court may try the matter on the merits and simply issue proposed findings of fact and conclusions of law for consideration by the district court.[91]  The district court then may review those recommendations *de novo* and render its own ruling.  Therefore, based on the *Executive Benefits* decision, at a minimum, this Court had authority to hear the merits of all claims by the estate.

### c. Claims against Phil Stepanian

In its counterclaims, Debtors asserted that conduct by "HSP and/or Stepanian" was both actionable and a defense to payment.  However, HSP's Complaints on Dischargeability, its proofs of claim, and  the Massachusetts Suit did not contain any claim by Stepanian, individually,  against Debtors or Artists.  As a result, the claims brought against Stepanian by Debtors fall squarely within

---

[90]  *Stern*, 131 S.Ct. at 2601.

[91]  *Executive Benefits*, 2014 WL at 2560461, at *6.

the holding of *Granfinanciera* and *Stern* as they are an attempt to augment the estate through a cause of action against a noncreditor.

A review of this Court's Opinions and Judgments does not address any claim by Debtors against Stepanian. All findings and rulings addressed the claims by and against HSP. Although claims were brought against Stepanian, this Court did not believe it had constitutional authority over Stepanian under the present status of the law. This Court did not make a ruling on this issue through oversight and due to the appeal, cannot correct this error. The Court apologizes to the District Court and parties for its error. Thus, the issues against Stepanian are still open for consideration by the District Court which holds both constitutional and jurisdictional authority to make rulings.

Because these issues are beyond this Court's constitutional authority, even if the District Court were to remand the matter to correct the record, this Court originally concluded that it could not resolve the issues against Stepanian. The recent ruling by the Supreme Court in *Executive Benefits* changes this conclusion.

The unanimous ruling in *Executive Benefits* holds that even if a bankruptcy court lacks constitutional authority to render judgment on a "Stern issue," it may try the matter and enter proposed findings of fact and conclusions of law for consideration by the district court. The district court may then review the matter *de novo* and render a judgment.

Thus, a claim against a noncreditor may be initially tried by the bankruptcy court. This appears to be a departure from the *Grandfinanciera* and *Katchen* precedents which prohibited a bankruptcy court from exercising authority over a matter at law when there was no claim allowance process at issue. Nevertheless, under *Executive Benefit's* holding, it appears this Court could be available to the District Court for a trial on the merits of claims against Stepanian.

### d.  Conclusion

Although this Court has rendered Judgment against HSP on all issues presented in its appeal and has concluded that they do not present a "*Stern*" question, it must concede that the law on this question is in a serious state of flux and is subject to varying interpretation.  Nevertheless, *Executive Benefits* confirms the propriety of this Court's initial consideration of *any* claim even against a noncreditor.

However, as to the "*Stern*" issue included within the Judgment already rendered, those portions may be merely proposed rulings subject to *de novo*  review by the District Court.  This Court does not find that HSP or Stepanian's consent to trial on the merits changes this conclusion.  Given the state of uncertainty as to the Judgment's effect, this factor supports appellants' request for a stay.

### 2.  The Other Requirements for Stay Relief

Due to the severity of the issue presented by the first factor, the remaining requirements to establish the need for a stay easily follow.

### a.  Will the Applicant Be Irreparably Injured Absent a Stay?

This Court has concluded that he Judgment it rendered was proper and within its constitutional authority.  However, because a question exists on this point, the Applicant may be irreparably injured should execution on the Judgment proceed while an appeal is pending. Specifically, if the Reason for Judgment and Judgment on even a portion of Debtors' counterclaims are merely proposed findings of fact and conclusions of law, execution would be wrongful. The damage to Applicant in such a circumstance could be irreparable.

### b. Will the Issuance of a Stay Substantially Injure the Other Parties?

For the identical reasons expressed above, a stay will protect Debtors from the potential claims for wrongful execution. Although HSP has allegedly removed as an issue for appeal its claim that this Court lacked constitutional authority in rendering the Judgment, the issue may be raised at any time until the Judgment is final. Should Debtors begin collection proceedings, they risk a claim for damages if in fact a portion of the Court's rulings are merely proposed rather than a judgment. Further, Debtors will not be injured by the imposition of a stay as HSP holds few assets from which collection could be made. Debtors' main source of satisfaction flows from their demands against Stepanian which have yet to be addressed.

### c. Is the Granting of the Stay in the Public Interest?

The granting of a stay pending appeal is in the public interest because the challenge to this Court's constitutional authority calls into question the nature of the Judgment. To allow execution on judgments which may or may not be judgments while an appeal is pending is not in the public or societal interest.

## III.  CONCLUSION

Because HSP affirmatively consented to the litigation that preceded these partial judgments and failed to raise any objection to this Court's constitutional authority to decide the issues involved until after both were on appeal, decisions have been rendered by this Court that, in light of still developing jurisprudence, may be final or simply considered  proposed.  This situation, including the waste of significant judicial resources, is solely a result of HSP's desire to get a second bite of

the proverbial apple.  Nevertheless, because this area of the law is in a serious state of flux and further refinement of Fifth Circuit holdings is likely, a stay pending appeal is warranted.

A separate Order will be rendered with these Reasons.

New Orleans, Louisiana, June 24, 2014.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge